# BHATIA & ASSOCIATES PLLC

ATTORNEYS & COUNSELORS AT LAW
Satishbhatiaus@yahoo.com

Satish K Bhatia

Joseph F. Kasper*
*of counsel

38 West 32nd St., Ste. 1511
New York, New York 10001
T: (212) 239-6898
F: (212)594-7980

May 6, 2019

By ECF
Hon. Judge Sterling Johnson, Jr.
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

Hon. Judge Cheryl L. Pollak
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

**Re:**   **Star Cable NA, Inc. v. Total Cable USA LLC and 1StopMedia and Entertainment;**
**Fully Briefed Motion for Summary Judgment**
**Case No.: 16-CV-04067**

Dear Hon. Judge Johnson & Hon. Judge Pollak,

Enclosed please find the fully briefed motion for summary judgment filed by the

Defendants Total Cable USA LLC and 1stop Media & Entertainment Inc. The motion for

summary judgment was served on March 25, 2019 on the Plaintiff's attorney. The opposition

was received on April 23, 2019 beyond the date provided in the briefing schedule, though I

consented in the change of briefing schedule, no Court approval was obtained by the Plaintiff's

Counsel. The Defendant's reply to the opposition was served on May 4, 2019. Also enclosed is

the covering letter for the serving the motion for summary judgment on the Plaintiff on March

25, 2019.

Respectfully Submitted,

_____/s/_____
Satish K. Bhatia (SB9222)

To: Michael Cassell, Esq.
Via: ECF

# BHATIA & ASSOCIATES PLLC

ATTORNEYS & COUNSELORS AT LAW
Satishbhatiaus@yahoo.com

Satish K Bhatia

Joseph F. Kasper*
*of counsel

38 West 32nd St., Ste. 1511
New York, New York 10001
T: (212) 239-6898
F: (212)594-7980

By: Email mcassell@hogancassell.com & FedEx

March 25, 2019

Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753

**RE: Star Cable v Total Cable USA LLC; Index No. 16-cv-4067**

Dear Michael,

Enclosed is the notice of motion and supporting documents as ordered by the Honorable Judge.

Yours Truly,

_____/s/_____

Satish K. Bhatia, Esq. (Sb9222)

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

**STAR CABLE NA, INC.,**                                 **Docket No. 16-cv-04067**

                                        **Plaintiff,**

        **vs.**

**TOTAL CABLE USA LLC. and RADIANT IPTV**

                                        **Defendants.**

-----------------------------------------------------------------x

## AMENDED NOTICE OF MOTION SEEKING SUMMARY JUDGMENT TO DISMISS THE COMPLAINT AGAINST TOTAL CABLE USA LLC

**PLEASE TAKE NOTICE** that on May 7, 2019 or as soon as counsel can be heard, at the United States District Court, 225 Cadman Plaza East, Brooklyn, NY 11201, before the Honorable Sterling Johnson Jr., U.S.D.J., the Defendant Total Cable USA LLC., by its attorneys Bhatia & Associates PLLC, will move this Court seeking summary judgment to dismiss the complaint against the Defendant Total Cable USA LLC., along with any other just and proper relief. The opposition to the motion is due on April 9, 2019 and the response to the opposition is due on April 25, 2019.

Dated: April 3, 2019

                                                        Respectfully submitted,

                                                        _____/s/_____

                                        SATISH K. BHATIA, ESQ.(SB9222),
                                                Bhatia & Associates PLLC
                                        38 West, 32nd Street, Suite #1511
                                                        New York, NY 10001
                                                        Tel: 212-239-6898
                                                        Fax: 212-594-7980

To:    Michael Cassell
       500 North Broadway, Suite 153
       Jericho, New York 11753
       (516) 942-4700

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

STAR CABLE NA, INC.,

Docket No 16-cv-04067
Assigned Judge Hon. Pollak

Plaintiff,

AFFIRMATION IN
SUPPORT OF NOTICE
OF MOTION SEEKING
SUMMARY JUDGMENT
TO DISMISS THE
COMPLAINT

vs.

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10

Defendants.
-------------------------------------------------------------------------x

Satish K. Bhatia, the attorney of record for Total Cable USA LLC and 1Stopmedia &

Entertainment Inc. d/b/a Radiant IPTV who is associated with Bhatia & Associates PLLC

affirms under penalty of perjury as follows:

1. I am associated with Bhatia & Associates PLLC, the attorney of the record for the

   Defendants Total Cable USA LLC and 1Stopmedia & Entertainment Inc. d/b/a Radiant

   IPTV and as such I am familiar with the facts and circumstances of this case.

2. I am making this affirmation in support of the Defendant Total Cable USA LLC's motion

   seeking summary judgment to dismiss the complaint inter alia on the ground that Total

   Cable USA LLC is no longer in business, was dissolved in May 2016 and filed for

   bankruptcy Chapter 7 in which Total Cable USA LLC was discharged and in fact Total

   Cable USA LLC never had any business in broadcasting channels.

3.  On or about July 22, 2016, the Plaintiff Star Cable NA Inc. had commenced the present
    action against the Defendant Total Cable USA LLC and 1Stopmedia & Entertainment
    Inc. d/b/a Radiant IPTV alleging copyright violations of various channels in which the
    Plaintiff has exclusive rights to broadcast (Docket No. 1, July 26, 2016).  Subsequently,
    on or about July 6, 2017, the Plaintiff Star Cable NA Inc. filed a second amended
    complaint (Docket No. 38, July 6, 2017).  In paragraph 1 of the complaint, the Plaintiff
    alleged that the Plaintiff has exclusive rights in the United States and Canada to distribute
    the programming services including i) Independent TV; ii) Jamuna TV; iii) Channel 16;
    iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekushey TV viii) Somoy.  In paragraph
    20 of the second amended complaint, the Plaintiff alleged that the Defendant Total Cable
    USA LLC advertised the exclusive services to their customers who desired to watch
    Bangladeshi programming.  The copy of the second amended complaint is annexed with
    this affirmation as **Exhibit A**.

4.  On or about September 16, 2016, the Defendant Total Cable USA LLC in response to the
    Plaintiff's complaint filed the answer (Docket No. 11, September 16, 2016).  The
    Defendant Total Cable USA LLC denied the allegations contained in paragraph 1 of the
    complaint.  The Defendant Total Cable USA LLC also denied the allegations contained
    in paragraph 20 of the complaint and states that Total Cable USA LLC does not
    redistribute any services as alleged in paragraph 20 of the complaint.  In the fourth
    affirmative defense, Total Cable USA LLC alleged that it does not sell or distribute cable
    TV services.  In the fifth affirmative defense Total Cable USA LLC stated that Total
    Cable USA LLC was dissolved in May 2016.  In the first counterclaim, the Defendant
    Total Cable USA LLC claimed a judgment for attorney fees on the ground that the

Plaintiff knew very well that the Defendant is not involved in the sale or distribution of television signals. The copy of the answer is annexed with this affirmation as **Exhibit B**.

5. On or about August 7, 2017, Defendant Total Cable USA LLC had filed a motion seeking dismissal of the complaint in which the Plaintiff seeks damages and injunctive relief against Total Cable USA LLC (Docket No. 43, August 7, 2017). In the motion to dismiss Total Cable USA LLC alleged that Total Cable USA LLC has not been broadcasting business since Total Cable USA LLC was dissolved in May 2016 and subsequently in December 2016, Total Cable USA LLC filed for Chapter 7 bankruptcy Petition and the Final Decree was passed in January 2017. The copy of the notice of motion seeking dismissal of the complaint is annexed with this affirmation as **Exhibit C**.

6. This Honorable Court denied the Defendant's motion on January 18, 2018 (Docket No. 58, January 23, 2018). The Court was of the opinion that even though Total Cable USA LLC was dissolved, a corporation may be held liable on cause of action that accrues after dissolution of the corporation. The Court further held that the complaint should not be dismissed on the grounds that the Final Decree was issued by the Bankruptcy Court in January 2017. The Court opined based upon the allegations contained in the second amended complaint wherein the Plaintiff claims that the Defendant Total Cable USA LLC continued to use the Plaintiff's exclusive services and has the right to obtain injunctive relief. In the order, the Court held that this type of injunctive relief is not dischargeable by bankruptcy. The copy of the order denying the motion to dismiss with supporting documents is annexed with this affirmation as **Exhibit D**.

7. In the operative part of the order, the Court held that the parties should be allowed to engage in discovery to determine the extent of any authorized users of the exclusive services that would entitle the Plaintiff to relief.

8. The discovery was conducted after passing of the order dated January 18, 2018. Defendant Total Cable USA LLC requested the Plaintiff to provide responses to interrogatories and also to provide the documents showing that the Defendant Total Cable USA LLC had been broadcasting the channels allegedly owned by the Plaintiff Star Cable NA.

9. In response to request for documents by Total Cable USA LLC, the Plaintiff provided approximately 214 documents, Bate Stamped 1-214. Out of the 214 documents, the documents Bate Stamped 162-214 presumptively have been filed by the Plaintiff to establish that the Defendant Total Cable USA LLC continues to broadcast TV channels. I have reviewed the documents bate Stamped 162-214. None of these documents show that Total Cable USA LLC is involved with the business of broadcasting TV channels. Almost all of the documents Bate Stamped 166-214 show that it is Total Cable Bd broadcasting the channels and not Total Cable USA LLC. It appears that the Plaintiff is confused with the words "Total Cable", there are many corporations that start with the words "Total Cable" but they have nothing to do with Total Cable USA LLC which is one of the Defendants in the present case. The documents Bate Stamped 162-163 show that Total Cable USA LLC applied for registration of the trademark "Total Cable" on August 22, 2014 and the mark was abandoned on June 11, 2015. The documents stamped 164-165 show that Total Cable USA LLC was incorporated on October 20, 2013 and Total Cable USA LLC was dissolved in May 2016. The documents Bate Stamped

162-165 do not establish that Total Cable USA LLC was in business after it was
dissolved in May 2016. The remaining documents Bate Stamped 166-214 do not pertain
to Total Cable USA LLC but pertain to a different corporation named Total Cable BD, to
which Total Cable USA LLC had not relation whatsoever. The copy of the documents
stamped 162-214 are collectively annexed as **Exhibit E.**

10. On or about June 18, 2018, Syed Ahmed who was the managing member of Total Cable
USA LLC and who had filed the Chapter 7 Bankruptcy Petition on behalf of Total Cable
USA LLC appeared in the deposition conducted by the Plaintiff's attorney Mr. Hogan
and in response to various questions, he clarified that Total Cable USA LLC is a different
corporation and has no relations whatsoever to the other corporations that start with the
words "Total Cable", particularly at page 48, lines 9-22 where Mr. Ahmed testifies that
he did not create any other company other than Total Cable USA LLC. At page 48, lines
23-25, Mr. Ahmed testified that he did not know any company by the name of Total
Cable Bd. At page 50, lines 13-16, Mr. Ahmed testified that Total Cable USA LLC
never did any business and Total Cable USA LLC had no transactions. At page 47, lines
1-5 Mr. Ahmed testified that Total Cable USA LLC did not have any assets and it filed
for bankruptcy. At page 48, lines 7-12, Mr. Ahmed testified that he is not aware of any
company by the name of Total Cable TV. At page 48, lines 13-15, Mr. Ahmed testified
that he had nothing to do with the company with the description Total Cable TV. At page
54, lines 14-16, Mr. Ahmed testified that Total Cable USA LLC did not have any website
and did not maintain any website prior to filing bankruptcy. At page 59, lines 12-14, Mr.
Ahmed testified that Total Cable USA LLC did not maintain any bank accounts. At page
59, lines 11-25 and page 60, lines 1-11, Mr. Ahmed testified that Total Cable USA LLC

did not have any revenue in the years 2012, 2013, 2014, 2015, 2016, 2017 and 2018. At page 66, lines 14-16, Mr. Ahmed testified that Total Cable USA LLC never provided any set up boxes to anyone. Mr. Ahmed reiterated at page 68, lines 6-9, that he did not have any interest or knowledge about Total Cable Bd. At page 77, lines 10-12, Mr. Ahmed testified that Total Cable USA LLC never had any bank accounts. The copy of the relevant pages of the transcripts is annexed with this affirmation as **Exhibit F**.

11. On or about February 22, 2019, the deposition of Ahmodul Barobhuiya who was a member of Total Cable USA LLC was conducted by the Plaintiff's attorney. Mr. Barobhuiya testified at page 27, lines 16-24 that he acquired 30%-33% of the interest by the end of 2013 of Total Cable USA LLC. At page 28, lines 5-12, he stated that he did not apply for and create or help create a bank account in the name of Total Cable USA LLC. At page 30, lines 16-18 he stated that he did not prepare any business plan for Total Cable USA LLC. At page 31, lines 8-11, he stated that Total Cable USA LLC did not acquire any equipment or software. At page 31, lines 23-25 and page 32, lines 2-7 he stated that Total Cable USA LLC does not have any relationship with Total Cable Bd and that he was not familiar with Total Cable Bd. At page 35, lines 21-24, he testified that Total Cable USA LLC received rights from Z Group and Jamuna TV but they did not broadcast anything. At page 37, lines 22-25 and page 38, lines 2-4, Mr. Barobhuiya testified that Total Cable USA LLC does not have any authority to show channels to customers right now anymore. At page 41, lines 18-22, he testified that Total Cable USA LLC did not have any rights to provide the service known as Star TV. At page 42, lines 9-12 Mr. Barobhuiya testified that Total Cable USA LLC does not exist anymore. They are not in business anymore and they filed for bankruptcy. At page 42, lines 15-18, Mr.

Barobhuiya admits that Total Cable USA LLC did not have any rights to provide Star TV

Bangladesh or Bangla to any customers. At page 42, lines 19-22, Mr. Barobhuiya

testified that Total Cable USA LLC never had any rights to provide the channel known as

NTV Bangla or Bangladesh. At page 43, lines 2-4, Mr. Barobhuiya testifies that Total

Cable USA LLC did not have any rights to provide Channel 1. At page 43, lines 5-8, Mr.

Barobhuiya testifies that Total Cable USA LLC did not have any rights to provide the

Channel Willow. At page 43, lines 9-12, he states that Total Cable USA LLC did not

have any rights known as Ten Sports. At page 43, lines 9-22, in response to the question

"What channels does Total Cable USA LLC have the right to?" Mr. Barobhuiya stated,

"Total Cable USA LLC does not exist anymore." At page 44, lines 3-11, he testifies that

Total Cable USA LLC had a contract with Z TV in the beginning of 2014, then they had

a contract with Jamuna TV and Total Cable USA LLC never broadcast nor showed to

any customers, those channels were never provided over the internet and Total Cable

USA LLC never did any business with these channels. AT page 44, lines 18-22, he

testified that Total Cable USA LLC never provided Star Television and TV Bangladesh

Channel 1, Sony TV, Willow TV and Ten Sports. At page 44, line 25 and page 45, lines

1-3, he testified that Total Cable USA LLC never operated any website. At page 45,

lines 4-7, he testified that any entity relate to Total Cable USA LLC never operated any

website for Total Cable USA LLC. At page 45, lines 8-10, he testified that Total Cable

USA LLC did not have any assets. At page 45, lines 23-25, Mr. Barobhuiya testified that

Total Cable USA LLC never had any revenue. At page 46, lines 1-4, Mr. Barobhuiya

testified that Total Cable USA LLC never had any bank account. At page 46, lines 12-

14, he states that no content was ever sold by Total Cable USA LLC. At page 47, lines

22-24, Mr. Barobhuiya that Total Cable USA LLC never used the service of any accountant. At page 47, line 25 and page 48, line 2, Mr. Barobhuiya testified that Total Cable USA LLC never used any bookkeeper. At page 48, lines 2-10, he testified that Total Cable USA LLC did not have any customers. At page 48, lines 14-25, Mr. Barobhuiya testified that Total Cable USA LLC did not have any technician and Total Cable USA LLC did not employ any individual in the Bangladesh Call Center, did not send any money to Bangladesh and did not have any employees. At page 49. Lines 2-3, he testified that Total Cable USA LLC did not provide any set up boxes. The copy of the relevant portions of the deposition of Mr. Barobhuiya are annexed as **Exhibit G**.

12. In the order by the Court dated January 23, 2018 (Exhibit D), the Court noted that the Plaintiff alleges continuing harm caused by the Defendant's unauthorized use of the exclusive services of the Plaintiff in the second amended complaint. The Court therefore allowed the parties to engage in discovery to determine the extent of unauthorized uses of the exclusive services that will entitle the Plaintiff to relief. The deposition of Syed Ahmed the former managing member of Total Cable USA LLC, the deposition of Ahmodul Barobhuiya and other members of Total Cable USA LLC conclusively establish that Total Cable USA LLC was inactive and has not been engaged in any services of the Plaintiff. The Plaintiff during a discovery request failed to provide any document showing that Total Cable USA LLC was involved or has been currently involved in broadcasting services. The documents provided by the Plaintiff in response to discovery show that it was Total Cable BD that is involved in the broadcasting business and not Total Cable USA LLC. The Plaintiff failed to provide any documentary evidence to establish unauthorized uses of the exclusive services that would entitle the

Plaintiff to any relief. At the time of recording the deposition, the undersigned attorney had informed the Plaintiff's attorney Mr. Hogan, that without going into respective allegations of the parties, the Defendant Total Cable USA LLC was prepared to given an undertaking that Total Cable USA LLC was never engaged in unauthorized uses of the exclusive services of the Plaintiff and would never engage in unauthorized uses of the Plaintiff's services. Even during the last Court hearing, the undersigned attorney informed your Honor that Total Cable USA LLC is prepared to give a statement that it was never engaged in the uses of the exclusive services as alleged by the Plaintiff in the second amended complaint.

13. There are no triable issues of the facts regarding use of the services by Total Cable USA LLC and there are no triable issues of the facts that there is no cause of action for the damages due to alleged unauthorized use of the Plaintiff's service by Total Cable USA LLC.

**WHEREFORE**, Total Cable USA LLC requests that the relief requested in the notice of motion for summary judgement seeking dismissal of the complaint be granted along with any other just and proper relief.

Dated: March 25, 2019

<div align="right">

_____/s/_____
Satish K. Bhatia, Esq.(Sb9222)
Bhatia & Associates PLLC
38W 32nd St., Suite 1511
New York, NY 10001
T: (212)239-6898
F: (212) 594-7980
satishbhatiaus@yahoo.com

</div>

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
STAR CABLE NA, INC.,                                    16-CV-04067 (SJ)

                     Plaintiff,

     -against-                                      **SECOND
                                                        AMENDED COMPLAINT**

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV.
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                     Defendants.
---------------------------------------------------------------------X

     The plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorney, as and

for its Second Amended Complaint herein against the defendants, alleges the following:

## NATURE OF THE ACTION

     1.    The defendants in this action, Total Cable USA LLC. ("Total Cable") and

1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("Radiant") (Total Cable and Radiant

will collectively be referred to as "Defendants") are involved in the sale and distribution of

cable television services to their customers, which include various programming, to which they

are not entitled. The programming originates in Bangladesh via an internet protocol television

system ("IPTV"). Plaintiff is an IPTV cable television company that has exclusive rights, in

the United States and Canada, to distribute eight individual programming services, via the

signal delivery services IPTV, WiMax Wireless and Mobile TV. The exclusive services

originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My

TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes

hereinafter referred to as the "Exclusive Services"). This is an action, based upon the discovery

that Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using,

divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. This is true with respect to each of the Exclusive Services except exclusive rights are shared with Radiant for Independent TV, in which Radiant may have some rights. Otherwise, Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. In this action, Star Cable seeks declaratory and injunctive relief and monetary damages, costs and attorneys' fees.

## PARTIES

2.     Star Cable NA, Inc. is a New York corporation that has its principal place of business at 3839 Bell Boulevard, Bayside, New York 11361.

3.     Total Cable USA is a New York business that has its principal place of business at 37-19 57th Street, Woodside, New York 11377, and which operated as a NY registered LLC from October 22, 2013 until May 2, 2016, on which date it was dissolved. Prior to October 22, 2013, Total Cable USA, upon information and belief, operated as a subsidiary of Lalon TV, Inc. an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram NY. Both Total Cable USA, LLC and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya, who upon information and belief is the principal of Total Cable USA. Moreover, in a Bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. A/K/A Total TV, A/K/A Total Cable.

4.     1Stop Media and Entertainment, Inc. ("1Stop") is an Illinois corporation with headquarters located at 3833 Gladston Drive, Naperville, Illinois 60565. On the FCC Form

499, which identifies certain communication business data, 1Stop lists "other trade names" to include Radiant IPTV. Further the CEO of 1Stop, Saiful Siddique, lists himself as the COO of Radiant IPTV. Mr. Siddique identifies himself as having addresses in Naperville, Illinois, for the purposes of his FCC filing and Brunswick, New Jersey for the purposes of 1Stop's Secretary of State incorporation data. 1Stop also does business as Radiant IPTV. On its Facebook page Radiant IPTV lists its parent corporation as 1Stop.

5.     1Stop d/b/a Radiant IPTV appears to operate from 150-47 Hillside Avenue, Jamaica, New York 11432. 1 Stop d/b/a Radiant appears to operate out of the second floor of that two story building, however the second floor is entirely occupied by Marvel Cable and Broadcasting, LLC, a New York LLC with its principal place of business at 150-47 Hillside Avenue. When a customer pays for Radiant IPTV services by credit card, the payment is received by 1Stop.

6.     ABC, INC., XYZ CORP. and JOHN DOES 1-10 are fictitious names of persons and entities that are the persons or corporate owners of Defendants. Although Plaintiff exercised its best efforts in discovering the true names and ownership interest of said named defendants, defendants seem to be engaged in a scheme to evade detection of their proper name and ownership. As such, Plaintiff reserves its right to amend this Second Amended Complaint upon discovery of true names and ownership of Total Cable USA LLC and 1Stop d/b/a Radiant IPTV, whether held in corporate or individual form.

## JURISDICTION AND VENUE

7.     This action arises under 47 U.S.C. §605 (a) and supplemental law claims.

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and/or 28 U.S.C. § 1332 as there is a Federal question and/or dispute in excess of the jurisdictional

limits, and supplemental jurisdiction over the state law claims.  Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), as Defendants reside in the District, do business in this District and a substantial part of the events giving rise to the claim occurred in the District.

## FACTUAL BACKGROUND

9.      Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access.  Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, NY to its subscribers via the internet in the process known as Internet Protocol Television.

10.     In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements").  The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered.  So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV.  In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights").  In exchange for the Exclusive Rights, Star Cable continues to pay the programming service provider's license fees, which generally increase annually in accordance with the terms of these multi-year agreements.  Such annual increases are often double and/or triple the previous year's license fee.  As such, Star Cable pays significant amounts for its Exclusive Rights.

11.     The Agreements are part of the marketing scheme of the Exclusive Services.

12.     Because Star Cable generates revenues through the sale of subscription packages
and other programming, and because the ability to attract and retain distribution rights for
programming is dependent upon preventing unauthorized reception of Star Cable's video
channels, Star Cable's channels are digitally secured and encrypted.  The encrypted video
services are then transmitted via the internet to its customers.

13.     Each Star Cable customer receives a set top channel converter that contains the
technology to receive encrypted programming from Star Cable, determine which services the
subscriber has purchased and decrypt those services so that they are intelligible on a television
screen.  The set top box can also communicate with Star Cable for the purposes of purchasing
pay per view material and billing for the same.  The set top box is part of the monthly service
charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a
service charge is added to the customer's bill each month.

14.     The set top box provided to a Star Cable customer is designed to make a direct-
to-server internet connection with the Star Cable server.  Once connected to the Star Cable
server, the Star Cable box streams the video channels from the server directly onto the
customer's television.  The customer can then use the remote control tied to the set top box and
watch programming in real time, in essence, live as transmitted.

15.     Star Cable, through IPTV, has essentially, identical functionality of a satellite
delivery service or a cable television service.

16.     At all times pertinent to this Complaint, Star Cable has been the beneficiary of
exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services:   i)

Independent TV (as it applies to Total Cable); ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV for all regions within the United States and Canada.

17.     A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Televison. A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd. Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited. Payments have been made by Star Cable on each of these Agreements.

## DEFENDANTS

18.     Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable.

19.     Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants.

20.     Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming.

21. Defendants do not have rights to transmit or sell the eight channels over an IPTV delivery system in any part of the United States or Canada.

22. Despite not having rights to transmit the Exclusive Services and in direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Defendants are not authorized to redistribute said communications over their IPTV systems in the United States or Canada. Said actions of Defendants are an unauthorized divulgence of satellite signals.

23. Defendants' violations of said exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Count I
## 47 U.S.C. § 605

24. Plaintiff incorporates the preceding paragraphs as if each allegation was fully set forth herein.

25. Through the transmitting, retransmitting, use, divulgement and sale of the Exclusive Services Defendants have violated various provisions of 47 U.S.C. § 605.

26. The use of the signals of the Exclusive Services in a manner in which they are not entitled, including effectuating the unauthorized receipt in the United States and transmitting, retransmitting, use, sale and divulging said Exclusive Services, which are radio communications,

to persons not entitled to the Exclusive Services for the purposes of commercial advantage and private financial gain is designed to injure, and will continue to injure Star Cable and cause it financial damage and irreparable harm.

27.     Defendants knew or should have known and had reason to know that assisting a third person in the reception and use of the Exclusive Services without authorization, was and is illegal and prohibited.

28.     Pursuant to 47 U.S.C. § 605(e)(3), Plaintiff is entitled to: equitable relief, either statutory damages of $1,000.00 to $10,000.00 per violation (each customer of Defendants' receiving each or all such Exclusive Services) or actual damages plus any profits realized by Defendants for each violation of 47 U.S.C. § 605(a), reasonable attorneys' fees and costs.

### Count II
### UNJUST ENRICHMENT

29.     Plaintiff hereby incorporates the preceding paragraphs as if set forth fully herein.

30.     Through the re-broadcasting scheme described above Defendants have received a financial benefit by, among other things, receiving subscription fees from each of Defendants' customers that have subscribed to the Exclusive Services.

31.     The financial benefit to Defendants was to the detriment of Plaintiff in that Defendants' customers who purchase the Exclusive Services would have had to acquire them from Star Cable rather than Defendants, thereby depriving Star Cable of subscription fees.

32.     Defendants have been unjustly enriched through these actions, and equity and good conscience requires restitution to Plaintiff.

33.     Star Cable has been damaged through the unjust enrichment of Defendants and

seeks remedy for the same.

## Count III
## CONVERSION

34.     Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

35.     Through the rebroadcasting scheme described above Defendants exercised and assumed unauthorized dominion and control over the signal of the Exclusive Services and disseminated and divulged said communications signals to third parties for payment and without the authorization of Plaintiff.

36.     Star Cable was excluded from exercising any control over the dissemination and divulgement of the signals of the Exclusive Services to third parties and received no income from this unauthorized use and divulgement.

37.     Plaintiff has been damaged through the unauthorized conversion of the signals of the Exclusive Services for which Star Cable seeks remedy.

## Count IV
## UNFAIR COMPETITION

38.     Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

39.     Through the rebroadcasting scheme described above Defendants misappropriated the product of Star Cable, namely the licensed Exclusive Services.

40.     Defendants' misappropriation of the Exclusive Services was undertaken in bad faith and without the authorization of or payment to Star Cable for the sale and divulgement of the Exclusive Services.

41.    Plaintiff has been damaged through Defendants' unfair competition with reference to Plaintiff's Exclusive Services and seeks remedy for the same.

**WHEREFORE,** Plaintiff requests that this Court grant the following relief:

(1)    Declare that Defendants' unauthorized sale, use and divulgement of the Exclusive Services without authorization violated 47 U.S.C. § 605(a) and that such violations were committed intentionally and for the purposes of commercial advantage and private financial and commercial gain;

(2)    In accordance with 47 U.S.C. § 605(e)(3), permanently enjoin Defendants, their agents, servants, employees, and those controlled directly or indirectly by any of them from the distribution, sale, rebroadcast or divulgement of the Exclusive Services;

(3)    In accordance with 47 U.S.C. § 605(e)(3), award Plaintiff against Defendants, damages for all losses incurred as a result of Defendants' violations:

(a)    The actual damages that Plaintiff has suffered, together with any additional profits earned by Defendants, or alternatively at Plaintiff's election,

(b)    Statutory damages in an amount between $1,000 and $10,000 for each of the customers to which the Exclusive Services were sold and/or distributed by Defendants.

(4)    An accounting of all profits and expenses realized by Defendants in violation of 47 U.S.C. § 605, together with Defendants' production of all records reflecting sales of the Exclusive Services;

(5)    An Order imposing a constructive trust based upon Defendants' unjust

enrichment derived from profits on sales of the Exclusive Services, and based upon

their conversion of profits diverted from and properly due to Star Cable by reason of

theft of its product;

(6)     An assessment of damages, to be determined at trial, based upon the New York

Law of Unfair Competition;

(7)     In accordance with 47 U.S.C. § 605 an award of all of Plaintiff's reasonable

attorneys' fees and costs of this action; and

(8)     Grant such other and further relief as is just.

Dated:  July 6, 2017

                                                    HOGAN & CASSELL, LLP
                                                    Attorneys for Plaintiff

                                            By: _____

                                                    Michael Cassell
                                                    500 North Broadway, Suite 153
                                                    Jericho, New York 11753
                                                    Tel.  516-942-4700
                                                    mcassell@hogancassell.com

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of New York

| | |
|---|---|
| STAR CABLE NA, INC. | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| TOTAL CABLE USA, LLC. and 1STOPMEDIA AND ENTERTAINMENT, INC. d/b/a RADIANT IPTV, ABC, INC., XYZ CORP. and JOHN DOES 1-10 | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No. 16-CV-04067 (SJ)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  1StopMedia and Entertainment, Inc., 3833 Gladston Drive, Naperville, Illinois 60565

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Michael Cassell, Esq.
> Hogan & Cassell, LLP
> 500 North Broadway, Suite 153
> Jericho, NY 11753

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

_____X

Star Cable NA INC.

                Plaintiff,

    -Against-

Total Cable USA LLC. and Radiant IPTV

              Defendants.

_____X

INDEX NO. 16-CV-04067
Assigned to: Judge Sterling
Johnson Jr.
Referred to: Magistrate Judge
Cheryl L. Pollak

ANSWER BY THE DEFENDENT
TOTAL CABLE USA LLC

Defendant Total Cable USA LLC (hereinafter referred to as "Defendant") by its attorneys Bhatia & Associates PLLC interposes the following Answer to the above Complaint:

## NATURE OF ACTION

1. The allegations contained in ¶ 1 of the Complaint pertaining to answering Defendant are denied. Each and every allegation contained in paragraph under reply is denied specifically and categorically.

## PARTIES

2. The allegations contained in ¶ 2 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

3. The allegations contained in ¶ 3 of the Complaint are admitted to the extent that answering Defendant operated as a New York registered LLC from October 22, 2013 until May 2, 2016, on which date it was dissolved. The rest of the allegations contained in paragraph under reply are denied.

1

4.  The allegations contained in ¶ 4 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

5.  Allegations pertaining paragraph 5 do not pertain to the answering defendant and needs no response or reply.

## JURISDICTION AND VENUE

6.  The allegations contained in ¶ 5 of the Complaint pertain to provisions of law and need no reply.

7.  The allegations contained in ¶ 6 of the Complaint pertain to provisions of law and need no reply.

## FACTUAL BACKGROUND

8.  The allegations contained in ¶ 7 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

9.  The allegations contained in ¶ 8 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

10. The allegations contained in ¶ 9 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

11. The allegations contained in ¶ 10 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

12. The allegations contained in ¶ 11 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

13. The allegations contained in ¶ 12 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

14. The allegations contained in ¶ 13 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

15. The allegations contained in ¶ 14 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

## DEFENDANTS

16. The allegations contained in ¶ 15 of the Complaint are denied.

17. The allegations contained in ¶ 16 of the Complaint are denied.

18. The allegations contained in ¶ 17 of the Complaint are denied.

19. The allegations contained in ¶ 18 of the Complaint are denied. The allegations are misconceived besides being false. Answering Defendant does not transmit or sell any channel as alleged in paragraph under reply.

20. The allegations contained in ¶ 19 of the Complaint are denied. The allegations are misconceived besides being false. Answering Defendant does not redistribute any communication or IPTV system as alleged in paragraph under reply.

21. The allegations contained in ¶ 19 of the Complaint are denied.

## COUNT I

22. Defendant reiterates and realleges the averments contained in ¶ 1-20 of this Answer as if each allegation was fully set forth herein.

23. The allegations contained in ¶ 22 of the Complaint are denied.

24. The allegations contained in ¶ 23 of the Complaint are denied.

25. The allegations contained in ¶ 24 of the Complaint are denied.

26. The allegations contained in ¶ 25 of the Complaint are denied.

## COUNT II

3

## UNJUST ENRICHMENT

27. Defendant reiterates and realleges the averments contained in ¶ 1-25 of this Answer as if each allegation was fully set forth herein.

28. The allegations contained in ¶ 27 of the Complaint are denied.

29. The allegations contained in ¶ 28 of the Complaint are denied.

30. The allegations contained in ¶ 29 of the Complaint are denied.

31. The allegations contained in ¶ 30 of the Complaint are denied.

## COUNT III

## CONVERSION

32. Defendant reiterates and realleges the averments contained in ¶ 1-30 of this Answer as if each allegation was fully set forth herein.

33. The allegations contained in ¶ 32 of the Complaint are denied.

34. The allegations contained in ¶ 33 of the Complaint are denied.

35. The allegations contained in ¶ 34 of the Complaint are denied.

## COUNT IV

## UNFAIR COMPETITION

36. Defendant reiterates and realleges the averments contained in ¶ 1-34 of this Answer as if each allegation was fully set forth herein.

37. The allegations contained in ¶ 36 of the Complaint are denied.

38. The allegations contained in ¶ 37 of the Complaint are denied.

39. The allegations contained in ¶ 38 of the Complaint are denied.

## FIRST AFFIRMATIVE DEFENSE

40. The Complaint fails to disclose any cause of action against answering Defendant.

4

## SECOND AFFIRMATIVE DEFENSE

41. No cause of action ever accrued to Plaintiff to commence the present action against Defendant.

## THIRD AFFIRMATIVE DFEFENSE

42. Defendant has no relationship whatsoever with Defendant Radiant IPTV. Complaint is liable to be dismissed due to misjoinder of parties.

## FOURTH AFFIRMATIVE DEFENSE

43. Answering Defendant does not sell or distribute cable television services. Defendant does not have a place of business in Woodside, NY. Defendant's place of business is at 15 Westmoylan Lane, Coram, NY 11727.

## FIFTH AFFIRMATIVE DEFENSE

44. Defendant Corporation was dissolved on May 2, 2016. As such, Defendant Corporation being dissolved, cannot be sued.

## FIRST COUNTERCLAIM

45. Plaintiff has dragged answering Defendant into false and frivolous litigation. Plaintiff knows very well that Defendant is not involved in the sale or distribution of television signals through IPTV distribution system. Answering Defendant had a few contracts to get distribution rights from channel owners, and sell to operators. Answering Defendant does not interact with any customers. Due to the false, frivolous, and vexatious litigation commenced by Plaintiff, answering Defendant claims judgment for reasonable attorney fees and other incidental expenses.

5

The prayer clause contained in the Complaint is denied. Plaintiff is not entitled to any relief requested in paragraphs 1-8 of the prayer clause. Defendant requests that Complaint be dismissed with costs. Defendant further requests that the Judgment for the relief requested in the Counterclaim be granted, along with any other just and proper relief.

Dated: September 16, 2016
       New York, NY

                                    _____/s/d/_____
                                    Satish K. Bhatia, Esq. (SB9222)
                                    Bhatia & Associates PLLC
                                    38W 32nd Street, Suite 1511
                                    New York, NY, 10001
                                    Tel: 212-239-6898
                                    Fax: 212-594-7980

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

STAR CABLE NA, INC.,                                 Docket No. 16-cv-04067

                          Plaintiff,

            vs.                                      AFFIRMATION OF

TOTAL CABLE USA LLC. and RADIANT IPTV               MAILING

                          Defendants.

-------------------------------------------------------------------x

Satish K. Bhatia, Esq., the attorney for the Defendant Total Cable USA LLC., duly

admitted to practice law in the Eastern District of New York swears under the penalty of

perjury that I have served a copy of the answer to the attorney for the plaintiff by

Ordinary First Class Mail on September 16, 2016 at the following addresses:

                        Daniel J. Lefkowitz, Esq.
                     Daniel J. Lefkowitz, Esq., P.C.
                             16 Titus Lane
                  Cold Spring Harbor, New York, 11724

Dated: September 16,2016
       New York, NY

                                        _____/s/d/_____
                                        SATISH K. BHATIA, ESQ.(SB9222),
                                                 Bhatia & Associates PLLC
                                        38 West, 32nd Street, Suite #1511
                                                    New York, NY 10001
                                                     Tel: 212-239-6898
                                                     Fax: 212-594-7980

# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

STAR CABLE NA, INC.,                                    Docket No. 16-cv-04067

                                        Plaintiff,

                vs.

TOTAL CABLE USA LLC. and RADIANT IPTV

                                        Defendants.

------------------------------------------------------------------x

## NOTICE OF MOTION TO DISMISS THE COMPLAINT AGAINST TOTAL CABLE
## USA LLC.

**PLEASE TAKE NOTICE** that on September 13, 2017, at 11AM, or as soon as counsel
can be heard, at the United States District Court, 225 Cadman Plaza East, Brooklyn, NY 11201,
before the Honorable Sterling Johnson Jr., U.S.D.J., the Defendant Total Cable USA LLC., by its
attorneys Bhatia & Associates PLLC, will move this Court for dismissing the action against the
Defendant Total Cable USA LLC., along with any other just and proper relief. The response of
the motion is due on July 18, 2017 and the response is due on August 8, 2017, as per order of the
Court dated July 10, 2017.

Date: New York, New York

July 11, 2017

                                        Respectfully submitted,

                                        _____/s/_____

                                SATISH K. BHATIA, ESQ.(SB9222),
                                        Bhatia & Associates PLLC
                                    38 West, 32nd Street, Suite #1511

New York, NY 10001
    Tel: 212-239-6898
    Fax: 212-594-7980

To:    Michael Cassell
       500 North Broadway, Suite 153
       Jericho, New York 11753
       (516) 942-4700

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

STAR CABLE NA, INC.,

                                                Docket No. 16-cv-04067

                                    Plaintiff,

        vs.

TOTAL CABLE USA LLC. and RADIANT IPTV

                                    Defendants.

--------------------------------------------------------------------X

| |
|---|
| AFFIRMATION IN SUPPORT OF MOTION SEEKING DISMISSAL OF THE COMPLAINT AGAINST DEFANDANT TOTAL CABLE USA LLC |

        Satish K. Bhatia, Esq., the Attorney of the defendants affirms under penalty or perjury as follows:

1.  I am the Attorney of the record for the defendants Total Cable USA LLC. and Radiant IPTV and as such I am fully conversant with the facts and circumstances of the case.

2.  I am making this affirmation in support of Notice of Motion seeking dismissal of the complaint against the defendant Total Cable USA LLC.

3.  On or about July 6, 2017, the plaintiff filed second amended complaint against the defendants Total Cable USA LLC and Radiant IPTV.

4.  In paragraph 3 of the second amended complaint, the plaintiff admitted that defendant Total Cable USA LLC., was dissolved on May 2, 2016. Total Cable USA LLC. was officially dissolved on May 2, 2016. The application for dissolution of the corporation was filed by the accountant as the members of Total Cable USA LLC. resolved to dissolve the corporation. The copy of the application

                                                            Page 1 of 7

for dissolution and certificate of dissolution are collectively annexed with this affirmation as **Exhibit A**.

5. In Count I of the second amended complaint, the plaintiff claimed statutory damages of $1,000-$10,000 for violation of the plaintiff copy rights and attorney's fees and costs. In Count II of the second amended complaint, the plaintiff claimed damages due to unjust enrichment. In Count III of the second amended complaint, the plaintiff claimed damages through unauthorized conversions of the signals of the exclusive services. In Count IV of the first amended complaint, the plaintiff claimed damages to the defendant's unfair competition with reference to the plaintiff's exclusive services and seek remedies for the same. The copy of the second amended complaint is annexed with this affirmation as **Exhibit B**.

6. Subsequently, after commencement of this action, Total Cable USA LLC. filed chapter 7 Bankruptcy Petition in the Bankruptcy Court Eastern District. Star Cable NA INC was shown one of the creditors in the Chapter 7 Bankruptcy petition in schedule E/F. The copy of the schedule E/F showing Star Cable as one of the creditors is annexed with this affirmation as **Exhibit C**.

7. On or about January 25, 2017, the Bankruptcy Court passed the final decree. The copy of the decree passed by the Bankruptcy Court is annexed with this affirmation as **Exhibit D**.

8. On or about September 16, 2016, defendant Total Cable USA LLC. filed an answer to the first amended complaint filed by the plaintiff. In the answer, defendant Total Cable USA LLC. raised various affirmative defenses. In the fifth affirmative defense, the defendant Total Cable USA LLC. alleged that defendant

Total Cable USA LLC, was dissolved on May 2, 2016, and as such defendant Total Cable USA LLC, being dissolved cannot be sued. In fourth affirmative defense, defendant Total Cable USA LLC, alleged that defendant Total Cable USA LLC. does not sell or distribute cable television services and does not have any place of business. The copy of the answer is annexed with this affirmation as Exhibit E.

9. On or about June 14, 2017, our office submitted a letter to the Court for scheduling a pre-motion conference seeking dismissal of the complaint against the defendant. In the letter, it was indicated that defendant Total Cable USA LLC. was dissolved in May 2016 and the Bankruptcy Court also passed the final decree on chapter 7 voluntary petition filed by defendant Total Cable USA LLC. after commencement of this action. The copy of the letter dated June 14, 2017, is annexed with this affirmation as Exhibit F.

10. On or about June 19, 2017, the plaintiff's attorney Michael Cassell filed a reply which opposed our letter seeking to schedule pre-motion conference on the ground that Total Cable USA LLC. represented by the same attorney as in this action and raised virtually identical argument in Asia TV USA, Ltd. v. Total Cable USA LLC., 16-cv-6873 (S.D.N.Y.) (AJN).

11. At the hearing before the Court on June 29, 2017, before Honorable Judge Sterling Johnson Jr., I informed the Court that the action against Total Cable USA LLC. despite bankruptcy petition and despite dissolution of the corporation in May 2016, was not dismissed as in that case the plaintiff sought injunctive relief on the ground that despite the dissolution and despite the bankruptcy petition, the

defendant Total Cable USA LLC. was still violating the plaintiff's copy right. In the present case, the plaintiff Star Cable is only claiming damages due to alleged past violation of the plaintiff's copy right and is not seeking any injunctive relief. The plaintiff is not alleging that despite of dissolution and despite of bankruptcy petition, the defendant Total Cable USA LLC. continues to violate the copy right of the plaintiff Star Cable rights. The plaintiff in view of the dissolution of the corporation of Total Cable USA LLC. and in view of chapter 7 Bankruptcy Petition, cannot claim damages as all the damages if any due to violation of the plaintiff's copy right has been discharged. In fact, the plaintiff can be sanctioned for violation of the provisions of 11 U.S.C.S. 362.

12. On June 29, 2017, the Honorable Judge Sterling Johnson Jr., granted time until Jul 14, 2017 to the defendants to file a motion seeking dismissal of the complaint. Our office had already served the motion to dismiss and supporting documents against the defendant Radiant IPTV on July 5, 2017. The plaintiff's attorney confirmed the receipt of notice of motion and affirmation in support of notice of motion seeking dismissal of the complaint against Radiant IPTV by email dated July 7, 2017, the copy of the email is annexed with this affirmation as **Exhibit G.**

13. Ahmodul Barobhuyia in his affidavit annexed with this affirmation has stated that the defendant Total Cable USA LLC. never conducted any business after its incorporation and never violated the copyright of the plaintiff, particularly after its dissolution in May 2016. The plaintiff has no right to claim any damages after final decree was passed in chapter 7 Bankruptcy Petition.

# Memorandum

14.11 USCS §362 provided automatic stay once the party filed Bankruptcy petition in the Bankruptcy court. The relevant provisions 11 USCS § 362 (a)(1) are reproduced as under

" Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title (11 USCS § 301, 302, or 303], or an application filed under section 5(a)(3) of the securities Investor Protection Act of 1970 [15 USCS § 78eee(a)(3)], operates as a stay, applicable to all entities, of –
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this tile;

# Broad Scope of Stay

15. Reach of stay is intended to be quite broad, and therefore exceptions to stay should be read narrowly to secure broad grant of relief to debtor. In re stringer (1988, CA9 Cal) 847 F2d 549, 17 BCD 1169, 19 CBC2d 233, CHH Bankr L Rptr P 72297. 11 USCS § 362 is extremely broad in scope and should apply to almost any type of formal or informal action against debtor or property of estate. Delpit v Commissioner (1994, CA9) 18 F3d 768,94 CDOS 1745, 94 Daily Journal DAE 3125, 25 BCD. Scope of automatic stay provisions in broad and applies to formal and informal proceedings against debtor; any action taken in violation of automatic stay is void. In

re Smith (1988, WD Mich) 86 BR 92, aff'd in part and rev'd in part on other grounds
(1989, CA 6 Mich) 876 F2d 524, 19BCD 1097, CCH Bankr L Rptr P 72936.
Automatic stay provision is very broad, and any exceptions to it must be strictly
construed to further purposes of automatic stay. Gunther v Glabb (In re Glabb) (2001,
BC WD Pa) 261 BR 170.

## Actions or proceedings Against Debtor [§ 362(a)(1)]

16. Stay of judicial proceedings against Chapter 7 debtor is automatic and mandatory
under 11 USCS § 362(a)(1) with filing of petition and thus motion for stay need not be
made in court where proceeding is pending or in Bankruptcy Court. Automatic stay
applies to all actions brought against debtor, either prepetition or postpetition,
regardless of whether assets in question are considered property of debtor's estate.
Raymark Industries, Inc v Lai( 1992, CA 3 Pa) 973 f2d 1125, 23 BCD 689, CCH Bankr
L Rptr P 74914. 11 USCS § 362(a)(1) stays all judicial proceedings against debtor,
even if debtor is arguably only nominal party. Green v Yang (1983, BC SD Ohio) 29
BR 682, 10 BCD 942, CCH Bankr L Rptr P 69194. Effect of automatic stay provision
is to halt pending judicial proceedings involving debtor. Howard v Howard (1984, Tex
App San Antonio) 670 SW2d 737.

## Final Decree in Chapter 7 Bankruptcy Petition

17. Applicable Law and Rules

1. Section 350(a) of the Bankruptcy Code (11.U.S.C. § 350(a)) provides that:
   "After an estate is fully administered and the court has discharged the trustee,
   the Court shall close the case."

2. Fed. R. Bankr. P. 5009 states:

"If in a chapter 7, chapter 12, or chapter 13 case the trustee has filed a

final report and final account and has certified that the estate has been fully

administered, and if within 30 days no objection has been filed by the united

states trustee or a party in interest, there shall be a presumption that the estate

has been fully administered."

WHEREFORE, the defendant Total Cable USA LLC, requests the Court to grant

the relief as requested in the notice of motion.

Dated: July 11, 2017

                                          /s/
                        SATISH K. BHATIA, ESQ. (SB9222)
                               Bhatia & Associates PLLC
                        38 West, 32nd Street, Suite #1511
                                  New York, NY 10001
                                    Tel: 212-239-6898
                                    Fax: 212-594-7980

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

STAR CABLE NA, INC.,                           Docket No. 16-cv-04067

                        Plaintiff,

        vs.

TOTAL CABLE USA LLC. and RADIANT IPTV

                        Defendants.

--------------------------------------------------------------x

| AFFIDAVIT IN SUPPORT OF MOTION SEEKING DISMISSAL OF THE COMPLAINT AGAINST DEFANDANT TOTAL CABLE USA LLC |
| --- |

I, Ahmodul Barobhuiya, do swear under penalty perjury as follows:

1. I am one of the defendants in the above action and as such I am conversant with the facts and circumstance of the case.

1. I am making this affidavit in support of Notice of Motion seeking dismissal of the complaint against the defendant Total Cable USA LLC.

2. On or about August 28,2016, the plaintiff filed first amendment complaint against the defendants Total Cable USA LLC and Radiant IPTV.

3. In paragraph 3 of the first amended complaint, the plaintiff admitted that defendant Total Cable USA LLC., was dissolved on May 2, 2016. Total Cable USA LLC. was officially dissolved on May 2, 2016. The application for dissolution of the corporation was filed by the accountant as the members of Total Cable USA LLC. resolved to dissolve the corporation.

4. In Count I of the first amended complaint, the plaintiff claimed statutory damages of $1,000-$10,000 for violation of the plaintiff copy rights and attorney's fees and costs. In Count II of the first amended complaint, the plaintiff claimed damages

due to unjust enrichment. In Count III of the first amended complaint, the plaintiff claimed damages through unauthorized conversions of the signals of the exclusive services. In Count IV of the first amended complaint, the plaintiff claimed damages to the defendant's unfair competition with reference to the plaintiff's exclusive services and seek remedies for the same.

5. Subsequently, after commencement of this action, Total Cable USA LLC. filed chapter 7 Bankruptcy Petition in the Bankruptcy Court Eastern District. On or about January 25,2017, the Bankruptcy Court passed the final decree.

6. On or about September 16, 2016, defendant Total Cable USA LLC. filed an answer to the first amended complaint filed by the plaintiff. In the answer, defendant Total Cable USA LLC. raised various affirmative defenses. In the fifth affirmative defense, the defendant Total Cable USA LLC. alleged that defendant Total Cable USA LLC. was dissolved on May 2, 2016, and as such defendant Total Cable USA LLC. being dissolved cannot be sued. In fourth affirmative defense, defendant Total Cable USA LLC. alleged that defendant Total Cable USA LLC. does not sell or distribute cable television services and does not have any place of business.

7. On or about June 14, 2017, my attorney through the offices of Bhatia & Associates PLLC, submitted a letter to the Court for scheduling a pre-motion conference seeking dismissal of the complaint against the defendant. In the letter, it was indicated that defendant Total Cable USA LLC. was dissolved in May 2016 and the Bankruptcy Court also passed the final decree on chapter 7 voluntary petition filed by defendant Total Cable USA LLC. after commencement of this action.

8. On or about June 19, 2017, the plaintiff's attorney Michael Cassell filed a reply which opposed our letter seeking to schedule pre-motion conference on the ground that Total Cable USA LLC. represented by the same attorney as in this action and raised virtually identical argument in Asia TV USA. Ltd. v. Total Cable USA LLC., 16-cv-6873 (S.D.N.Y.) (AJN).

9. At the hearing before the Court on June 29, 2017, before Honorable Judge Sterling Johnson Jr., I informed the Court that the action against Total Cable USA LLC. despite bankruptcy petition and despite dissolution of the corporation in May 2016, was not dismissed as in that case the plaintiff sought injunctive relief on the ground that despite the dissolution and despite the bankruptcy petition, the defendant Total Cable USA LLC. was still violating the plaintiff's copy right. In the present case, the plaintiff Star Cable is only claiming damages due to alleged past violation of the plaintiff's copy right and is not seeking any injunctive relief. The plaintiff is not alleging that despite of dissolution and despite of bankruptcy petition, the defendant Total Cable USA LLC. continues to violate the copy right of the plaintiff Star Cable rights.

10. Defendant Total Cable USA LLC. never conducted any business after its incorporation and never violated the copyright of the plaintiff, particularly after its dissolution in May 2016. The plaintiff has no right to claim any damages after Total Cable USA LLC. was discharged in chapter 7 Bankruptcy Petition.

11. Defendant Total Cable USA LLC, Infact, never opened any account in any bank and never issued any check to any entity or to any individual. The plaintiff Star Cable never appeared in the Bankruptcy petition filed by Total Cable USA LLC.

WHEREFORE I request that notice of motion filed by Total Cable USA LLC seeking dismissal of the complaint against Total Cable USA LLC be granted along with any other just and proper relief.

Ahmodul Barobhuiya

Verified On: July ⦂⦂2017
In the County of New York
In the State of New York

(Notary Public)

**SATISH KUMAR BHATIA**
**Notary Public, State Of New York**
**No. 02BH6343050**
**Certified in New York County**
**Commission Expires 05/31/2020**

# EXHIBIT A

New York State Department of State
Division of Corporations, State Records, and Uniform Commercial Code
One Commerce Plaza, 99 Washington Avenue Albany, NY 12231
www.dos.ny.gov

# ARTICLES OF DISSOLUTION

## Of

### TOTAL CABLE USA LLC

Under Section 705 of the Limited Liability Company Law

**FIRST:** The name of the limited liability company is:

TOTAL CABLE USA LLC

If the name of the limited liability company has been changed, the name under which it was organized is:

**SECOND:** The date of filing of the articles of organization is: 10/23/2013

**THIRD:** The event giving rise to the filing of the articles of dissolution is:
*(Check appropriate statement)*

☒ The vote or written consent of a majority in interest of the members of the limited liability company.

☐ There are no members of the limited liability company.

☐ Pursuant to the dissolution date set forth in the articles of organization or operating agreement of the limited liability company.

☐ The following event, as specified in the operating agreement:

☐ The entry of a decree of judicial dissolution.

X _____
*(Signature)*

SYED S AHMED
*(Type or Print Name)*

Capacity of signer *(Check appropriate box)*:

☐ Member

☐ Manager

☒ Authorized Person

DOS-1366-f-a  (Rev. 05/13)

Page 1 of 2

ARTICLES OF DISSOLUTION
OF

TOTAL CARE UPA LLC

Under Section 705 of the Limited Liability Company Law

Filed by:

Name.    SHAKIL M KHAN

Address:    41-18 69th ave.

City, State and ZIP Code:    Woodside, NY. 11377

NOTE: This form was prepared by the New York State Department of State for filing articles of dissolution for a domestic limited liability company. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal supply stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The completed form must be submitted with a $60 filing fee made payable to the Department of State.

(For office use only.)

DOS-1366-f-l   (Rev. 06/12)                                                                 Page 2 of 2

N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS                ALBANY, NY 12231-0001

FILING RECEIPT

ENTITY NAME: TOTAL CREDIT USA LLC

DOCUMENT TYPE: DISSOLUTION (DOM. LLC)                                    COUNTY: QUEE

FILED: 05/02/2016  DURATION: ********    CASH#: 160502000635  FILE #: 160502000629

FILER:
DARRYL M KUHN
37-19 57TH ST.

WOODSIDE          NY       11377

ADDRESS FOR PROCESS:

REGISTERED AGENT:



SERVICE COMPANY: ** NO SERVICE COMPANY **          SERVICE CODE: 00

| FEES | 85.00 | | PAYMENTS | 85.00 |
|------|-------|---|----------|-------|
| FILING | 60.00 | | CASH | 0.00 |
| TAX | 0.00 | | CHECK | 85.00 |
| CERT | 0.00 | | CHARGE | 0.00 |
| COPIES | 0.00 | | DRAWDOWN | 0.00 |
| HANDLING | 25.00 | | OPAL | 0.00 |
| | | | REFUND | 0.00 |

DOS-1025 (04/2007)

# EXHIBIT B

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 06/28/16   Page 1 of 11 PageID #: 42

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK.

---------------------------------------------------------------X

STAR CABLE NA, INC.,                              INDEX NO: 16-CV-04067

                                    Plaintiff,    USJ STERLING JOHNSON, JR.
                                                  MJ: CHERYL L. POLLACK

vs.                                               FIRST AMENDED
                                                  COMPLAINT
TOTAL CABLE USA LLC. and RADIANT IPTV
ABC, INC., XYZ CORP., JOHN DOES 1-10

                                    Defendants.:
---------------------------------------------------------------X

   The plaintiff Star Cable NA, Inc. ("plaintiff" or "Star Cable"), by its attorney, as and for

its Complaint herein against the defendants, alleges the following:

                           NATURE OF THE ACTION

   1.      The defendants in this action ("Total Cable" and/or "Radiant" or collectively

referred to as the "Defendants") are involved in the sale and distribution of cable television

services to its customers which include various programming, to which they are not entitled,

which originates in Bangladesh via an internet protocol television system ("IPTV").  The

plaintiff is an Internet Protocol Television ("IPTV") cable television company which has

exclusive rights, in the United States and Canada, to distribute eight individual programming

services, via the signal delivery services IPTV, WiMax Wireless and Mobile TV.  The exclusive

services originate in Bangladesh and include i) Independent TV,  ii) Jamuna TV, iii) Channel 16,

iv) My TV, v) Asian TV, vi)Bangla Vision, vii) Ekhusey TV, and, ix) Somoy TV ( sometimes

hereinafter referred to as the "Exclusive Services").  This is an action, based upon the discovery

that defendants, in direct violation of plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. This is true with respect to each of the Exclusive Services except exclusive rights are shared with Radiant IPTV for Independent TV, in which Radiant may have some rights. Otherwise, Defendants conduct is a violation of the Communications Act of 1934, 47 U.S.C. §605(a), and New York Law. In this action, Star Cable seeks declaratory and injunctive relief and monetary damages, costs and attorneys fees.

### Parties

2. Star Cable NA, Inc. is a New York corporation that has its principal place of business at 3839 Bell Boulevard, Bayside New York 11361.

3. Total Cable USA is a New York business which has its principal place of business at 37-19 57th Street, Woodside NY 11377, and which operated as a NY registered LLC from October 22, 2013 until May 2, 2016, on which date it was dissolved. Prior to October 22, 2013 Total Cable USA, upon information and belief operated as a subsidiary of Lalon TV, Inc. an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram NY. Both Total Cable USA, LLC and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya, who upon information and belief is the principal of Total Cable USA. Moreover, in a Bankruptcy proceeding in the Southern District of New York, Lalon TV, Inc. (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc.entered an appearance by counsel as Lalon TV, Inc. A/K/A Total TV, A/K/A Total Cable.

4. Radiant IPTV is a business entity operating from its principal place of business at 150-47 Hillside Avenue, Ja maica NY 11432. Radiant IPTV appears to operate out of the second

2

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 08/26/16   Page 3 of 11 PageID #: 44

floor of that two story building, however the second floor is entirely occupied by Marvel Cable and Broadcasting, LLC a New York LLC with its principal place of business at 150-17 Hillside Avenue. When a customer pays forRadiant IPTV services by credit card the payment is received by 1StopMedia and Entertainment, Inc., ("1Stop") an Illinois corporation. On the FCC Form 499, which identifies certain communication business data, 1Stop lists "other trade names" to include Radiant IPTV. Further the CEO of 1Stop, Saiful Siddique, lists himself as the COO of Radiant IPTV. Mr. Siddique identifies himself as having addresses in Naperville, Illinois, for the purposes of his FCC filing and Brunswick, New Jersey for the purposes of 1Stop's Secretary of State incorporation data. On it's Facebook page Radiant IPTV lists it's parent corporation as 1Stop.

5.  ABC, INC., XYZ CORP. and JOHN DOES 1-10 are fictitious names of persons and entities that are the persons or corporate owners of defendants Total Cable USA LLC and Radiant IPTV. Although Plaintiff exercised it's best efforts in discovering the true names and ownership interest of said named defendants, defendants seem to be engaged in a scheme to evade detection of their proper name and ownership. As such, Plaintiff reserves its right to amend this FIRST AMENDED COMPLAINT upon discovery of true names and ownership of Total Cable USA LLC and Radiant IPTV, whether held in corporate or individual form.

### Jurisdiction and Venue

6.  This action arises under 47 U.S.C. §605 (a) and supplemental law claims.

7.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and/or 28 U.S.C. §1332 as there is a dispute in excess of the jurisdictional limits, and supplemental jurisdiction over the state law claims. Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. §§1391(b) and 1400(a), as the defendants reside in the District,

3

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 08/28/16   Page 4 of 11 PageID #: 46

do business in this District and a substantial part of the events giving rise to the claim occurred in the District.

## FACTUAL BACKGROUND

8.     Star Cable is a multi channel provider of subscription video services included in a channel lineup which includes hundreds of channels including several from Bangladesh which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access. Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, NY to its subscribers via the internet in the process known as Internet Protocol Television.

9.     In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered. So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV. In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV "the Exclusive Rights". In exchange for the Exclusive Rights Star Cable continues to pay the programming service providers license fees which generally increase annually in accordance with the terms of these multi year agreements. Such annual increases are often double and/or triple the previous years license fee. As such, Star Cable pays significant amounts for its Exclusive Rights.

10.    The Agreements are part of the marketing scheme of the Exclusive Services.

4

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 06/28/16   Page 6 of 11 PageID #: 46

11.     Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cables channels are digitally secured and encrypted. The encrypted video services are then transmitted via the internet to its customers.

12.     Each Star Cable customer receives a set top channel converter which contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen. The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same. The set top box is part of the monthly service charge of a customer's purchase of IPTV service. If a customer wants a second set top box a service charge is added to the customer's bill each month.

13.     The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.

14.     Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service.

15.     At all times pertinent to this Complaint, Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services i) Independent TV (as it applies to Total Cable), ii) Jamuna TV, iii) Channel I 6, iv) My TV, v) Asian TV, vi) Bangla Vision, vii) Ekhusey TV, and, ix) Somoy TV for all regions within the

5

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 09/20/16   Page 0 of 11 PageID #: 47

United States and Canada. A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television. A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd. Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Samoy Media Limited. Payments have been made by Star Cable on each of these Agreements.

### The Defendants

16.     The Defendants Total Cable USA and Radiant IPTV (sometimes collectively the "Defendants") are telecommunications distribution companies which sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. The Defendant's signal delivery system is almost identical to that of Star Cable.

17.     The Defendant's customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from the Defendants.

18.     The Defendant's each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming.

19.     The Defendant's do not have rights to transmit or sell the nine channels over an IPTV delivery system in any part of the United States or Canada.

6

20.     Despite not having rights to transmit the Exclusive Services and in direct derogation of the exclusive rights of Star Cable received the Exclusive Services in the United States and uses or divulges or redistributes said communications to their customers. The Defendants are not authorized to redistribute said communications over their IPTV systems in the United States or Canada. Said actions of Defendants are an unauthorized divulgence of satellite signals.

21.     Defendants violations of said exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Count I

### 47 U.S.C. § 605

22.     Plaintiffs incorporate the preceding paragraphs as if each allegation was fully set forth herein.

23.     Through the transmitting, retransmitting, use, divulgement and sale of the Exclusive Services the Defendants have violated various provisions of 47 U.S.C. §605.

24.     The use of the signals of the Exclusive Services in a manner in which they are not entitled, including effectuating the unauthorized receipt in the United States and transmitting, retransmitting, use, sale and divulging said Exclusive Services, which are radio communications,

7

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 08/28/18   Page 8 of 11 PageID #: 49

to persons not entitled to the for the purposes of commercial advantage and private financial gain is designed to injure, and will continue to injure Star Cable and cause it financial damage and irreparable harm.

25.    Defendants know or should have known and had reason to know that assisting a third person in the reception and use of the Exclusive Services without authorization, was and is illegal and prohibited.

26.    Pursuant to 47 U.S.C. §605(e)(3), Plaintiff is entitled to: equitable relief, either statutory damages of $1,000.00 to $10,000.00 per violation (each customer of Defendant's receiving each or all such Exclusive Services) or actual damages plus any profits realized by Defendants for each violation of 47 U.S.C. §605(a), reasonable attorneys fees and costs.

<div align="center">Count II</div>

<div align="center">UNJUST ENRICHMENT</div>

27.    Plaintiff hereby incorporates the preceding paragraphs as if set forth fully herein.

28.    Through the re-broadcasting scheme described above the Defendants have received a financial benefit by, among other things, receiving subscription fees from each of the Defendant's customers that have subscribed to the Exclusive Services.

29.    The financial benefit to the Defendants was to the detriment of the Plaintiff in that the Defendants customers who purchase the Exclusive Services would have had to acquire them from Star Cable rather than the Defendants, thereby depriving Star Cable of subscription fees.

30.    The Defendants have been unjustly enriched through these actions, and equity and good conscience requires restitution to the Plaintiff.

31.    Star Cable has been damaged through the unjust enrichment of the Defendants and seeks remedy for the same.

<div align="center">8</div>

Case 1:16-cv-04067-SJ-CLP   Document 9   Filed 09/28/16   Page 9 of 11 PageID #: 50

## Count III

### CONVERSION

32.    Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

33.    Through the rebroadcasting scheme described above the Defendants exercised and assumed unauthorized dominion and control over the signal of the Exclusive Services and disseminated and divulged said communications signals to third parties for payment and without the authorization of the Plaintiff.

34.    Star Cable was excluded from exercising any control over the dissemination and divulgement of the signals of the Exclusive Services to third parties and received no income from this unauthorized use and divulgement.

35.    The Plaintiff has been damaged through the unauthorized conversion of the signals of the Exclusive Services for which Star Cable seeks remedy.

## Count IV

### UNFAIR COMPETITION

36.    Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

37.    Through the rebroadcasting scheme described above the Defendants misappropriated the product of Star Cable, namely the licensed Exclusive Services.

9

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 08/28/16   Page 10 of 11 PageID #: 61

38.     The Defendants misappropriation of the Exclusive Services was undertaken in bad faith and without the authorization of or payment to Star Cable for the sale and divulgement of the Exclusive Services.

39.     The Plaintiff has been damaged through the Defendants unfair competition with reference to the Plaintiff's Exclusive Services and seeks remedy for the same.

WHEREFORE, the plaintiff requests that this Court grant the following relief:

(1)     Declare that the defendants' unauthorized sale use and divulgement of the Exclusive Services without authorization violated 47 U.S.C. § 605 (a) and that such violations were committed intentionally and for the purposes of commercial advantage and private financial and commercial gain;

(2)     In accordance with 47 U.S.C. §605(e)(3), permanently enjoin the defendants, their agents, servants, employees, and those controlled directly or indirectly by any of them from the distribution, sale rebroadcast or divulgement of the Exclusive Services;

(3)     In accordance with 47 U.S.C. § 605 (e) (3), award the plaintiff against the defendants, damages for all losses incurred as a result of defendants violation.

> (a)     The actual damages which the plaintiff has suffered, together with any additional profits earned by defendants' sale of hacked modem devices, or alternatively at plaintiffs election,

> (b)     Statutory damages in an amount between $1000.00 and $10,000.00 for each of the customers to which the Exclusive Services were sold and/or distributed by the defendants.

10

Case 1:16-cv-04067-SJ-CLP   Document 0   Filed 08/28/16   Page 11 of 11 PageID #: 42

(4)    An accounting of all profits and expenses realized by defendants in violation of

47 U.S.C. §605, together with defendants' production of all records reflecting sales of the

Exclusive Services; and,

(5)    An Order imposing a constructive trust based upon defendants' unjust enrichment

derived from profits on sales of the Exclusive Services, and based upon their conversion of

profits diverted from and properly due to Star Cable by reason of theft of its product; and

(6)    An assessment of damages, to be determined at trial, based upon the New York

Law of Unfair Competition;

(7)    In accordance with 47 U.S.C. §605 an award of all Plaintiffs' reasonable attorney

fees and costs of this action;

(8)    Grant such other and further relief as is just.

Dated: August 28, 2016

Respectfully submitted for the Plaintiff
By its Attorneys,

Daniel J. Lefkowitz    (DL 331)
Daniel J. Lefkowitz, Esq., P.C.
16 Titus Lane
Cold Spring Harbor, New York 11724
(631) 692-4700
djlesq@optimum.net

11

# EXHIBIT C

Fill in this information to identify the case:

Debtor: Total Cable USA LLC

United States Bankruptcy Court for the: Eastern District of NY

Case number: 8-16-75005

☐ Check if this is an amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims
12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).
   ☐ No. Go to Part 2.
   ☒ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address: Level 3 Communications LLC PO Box 910182 Denver, CO 80291-0182 | As of the petition filing date, the claim is: Check all that apply. ☐ Contingent ☐ Unliquidated ☒ Disputed | $ 85,000 | $ |

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _ _ _ _

Is the claim subject to offset? ☒ No ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (___)

| **2.2** Priority creditor's name and mailing address: Asia TV USA, LTD. 200 Middlesex Essex Turnpike, Suite 202, Iselin, NJ | As of the petition filing date, the claim is: Check all that apply. ☐ Contingent ☐ Unliquidated ☒ Disputed | $ 200,000 | $ |

Date or dates debt was incurred   08830

Basis for the claim:

Last 4 digits of account number _ _ _ _

Is the claim subject to offset? ☒ No ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (___)

| **2.3** Priority creditor's name and mailing address: Star Cable NA Inc. 36-39 Bell Blvd. Suite 223 Bayside, NY 11361 | As of the petition filing date, the claim is: Check all that apply. ☐ Contingent ☐ Unliquidated ☒ Disputed | $ 200,000 | $ |

Date or dates debt was incurred

Basis for the claim:

Last 4 digits of account number _ _ _ _

Is the claim subject to offset? ☒ No ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (___)

Official Form 206E/F      Schedule E/F: Creditors Who Have Unsecured Claims      page 1 of ___

# EXHIBIT D

Case 8-16-75603-ast    Doc 25    Filed 01/25/17    Entered 01/25/17 10:24:05

| Information to identify the case: | | |
|---|---|---|
| Debtor 1 | Total Cable USA LLC | Social Security number or ITIN ........... |
| | First Name   Middle Name   Last Name | EIN   40-3028150 |
| Debtor 2 | | Social Security number or ITIN ........... |
| (Spouse, if filing) | First Name   Middle Name   Last Name | EIN   .................... |
| United States Bankruptcy Court   Eastern District of New York | | |
| 290 Federal Plaza | | |
| Central Islip, NY 11722 | | |
| Case number:   8-16-75603-ast | | Chapter:   7 |

## FINAL DECREE

The estate of the above named debtor(s) has been fully administered.

### IT IS ORDERED THAT:

- Robert L. Pryor (Trustee) is discharged as trustee of the estate of the above-named debtor(s).
- The Chapter 7 case of the above-named debtor(s) is closed.

s/ Alan S. Trust
United States Bankruptcy Judge

Dated: January 25, 2017

B1.6ü67 [Final Decree 7 rev 12/01/15]

# EXHIBIT E

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
Star Cable NA INC.

    Plaintiff,         INDEX NO. 16-CV-04067
                  Assigned for Judge Sterling
                  Johnson Jr.
  -Against-         Referred for Magistrate Judge
                  Cheryl L. Pollak

                  ANSWER BY THE DEFENDENT
                  TOTAL CABLE USA LLC
Total Cable USA LLC. and Radiant IPTV

    Defendants.
----------------------------------------------------------------X

Defendant Total Cable USA LLC (hereinafter referred to as "Defendant") by its attorneys Bhatia
& Associates PLLC interposes the following Answer to the above Complaint:

## NATURE OF ACTION

1. The allegations contained in ¶ 1 of the Complaint pertaining to answering Defendant are

 denied. Each and every allegation contained in paragraph under reply is denied

 specifically and categorically.

## PARTIES

2. The allegations contained in ¶ 2 of the Complaint are denied due to lack of knowledge

 sufficient to form belief as to the truth of the allegations contained therein.

3. The allegations contained in ¶ 3 of the Complaint are admitted to the extent that

 answering Defendant operated as a New York registered LLC from October 22, 2013

 until May 2, 2016, on which date it was dissolved. The rest of the allegations contained in

 paragraph under reply are denied.

1

4. The allegations contained in ¶ 4 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

5. Allegations pertaining paragraph 5 do not pertain to the answering defendant and needs no response or reply.

## JURISDICTION AND VENUE

6. The allegations contained in ¶ 5 of the Complaint pertain to provisions of law and need no reply.

7. The allegations contained in ¶ 6 of the Complaint pertain to provisions of law and need no reply.

## FACTUAL BACKGROUND

8. The allegations contained in ¶ 7 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

9. The allegations contained in ¶ 8 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

10. The allegations contained in ¶ 9 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

11. The allegations contained in ¶ 10 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

12. The allegations contained in ¶ 11 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

13. The allegations contained in ¶ 12 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

14. The allegations contained in ¶ 13 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

15. The allegations contained in ¶ 14 of the Complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

## DEFENDANTS

16. The allegations contained in ¶ 15 of the Complaint are denied.

17. The allegations contained in ¶ 16 of the Complaint are denied.

18. The allegations contained in ¶ 17 of the Complaint are denied.

19. The allegations contained in ¶ 18 of the Complaint are denied. The allegations are misconceived besides being false. Answering Defendant does not transmit or sell any channel as alleged in paragraph under reply.

20. The allegations contained in ¶ 19 of the Complaint are denied. The allegations are misconceived besides being false. Answering Defendant does not redistribute any communication or IPTV system as alleged in paragraph under reply.

21. The allegations contained in ¶ 19 of the Complaint are denied.

## COUNT I

22. Defendant reiterates and realleges the averments contained in ¶ 1-20 of this Answer as if each allegation was fully set forth herein.

23. The allegations contained in ¶ 22 of the Complaint are denied.

24. The allegations contained in ¶ 23 of the Complaint are denied.

25. The allegations contained in ¶ 24 of the Complaint are denied.

26. The allegations contained in ¶ 25 of the Complaint are denied.

## COUNT II

3

## UNJUST ENRICHMENT

27. Defendant reiterates and realleges the averments contained in ¶ 1-25 of this Answer as if each allegation was fully set forth herein.

28. The allegations contained in ¶ 27 of the Complaint are denied.

29. The allegations contained in ¶ 28 of the Complaint are denied.

30. The allegations contained in ¶ 29 of the Complaint are denied.

31. The allegations contained in ¶ 30 of the Complaint are denied.

## COUNT III

## CONVERSION

32. Defendant reiterates and realleges the averments contained in ¶ 1-30 of this Answer as if each allegation was fully set forth herein.

33. The allegations contained in ¶ 32 of the Complaint are denied.

34. The allegations contained in ¶ 33 of the Complaint are denied.

35. The allegations contained in ¶ 34 of the Complaint are denied.

## COUNT IV

## UNFAIR COMPETITION

36. Defendant reiterates and realleges the averments contained in ¶ 1-34 of this Answer as if each allegation was fully set forth herein.

37. The allegations contained in ¶ 36 of the Complaint are denied.

38. The allegations contained in ¶ 37 of the Complaint are denied.

39. The allegations contained in ¶ 38 of the Complaint are denied.

## FIRST AFFIRMATIVE DEFENSE

40. The Complaint fails to disclose any cause of action against answering Defendant.

4

## SECOND AFFIRMATIVE DEFENSE

41. No cause of action ever accrued to Plaintiff to commence the present action against
Defendant.

## THIRD AFFIRMATIVE DEFENSE

42. Defendant has no relationship whatsoever with Defendant Radiant IPTV, Complaint is
liable to be dismissed due to misjoinder of parties.

## FOURTH AFFIRMATIVE DEFENSE

43. Answering Defendant does not sell or distribute cable television services. Defendant does
not have a place of business in Woodside, NY. Defendant's place of business is at 15
Westmoylan Lane, Coram, NY 11727.

## FIFTH AFFIRMATIVE DEFENSE

44. Defendant Corporation was dissolved on May 2, 2016. As such, Defendant Corporation
being dissolved, cannot be sued.

## FIRST COUNTERCLAIM

45. Plaintiff has dragged answering Defendant into false and frivolous litigation. Plaintiff
knows very well that Defendant is not involved in the sale or distribution of television
signals through IPTV distribution system. Answering Defendant had a few contracts to
get distribution rights from channel owners, and sell to operators. Answering Defendant
does not interact with any customers. Due to the false, frivolous, and vexatious litigation
commenced by Plaintiff, answering Defendant claims judgment for reasonable attorney
fees and other incidental expenses.

5

The prayer clause contained in the Complaint is denied. Plaintiff is not entitled to any relief requested in paragraphs 1-8 of the prayer clause. Defendant requests that Complaint be dismissed with costs. Defendant further requests that the Judgment for the relief requested in the Counterclaim be granted, along with any other just and proper relief.

Dated: September 16, 2016
    New York, NY

                                    /s/d/
                                  Satish K. Bhatia, Esq. (SB9222)
                                  Bhatia & Associates PLLC
                                  38W 32nd Street, Suite 1511
                                  New York, NY, 10001
                                  Tel: 212-239-6898
                                  Fax: 212-594-7980

# EXHIBIT F

Case 1:16-cv-04067-SJ-CLP   Document 33   Filed 06/14/17   Page 1 of 3 PageID #: 105

# BHATIA & ASSOCIATES PLLC

ATTORNEYS & COUNSELORS AT LAW
Satishbhatiaesq@yahoo.com

Satish K Bhatia

Joseph F. Kasper*
*of counsel

18 West 32nd St., Ste. 4 511
New York, New York 10001
T: (212) 239-6800
F: (212)594-7980

June 14, 2017

By ECF & Regular Mail
Judge Sterling Johnson Jr.
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

> Re:  Star Cable NA, Inc. v. Total Cable USA LLC and Radiant IPTV.
> Case No.: 16-CV-04067
> Request for scheduling conference to discuss schedule for motion practice
> and briefing seeking dismissal of the complaint.

Dear Hon Judge Johnson,

The Plaintiff commenced this action against Total Cable USA LLC and Radiant IPTV. In Count I, the Plaintiff claims statutory damages of $10,000.00 per violation or actual damages plus profits realized by the Defendants for each violation. In Count II, the Plaintiff claims damages due to unjust enrichment. In Count III, the Plaintiff claims damages due to unauthorized conversion of the signals of the exclusive services of the Plaintiff. In Count IV, the Plaintiff claims damages through Defendants' unfair competition.

During the pending proceedings, the Defendant Total Cable USA LLC filed Chapter 7 Bankruptcy Petition in the Bankruptcy Court Eastern District. The Bankruptcy Court passed the final decree. The Defendant Radiant IPTV interposed the answer to the complaint and raised various affirmative defenses. In the sixth affirmative defense, it was stated that Plaintiff's action against Radiant IPTV is not maintainable as Radiant IPTV is not a legal entity and the action can be filed only against the individual or against a legal entity. In fact, Radiant IPTV is d/b/a of 1Stopmedia and Entertainment Inc.

On or about May 30, 2017, the Plaintiff filed a notice of motion to amend the complaint on which the return date is June 26, 2017. The Plaintiff served the proposed amended complaint

to our office along with the notice of motion and supporting documents. In the proposed amended complaint, the Defendants are Total Cable USA LLC and 1Stopmedia and Entertainment Inc. d/b/a Radiant IPTV. It appears, the Plaintiff's attorney realized that action against Radiant IPTV is not maintainable as Radiant IPTV is only d/b/a. In addition, the Plaintiff's attorney is aware that the other Defendant Total Cable USA LLC was dissolved on May 16, 2016 and the Bankruptcy Court passed the final decree on Chapter 7 Voluntary Petition filed by the Defendant Total Cable USA LLC after the commencement of the present action.

The undersigned attorney conferred with Michael Cassell the attorney for the Plaintiff requesting to discontinue the action against Total Cable USA LLC in view of 11 USCS 362 under which the automatic stay is triggered once the Defendant files a Bankruptcy Petition and after filing the Bankruptcy Petition only Bankruptcy Court has jurisdiction on Total Cable USA LLC. The attorney for the Plaintiff was willing to discontinue the action against Radiant IPTV on the condition that our office accepts the process on behalf of 1Stopmedia and Entertainment Inc. Though our office expects that our office would be retained by 1Stopmedia and Entertainment Inc. once the Court allows the amendment, 1Stopmedia and Entertainment Inc. is not yet a party in the action and once the Court allows the amendment and our office is retained by 1Stopmedia and Entertainment Inc. only then our office can accept the process and would defend the action commenced by Star Cable against 1Stopmedia and Entertainment Inc.

We intend to file a motion seeking dismissal of the action against Total Cable USA LLC and against Radiant IPTV which is only d/b/a and not a legal entity. The Defendants therefore request a conference with the Court to discuss a schedule for Motion/Cross-Motion practices and briefing.

Respectfully Submitted,

Bhatia & Associates PLLC

/s/ Satish K. Bhatia (SB9222)

Case 1:16-cv-04067-SJ-CLP  Document 43-3  Filed 08/07/17  Page 31 of 34 PageID #: 225
Case 1:16-cv-04067-SJ-CLP  Document 81  Filed 05/06/19  Page 80 of 408 PageID #: 485

Case 1:16-cv-04067-SJ-CLP  Document 33  Filed 06/14/17  Page 3 of 3 PageID #: 107

To: Michael Cassell, Esq.
Via: Email & Regular Mail
mcassell@hogancassell.com
500 North Broadway, Suite 153
Jericho, New York 11753

# EXHIBIT G

&#x1f4f0; ✕

**subject:** RE: Star Cable v Total Cable

**From:** mcassell@hogancassell.com
**To:** satishbhatiaus@yahoo.com
**Date:** Friday, July 7, 2017, 5:49:50 PM EDT

I received your motion today.  I will look it over.

Mike

From: satish bhalla [mailto:satishbhatiaus@yahoo.com]
Sent: Thursday, July 6, 2017 6:27 PM
To: Michael Cassell
Subject: Re: Star Cable v Total Cable

Dear Michael,

I only filed a letter in Court by ECF and sent you the Notice of Motion with supporting documents on July 6, 2017 by Ground FedEx.  You might Monday.  In response to my letter seeking pre motion conference, you indicated that motion to dismiss by Radiant IPTV becomes moot in view complaint.  In your amended complaint, you did not make Radiant IPTV as an Independent Defendant but made 1Stopmedia & Entertainment a view of your amended complaint you will not oppose the notice of motion seeking dismissal of the complaint against Radiant IPTV.  I shall be re & Entertainment Inc once 1Stopmedia & Entertainment Inc. is served with the second amended complaint.

Regards,

Satish K Bhatla, Esq.
Bhalla & Associates PLLC
38W 32nd Street Suite # 1611
New York NY 10001
Phone: (212) 239-6800
Fax: (212) 594-7980

Disclaimer:

This email is intended only for the use of the individual to whom or the entity to which it is addressed and may contain information that is pr
exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distrib
communication is prohibited. If you have received this communication in error, please notify us immediately by collect tele

On Thursday, July 6, 2017, 4:42:26 PM EDT, Michael Cassell <mcassell@hogancassell.com> wrote:

Print Window

https://mg.mail.yahoo.com/d/folders/1/messages/26144

I received an ECF bounce yesterday that you had filed a letter dated June 22, 2017, regarding a motion to dismiss by Radiant IPTV.   I don't motion papers for this and it would appear that the issue is now moot.  Please advise.

Mike Cassell

This electronic transmission contains information from the law firm of Hogan and Cassell, LLP, which may be confidential or privileged. The for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (810.942.4700) or by a (mcassell@hoganconnell.com) immediately.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

STAR CABLE NA, INC.,                                    Docket No. 16-cv-04067

                           Plaintiff,

                                                        ┌────────────────────────────┐
         vs.                                            │  AFFIRMATION OF MAILING     │
                                                        └────────────────────────────┘
TOTAL CABLE USA LLC. and 1STOP MEDIA
AND ENTERTAINMENT, INC. d/b/a RADIANT
IPTV, ABC, INC., XYZ CORP. and JOHN DOES
1-10                            Defendants.
------------------------------------------------------------------------x

Satish K. Bhatia, Esq., the attorney for the Defendant Total Cable USA LLC, duly

admitted to practice law in the State of New York affirms under the penalty of perjury

that I have served a copy of the Notice of Motion along with the supporting documents to

the attorney for the Plaintiff by FedEx on July 11, 2017 at the following address:

                      Micheal Cassell
                500 North Broadway, Suite 153
                  Jericho, New York 11753

Dated: July 11, 2017
New York, NY

                                        _____s/d_____
                                        SATISH K. BHATIA, ESQ.(SB9222),
                                                  Bhatia & Associates PLLC
                                               38 West, 32nd Street, Suite #1511
                                                      New York, NY 10001
                                                      Tel: 212-239-6898
                                                      Fax: 212-594-7980

Page 1 of 1

# EXHIBIT D

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ **JAN 2 3 2018** ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
STAR CABLE NA, INC.,

               Plaintiff,

                        16 CV 4067 (SJ) (CLP)

                        MEMORANDUM
                        AND ORDER

       -against-

TOTAL CABLE USA LLC and 1STOPMEDIA
AND ENTERTAINMENT, INC. d/b/a/
RADIANT IPTV, ABC, INC., XYZ CORP.
and JOHN DOES 1-10,

               Defendants.
-------------------------------------------------X

APPEARANCES

HOGAN & CASSELL LLP
500 North Broadway
Suite 153
Jericho, NY 11753
By:    Michael D. Cassell
*Attorneys for Plaintiff*

SATISH K. BHATIA
38 West 32nd Street
Suite 1511
New York, NY 10001
By:    Satish K. Bhatia
*Attorney for Defendants*

JOHNSON, Senior District Judge:

Before this Court are motions to dismiss by Total Cable USA LLC and Radiant IPTV. Based on the submissions of the parties and oral argument, and for the reasons stated below, both motions to dismiss are DENIED.[1]

## I.    BACKGROUND

This is an unauthorized publication or use of communications action brought pursuant to 47 U.S.C. § 605. Plaintiff's Second Amended Complaint ("SAC") alleges that the defendants utilized certain individual programming services in contravention of Plaintiff's exclusive rights to air those programming services in the United States (the "Exclusive Services"). Plaintiff seeks enjoinment of the defendants from utilizing the Exclusive Services and monetary damages.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient facts that, if accepted as true, would "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also Fed. R. Civ. P. 12(b)(6). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. The complaint must contain "more

---

[1] Radiant IPTV's motion to dismiss is denied as moot as the Second Amended Complaint eliminated it as a defendant in this action.

2

than labels" and conclusory assertions.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

## III.    DISCUSSION

Total Cable's motion to dismiss chiefly claims that the action against it should be dismissed because it dissolved in May 2016 and filed for bankruptcy in December 2016.  Both arguments are without merit.  "A dissolved corporation may sue or be sued."  <u>Ford v. Pulmosan Safety Equip. Corp.</u>, 862 N.Y.S.2d 56, 58 (N.Y. App. Div. 2008); <u>see also</u> <u>Bruce Supply Corp. v. New Wave Mech.</u>, 773 N.Y.S.2d 408, 408 (N.Y. App. Div. 2004) ("A corporation may be held liable on a cause of action that accrues after dissolution if the corporation continued its operations, operated its premises, and held itself out as a de facto corporation, notwithstanding its dissolution.").  Here, the SAC alleges that Total Cable's continued unauthorized use of the Exclusive Services violates Plaintiff's rights and injures Plaintiff.  (<u>See</u> SAC ¶¶ 23, 26.)  These well-pleaded allegations, taken as true, are sufficient to withstand a motion to dismiss.  Thus, Total Cable's dissolution is not a basis for dismissal of the action.

Total Cable next argues that the action should be dismissed because it filed for bankruptcy, with a final decree issued in January 2017.  In so doing, Total Cable attempts to distinguish the instant action from that in <u>Asia TV USA, Ltd. v. Total Cable USA LLC</u>.  In <u>Asia TV</u>, the court rejected the contention that bankruptcy was a basis to deny a claim for injunctive relief.  No. 16-cv-6873

3

(S.D.N.Y. Mar. 2, 2017) (order granting plaintiff leave to file a motion seeking injunctive relief). Here, Total Cable argues that Plaintiff is claiming damages based solely upon Total Cable's past unauthorized use of the Exclusive Services, and is not seeking injunctive relief. This argument is belied by the well-pleaded allegations in the SAC. Plaintiff claims that the defendants continue to use the Exclusive Services without intermission, and requests that the Court enjoin defendants. (See SAC ¶¶ 23, 26; WHEREFORE clause ¶ 2.) This type of injunctive relief is not dischargeable by bankruptcy, and no stay presently exists with respect to any claims against the defendants in this case. See, e.g., In re Chateaugay Corp., 944 F.2d 997, 1008 (2d Cir. 1991). Moreover, it is possible for a plaintiff to recover damages from a corporation post-bankruptcy. See, e.g., Comty. Television Sys., Inc. v. Caruso, 284 F.3d 430, 435–36 (2d Cir. 2002) (a violation occurs each time a device is purchased and installed); In re Velo Holdings, Inc., 500 B.R. 693, 698–99 (Bankr. S.D.N.Y. 2013) (citing cases). Plaintiff alleges continuing harm caused by the defendants' unauthorized use of the Exclusive Services in the SAC. Therefore, the parties should be allowed to engage in discovery to determine the extent of any unauthorized uses of the Exclusive Services that would entitle Plaintiff to relief.

## IV.   CONCLUSION

For the foregoing reasons, Total Cable's motion to dismiss is DENIED.

Radiant's motion to dismiss is DENIED as moot.

SO ORDERED.

Dated: January 18, 2018                               /s/(SJ)
       Brooklyn, New York                    _____
                                             Sterling Johnson, Jr., U.S.D.J.

5

# EXHIBIT E

STAR CABLE0162

 **United States Patent and Trademark Office**

Home  Site Index  Search  FAQ  Glossary  Guides  Contacts  eBusiness  eBiz alerts  News  Help

## Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Thu Apr 19 03:31:02 EDT 2018

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | Brows Dict | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

( Logout )  Please logout when you are done to release system resources allocated for you.

( Start )  List At: [      ]  OR ( Jump ) to record: [      ]  **Record 1 out of 2**

**TSDR**   **ASSIGN Status**   **TTAB Status**  ( Use the "Back" button of the Internet Browser to
return to TESS)



"Reliable, Affordable!"

আমরা বাংলায় কথা বলি

| | |
|---|---|
| **Word Mark** | TOTAL CABLE "RELIABLE, AFFORDABLE!" |
| **Goods and Services** | (ABANDONED) IC 009. US 021 023 026 036 038. G & S: Internet protocol television. FIRST USE: 20110101. FIRST USE IN COMMERCE: 20140531 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.07.01 - Globes with outlines of continents<br>16.01.03 - CB radios; Projection screens (television); Radios; Remote controls, television; Screens, projection; Screens, television; Television sets<br>26.17.09 - Bands, curved; Bars, curved; Curved line(s), band(s) or bar(s); Lines, curved<br>27.03.05 - Objects forming letters or numerals<br>28.01.01 - Arabic characters |
| **Serial Number** | 86375228 |
| **Filing Date** | August 22, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) TOTAL CABLE USA LLC LIMITED LIABILITY COMPANY NEW YORK 15 West Moylan Lane CORAM NEW YORK 11727 |
| **Description** | Color is not claimed as a feature of the mark. The mark consists O- Under "Total" there is sign of |

STAR CABLE0163

of Mark      globe. This means whoever is our customer they can watch whole world updates by taking our service. "Cable" word - It's a sign of TV, "Reliable" & "Affordable"- Is the motto of our business. Whatever service we are providing customer can rely on our service also we provide our service customer can afford. ???? ?????? ??? ???- Means we speak Bengali.

**Type of Mark**   TRADEMARK

**Register**   PRINCIPAL

**Live/Dead Indicator**   DEAD

**Abandonment Date**   June 11, 2015

TESS HOME   NEW USER   STRUCTURED   FREE FORM   Browse Dict   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST
NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

STAR CABLE0164

 **NEW YORK STATE**   Services   News   Government   Local

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through April 18, 2018.

Selected Entity Name: TOTAL CABLE USA LLC
Selected Entity Status Information

**Current Entity Name:** TOTAL CABLE USA LLC
**DOS ID #:** 4476270
**Initial DOS Filing Date:** OCTOBER 22, 2013
**County:** SUFFOLK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC LIMITED LIABILITY COMPANY
**Current Entity Status:** INACTIVE - Dissolution (May 02, 2016)

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
AHMODUL BAROBHUIYA
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Registered Agent**

NONE

This office does not require or maintain
information regarding the names and addresses of
members or managers of nonprofessional limited

STAR CABLE0165

liability companies. Professional limited liability
companies must include the name(s) and
address(es) of the original members, however this
information is not recorded and only available by
<u>viewing the certificate.</u>

## *Stock Information

**# of Shares**      **Type of Stock**      **$ Value per Share**

No Information Available

*Stock information is applicable to domestic business corporations.

## Name History

**Filing Date   Name Type      Entity Name**

OCT 22, 2013  Actual      TOTAL CABLE USA LLC

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in
New York State. The entity must use the fictitious name when conducting its activities or business in
New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS
Homepage   |   Contact Us



STAR CABLE01G6



✏ Status  📷 Photo/Video

Write something on this Page...

**Total Cablebd**
April 13 at 12:04pm · ⚙

বাংলা নববর্ষ থাকুন জিবিএন২৪ টেলিভিশনের সাথে
সবাইকে বাংলা নববর্ষর শুভেচ্ছা।
See Translation

45 Views

👍 Like          💬 Comment          ↪ Share

😊 1

Write a comment...                    😊 📷 🖼 🎁 ⋮

**Total Cablebd**
February 26 · ⚙

SULTAN SULEIMAN KOSEM!

Subscribe Total Cablebd today by calling us at (718) 777-8556 and bring
quality in your home!
#totalcablebd

STAR CABLE0167



**Total Cablebd** updated their cover photo.
January 28 · ⊕

👍 Like          💬 Comment          ↪ Share

😊 2

Write a comment...          😊 📷 🎥 👾 )

**Total Cablebd**
January 24 · ⊕

দীর্ঘ ধারা সিরিয়াল: পালকী

শনিবার থেকে বৃহস্পতিবার । সকাল ৭:০০ মিনিট ও রাত ৯:০০ মিনিট (প্রেক্ষনীয় ছাড়া)
Subscribe Total Cablebd today by calling us at (718) 777-6556 and bring
quality in your home!... See More
See Translation

111 Views

👍 Like          💬 Comment          ↪ Share

STAR CABLE0168



1 Share

Write a comment...

**Total Cablebd**
January 11 · 

SULTAN SULEIMAN: Kosem
Coming soon on Deepto TVI

Get your Total Cablebd subscription today and enjoy all your favorite programs across the global!
#totalcablebd

112 Views

👍 Like        💬 Comment        ➦ Share

Write a comment...

**Total Cablebd**
December 25, 2017 · 

Merry Christmas and Happy Holidays!

STAR CABLE0169

42 Views

👍 Like    💬 Comment    ↪ Share

😊 3

Write a comment...

😊 📷 📹 😊

**Total Cablebd** updated their cover photo.
December 24, 2017 · ✶

👍 Like    💬 Comment    ↪ Share

😊 4

Write a comment...

😊 📷 😂 😊

**Total Cablebd**
November 19, 2017 · ✶

তত্ত্ব দলের পরীক্ষা তথা শিক্ষনে যা কুশলতার।

Subscribe Total Cablebd today and watch TBN24 to get updated news
about current politics, sports and many more.
Call us (718)-777-0556 and get your subscription today.
#totalcablebd

See Translation

126 Views

👍 Like    💬 Comment    ↪ Share

😊 6

Top Comments ▾

Write a comment...

😊 📷 😂 😊 ⓙ

View 1 comment

**Total Cablebd**
October 22, 2017 · ✶

Sultan Suleiman: s06ep349

                                        ···
                                        :

STAR CABLE0170

On air: Monday, October 23 at 7:30pm and 10:00pm.
Please keep eyes on Total Cablebd and enjoy all your favorite programs!
#totalcablebd



59 Views

👍 Like          💬 Comment          ↪ Share

👍❤ 6

Write a comment...                    😊 📷 🎞 🎁

**Total Cablebd**
September 23, 2017 · 🌐

Did you check out our Video On Demand feature?
If not, check it out today and explore the new world of entertainment with
high quality contents of your favorite!
#totalcablebd

👍 Like          💬 Comment          ↪ Share

👍 4

Write a comment...                    😊 📷 🎞 🎁 ;

**Total Cablebd**
September 12, 2017 · 🌐

দীর্ঘ মেগা সিরিয়াল: শালুকী
শনিবার থেকে বৃহস্পতিবার। সন্ধ্যা ৭:০০ মিনিট ও রাত ৯:০০ মিনিট (শুক্রবার হাবা)
Tune to Total Cablebd and enjoy Bangladeshi Mega Serials!
#totalcablebd
See Translation

STAR CABLE0171



77 Views

👍 Like          💬 Comment          ↗ Share

3

Write a comment...          😊 📷 🖼 💬

**Total Cablebd**
September 4, 2017 · ❄

Bangladesh vs Australia Second Test Match Update!
Tune to Total Cablebd and watch your favorite sports LIVE!
#totalcablebd

126 Views

👍 Like          💬 Comment          ↗ Share

3

Write a comment...          😊 📷 🖼 💬

**Total Cablebd**
August 31, 2017 · ❄

সবারিক ঈদের হ্যাভভশা ঈদ মোবারক।
এই ঈদ চোখ রাখুন টিবিএস ২৪ এর পর্দায়।

ঈদ অনুষ্ঠানে যুক্ত সাকিব। চোখ রাখুন ঈদের দিন রাত ৮০৪০০ টায়া।... See More
See Translation

STAR CABLE0172

65 Views

👍 Like          💬 Comment          ↪ Share

😊 4

Write a comment...          😊 📷 📹 🎁

**Total Cablebd**
August 28, 2017 · ☀

অস্ট্রেলিয়ার ৫০তম টেস্ট অ্যাভেঞ্চারের রাঙিত তুলবেন যারা

Watch Bangladesh vs Australia's 1st Test match only on Total Cablebd and enjoy the actions of the Tigers!
#totalcablebd

See Translation

271 Views

👍 Like          💬 Comment          ↪ Share

😊 3

Write a comment...          😊 📷 📹 🎁

**Total Cablebd** updated their cover photo.
August 28, 2017 · ☀

👍 Like          💬 Comment          ↪ Share

😊 4

STAR CABLE0173



Write a comment...

**Total Cablebd**
August 22, 2017 ·

Eid Program Schedule for Deepto TV.
Get your Total Cablebd subscription today and enjoy Eid Programs!
Call us today at (718)-777-6666 and get your service.
#totalcablebd

43 Views

👍 Like        💬 Comment        ➤ Share

**Total Cablebd**
August 13, 2017 ·

Musical show Deepto Provati, every day (except Friday) at 9:30 PM EST.
Tune to Total Cablebd and enjoy the musical program!
#totalcablebd

86 Views

👍 Like        💬 Comment        ➤ Share

💙 2

Write a comment...

**Total Cablebd**
August 11, 2017 ·

এখন আর টাকা কিংবা চ্যাম্পিয়নশিপের লক্ষ্য নিয়ে গলফ কোর্স নামবেন সিদ্দিকুর
রহমান। নামেন লাল সবুজের প্রতিনিধিত্ব করার গৌরব নিয়ে আগামী বছর গলফ বিশ্বকাপ
তার অংশ নেয়া প্রায় নিশ্চিত জানিয়েছেন সিদ্দিক।
এখন আর টাকা কিংবা চ্যাম্পিয়নশিপের লক্ষ্য নিয়ে গলফ কোর্স নামবেন সিদ্দিকুর
রহমান। নামেন লাল সবুজের প্রতিনিধিত্ব করার গৌরব নিয়ে আগামী বছর গলফ বিশ্বকাপ
তার অংশ নেয়া প্রায় নিশ্চিত জানিয়েছেন সিদ্দিক।

STAR CABLE0174



Get latest Bangladeshi Sports update by tuning on Channel 24 at Total Cablebd. Subscribe today by calling us at (718)-777-6656 and get your service anywhere in North America.
#totalcablebd

See Translation

135 Views

👍 Like      💬 Comment      ➦ Share

👍 5

Write a comment...                    ☺ 📷 🎬 🎁

**Total Cablebd**
August 9, 2017 · ✦

শীঘ্র দেখা মিরিয়ালঃ মালঙ্কী
শনিবার (থেকে বৃহস্পতিবার ) সকাল ৭:০০ মিনিটে ও রাত ৯:০০ মিনিটে

Don't forget to tune Total Cablebd's Bangladeshi Channels for quality entertainment!
#totalcablebd

See Translation

90 Views

👍 Like      💬 Comment      ➦ Share

👍 2

Write a comment...                    ☺ 📷 🎬 🎁

STAR CABLE0175



**Total Cablebd**
July 30, 2017 · ✿

ধারাবাহিক নাটক Aparajitai প্রতিদিন সন্ধ্যা ৬:৩০ মিনিট ও রাত ৮:৩০ মিনিট (রিপ্রচার ছাড়া)।

Tune to Total Cablebd and enjoy all Bangladeshi TV Channels!
#totalcablebd

See Translation

71 Views

👍 Like        💬 Comment        ➤ Share

👍 2

Write a comment...        😊 📷 📹 💬

**Total Cablebd**
July 22, 2017 · ✿

Do not miss any sports news by subscribing to Total Cablebd.
Call us today at (718)-777-6566 and get your service tomorrow!
#totalcablebd

104 Views

👍 Like        💬 Comment        ➤ Share

👍 2

Write a comment...        😊 📷 📹 💬

STAR CABLE0176



**Total Cablebd**
July 19, 2017 ·

ধারাবাহিক নাটক Palki! শনিবার থেকে বৃহস্পতিবার। সকাল ৭:০০ মিনিট ও রাত ৮:০০ মিনিট।

Don't forget to tune Deepto TV from your Total Cablebd box!
#totalcablebd
See Translation

60 Views

👍 Like          💬 Comment          ➤ Share

👍 1

( Write a comment...                          😊 📷 🎬 👾 )

**Total Cablebd**
July 17, 2017 ·

Sultan Suleiman, season 5.
Daily (except Friday): 7:30pm and 10:00pm.
Keep eyes on Total Cablebd and enjoy quality Bangla Entertainment!
#totalcablebd

101 Views

👍 Like          💬 Comment          ➤ Share

👍 1

Write a comment...                          😊 📷 🎬 👾

**Total Cablebd**
July 14, 2017 ·

Do you know that Total Cablebd has a rich library of Movies and Drama
including Cartoon in their Video-On-Demand Library?

STAR CABLE0177



Get your Total Cablebd subscription today and enjoy everyday updated library of your favorite entertainment without any ad!
#totalcablebd

## Video On Demand

👍 Like          💬 Comment          ↪ Share

👍 1                                              Top Comments ▾

Write a comment...                          ☺ 📷 📹 🎁

**Labiq Jalgirdar** We do not have Video On Demand on our system.

Like · Reply · 39w

> **Total Cablebd** Dear Mr. Jalgirdar,
> Thanks for letting us know your concern. We surely do have a solution for that. Please provide us with your contact number in our inbox, and we will show you how to access Video On Demand in your service. Thanks for being with us.
>
> Like · Reply · 39w

**Total Cablebd**
July 10, 2017 · ✦

নর্থ কোরিয়ার ছোড়া আন্তমহাদেশীয় ক্ষেপণাস্ত্র প্রতিরোধ করতে, থাড প্রযুক্তি ব্যবহার করবে, আ্যামেরিকা। প্রত্যকবার মিসাইল ডিফেন্স এবং এই তথ্যটি নিশ্চিত করা। এদিক, জি-২০ সাম্মেলন চীনের প্রেসিডেন্ট শি জিনপিং একই ইঙ্গিত দেন, প্রেসিডেন্ট ডনাল্ড ট্রাম্প। অপরদিকে, দক্ষিণ চীন সাগরের বিরোধপূর্ণ অঞ্চলে, আ্যামেরিকার শক্ত অবস্থানের জানান দিতে, করেকটি রোমাক্ত ক্ষিপ্র মহড়া দিয়েছে।

To get more local and international news, watch TBN24 by subscribing Total Cablebd
#totalcablebd

See Translation

161 Views

👍 Like          💬 Comment          ↪ Share

😍 5

Write a comment...                          ☺ 📷 📹 🎁

STAR CABLE0178

**Total Cablebd**
July 6, 2017 · ⚄

Blast from the past.
Deepto Music Fest.
Friday, July 7 at 4:30pm and 10:00pm.
Don't forget to subscribe Total Cablebd and enjoy Quality Entertainment!
... See More

89 Views

👍 Like          💬 Comment          ↗ Share

🖒 2

Write a comment...          ☺ 📷 🎞 🎁

**Total Cablebd**
July 2, 2017 · ⚄

Sultan Suleiman.
Saturday to Thursday.
7:30pm and 10:00pm.
Tune to Total Cablebd and enjoy quality entertainment!
#totalcablebd

48 Views

👍 Like          💬 Comment          ↗ Share

🖒 2

Write a comment...          ☺ 📷 🎞 🎁

**Total Cablebd**
June 27, 2017 · ⚄

ঈদ উল ফিতর '১৭ উপলক্ষে দীর্ঘ ফিল্ডির তিন দিন ব্যাপী আয়োজন
|||| ঈদের তৃতীয় দিন ||||

STAR CABLE0179

৮:৩০মি – ৯:০০মি: আমাদের হরি আমাদের গান । গহীমণি, জায়েদ খান/বাপ্পি
৯:৩০মি – ১২:৩০মি: চলকিত, তুমি স্বর ভূমি সাধনা । শাকিব খান, অপু বিশ্বাস
১২:৩০মি – ১:৩০মি: আমাদের হরি আমাদের গান । গহীমণি, জায়েদ খান/বাপ্পি...
See More
See Translation



70 Views

👍 Like          💬 Comment          ↪ Share

👍 3

Write a comment...          😊 📷 🎬 🎁 )

**Total Cablebd**
June 25, 2017 · 🌐

Eid Mubarak!

👍 Like          💬 Comment          ↪ Share

👍 1

Write a comment...          😊 📷 🎬 🎁 )

**Total Cablebd**
June 24, 2017 · 🌐                                              •••

নাটিকঃ রেড রোজ
দেখাবে ঈদের দিন সন্ধ্যা ০৭০১০০ টায় চিত্রিএন24 -এ

Please subscribe Total Cablebd today and enjoy Eid Programs with
friends and family. Call us today at 718-777-6666 and get your Total
Cablebd Service!... See More
See Translation

STAR CABLE0180

ঈদ মোবারক

71 Views

Like Comment Share

4

Write a comment...

**Total Cablebd**
June 23, 2017 ·

Ekti Biral Birombona (prequel of Arekti Biral Birombona).
On-air: June 24 and June 25.
5:15pm

Tune to Total Cablebd for your Eid Entertainment!... See More

229 Views

Like Comment Share

6

Write a comment...

**Total Cablebd**
June 22, 2017 ·

৬ পর্বের ধারাবাহিকঃ থাই বিশেষ-অজ্ঞ গণ..
গল্পঃ সাজু খাদেম
চিত্রনাট্য ও পরিচালনাঃ মুহাম্মদ মোস্তফা কামাল রাজ
অভিনয়েঃ তৌকির আহমেদ, ফারিয়া আহমেদ, আরফান আহমেদ, সাজু খাদেম, মিশু সাব্বির, তাওসিফ মাহবুব, সাফা কবির, শবনম ফারিয়া প্রমুখ।
প্রচারঃ এসএ টিভি... See More
See Translation

STAR CABLE0181



70 Views

👍 Like          💬 Comment          ➤ Share

👍😊 4

Write a comment...

**Total Cablebd**
June 21, 2017 · 🌐

|| থাকুন আমাদের সাথ্য ||
ঈদ উল ফিতর উপলক্ষে চিত্র চিত্রিত তিন দিন ব্যাপী "প্রোগ্রাম" আয়োজন:
এখন দেখ সময় ভালোবাসার . . . [১২টি নাটকের সংকলন্য]
বিকাল ৫:০০মি - রাত ১:০০মি

See More

See Translation

69 Views

👍 Like          💬 Comment          ➤ Share

😊 3

Write a comment...

**Total Cablebd**
June 18, 2017 · 🌐

"ফুল কোটালদের খেলা" আসছে আয়ানাবাড়ি অরিজিনাল সিরিজ! ঈদের প্রথম দিন রাত
৮টায় ৩ চ্যানেলে এক যোগে !

Subscribe Total Cablebd today to enjoy Eid Entertainment! Call us at 718-
777-6666 to get your service before Eid!

#totalcablebd #EidUlFitr

See Translation

STAR CABLE0182



43 Views

👍 Like          💬 Comment          ↪ Share

Total Cablebd shared a post.
June 16, 2017 · ✿                                                    ···

TBN24
June 14, 2017 · ⊕                              👍 Like Page
www.youtube.com/Tbn24usa

# TBN24

TBN24
"THE GLOBAL VOICE OF NON RESIDENT BENGALI."
YOUTUBE.COM

👍 Like          💬 Comment          ↪ Share

Total Cablebd
June 14, 2017 · ✿                                                  ···

Are you ready for the exciting match between Bangladesh and India tomorrow at 5:30 AM EST.

Total Cablebd's Sports will broadcast this match LIVE!

#totalcablebd #BangladeshVsIndia #BDvsIND #BangladeshTigers

👍 Like          💬 Comment          ↪ Share

⊕ 5

Write a comment...                                      ☺ ⊡ ⊞ ⊟

Total Cablebd
June 13, 2017 · ✿                                                  ···

শেষ হলে ফিক্চর ২০১৭

STAR CABLE0183

শ্রীদের জিপগ ধারাবাহিক নাটক- রুসাগান্ধা
দোখাবেন ঈদের দিন থেকে ঈদের ৭ম দিন পর্যন্ত সন্ধ্যা ০৭.২৫ মিনিট

Subscribe Total Cablebd today to enjoy quality Eid Programs!... See More
See Translation



93 Views

👍 Like          💬 Comment          ↪ Share

👍 3

( Write a comment...                      ☺ 📷 🔲 🎁 )

Total Cablebd
June 0, 2017 · ✳

Congratulations Bangladesh for stunning win against New Zealand!
#totalcablebd #BDvsNZ #BangladeshTigers



STAR CABLE0184



STAR CABLE0185

👍 Like      💬 Comment      ↪ Share

❶ 6

Write a comment...        😊 📷 🖼 🎞

**Total Cablebd**
June 7, 2017 · 🌐

Don't forget to subscribe Total Cablebd to watch Champions Trophy!
Call us at +1(718)-777-6566 today and enjoy the Cricket Madness!
#BangladeshTigers #totalcablebd

## Standings

### Group A

| Pos | Team | P | NRR | Pts |
|---|---|---|---|---|
| 1 | England | 2 | 1.06 | 4 |
| 2 | Australia | 2 | 0.00 | 2 |
| 3 | Bangladesh | 2 | -0.40 | 1 |
| 4 | New Zealand | 2 | -1.74 | 1 |

### Group B

| Pos | Team | P | NRR | Pts |
|---|---|---|---|---|
| 1 | India | 1 | 3.02 | 2 |
| 2 | South Africa | 1 | 1.92 | 2 |
| 3 | Sri Lanka | 1 | -1.92 | 0 |
| 4 | Pakistan | 1 | -3.02 | 0 |

👍 Like      💬 Comment      ↪ Share

❶ 10

Write a comment...        😊 📷 🎞 🎮

**Total Cablebd**
June 6, 2017 · 🌐

Bangladesh vs Australia today sharp at 8:30 AM EST.
Tune to Total Cablebd's Sports channel for LIVE Match and enjoy the
battle of Tigers and Aussies!

#totalcablebd #BangladeshvsAustralia #BDvsAUS #BangladeshTigers
#BangladeshCricket #CricketAustralia

https://www.facebook.com/pg/TotalCable/posts/

STAR CABLE0186



👍 Like          💬 Comment          ↪ Share

👍 4

Write a comment...          😊 📷 🎦 🎁

**Total Cablebd**
June 3, 2017 · 🌐

ধারাবাহিক নাটিক "সাগর মধুতে" দেখুন এশিয়ান টিভিতে প্রতি মঙ্গলবার থেকে শুক্রবার রাত ৮ টায়

Please subscribe Total Cablebd today and enjoy all Bangladeshi Channels!

#totalcablebd

See Translation

141 Views

👍 Like          💬 Comment          ↪ Share

**Total Cablebd**
June 1, 2017 · 🌐

Bangladesh is facing England in the First Champions Trophy ODI sharp at 5:30 AM Eastern Time.

Tune to Total Cablebd Sports Channel to watch the LIVE Match!

#totalcablebd #BDvsEng #BangladeshTigers #Cricket

STAR CABLE0187



👍 Like          💬 Comment          ↪ Share

👍 3                                      Top Comments ▾

Write a comment...                    ☺ 📷 🎞 🎁

Abujh Balok Temim শিব্ক লাখাুর?
Like · Reply · See Translation · 46w

Total Cablebd shared a Page.
May 31, 2017 · ⚙

In this Ramadan, tune AD Deen for Islamic Programs and ask questions and learn more about Islam.

And subscribe AD Deen today for LIVE and Snippets of programs!
#totalcable

AD Deen                          AD-DEEN
TV Channel

113 Likes
2 talking about this              👍 Like Page

👍 Like          💬 Comment          ↪ Share

👍 1

Write a comment...                    ☺ 📷 🎞 🎁

Total Cablebd
May 26, 2017 · ⚙

Deepto Shohoj Iftar.

Tune to Total Cablebd and enjoy iftari-cooking programs!
#totalcablebd

STAR CABLE0188



100 Views

👍 Like          💬 Comment          ➦ Share

**Total Cablebd**
May 21, 2017 · 🌐

'লেব থেকে হতে' | শীঘ্র মিনি সিরিয়াল (৬ পর্বের ধারাবাহিক)
দেখাবেন ২০ মে থেকে ২৫ মে
সন্ধ্যা ৬.০০ মিনিট ও রাত ৯.৩০ মিনিট
প্রধ্যমাত্র শীঘ্র টিভিতে... See More
See Translation

103 Views

👍 Like          💬 Comment          ➦ Share

🔵 1

| Write a comment...                    😊 📷 😀 🖼

**Total Cablebd**
May 17, 2017 · 🌐

Bangladesh vs New Zealand LIVE in Tri-Nation series!

Tune Total Cablebd's Sports Channels and enjoy the LIVE Battle of Tigers
and Kiwis!

#totalcablebd #BangladeshTiger #BangladeshCricket #BDvsNZ

**Bangladesh vs New Zealand**
ODI
Live
Clontarf Cricket Ground

| | | |
|---|---|---|
| 🏏 Bangladesh | VS | New Zealand 🏏 |
| 160/4 (34.2) | Live | Yet to bat |

All times are in Eastern Time

👍 Like          💬 Comment          ➦ Share

See More ▼

Final.

STAR CABLE0189

**Total** CABLEBD

*(/)* Watch All Your Favorite TV Shows Movies Channels Music Videos Sports

Home (/)    About (http://totalcablebd.com/#about)    **Video** (http:/.

Channels (http://totalcablebd.com/#channels)    **Radio** (http://tota

International TV (http://totalcablebd.com/#international)

**Cut the Cord for only** $29.99 /mo

FAQ'S (http://totalcablebd.com/#question)

NO CONTRACTS, NO HIDDEN FEES.

CANCEL ANYTIME

Watch current episodes, full seasons, hit movies and live channels all in one place.

**Join millions today.**

The Total Cable BD Guide Brings Together:

- Video on Demand
- **Unlimited** Movies
- Pay Per View
- Radio Stations
- Premium Add-ons
- **250+ Live Channels**
- & More



**Cut your cable and save up to $2400 a year.**

Watch anytime, anywhere.

Order Now (/registration) Additional payment or subscription may be required.

Broadcasters may alter or replace live and pre-programmed content at their discretion.

## What is Total Cable BD?

Total Cable BD is the online cable TV alternative, bringing together TV shows, movies, live channels, radio stations and more from over many countries, all in one place, on every device.

STAR CABLE0190



Order Now (/registration)



## Watch Unlimited Video On Demand

Watch your favorite movies, TV shows, and web videos on your terms: any episode, anytime, anywhere, on-demand!

**Order Now (/registration)**

STAR CABLE0191

# Enjoy 250+ Live & Curated Channels

Watch the latest episodes from top networks like ABC, NBC, CBS, History, A&E and many more.

**Channel List (/channels)**





# World Radio Stations

Total Cable BD features live streams of web-based and terrestrial radio stations. Don't let location limit you to what's on the radio dial. Find a radio station that matches your taste in music or tune in to a local station that you love.

**Order Now (/registration)**

STAR CABLE0192

# Get the Latest Box Office Hits & More

From the top TV hits to the latest big screen blockbusters, with Total Cable BD video-on-demand, there's no limit to what you can watch. With price comparisons to digitally rent or purchase TV shows and movies from all the major providers, you'll always be sure you're getting the best price on content you can watch on your device of choice.

**Order Now (/registration)**





# International TV Channels & More

Broaden your horizons with thousands of on-demand TV shows, movies, channels, videos and more from over many countries around the world.

**Order Now (/registration)**

STAR CABLE0193

# Whatever your sport, We've Got You Covered.

With Total Cable BD, you'll have access to a full calendar of live events, sports, concerts, and more, all streamed live via the web. Catch the as-it-happens action or that live performance feel, right in your living room.



**Order Now (/registration)**

# Frequently Asked Questions

— What kind of content is available through Total Cable BD?

Total Cable BD pulls all kinds of entertainment content from all over ther web into one easy-to-use guide, so you can quickly find what you're looking for, or get recommendations on what to watch. The Total Cable BD content library includes over half a million TV shows, movies, channels, live sports, events, news, music videos, radio stations, viral videos, games, world channels, and much more, all in one place.

+ What devices can I watch Total Cable BD on?

+ How do I connect Total Cable BD to my TV?

+ What kind of system specifications does my computer need to enjoy Total Cable BD?

+ Do I need multiple account logins for different devices?



STAR CABLE0194



STAR CABLE0195

# OUR CHANNEL



Disney Channel



Nickelodeon



Cartoon Network



Eurosports HD



AYM Sports



Animal Planet



Discovery Channel



National Geographic



One America News



CNN



History



TNT Serie HD



FX



Food Network



A&E



Bloomberg Television



HG TV



Channel i




Rtv



Boishakhi TV



Ekattor TV



Independent

Jamuna TV



Channel 24

STAR CABLE0196



My TV



ATN Bangla



ATN Music



Gaanbangla TV



Asian TV



ATN Bangla UK



SATV



BTV



BTV World



S Bangla



ATN Islamic TV



ATN News



TBN 24



TBN Music



TBN Cinema



TBN Weather



ITV 24



Peace TV



Peace TV Bangla



Guide US TV



Iqra TV Bangla



Huda TV



Al Quran



Quran Bangla



Al Madina



Al Mahabba

STAR CABLE0197

# NEWS CHANNELS



One America News



Fox News Channel



CNN



ATN News

(/)

ekattor tv

Ekattor TV





Independent

Home (/)  **About** (http://totalcablebd.com/#about)  **Video** (http:/.

**Channels** (http://totalcablebd.com/#channels)  **Radio** (http://tota

**International TV** (http://totalcablebd.com/#international)

**FAQ'S** (http://totalcablebd.com/#question)

# ISLAMIC CHANNELS



ITV 24



Peace TV



Peace TV Bangla



Guide US TV





Huda TV



Quran Tv Soudi



STAR CABLE0198

Iqra TV Bangla            Huda TV            Al Quran          Quran Bangla



Al Madina          Al Mahabba

# SERIES

   

S Bangla          TNT Serie HD

# MUSIC CHANNELS

      

TBN Music          ATN Music          S Bangla

2

STAR CABLE0199

# KID'S CHANNELS

 

Cartoon Network



Nickelodeon



Disney Channel



http://totalcablebd.com/channels

4/19/18, 11:26 AM
Page 6 of 6

STAR CABLE0200



STAR CABLE0201



*(/)* 
# Total Cable BD is the future of online TV.



Please fill up the required information below to Video (http:/. confirm your order.

**Home** (http://totalcablebd.com/#away) to **Video** (http:/.

**Channels** (http://totalcablebd.com/#channels)   **Radio** (http://tota

**International TV** (http://totalcablebd.com/#international) A\

**FAQ'S** (http://totalcablebd.com/#question)

State and Zip Code                 Home/Business Phone Num

Cell Phone Number                  Internet Provider

Internet Speed                     How did you hear about us

Comment / Note

Submit Order



STAR CABLE0202



totalcablebd.com WHOIS domain registration information fro...

STAR CABLE0203
http://www.networksolutions.com/whois/results.jsp?domain=tot...

# network solutions·

## Sorry, someone else already owns this domain, but we can help you get it.

Backorder for:
totalcablebd.com ...................................................

Backorder

For only $10.00, we can help you get this domain. Here's how it works:

    We'll negotiate for you anonymously with whoever currently owns the domain.

    If the owner of the domain isn't ready to sell yet, we will watch it every day to see when it becomes available.

    If the owner doesn't renew, we'll get it for you before it becomes available to the general public.

---

totalcablebd.com

Is this your domain name? Renew it now.

```
Domain Name: TOTALCABLEBD.COM
Registry Domain ID: 1938827466_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2015-06-15T17:08:21Z
Creation Date: 2015-06-15T17:08:21Z
Registrar Registration Expiration Date: 2020-06-15T17:08:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#client
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUp
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRen
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDe
Registry Registrant ID: Not Available From Registry
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: +1.6464740418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Registry Admin ID: Not Available From Registry
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
```

8/17/16, 9:42 AM

totalcablebd.com WHOIS domain registration information fro...                http://www.networksolutions.com/whois/ARGDASGLXXROmain=tot...

```
Admin Phone: +1.6464740418
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: info@totaltvs.com
Registry Tech ID: Not Available From Registry
Tech Name: Habib Rahman
Tech Organization: Total Tvs
Tech Street: 15 westmoylan ln
Tech City: coram
Tech State/Province: New York
Tech Postal Code: 11727
Tech Country: US
Tech Phone: +1.6464740418
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: info@totaltvs.com
Name Server: NS31.DOMAINCONTROL.COM
Name Server: NS32.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.inte
>>> Last update of WHOIS database: 2016-08-17T13:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden witho
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In part
you agree not to use this data to allow, enable, or otherwise make poss
dissemination or collection of this data, in part or in its entirety, f
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electr
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

totalcablehd.com WHOIS domain registration information fro...

STAR CABLE0205
http://www.networksolutions.com/whois/results.jsp?domain=tot...



Stone Siding - Quartzite Finished
Slate Collection Quartzite
Finished Slate - Bermuda Green /
Ledge Stone 6"x24

## $4.59 Sq ft

View Now

Search Again



Search again here...

Search by either

⊘ Domain Name e.g. networksolutions.com
○ IP Address e.g. 205.178.187.13

Search

totalcablebd.com WHOIS domain registration information fro...          http://www.networksolutions.com/whois/results.jsp?domain=tot...





$0.79 Sq ft

View Now

The price includes a one-time, non-refundable set-up fee and
annual subscription fee for the Service per each domain name
requested for backorder. Network Solutions reserves the right
to waive or discount the set-up fee at any time. The price does
not include the cost of the actual domain name. If the domain
name is acquired, the cost of the one-year domain name
registration will be charged to your credit card or other
payment method on file. Network Solutions does not
guarantee that you will obtain the domain name through this
Service.

STAR CABLE0207

Entity Information                                    https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENT...

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 16, 2016.

Selected Entity Name: LALON TV INC.
Selected Entity Status Information

**Current Entity Name:** LALON TV INC.
**DOS ID #:** 3848817
**Initial DOS Filing Date:** AUGUST 25, 2009
**County:** SUFFOLK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
LALON TV INC.
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Chief Executive Officer**

AHMODUL K BAROBHUIYA
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Principal Executive Office**

LALON TV INC.
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Registered Agent**

NONE

STAR CABLE0208

Entity Information

https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENT...

This office does not record information regarding
the names and addresses of officers, shareholders
or directors of nonprofessional corporations except
the chief executive officer, if provided, which
would be listed above. Professional corporations
must include the name(s) and address(es) of the
initial officers, directors, and shareholders in the
initial certificate of incorporation, however this
information is not recorded and only available by
viewing the certificate.

### *Stock Information

**# of Shares  Type of Stock  $ Value per Share**
200          No Par Value

*Stock information is applicable to domestic business corporations.

### Name History

**Filing Date    Name Type    Entity Name**
AUG 25, 2009  Actual        LALON TV INC.

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in
New York State. The entity must use the fictitious name when conducting its activities or business in
New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results  New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS
Homepage  |  Contact Us

STAR CABLE0209

# Whois Search Results

totalcable.nyc     Q

### Whois lookup for totalcable.nyc

*i* DNS Records

```
Domain Name: totalcable.nyc
Domain ID: D1912929-NYC
WHOIS Server:
Referral URL: whois.godaddy.com
Updated Date: 2015-06-15T17:08:12Z
Creation Date: 2015-06-15T17:08:12Z
Registry Expiry Date: 2017-06-14T23:59:59Z
Sponsoring Registrar: GoDaddy.com, Inc.
Sponsoring Registrar IANA ID: 146
Domain Status: clientDeleteProhibited https://icann.org/epp#clientDeleteProhibited
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited https://icann.org/epp#clientRenewProhibited
Registrant ID: C1912925-NYC
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant Street:
Registrant Street:
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: +1.6464740418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Admin ID: C1912927-NYC
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin Street:
Admin Street:
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
Admin Phone: +1.6464740418
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: info@totaltvs.com
Tech ID: C1912926-NYC
Tech Name: Habib Rahman
Tech Organization: Total Tvs
Tech Street: 15 westmoylan ln
Tech Street:
Tech Street:
Tech City: coram
Tech State/Province: New York
Tech Postal Code: 11727
Tech Country: US
Tech Phone: +1.6464740418
```

STAR CABLE0210

```
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: info@totaltvs.com
Name Server: ns31.domaincontrol.com
Name Server: ns32.domaincontrol.com
DNSSEC: unsigned
nyc ID: C1912924-NYC
nyc Name: Habib Rahman
nyc Organization: Total Cable
nyc Street: 3719 57th ST
nyc Street:
nyc Street:
nyc City: Woodside
nyc State/Province: NY
nyc Postal Code: 11377
nyc Country: US
nyc Phone: +1.6464740416
nyc Phone Ext:
nyc Fax:
nyc Fax Ext:
nyc Email: hrahman81@gmail.com
nyc Nexus Category: ORG
>>> Last update of WHOIS database: 2017-05-29T20:26:46Z <<<
```

For more information on Whois status codes, please visit https://icann.org/epp

The WHOIS service offered by Neustar, Inc, on behalf of the City of New York, the Registry Operator for .nyc, and the access to the records in the .nyc WHOIS database are provided for information purposes only and is designed to assist persons in obtaining information related to the registration records of existing domain names. Neither Neustar nor the City can, under any circumstances, be held liable in such instances where the stored information would prove to be wrong, incomplete, or not accurate in any sense. By submitting a WHOIS query, you agree that you will not use this data: (i) to allow, enable or otherwise support in any way the transmission of unsolicited, commercial advertising or other solicitations whether via direct mail, email, telephone or otherwise; (ii) to enable high volume, automated, electronic processes that apply to the registry (or its systems ); (iii) for target advertising in any possible way; (iv) to cause nuisance in any possible way to the registrants by sending (whether by automated, electronic processes capable of enabling high volumes or other possible means) messages to them; (v) to violate any law, rule, regulation or statute; and/or (vi) in contravention of any applicable data and privacy protection acts. Without prejudice to the above, it is explicitly forbidden to extract, copy and/or use or re-utilize in any form and by any means (electronically or not) the whole or a quantitatively or qualitatively substantial part of the contents of the WHOIS database without prior and explicit permission by Neustar or the City of New York, nor in any attempt hereof, or to apply automated, electronic processes to Neustar (or its systems). You agree that any reproduction and/or transmission of data for commercial purposes will always be considered as the extraction of a substantial part of the content of the WHOIS database. By utilizing this website and/or submitting a query you agree to abide by this policy and accept that Neustar, can take measures to limit the use of its WHOIS services in order to protect the privacy of its registrants or the integrity of the database. We reserve the right to make changes to the Website, the Service(s) and these Terms and Conditions at any time without prior notice to you. It is your responsibility to review these Terms and Conditions each time you access or use the Website and/or Service(s) to keep apprised of any changes. If you do not agree to the changes implemented by Neustar, your sole and exclusive remedy is to terminate your use of the Website and/or Service(s).

By executing a query, in any manner whatsoever, you agree to abide by these Terms and Conditions.

Learn more about your favorite domains:

orologi-rolex.com (/whois/orologi-rolex.com)
xn--rh1s45bwtlsgjt0a.mobi (/whois/xn--rh1s45bwtlsgjt0a.mobi)
ikkr.nu (/whois/ikkr.nu)
saintjo-laroche.info (/whois/saintjo-laroche.info)
scharhak.info (/whois/scharhak.info)
insura-sync.info (/whois/insura-sync.info)
insurasync.info (/whois/insurasync.info)
eurodental.pro (/whois/eurodental.pro)

STAR CABLE0211

equipofutucam.org (/whois/equipofutucam.org)
h-salon.mobi (/whois/h-salon.mobi)
hunefalk.org (/whois/hunefalk.org)
takislazopoulos.info (/whois/takislazopoulos.info)
accentrfid.com (/whois/accentrfid.com)
clubberstore.com (/whois/clubberstore.com)
bodybasicshairbasics.com (/whois/bodybasicshairbasics.com)
legalbrazil.biz (/whois/legalbrazil.biz)
madaweb.org (/whois/madaweb.org)
royvizercreative.com (/whois/royvizercreative.com)
elliott-johnson.com (/whois/elliott-johnson.com)
breakingnewsandsport.com (/whois/breakingnewsandsport.com)
gepple.org (/whois/gepple.org)
radioshalomhaiti.com (/whois/radioshalomhaiti.com)
rynn.info (/whois/rynn.info)

See more domains (/whois-index)

Total Cable I Building and delivering broadcast networks worldwide

STAR CABLE0212
http://totalcableusa.com/channels

📞 1-212-444-8138  | ✉ Info@totalcablebd.com          Log in (/login)  | Service Order (/customerSignup)

 (/)



# TOTAL CABLE CHANNELS PACKAGE

### REQUIRES 4MB MINIMUM BANDWIDTH FOR ALL CHANNELS.



Including all European and American Sports.



Including the Latest Movie, Drama, Comedy.

| | | | | | |
|---|---|---|---|---|---|
| ♛ জি বাংলা | ♛ AYM Sports | ♛ TNT Serie | 📹 Boishakhi TV | 📹 SATV | 📹 Al Ramadan |
| ♛ জি বাংলা সিনেমা | ♛ Animal Planet | HD | 📹 Ekattor TV | 📹 BTV | 📹 Peace TV |
| ♛ Zee TV HD | ♛ Discovery Channel | ♛ FX | 📹 | 📹 BTV World | 📹 Peace TV Bangla |
| ♛ Zee Bollywood | ♛ National Geographic | ♛ Food Network | Independent | 📹 S Bangla | 📹 Guide US |
| ♛ Zee Living | ♛ One | ♛ A&E | 📹 Jamuna TV | 📹 ATN Islamic TV | TV |
| ♛ ২৪ ঘন্টা | America News | ♛ Bloomberg Television | 📹 Channel 24 | 📹 ATN News | 📹 Iqra TV |
| ♛ Disney Channel | ♛ CNN | ♛ HGTV | 📹 My TV | 📹 TBN 24 | Bangla |
| ♛ Nickelodeon | ♛ History | ♛ Channel I | 📹 ATN Bangla | 📹 TBN Music | 📹 Huda TV |
| ♛ Cartoon Network | | ♛ Rtv | 📹 ATN Music | 📹 TBN Cinema | 📹 Al.Quran |
| ♛ Eurosports HD | | | 📹 Gaanbangla TV | 📹 TBN Weather | 📹 Quran Bangla |
| | | | 📹 Asian TV | 📹 ITV 24 | 📹 Al Madina |
| | | | 📹 ATN Bangla UK | | 📹 Al Mahabba |



Always be up-to-date with live news channels from around the world.

Total Cable | Building and delivering broadcast networks worldwide          http://totalcablebd.com/channels



📞 ২৪ ঘন্টা
1-212-444-8138
🔊 Ekattor TV

📶 One
✉ info@totalcablebd.com
America News

📶 Fox News
Channel

📶 CNN
Log in (/login)

📶 ATN News
Service Order (/customerSignup)

(/)

──── দেশী আইটিভি অপারেটর ────

## ☾ ISLAMIC CHANNELS

Lead your life according to the teaching of the Quran and Sunnah.

| | | | | | |
|---|---|---|---|---|---|
| ☆ ITV24 | ☆ Quran | ☆ Peace TV | ☆ Al Ramadan | ☆ Al Mahabba | ☆ Iqra TV |
| ☆ Al Quran | Bangla | ☆ Peace TV | ☆ Al Madina | | Bangla |
| | ☆ Guide US | Bangla | | | |

 SERIES

Stay connected with
latest Bengali and
English TV series

 MUSIC CHANNELS

Both Bengali and English
and other other music.

 KID'S CHANN

Keep your kid:
entertained w
cartoons chan

| | | | | | |
|---|---|---|---|---|---|
| 🎬 ছি বাংলা | 🎬 ছি বাংলা | ⊙ TBN Music | ⊙ Zee TV HD | 🎭 Cartoon | 🎭 Disney |
| 🎬 S Bangla | সিনেমা | ⊙ ATN Music | ⊙ S Bangla | Network | Channel |
| | 🎬 TNT Serie | ⊙ Gaanbangla | ⊙ Zee | 🎭 | |
| | HD | TV | Bollywood | Nickelodeon | |

## About us

Total Cable USA is leading IPTV providers
to the Bangladeshi community in the USA
and Canada. We are a consumer
technology and Services Company based
in Bangladesh, committed to delivering
Live and On-Demand content to viewers

# EXHIBIT F

1

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5  STAR CABLE NA, INC.,

6                                    Plaintiff,

7              -against-

8  TOTAL CABLE USA, LLC and 1STOPMEDIA AND

9  ENTERTAINMENT, INC. d/b/a RADIANT IPTV,

10  ABC, INC., XYZ CORP. and JOHN DOES 1-10,

11                                    Defendants.

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13

14

15                          June 18, 2018
                            10:30 a.m.

16                          500 North Broadway
                            New York, New York

17

18          EXAMINATION OF SYED S. AHMED, a

19  witness on behalf of TOTAL CABLE USA, LLC,

20  one of the Defendants in the above-entitled

21  action, held at the above date, time and

22  place, pursuant to Subpoena, taken before

23  Holly Daloia Osteen, a Reporter and Notary

24  Public of the State of New York.

25

ON TIME COURT REPORTING
516-535-3939

*Syed S. Ahmed*

47

1

2     Q.    At the time you filed or Total

3     Cable filed for bankruptcy, that's Total

4     Cable LLC, did it have any assets?

5     A.    No.

6     Q.    Did you identify Asia TV and your

7     ability to broadcast Asia TV as an asset in

8     the bankruptcy?

9     A.    No.

10    Q.    Who was involved in the filing of

11    that bankruptcy?

12    A.    Me.

13    Q.    With respect to that bankruptcy,

14    was the trustee in that bankruptcy Richard

15    McCord?

16    A.    I don't remember.

17    Q.    In the context of the bankruptcy,

18    did you make any settlement payments?

19    A.    On the bankruptcy?

20    Q.    Yes.

21    A.    No.

22    Q.    Did you make any payments at all to

23    any creditors?

24    A.    No.

25    Q.    Did Total Cable LLC make any

*Syed S. Ahmed*

48

payments to any creditors?

    A.   No.

    Q.   Did they settle claims with World Cable at any point in time?

    A.   No.

    Q.   Is there a Total Cable TVS?

    A.   I don't know.  Total Cable US LLC.

    Q.   I'm not asking you that.

    I said, are you familiar with an entity known as Total Cable TVS?

    A.   No.

    Q.   You had nothing to do with the company with that description?

    A.   No.

    Q.   How about Total Cable USA, are you familiar with that entity?

    A.   Total Cable US, LLC.

    Q.   Did you create any other corporate entity other than Total Cable, LLC or USA, LLC?

    A.   No.

    Q.   What it Total Cable BD?

    A.   I don't know.

    Q.   Where are they located?

*Syed S. Ahmed*                                          50

1

2   programming or programing that emanated from

3   Bangladesh?

4

5                    MR. BHATIA:   I object.

6                    When you say "you," let's

7            clarify you to who --

8        Q.    I'm asking you personally, did you?

9        A.    No.

10       Q.    Did Total Cable or any other entity

11  that you worked for secure the rights to

12  provide programming that emanated from

13  Bangladesh?

14       A.    Total Total Cable never did the

15  business.   Total Cable never do the business.

16  It never worked out.   So we have no

17  transaction, nothing.   So I don't know like

18  -- I'm not able to answer your question.

19       Q.    Let me clarify.

20              You personally never negotiated any

21  type of contract wherein you or any company

22  you worked for enabled you or authorized you

23  to provide Bangladeshi based content over a

24  cable system, correct?

25       A.    No.

        Q.    In addition to the cable system

*Syed S. Ahmed*                                  54

1

2       Q.    No other type of electronic or

3    nonelectronic communication?

4       A.    No.

5       Q.    So it's your testimony that

6    exclusively the only communications regarding

7    Asia TV and that litigation would come

8    through your attorney or the attorneys for

9    Asia TV, correct?

10      A.    Yes.

11      Q.    How many websites does Total Cable,

12   LLC currently maintain?

13      A.    Nothing.

14      Q.    How many websites did it maintain

15   during the time prior to its bankruptcy?

16      A.    None.

17      Q.    Whether it's Total Cable USA or

18   Total Cable TVS or Total Cable BD, never had

19   a website for any of those entities?

20      A.    Not sure of other guys.  I just

21   know Total Cable, LLC don't have any website.

22      Q.    It never had?

23      A.    No.

24      Q.    And if it did, you would know?

25      A.    Sure.

*Syed S. Ahmed*

59

A.    I have checking account.

Q.    With which bank?

A.    Chase bank.

Q.    How much do you have currently in that account?

A.    Maybe 3,000.

        MR. HOGAN:   Call for production of any and all Chase bank accounts in the name of the witness.

Q.    Does Total Cable maintain any bank accounts at this point?

A.    No.

Q.    By that I mean, Total Cable, Total TVS or Total Cable BD?

A.    I don't know.

Q.    But you know that Total Cable USA, LLC doesn't have any bank accounts currently?

A.    Yes, no accounts.

Q.    Do you know what the total revenue for Total Cable were in 2012?

A.    Zero.   2012, it doesn't exist.

Q.    2013?

A.    Zero.

*Syed S. Ahmed*

60

Q.    2014?

A.    Zero.

Q.    2015?

A.    Zero.

Q.    '16?

A.    Zero.

Q.    '17?

A.    Nothing.

Q.    '18?

A.    No.

Q.    Were tax returns filed by the company?

A.    Yes.  2013, 2015 and 2016, we just dissolved the company, so no tax return for 2016.

Q.    What about 2014?

A.    We didn't file because no business, no income to tax.

Q.    Because you had to income?

A.    Uh-huh.

Q.    Once again, you have to say yes. You can't say uh-huh.

A.    Yes.

Q.    So a tax return was filed in 2013,

*Syed S. Ahmed*

66

1
2    servers to get the streams and get the
3    signals and release it.
4        Q.    How much was your CTO paid?
5        A.    He was paid nothing.
6        Q.    What services did he provide?
7        A.    He just set up the servers for us.
8        Q.    Was he a relative of yours?
9        A.    No.
10       Q.    But he worked for you for free?
11       A.    No.  It was like if it works, he
12   would get paid, but it never worked, so he
13   didn't get paid.
14       Q.    Total Cable never provided set top
15   boxes to anyone?
16       A.    No.
17       Q.    Between 2012 and 2018, did Total
18   Cable have any customers?
19       A.    No.  I have two desktops at my
20   house.  I used to have two desktops.
21       Q.    Desktops?
22       A.    Desktop computers.
23       Q.    Any other assets other than those?
24       A.    No.
25       Q.    Were you renting space for this

68

*Syed S. Ahmed*

Q.     How much was your rent?

A.     It was like $1,000.

Q.     Per month?

A.     Yeah.

Q.     Just to be clear, you have no interest or knowledge of Total Cable BD, correct?

A.     Yes.

Q.     When you were working for World Cable, did you access a customer list?

A.     No.

Q.     Did you copy a customer list?

A.     No.

Q.     Did you forward any form of electronic version of a customer list?

A.     No.

Q.     Do you currently own a home?

A.     No.

Q.     What were the source funds that were used to start TVN24?

A.     I don't know.

Q.     Did you contribute any funds to start it?

A.     No.

*Syed S. Ahmed*

77

damages?

A.     No.

MR. HOGAN:   Let's take a short break.

(Whereupon, a recess was taken at and the proceedings resumed as follows:)

BY MR. HOGAN:

Q.    When Total Cable was doing business, where did they have bank accounts?

A.    Nowhere.

Q.    How did it conduct business without bank accounts?

A.     They didn't open bank account.

Q.    How did it provide the necessary assets to acquire programming?

A.     From personal accounts.

Q.    When you say from personal accounts, these would be individuals taking money out of their own bank accounts, giving it to you or other people there in the form of cash?

A.     No.  It's like my account.  I use my money.

# EXHIBIT G

```
1                    Ahmodul K. Barobhuiya          27
2          A.    No.   I don't remember.
3          Q.    Did you submit anything to the
4    Bankruptcy Court of the United States
5    regarding -- I'll just leave it at that.
6               At any point, did you submit any
7    kind of a statement to the Bankruptcy Court
8    of the United States of America?
9          A.    No.   I have not.
10         Q.    You never represented to any court
11   of law that you had an ownership interest in
12   any company other than TBN24?
13         A.    I don't remember and I don't think
14   so that I've made any such statements in any
15   court, but I had a share in another company.
16         Q.    What was the other company that you
17   had a share in?
18         A.    Total Cable USA.
19         Q.    What percentage of ownership did
20   you have in Total Cable USA?
21         A.    Possibly 30 to 33 percent.
22         Q.    When did you acquire that degree of
23   ownership of Total Cable USA?
24         A.    I think end of 2013, possibly.
25         Q.    In connection with your partial
```

```
1                    Ahmodul K. Barobhuiya        28
2      ownership of Total Cable USA, did you ever
3      apply for a bank account or to create a bank
4      account?
5           A.    Could you complete the name of the
6      company?
7           Q.    Total Cable USA.
8           A.    USA LLC.
9           Q.    Did you apply for and create or
10     help create a bank account in the name of
11     Total Cable USA LLC?
12          A.    No.
13          Q.    Did you apply for or assist in the
14     creation of a bank account for Lalon TV?
15          A.    Yes.  At the time, working at
16     Lalon, they had different kinds of bank
17     accounts and I believe I had a bank account
18     -- I didn't have a bank account -- Lalon had
19     bank accounts but not in my name.
20          Q.    Did you apply for bank accounts on
21     behalf of Lalon TV?
22          A.    I did open bank accounts on behalf
23     of Lalon TV.
24          Q.    Which bank?
25          A.    I don't remember.
```

```
 1                    Ahmodul K. Barobhuiya          30
 2           A.     Total Cable USA LLC began business
 3     end of 2013.
 4           Q.     Who formed that company?
 5           A.     Partially Syed Ahmed, S-Y-E-D,
 6     A-H-M-E-D.
 7           Q.     Did you prepare a business plan for
 8     Total Cable?
 9           A.     Can you repeat the question?
10           Q.     For purposes of moving this along,
11     as it's been a snail's pace at this point,
12     when I say Total Cable, that will refer to
13     Total Cable USA LLC.
14                  All right?
15           A.     Okay.  I understand.
16           Q.     Did you prepare the business plan
17     for Total Cable?
18           A.     No.
19           Q.     Do you know who did?
20           A.     Actually, there wasn't any business
21     plan for Total Cable.  Not in that way -- in
22     that perspective.
23           Q.     In what perspective?
24           A.     Question is, would you like to know
25     how they ran the business?
```

```
1                    Ahmodul K. Barobhuiya        31
2          Q.    My question was clear.
3                     THE INTERPRETER:  He asked
4               you a question.
5                     MR. HOGAN:  He can't ask me
6               questions.
7          A.    Okay.
8          Q.    Did there come a time in which
9     Total Cable acquired certain equipment and
10    software?
11         A.    No.
12         Q.    What was the source of funding or
13    funds that allowed Total Cable to be created
14    and operated?
15         A.    The owners provided the money.
16         Q.    Do you know the source of the
17    money?
18         A.    I told you, the owners provided the
19    finance.
20         Q.    My question to you is, do you know
21    where the owners got the financing?
22         A.    No, I don't.
23         Q.    What was the relationship between
24    Total Cable USA LLC and Total Cable BD.COM?
25         A.    When I was in Total Cable, we
```

```
1                    Ahmodul K. Barobhuiya          35

2       answer.  That's a very difficult question.

3       It's not an easy question.

4            Q.    Are you able to answer it?

5            A.    Please repeat the question.

6            Q.    Are there any shareholders of an

7       entity known as Total Cable or Total Cable

8       USA LLC?

9            A.    No, no shareholders.

10            Q.    Any ownership interest other than

11       the interest that you described you have for

12       anyone else in that company?

13            A.    There was.

14            Q.    Who were they?

15            A.    Syed Ahmed, Ziauddin Ahmed,

16       Z-I-A-U-D-D-I-N.

17                 MR. BHATIA:   (Inaudible.)

18            A.    Just those two.

19            Q.    When did Total Cable obtain any

20       rights to any channel that they broadcast?

21            A.    Total Cable received the rights to

22       broadcast from G-Group and Jamuna TV,

23       J-A-M-U-N-A, but they did not broadcast

24       anything.

25            Q.    They obtained certain channels from
```

```
1              Ahmodul K. Barobhuiya          37
2                  THE INTERPRETER:  Can I go
3              off the record for a second?
4         A.    That's not going to be "G" as in
5     George.  That's going to be "Z" as in zebra.
6     The second one is Z-Bangla, B-A-N-G-L-A, 24
7     Hours.  The name of the channel is 24 Hours.
8     There is a Bengali name.  It's not 24 Hours.
9     A variation is 24 Hours but in this Bengali
10    it should be Chobbish, C-H-O-B-B-I-S-H, and
11    Ghanta, G-H-A-N-T-A.  Meaning 24 Hours in
12    English.  There were a few other channels.
13        Q.    Do you recall the names of the
14    other channels?
15        A.    Z-Cinema.  I don't remember the
16    rest.
17        Q.    Does Total Cable still own or have
18    the right to provide those channels to
19    individuals to whom they provide service?
20        A.    Could you please repeat the
21    question?
22        Q.    Does Total Cable USA LLC or Total
23    Cable have still have any right to provide
24    those channels that you described to
25    customers?
```

ON TIME COURT REPORTING
516-535-3939

1          *Ahmodul K. Barobhuiya*          41
2     did they receive from Jamuna TV?
3          A.    The name of the channel is Jamuna
4     TV.
5          Q.    Did Total Cable TV ever have the
6     right to provide the service or cannel known
7     as Star Television?
8          A.    Total Cable TV or Total Cable USA
9     LLC?
10         Q.    We will break it down then.  We
11    will be here until midnight.
12              With respect to Total Cable TV, did
13    they have the right to broadcast or not
14    broadcast but provide the channel known as
15    Star Television?
16         A.    I am not aware of anything called
17    Total Cable TV.
18         Q.    As to Total Cable USA LLC, did they
19    have the right to or the rights to provide
20    the service known as or a channel known as
21    Star Television?
22         A.    No.
23         Q.    When was Total Cable USA LLC
24    created?
25         A.    I'm not sure, but I joined Total

```
 1                    Ahmodul K. Barobhuiya          42
 2    Cable 2013 -- end of 2013.   They probably
 3    began business in the beginning of 2013 but
 4    I'm not sure.   Two, three months before I
 5    joined.
 6         Q.    Did Total Cable USA LLC have the
 7    rights to provide Star TV Bangladesh or
 8    B-A-N-G-L-A?
 9         A.    Total Cable USA LLC doesn't exist
10    anymore.   They are not in business anymore.
11    They filed for bankruptcy and they're not in
12    business anymore.
13         Q.    That's not responsive to my
14    question.
15              Did they, at any point in time,
16    have the rights to provide Star TV Bangladesh
17    or Bangla to any customers?
18         A.    No.
19         Q.    Did Total Cable USA LLC ever have
20    the rights to provide the channel known as
21    NTV Bangla or Bangladesh?
22         A.    No.
23         Q.    Do you know of another entity that
24    had the right to provide that challenge?
25         A.    I'm not aware of that.
```

```
1                    Ahmodul K. Barobhuiya          43
2            Q.    Did Total Cable USA LLC have the
3       right to provide the Channel I?
4            A.    No.
5            Q.    Did Total Cable USA LLC have the
6       right to provide Channel Willow, W-I-L-L-O-W,
7       TV?
8            A.    No.
9            Q.    Did Total Cable USA LLC have the
10      rights to provide channel known as Ten
11      Sports?
12           A.    No.
13           Q.    With respect to each of the
14      channels that I just mentioned, they number
15      one, two, three, four, five, six, do you know
16      of any other entity that had the right to
17      provide those?
18           A.    I do not know.
19           Q.    What channels does Total Cable USA
20      LLC have the rights to?
21           A.    Total Cable USA LLC, itself,
22      doesn't exist anymore.
23           Q.    Was there a time when Total Cable
24      USA LLC had the rights to certain channels?
25           A.    Yes.
```

1              *Ahmodul K. Barobhuiya*          44

2           Q.   When was that time?

3           A.   They had a contract with ZTV in the

4    beginning of 2014.  Then they had contract

5    with Jamuna TV.  I believe those were the

6    ones.  And they were never broadcasted nor

7    shown to any customers.

8           Q.   So they weren't provided over the

9    internet?

10          A.   They were not given these channels.

11   They never did business with these channels.

12          Q.   What channels is he referring to?

13          A.   All the channels Z-Group's channel

14   and Jamuna TV channels.  They were not shown.

15          Q.   Were they provided over the

16   internet to anyone?

17          A.   No.

18          Q.   With respect to Star Television NTV

19   Bangladesh Channel I, Sony TV, Willow TV, Ten

20   Sports, were those channels ever provided by

21   Total Cable USA LLC to anyone?

22          A.   No.

23          Q.   What is a production contract?

24          A.   I don't know.

25          Q.   Does Total Cable USA LLC operate or

```
1                    Ahmodul K. Barobhuiya          45
2        did they ever operate any websites?
3             A.    No.
4             Q.    Did any entity related to Total
5        Cable USA LLC operate websites for the
6        company?
7             A.    No.
8             Q.    When Total Cable USA LLC was
9        operating, what assets did it have?
10            A.    It didn't have any assets at all.
11            Q.    How did it operate without any
12       assets?
13            A.    It was never operated in that way.
14            Q.    When you say, "In that way," what
15       are you referring to?
16            A.    The way a business is run, it was
17       never run from that perspective.
18            Q.    Was there another entity that was
19       operating or providing channels to people
20       that related to or in some way was working
21       with Total Cable USA LLC?
22            A.    No.
23            Q.    Did Total Cable USA LLC have any
24       revenue?
25            A.    No.
```

1                          *Ahmodul K. Barobhuiya*        46

2           Q.    Did Total Cable USA LLC have any

3      bank accounts?

4           A.    No.

5           Q.    What did Total Cable USA LLC do?

6           A.    This company once -- was created

7      the intention or idea was to buy contents and

8      resale those content.

9           Q.    Did that ever occur?

10          A.    They did receive the right to sell

11     the contents but that never happened.

12          Q.    So no content was ever sold by

13     Total Cable USA LLC?

14          A.    No, they never did.

15          Q.    If they had no revenue, how did

16     they obtain content?

17          A.    In the beginning, they did receive

18     the contents and then later on they were

19     unable to sell the contents.  Therefore, it

20     didn't work out.  That was the reason the

21     company went out of business.  It stopped

22     working.

23          Q.    How did they obtain the content?

24          A.    Contract was made with them and an

25     agreement was signed and they received the

1          *Ahmodul K. Barobhuiya*          47

2     contents.

3          Q.   Were any of the channels or content

4     that Total Cable USA LLC obtained exclusive

5     content contracts?

6          A.   No.

7          Q.   Do you know what a "merchant

8     processor" is?

9          A.   Yes, I do.

10         Q.   What is it?

11         A.   Those who process credit cards and

12    those who deal with banks.

13         Q.   Did Lalon TV use a content

14    processor?

15         A.   They do.

16         Q.   Who is that content processor --

17    I'm sorry, who is the merchant processor?

18         A.   I couldn't tell you that.

19         Q.   You can't tell me that because you

20    don't know or you're refusing to tell me?

21         A.   Yes.  I don't know.

22         Q.   Did Total Cable USA LLC use the

23    services of any accountant?

24         A.   No.

25         Q.   Did they use a bookkeeper?

```
 1                    Ahmodul K. Barobhuiya          48
 2          A.   No.
 3          Q.   Did they ever have any customers?
 4          A.   No.
 5          Q.   Was there ever a subscription
 6     charge to customers?
 7          A.   No.
 8          Q.   And it's your testimony that Total
 9     Cable USA LLC never had any customers?
10          A.   Yes.  That's correct.  Never did.
11          Q.   Did it have any charges for
12     internet service providers?
13          A.   I don't remember.
14          Q.   Was there anyone who served as a
15     technician for the company?
16          A.   No, no technicians.
17          Q.   Did the company employ any
18     individuals in the Bangladesh call center?
19          A.   No.
20          Q.   Did the company send money to
21     Bangladesh?
22          A.   No.
23          Q.   How many employees did the company
24     have?
25          A.   No employees at all.
```

```
1                    Ahmodul K. Barobhuiya          49
2          Q.    Did it provide set-top boxes?
3          A.    No.
4          Q.    To your knowledge, did Lalon TV
5     have any income stream?
6          A.    When I was with them, there was
7     income for Lalon TV.
8          Q.    What was the source of that income?
9          A.    From customers.
10         Q.    Customers would have been
11    individuals receiving channels provided over
12    the internet by Lalon TV?
13         A.    Yes.
14         Q.    What is the current status of Lalon
15    TV?
16         A.    I'm not aware.
17         Q.    Do you know if when you were
18    working for Lalon TV they used a Bangladesh
19    call center?
20         A.    Again, that wouldn't be right on my
21    behalf to answer the question.
22         Q.    So, again, you're refusing to
23    answer it on the grounds that you believe
24    it's confidential?
25         A.    Yes.
```

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

STAR CABLE NA, INC.,
                                                  Docket No 16-cv-04067
                                                  Assigned Judge Hon. Pollak

                          Plaintiff,                AFFIDAVIT IN SUPPORT
                                                  OF NOTICE OF MOTION
                                                    SEEKING SUMMARY
                                                  JUDGMENT TO DISMISS
                                                  THE COMPLAINT

                      vs.
TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10

                        Defendants.
---------------------------------------------------------------------------x

I Syed Ahmed, the former managing member of Total Cable USA LLC swear as follows:

1.  I was the managing member of Total Cable USA LLC and as such I am familiar with the facts and circumstances of this case.

2.  I am making this affidavit in support of the Total Cable USA LLC's motion seeking summary judgment to dismiss the complaint on the ground that Total Cable USA LLC is no longer in business, was dissolved in May 2016 and filed for bankruptcy Chapter 7 in which Total Cable USA LLC was discharged and in fact Total Cable USA LLC never had any business in broadcasting channels.

3.  On or about July 22, 2016, the Plaintiff Star Cable NA Inc. had commenced the present action against the Defendant Total Cable USA LLC and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV alleging copyright violations of various channels in which the Plaintiff has exclusive rights to broadcast. Subsequently, on or about July 6, 2017, the

Plaintiff Star Cable NA Inc. filed a second amended complaint. In paragraph 1 of the complaint, the Plaintiff alleged that the Plaintiff has exclusive rights in the United States and Canada to distribute the programming services including i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekushey TV viii) Somoy. In paragraph 20 of the second amended complaint, the Plaintiff alleged that the Defendant Total Cable USA LLC advertised the exclusive services to their customers who desired to watch Bangladeshi programming.

4.  On or about June 16, 2016, the Defendant Total Cable USA LLC in response to the Plaintiff's complaint filed the answer. The Defendant Total Cable USA LLC denied the allegations contained in paragraph 1 of the complaint. The Defendant Total Cable USA LLC also denied the allegations contained in paragraph 20 of the complaint and states that Total Cable USA LLC does not redistribute any services as alleged in paragraph 20 of the complaint. In the fourth affirmative defense, Total Cable USA LLC alleged that it does not sell or distribute cable TV services. In the fifth affirmative defense Total Cable USA LLC stated that Total Cable USA LLC was dissolved in May 2016. In the first counterclaim, the Defendant Total Cable USA LLC claimed a judgment for attorney fees on the ground that the Plaintiff knew very well that the Defendant is not involved in the sale or distribution of television signals.

5.  On or about August 7, 2017, Defendant Total Cable USA LLC had filed a motion seeking dismissal of the complaint in which the Plaintiff seeks damages and injunctive relief against Total Cable USA LLC. In the motion to dismiss Total Cable USA LLC alleged that Total Cable USA LLC has not been broadcasting business since Total Cable USA LLC was dissolved in May 2016 and subsequently in December 2016, Total Cable

USA LLC filed for Chapter 7 bankruptcy Petition and the Final Decree was passed in January 2017.

6.  This Honorable Court denied the Defendant's motion on January 18, 2018. The Court was of the opinion that even though Total Cable USA LLC was dissolved, a corporation may be held liable on cause of action that accrues after dissolution of the corporation. The Court further held that the complaint should not be dismissed on the grounds that the Final Decree was issued by the Bankruptcy Court in January 2017. The Court opined based upon the allegations contained in the second amended complaint wherein the Plaintiff claims that the Defendant Total Cable USA LLC continued to use the Plaintiff's exclusive services and has the right to obtain injunctive relief. In the order, the Court held that this type of injunctive relief is not dischargeable by bankruptcy.

7.  In the operative part of the order, the Court held that the parties should be allowed to engage in discovery to determine the extent of any authorized users of the exclusive services that would entitle the Plaintiff to relief.

8.  The discovery was conducted after passing of the order dated January 18, 2018. Defendant Total Cable USA LLC requested the Plaintiff to provide responses to interrogatories and also to provide the documents showing that the Defendant Total Cable USA LLC had been broadcasting the channels allegedly owned by the Plaintiff Star Cable NA.

9.  In response to request for documents by Total Cable USA LLC, the Plaintiff provided approximately 214 documents, Bate Stamped 1-214. Out of the 214 documents, the documents Bate Stamped 162-214 presumptively have been filed by the Plaintiff to establish that the Defendant Total Cable USA LLC continues to broadcast TV channels.

My attorney and I have reviewed the documents bate Stamped 166-214. None of these documents show that Total Cable USA LLC is involved with the business of broadcasting TV channels. Almost all of the documents Bate Stamped 166-214 show that it is Total Cable Bd broadcasting the channels and not Total Cable USA LLC. It appears that the Plaintiff is confused with the words "Total Cable", there are many corporations that start with the words "Total Cable" but they have nothing to do with Total Cable USA LLC which is one of the Defendants in the present case.

10. Total Cable USA LLC is a different corporation and has no relations whatsoever with the other corporations that start with the words "Total Cable". I did not create any other company other than Total Cable USA LLC. I did not know any company by the name of Total Cable Bd. Total Cable USA LLC never did any business and Total Cable USA LLC had no transactions Total Cable USA LLC did not have any assets and it filed for bankruptcy. I am not aware of any company by the name of Total Cable TV. I had nothing to do with the company with the description Total Cable TV. Total Cable USA LLC did not have any website and did not maintain any website prior to filing bankruptcy. Total Cable USA LLC did not maintain any bank accounts. Total Cable USA LLC did not have any revenue in the years 2012, 2013, 2014, 2015, 2016, 2017 and 2018. Total Cable USA LLC never provided any set up boxes to anyone. I did not have any interest or knowledge about Total Cable Bd. Total Cable USA LLC never had any bank accounts.

11. As a managing member of Total Cable USA LLC, I had filed Chapter 7 bankruptcy petition in December 2016. Star Cable was shown as one of the creditors as Star Cable has initiated the present action claiming damages and injunctive relief. Star Cable, the

Plaintiff herein was duly served with the notice for Chapter 7 Petition. Star Cable did not appear in the Meeting with Creditors and did not file any adversary proceedings. Total Cable USA LLC has not been in the broadcasting business since it was dissolved in May 2016. Assuming arguendo, Total Cable USA LLC was in the broadcasting business and had violated the Plaintiff's copyrights and were liable for the damages, Total Cable USA LLC is not liable to pay any damages as Total Cable USA LLC were discharged under Chapter 7, wiping out any of the damages if any, prior to filing our bankruptcy petition. There is no evidence that Total Cable USA LLC has violated any of the rights of the Plaintiff after filing for bankruptcy and after commencement of the present action.

12. Total Cable USA LLC is a dead company. It has no employees since it was dissolved. It has no assets since it was dissolved. It never opened any bank account. It never had any customers or has any customers. It has no connection with Total Cable Bd or any other corporation.

**WHEREFORE**, I request that the notice of motion filed by Total Cable USA LLC seeking summary judgment for dismissal of the complaint be granted along with any other just and proper relief.

Syed Ahmed

Verified On: March 22, 2019
In the State of New York
In the County of New York

(Notary Public)

SATISH KUMAR BHATIA
Notary Public, State Of New York
No. 02BH6343050
Certified in New York County
Commission Expires 05/31/2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

STAR CABLE NA, INC.,                                        16-CV-04067 (SJ)

                                    Plaintiff,

                -against-

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                                    Defendants.

-----------------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION
# TO MOTION FOR SUMMARY
# <u>JUDGMENT FILED BY TOTAL CABLE USA LLC</u>

                                HOGAN & CASSELL, LLP
                                *Attorneys for Plaintiff, Star Cable NA, Inc.*
                                Michael Cassell
                                500 North Broadway, Suite 153
                                Jericho, New York 11753
                                Tel.  (516) 942-4700
                                Fax  (516) 942-4705
                                Email  mcassell@hogancassell.com

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.     RELEVANT FACTS............................................................................................2

        A.      Nature of Plaintiff's Claims in this Action.............................................2

        B.      Defendants' Improper Conduct..................................................................7

        C.      Total Cable's Motion Should Not be Granted.........................................8

III.    ARGUMENT.........................................................................................................9

        A.      Total Cable's Motion is Procedurally Defective....................................9

        B.      Total Cable's Motion is Substantively Defective..................................11

                1.      Legal Standard...........................................................................11

                2.      There are Issues of Fact as to
                        Whether Defendant is Still Operating.........................................12

IV.     CONCLUSION.....................................................................................................14

## TABLE OF AUTHORITIES

*Decisions:*                                                                                                *Page:*

Brezler v. Mills, 220 F. Supp. 3d (E.D.N.Y. 2016)......................................................................11

Briere v. Barbera, 163 A.D.2d 659, 558 N.Y.S.2d 278 (3d Dep't 1990)......................................13

Bruce Supply Corp. v. New Wave Mech., Inc., 4 A.D.3d 444,
773 N.Y.S.2d 408 (2d Dep't 2004)..................................................................................................13

Byrd v. NYS Fingerlakes Developmental Disabilities Servs., 2018 U.S. Dist. LEXIS 111950,
2018 WL 3305423 (W.D.N.Y. July 5, 2018)...................................................................................12

Camacho v. New York City Transit Authority, 115 A.D.2d 691
496 N.Y.S.2d 516 (2d Dep't 1985)..................................................................................................13

Cea v. Access 23 TV, 2015 U.S. Dist. LEXIS 123585,
2015 WL 5474070 (S.D.N.Y. Sep. 15, 2015)..................................................................................11

Corbley v. County of Suffolk, 45 F. Supp. 3d 276 (E.D.N.Y. 2014)..........................................9-10

Kloner v. United States, 196 F. Supp. 3d 375 (E.D.N.Y. 2016)...................................................12

Miller v. Nassau Cnty., 2015 U.S. Dist. LEXIS 164580
(E.D.N.Y. Oct. 22, 2015) (Report & Recommendation)................................................................12

Oladokun v. Ryan, 2010 U.S. Dist. LEXIS 1033814,
2010 WL 3910578 (S.D.N.Y. Sept. 30, 2010)..............................................................................11-12

Pinto v. Allstate Ins. Co., 221 F.3d 394 (2d Cir. 2000).................................................................11

Price v. Oropallo, 2014 U.S. Dist. LEXIS 116019 (N.D.N.Y. June 18, 2014)
(Report & Recommendation)..........................................................................................................12

United States v. Katz, 2011 U.S. Dist. LEXIS 59159,
2011 WL 2175787 (S.D.N.Y. June 2, 2011)...................................................................................10

Wenzhou Wanli Food Co. v. Hop Chong Trading Co., 2000 U.S. Dist. LEXIS 9554,
2000 WL 964944 (S.D.N.Y. July 11, 2000)...............................................................................10-11

*Statutes:*                                                                                                       *Page*

Local Rule Civ. P. 7.1...................................................................................................................9-10

Local Rule Civ. P. 56.1..............................................................................................................*passim*

# I. **INTRODUCTION**

The plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorneys, Hogan & Cassell, LLP, respectfully submits this Memorandum of Law in Opposition to the motion for summary judgment filed by the defendant, Total Cable USA LLC ("Defendant" or "Total Cable").

The main argument raised by Total Cable in its motion for summary judgment is that the claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating.

Defendant's motion for summary judgment should be denied since it is procedurally and substantively defective.

It is well settled that a motion for summary judgment has to be supported by a memorandum of law and a statement pursuant to Local Rule Civ. P. 56.1(a) ("Rule 56.1"). Total Cable's motion, however, does not include a memorandum of law and does not include a Rule 56.1 statement. Thus, the motion should be denied on its face.

Even if the Court was to overlook these significant procedural deficiencies, there is still no basis to grant the motion.

As noted, the key argument in Total Cable's motion is that it cannot be liable because it is no longer operating. It is axiomatic under New York law, however, that a corporation can be liable for its conduct even after dissolution if there are allegations that the corporation continued to operate after the dissolution. As set forth below, Total Cable's motion should be denied given that there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD.

1

## II. RELEVANT FACTS[1]

### A.   Nature of Plaintiff's Claims in this Action

Plaintiff is a cable television company that has exclusive rights, in the United States and Canada, to distribute eight individual programming services, via the signal delivery services internet protocol television system ("IPTV"), WiMax Wireless and Mobile TV. The exclusive services originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes hereinafter referred to as the "Exclusive Services"). See Plaintiff's Rule 56.1 ¶ 14; Rasul Aff. ¶ 3.

The defendants in this action, Total Cable and 1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("1StopMedia") (collectively "Defendants"), in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. See Plaintiff's Rule 56.1 ¶ 15; Rasul Aff. ¶ 4.

Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. See Plaintiff's Rule 56.1 ¶ 16; Rasul Aff. ¶ 5.

Prior to October 22, 2013, Total Cable, upon information and belief, operated as a subsidiary of Lalon TV, Inc., an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram, New York. Both Total Cable and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya ("Barobhuiya"), who testified that he was the CEO of Total Cable. See Plaintiff's Rule 56.1 ¶ 17; Rasul Aff. ¶ 6.

Confirming the extremely close relationship between Total Cable and Lalon TV, Inc., in

---

[1] All of the relevant facts set forth herein are taken from Plaintiff's Local Rule 56.1(b) Statement ("Plaintiff's Rule 56.1") and the accompanying affidavit of Shahid Bob Rasul ("Rasul Aff.").

a bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc., Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. a/k/a Total TV, a/k/a Total Cable. See Plaintiff's Rule 56.1 ¶ 18; Rasul Aff. ¶ 7.

Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access. See Plaintiff's Rule 56.1 ¶ 19; Rasul Aff. ¶ 8.

Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television (i.e. IPTV). See Plaintiff's Rule 56.1 ¶ 20; Rasul Aff. ¶ 9.

In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered. So, for example, there might be exclusive distribution rights for the United States for a satellite delivery service such as Direct TV. See Plaintiff's Rule 56.1 ¶ 21; Rasul Aff. ¶ 10.

In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights"). See Plaintiff's Rule 56.1 ¶ 22; Rasul Aff. ¶ 11.

Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's

3

channels are digitally secured and encrypted.  The encrypted video services are then transmitted via the internet to its customers.  See Plaintiff's Rule 56.1 ¶ 23; Rasul Aff. ¶ 12.

Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen.  The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same.  See Plaintiff's Rule 56.1 ¶ 24; Rasul Aff. ¶ 13.

The set top box is part of the monthly service charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a service charge is added to the customer's bill each month.  See Plaintiff's Rule 56.1 ¶ 25; Rasul Aff. ¶ 14.

The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server.  Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television.  The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.  See Plaintiff's Rule 56.1 ¶ 26; Rasul Aff. ¶ 15.

Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service.  See Plaintiff's Rule 56.1 ¶ 27; Rasul Aff. ¶ 16.

Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada.  See Plaintiff's Rule 56.1 ¶ 28; Rasul Aff. ¶ 17.

A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M.

4

International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television. See Plaintiff's Rule 56.1 ¶ 29; Rasul Aff. ¶ 18.

A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd. Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited. See Plaintiff's Rule 56.1 ¶ 30; Rasul Aff. ¶ 19.

More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the exclusive right to broadcast Independent TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 31; Rasul Aff. ¶ 20.

With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the exclusive right to broadcast Jamuna TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 32; Rasul Aff. ¶ 21.

With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Channel 16 provides Plaintiff with the exclusive right to broadcast Channel 16 in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 33; Rasul Aff. ¶ 22.

With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014. The agreement is for nine years. This agreement is still in effect. The agreement with My TV provides Plaintiff with the exclusive right to broadcast My TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 34; Rasul Aff. ¶ 23.

With regard to Asian TV, Plaintiff and Asian TV entered into an agreement on November 25, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Asian TV provides Plaintiff with the exclusive right to broadcast Asian TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 35; Rasul Aff. ¶ 24.

With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016. The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Bangla Vision provides Plaintiff with the exclusive right to broadcast Bangla Vision in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 36; Rasul Aff. ¶ 25.

With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016. The agreement is for five years. This agreement is still in effect. The agreement with Ekhusey TV provides Plaintiff with the exclusive right to broadcast Ekhusey TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 37; Rasul Aff. ¶ 26.

With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014. The agreement is for five years. This agreement is still in effect. The agreement with Somoy TV provides Plaintiff with the exclusive right to broadcast Somoy TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 38; Rasul Aff. ¶ 27.

**B.     Defendants' Improper Conduct**

Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable. See Plaintiff's Rule 56.1 ¶ 39; Rasul Aff. ¶ 28.

Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants. See Plaintiff's Rule 56.1 ¶ 40; Rasul Aff. ¶ 29.

Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming. See Plaintiff's Rule 56.1 ¶ 41; Rasul Aff. ¶ 30.

In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Said actions of Defendants are an unauthorized divulgence of satellite signals. See Plaintiff's Rule 56.1 ¶ 42; Rasul Aff. ¶ 31.

Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable. See Plaintiff's Rule 56.1 ¶ 43; Rasul Aff. ¶ 32.

7

**C.     Total Cable's Motion Should Not be Granted**

The main argument raised by Total Cable in its motion for summary judgment is that the claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating. See Plaintiff's Rule 56.1 ¶ 44; Rasul Aff. ¶ 33.

Total Cable's motion should be denied given that there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD. See Plaintiff's Rule 56.1 ¶ 45; Rasul Aff. ¶ 34.

Specifically, historical website documents pertaining to Total Cable from 2012 to 2016, reflect Total Cable's phone number of (212) 444-8138. See Plaintiff's Rule 56.1 ¶ 46; Rasul Aff. ¶ 35.

The same exact website as Total Cable's website as of May 7, 2016, on August 17, 2016, has the logo changed to Total Cable BD and the email address changed to info@totalcablebd.com. The phone number of (212) 444-8138 and rest of information is identical on both websites. See Plaintiff's Rule 56.1 ¶ 47; Rasul Aff. ¶¶ 36-37.

Before this action was filed, Total Cable and Total Cable BD had its website "who-is" information that shows the owners as publicly available until sometime in 2016. Both websites "who-is" information shows the same individual Habib Rahman as the registrant with address of 15 Westmoylan Lane, Coram New York. See Plaintiff's Rule 56.1 ¶ 48; Rasul Aff. ¶ 38.

The "who-is" information for Total Cable as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York. After this suit was commenced, Total Cable changed its "who-is" information to anonymous. See Plaintiff's Rule 56.1 ¶ 49; Rasul Aff. ¶ 39.

Just like Total Cable, the "who-is" information for Total Cable BD as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York. Just like Total Cable, after

8

the commencement of this suit, Total Cable BD made its "who-is" information anonymous. See Plaintiff's Rule 56.1 ¶ 50; Rasul Aff. ¶ 40.

Notably, as reflected in information printed from Secretary of State of New York website on April 11, 2019, Total Cable had the same exact address as the address for Total Cable BD, which is 15 Westmoylan Lane, Coram New York. See Plaintiff's Rule 56.1 ¶ 51; Rasul Aff. ¶ 41.

While Total Cable claims that after it filed for bankruptcy in 2016, that it had no assets or revenues and dissolved, Rasul's debit card was charged $90.00 on October 2, 2017, by Total Cable. The charge was for a subscription for services that had been active since approximately 2014. This charge was made nearly eleven months after Total Cable filed for bankruptcy and even though Total Cable is claiming that the company was not conducting any business while doing so. The charge depicts the same Total Cable phone number of (212) 444-8138. See Plaintiff's Rule 56.1 ¶ 52; Rasul Aff. ¶ 42.

In a suit commenced by Asia TV USA Ltd. against Total Cable and other defendants, the defendants recently settled the action for $450,000. Barobhuiya executed the agreement on behalf of Total Cable in August 2018. See Plaintiff's Rule 56.1 ¶ 53; Rasul Aff. ¶ 43.

## III. ARGUMENT

### A.   Total Cable's Motion is Procedurally Defective

Pursuant to this Court's Local Rules 7.1 and 56.1, a motion for summary judgment has to be supported by a memorandum of law and a Rule 56.1 statement. As courts have held, a party's failure to comply with these Rules is a sufficient basis to deny a motion for summary judgment on its face.

For example, in Corbley v. County of Suffolk, 45 F. Supp. 3d 276 (E.D.N.Y. 2014), the

court denied the plaintiff's cross-motion on its face because the plaintiff did not submit a Rule

56.1 statement with the cross-motion:

> Yet, as argued by the Defendant, Plaintiff failed to submit a Local Rule 56.1 Statement outlining the undisputed facts. The Court has discretion to deny a motion for summary judgment when it does not include a Rule 56.1 Statement. "Failure to submit such a statement may constitute grounds for denial of the motion." Local Civil Rule 56.1(a). The Court finds that Plaintiff's failure to provide a statement of undisputed facts is fatal to its motion for summary judgment, and therefore the motion is denied on this basis.

45 F. Supp. 3d at 284 (citation omitted).

In United States v. Katz, 2011 U.S. Dist. LEXIS 59159, 2011 WL 2175787 (S.D.N.Y.

June 2, 2011), the defendant, Stanley Katz, filed a motion for summary judgment seeking to

dismiss the complaint of the United States. Instead of submitting a statement consistent with

Local Rule 56.1, Katz submitted affidavits. The affidavits contained arguments in support of

Katz's position. In denying the motion on its face, the court explained that courts in the

Southern District and Eastern District of New York are empowered to deny a motion for

summary judgment just because the motion fails to comply with Rule 56.1. The court found that

the affidavits were an insufficient substitute for a Rule 56.1 statement, finding that the affidavits

were unhelpful since they contained arguments and subjective characterizations of the facts.

2011 U.S. Dist. LEXIS 59159, at *12-*14.

And, in Wenzhou v. Wanli Food Co. v. Hop Chong Trading Co., 2000 U.S. Dist. LEXIS

9554, 2000 WL 964944 (S.D.N.Y. July 11, 2000), the defendant, Hop Chong, moved for

summary judgment. Instead of submitting a memorandum of law in support of the motion, Hop

Chong relied upon an affidavit. The affidavit did not cite to any statutes or case law. The court

denied the motion on its face, explaining that the motion failed to comply with Local Rule 7.1.

In addition, the court explained that a party's failure to provide the court with authorities,

improperly places the burden on the court to conduct the initial legal analysis. The court denied

Hop Chong's motion because if failed to submit a memorandum of law in support of its motion.

2000 U.S. Dist. LEXIS 9554, at *11-*13. See also Cea v. Access 23 TV, 2015 U.S. Dist. LEXIS

123585, at *2-*3, 2015 WL 5474070 (S.D.N.Y. Sep. 15, 2015) ("The 'failure to submit a

memorandum of law, standing alone, is sufficient cause for granting or denying a motion. It is

not necessary to reach the merits.'").

As in the above cases, it is evident that Total Cable's motion should be denied.

Significantly, the motion is not supported by a memorandum of law and does not cite to any

cases or statutes in support of its position. While the motion is "supported" by the affirmation of

its counsel, as the above cases make clear, this is patently insufficient. In addition, the motion is

not supported by a Rule 56.1 statement.

Therefore, Total Cable's motion should be denied on its face.

**B.      Total Cable's Motion is Substantively Defective**

      **1.      Legal Standard**

It is axiomatic that on a motion for summary judgment that the court must interpret all of the

material facts in the light most favorable to the non-moving party. Summary judgment is

inappropriate if a reasonable jury could find for the nonmoving party. See, e.g., Pinto v. Allstate

Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000) (explaining that in deciding a motion for summary

judgment that a court should resolve all ambiguities and draw all inferences in favor of the non-

moving party); Brezler v. Mills, 220 F. Supp. 3d 303, 320-21 (E.D.N.Y. 2016) (explaining that at

the summary judgment stage, the court is required "'to view the evidence in the light most favorable

to the party opposing summary judgment, to draw all reasonable inferences in favor of that party,

and to eschew credibility assessments.'"); Oladokun v. Ryan, 2010 U.S. Dist. LEXIS 1033814, at

\*11-\*12, 2010 WL 3910578 (S.D.N.Y. Sept. 30, 2010) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of truth"); Kloner v. United States, 196 F. Supp. 3d 375, 381 (E.D.N.Y. 2016) ("A genuine issue of fact exists when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'").

Moreover, it is black letter law that a court can only consider admissible evidence on a motion for summary judgment. Thus, a court should not consider unauthenticated documents and documents such as unsworn letters. See, e.g., Price v. Oropallo, 2014 U.S. Dist. LEXIS 116019, at \*22 (N.D.N.Y. June 18, 2014) (Report & Recommendation) (stating that "'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment'" and noting that cases have held that unsworn letters could not be considered in connection with a motion for summary judgment); Miller v. Nassau Cnty., 2015 U.S. Dist. LEXIS 164580, at \*19 (E.D.N.Y. Oct. 22, 2015) (Report & Recommendation) (holding that factual assertions made in certain letters were not admissible for purposes of a motion for summary judgment); Byrd v. NYS Fingerlakes Developmental Disabilities Servs., 2018 U.S. Dist. LEXIS 111950, at \*3, 2018 WL 3305423 (W.D.N.Y. July 5, 2018) ("Defendant relies heavily on various documents, including reports, emails, and letters. However, these documents are not in admissible evidentiary form because none of them has been properly authenticated through deposition testimony or an affidavit from its author.").

In this matter, when viewing the evidence in the light most favorable to Plaintiff, it is evident that Defendant is not entitled to summary judgment.

## 2.   There are Issues of Fact as to Whether Defendant is Still Operating

The main argument raised by Total Cable in its motion for summary judgment is that the

12

claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating. See March 25, 2019 Affirmation of Satish K. Bhatia in support of Total Cable's motion ("Bhatia Aff.") ¶¶ 2, 4.

Total Cable's motion is legally and factually without merit.

Significantly, under New York law, a corporation can be liable for its conduct even after dissolution if there are allegations that the corporation continued to operate after the dissolution. See, e.g., Camacho v. New York City Transit Authority, 115 A.D.2d 691, 693, 496 N.Y.S.2d 516, 519-20 (2d Dep't 1985) ("The filing of a certificate of dissolution does not entirely terminate corporate existence. A corporation may be held liable on a cause of action which accrues after dissolution") (citation omitted); Bruce Supply Corp. v. New Wave Mech., Inc., 4 A.D.3d 444, 773 N.Y.S.2d 408, 409-10 (2d Dep't 2004) ("A corporation may be held liable on a cause of action that accrues after dissolution if the corporation continued its operations, operated its premises, and held itself out as a de facto corporation, notwithstanding its dissolution"); Briere v. Barbera, 163 A.D.2d 659, 558 N.Y.S.2d 278, 279 (3d Dep't 1990) (holding that a dissolved corporation was properly sued).

Here, as set forth in detail in the Rasul Aff., there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD. In fact, Total Cable and Total Cable BD share the same website, the same telephone number and the same exact address. See Plaintiff's Rule 56.1 ¶¶ 44-51; Rasul Aff. ¶¶ 33-41.

In addition, While Total Cable claims that after it filed for bankruptcy in 2016, that it had no assets or revenues and dissolved, Rasul's debit card was charged $90.00 on October 2, 2017, by Total Cable. The charge was for a subscription for services that had been active since approximately 2014. This charge was made nearly eleven months after Total Cable filed for

13

bankruptcy and even though Total Cable is claiming that the company was not conducting any business while doing so. The charge depicts the same Total Cable phone number of (212) 444-8138. See Plaintiff's Rule 56.1 ¶ 52; Rasul Aff. ¶ 42.

And, in a suit commenced by Asia TV USA Ltd. against Total Cable and other defendants, the defendants recently settled the action for $450,000. The CEO of Total Cable, Barobhuiya, executed the agreement on behalf of Total Cable in August 2018. See Plaintiff's Rule 56.1 ¶¶ 17, 52; Rasul Aff. ¶¶ 6, 42.

Accordingly, Total Cable's motion for summary judgment should be denied.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment.

Dated:  April 22, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP
Attorneys for Star Cable NA, Inc.

By: _____
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700
(516) 942-4705
mcassell@hogancassell.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
STAR CABLE NA, INC.,

                Plaintiff,

      -against-

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV.
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                Defendants.
-----------------------------------------------------------------X

16-CV-04067 (SJ)

**AFFIDAVIT OF
BOB RASUL IN
OPPOSITION TO
DEFENDANTS'
MOTIONS FOR
SUMMARY JUDGMENT**

STATE OF NEW YORK  )
                   )   ss:
COUNTY OF NASSAU  )

     SHAHID BOB RASUL, being duly sworn, deposes and states the following under penalty of perjury:

### Introduction

    1.    I am the Chief Technology Officer of the plaintiff in this action, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"). I submit this affidavit in opposition to the motion for summary judgment filed by Total Cable USA LLC ("Total Cable") and the motion for summary judgment filed by 1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("1StopMedia") (Total Cable and 1StopMedia will collectively be referred to as "Defendants").

    2.    As set forth below, neither motion has merit.

### Nature of Plaintiff's Claims in this Action

    3.    Plaintiff is a cable television company that has exclusive rights, in the United States and Canada, to distribute eight individual programming services, via the signal delivery services internet protocol television system ("IPTV"), WiMax Wireless and Mobile TV. The

exclusive services originate in Bangladesh and include:  i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes hereinafter referred to as the "Exclusive Services").

4.   Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services.

5.   Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law.

6.   Prior to October 22, 2013, Total Cable, upon information and belief, operated as a subsidiary of Lalon TV, Inc., an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram NY.  Both Total Cable and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya ("Barobhuiya"), who testified that he was the CEO of Total Cable.

7.   Confirming the extremely close relationship between Total Cable and Lalon TV, Inc., in a bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. a/k/a Total TV, a/k/a Total Cable.

8.   Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service

otherwise known as internet access.

9.      Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television (i.e. IPTV).

10.     In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered.  So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV.

11.     In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights").

12.     Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted.  The encrypted video services are then transmitted via the internet to its customers.

13.     Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen.  The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same.

14.     The set box is part of the monthly service charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a service charge is added to the

customer's bill each month.

15.     The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.

16.     Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service.

17.     Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services:  i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada.

18.     A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television.

19.     A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd.   Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited.

20.     More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014.  The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement.  This agreement has not

been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the <u>exclusive</u> right to broadcast Independent TV in United States and Canada via IPTV. <u>See</u> agreement between Plaintiff and Independent TV (attached hereto as Exhibit A).

21.     With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the <u>exclusive</u> right to broadcast Jamuna TV in United States and Canada via IPTV. <u>See</u> agreement between Plaintiff and Jamuna TV (attached hereto as Exhibit B).

22.     With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Channel 16 provides Plaintiff with the <u>exclusive</u> right to broadcast Channel 16 in United States and Canada via IPTV. <u>See</u> agreement between Plaintiff and Channel 16 (attached hereto as Exhibit C).

23.     With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014. The agreement is for nine years. This agreement is still in effect. The agreement with My TV provides Plaintiff with the <u>exclusive</u> right to broadcast My TV in United States and Canada via IPTV. <u>See</u> agreement between Plaintiff and My TV (attached hereto as Exhibit D).

24.     With regard to Asian TV, Plaintiff and Asian TV entered into an agreement on November 25, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Asian TV provides Plaintiff with the <u>exclusive</u> right to broadcast Asian TV in

United States and Canada via IPTV.  See agreement between Plaintiff and Asian TV (attached hereto as Exhibit E).

25.   With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016.  The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement.  This agreement has not been terminated and is still in effect.  The agreement with Bangla Vision provides Plaintiff with the exclusive right to broadcast Bangla Vision in United States and Canada via IPTV.  See agreement between Plaintiff and Bangla Vision (attached hereto as Exhibit F).

26.   With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016.  The agreement is for five years.  This agreement is still in effect.  The agreement with Ekhusey TV provides Plaintiff with the exclusive right to broadcast Ekhusey TV in United States and Canada via IPTV.  See agreement between Plaintiff and Ekhusey TV (attached hereto as Exhibit G).

27.   With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014.  The agreement is for five years.  This agreement is still in effect.  The agreement with Somoy TV provides Plaintiff with the exclusive right to broadcast Somoy TV in United States and Canada via IPTV.  See agreement between Plaintiff and Somoy TV (attached hereto as Exhibit H).

<div align="center">

**Defendants' Improper Conduct**

</div>

28.   Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business.  They are currently distributing their television signals through an IPTV distribution system

through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable.

29.     Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants.

30.     Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming.

31.     In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Said actions of Defendants are an unauthorized divulgence of satellite signals.

32.     Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Total Cable's Motion Should Not be Granted

33.     The main argument raised by Total Cable in its motion for summary judgment is that the claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating.

34.     Total Cable's motion should be denied given that there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD.

35.     Specifically, attached hereto as Exhibit I are historical website documents

pertaining to Total Cable from 2012 to 2016. These documents reflect Total Cable's phone number of (212) 444-8138.

36.    Attached hereto as Exhibit J is a printout from Total Cable's website as it existed on May 7, 2016.

37.    Attached hereto as Exhibit K is a printout from the same exact website on August 17, 2016. Notably, the website now has the logo changed to Total Cable BD and the email address changed to info@totalcablebd.com. Most significantly, the phone number of (212) 444-8138 and rest of information is identical on both websites.

38.    Before this action was filed, Total Cable and Total Cable BD had its website "who-is" information that shows the owners as publicly available until sometime in 2016. Both websites "who-is" information shows the same individual Habib Rahman as the registrant with address of 15 Westmoylan Lane, Coram New York.

39.    Exhibit L hereto, shows the "who-is" information for Total Cable as of August 17, 2016. The information shows the address of 15 Westmoylan Lane, Coram New York. After this suit was commenced, Total Cable changed its "who-is" information to anonymous, as depicted in Exhibit L.

40.    Just like Total Cable, the "who-is" information for Total Cable BD as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York. Just like Total Cable, after the commencement of this suit, Total Cable BD made its "who-is" information anonymous. See Exhibit M.

41.    Notably, as reflected in information printed from Secretary of State of New York website on April 11, 2019, Total Cable had the same exact address as the address for Total Cable BD, which is 15 Westmoylan Lane, Coram New York. See Exhibit N.

42.     While Total Cable claims that after it filed for bankruptcy in 2016, that it had no assets or revenues and dissolved, Exhibit O, shows a transaction from my debit card dated October 2, 2017, for $90.00  This is for a subscription for services that have been active since approximately 2014.   This charge was nearly eleven months after Total Cable filed for bankruptcy and even though Total Cable is claiming that the company was not conducting any business while doing so.  Notably, the charge depicts the same Total Cable phone number of (212) 444-8138.

43.     Interestingly, in a suit commenced by Asia TV USA Ltd. against Total Cable and other defendants, the defendants recently settled the action for $450,000.  Barobhuiya executed the agreement on behalf of Total Cable in August 2018.  See Exhibit P.

44.     In sum, this Court should reject Total Cable's claims that it is not operating and that it has no affiliation with Total Cable BD and deny its motion for summary judgment.

## 1StopMedia's Motion Should Not be Granted

45.     In its motion, 1StopMedia does not dispute that it is also broadcasting the Exclusive Services.  According to 1StopMedia, however, its conduct is not improper because Plaintiff supposedly does not have the exclusive rights to the eight programming services that comprise the Exclusive Services and that 1StopMedia supposedly has rights to broadcast the Exclusive Services.

46.     As set forth below, for two main reasons, 1StopMedia's position does not lead to the conclusion that its motion should be granted.

47.     First, almost all of the documents relied upon by 1StopMedia are unauthenticated and uncertified.

48.     Second, even if the Court considers the documents, they do not support the relief

sought by 1StopMedia.

49.      Specifically, in the March 25, 2019 Affirmation of Satish K. Bhatia in support of 1StopMedia's motion ("Bhatia Aff."), Bhatia claims that 1StopMedia is not broadcasting Somoy TV, just because it so alleged in its answer to the Complaint. See Bhatia Aff. ¶ 4.  I submit that this is insufficient to find as a matter of law that 1StopMedia is not broadcasting Somoy TV.

50.      Bhatia next states in his affirmation that Plaintiff has no rights to broadcast Boishaki TV. See Bhatia Aff. ¶ 5.  Given that Boishaki TV is not part of the claims in this action, I fail to see the relevance of 1StopMedia's reference to Boishaki TV.

51.      The only issue raised in the Bhatia Aff. that concerns Independent TV is the claim that Plaintiff's agreement with Independent TV expired because it was for a period of three years and Plaintiff never demonstrated that the agreement was renewed. See Bhatia Aff. ¶ 6.

52.      As noted above, however, the Independent TV agreement specifically states that the agreement automatically renews after the three years.  Given, as explained above, that the agreement has never been terminated, Star Cable still retains the exclusive rights to broadcast Independent TV in the United States and Canada over IPTV.

53.      Moreover, since 1StopMedia does not deny broadcasting Independent TV -- which would be in clear contravention of Star Cable's exclusive rights -- it is evident that 1StopMedia is not entitled to summary judgment as to Star Cable's claims against it.

54.      With regard to Jamuna TV, Bhatia argues that 1StopMedia is entitled to summary judgment because: 1) there is no showing that Star Cable's agreement with Jamuna TV was ever renewed; and 2) Jamuna TV has certified that 1StopMedia has rights to broadcast Jamuna TV in North America and that no other entity has exclusive rights to broadcast Jamuna TV anywhere in the world. See Bhatia Aff. ¶¶ 7, 8; Exhibit G to Bhatia Aff.

55.     With regard to the first claim, as explained above, the agreement between Star Cable and Jamuna TV automatically renews. Thus, the mere fact that there is no additional documentation showing that the agreement was extended after the first time (which expired on December 1, 2017), does not lead to the conclusion that the agreement is no longer in effect.

56.     With regard to the "certification," notably this document is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that no other organization has the exclusive rights with Jamuna TV to broadcast Jamuna TV anywhere in the world is undeniably false given that it is belied by the exclusive agreement between Star Cable and Jamuna TV. See Exhibit B.

57.     Bhatia next asserts that Star Cable's claim against 1StopMedia pertaining to Channel 16 is deficient because Channel 16 is supposedly no longer broadcasting and because Channel 16 has an agreement with Lalon TV. See Bhatia Aff. 7.

58.     Even assuming that Channel 16 has an agreement with Lalon TV, 1StopMedia does not put forth anything to demonstrate that this would insulate it from liability in this matter. Moreover, the only support for the statement that Channel 16 is no longer broadcasting is the unsupported assertion made by the president of 1StopMedia, Saiful Siddique ("Siddique"). Star Cable submits that Siddique's unsupported claim is not sufficient for this Court to find as a matter of law that Channel 16 is no longer broadcasting.

59.     Similar to its position with Jamuna TV, with regard to My TV, 1StopMedia argues that based upon a "certification" Star Cable does not have the right to broadcast My TV. See Bhatia Aff. ¶ 10; Exhibit I. As with Jamuna TV, the alleged certification is nothing more than a letter "To Whom it May Concern" that is not authenticated, not certified and not notarized. And, the letter is directly contradicted by the exclusive agreement between Star Cable

and My TV. See Exhibit D.

60.     With regard to Ekhusey TV, Bhatia claims that Ekhusey TV terminated its
agreement with Star Cable by sending a letter to Star Cable on August 23, 2016. See Bhatia Aff.
¶11; Exhibit J.

61.     1StopMedia's reliance upon this letter fails. The agreement between Star Cable
and Ekhusey TV only permits the termination of the agreement prior to the expiration of the five-
year term, which does not expire until June 2021, if there is a material breach of the agreement
and the breach is not cured within sixty days. See agreement ¶ 10 (Exhibit G). Even assuming
that the letter attached as Exhibit J to the Bhatia Aff. is authentic, the letter does not come close
to complying with the language in the agreement for a proper termination of the agreement. In
fact, the letter does not even mention paragraph 10 of the agreement, which, if the letter was
authentic, one would expect to see in the letter.

62.     With regard to Bangla Vision, 1StopMedia claims that it cannot be liable for its
broadcasting of this service because it entered into an agreement with Bangla Vision on
September 23, 2014. See Bhatia Aff. ¶ 14; Exhibit M.

63.     Most notably, however, the referenced agreement is for mobile apps, not for
broadcasting over IPTV. Thus, this agreement is irrelevant.

64.     Finally, 1StopMedia claims that it entered into an agreement with Asia TV on
November 20, 2014, for exclusive rights and then entered into another agreement with Asia TV
on June 6, 2016, for non-exclusive rights to broadcast Asia TV. See Bhatia Aff. ¶¶ 12-13;
Exhibits K and L.

65.     Highlighting that there are issues of fact as to the authenticity of these documents,
1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from

Asia TV in November 20, 2014 it would then enter into an agreement less than two years later for non-exclusive rights.

66.    1StopMedia's motion should be denied

## Conclusion

67.    Accordingly, this Court should deny Defendants' motions for summary judgment.

SHAHID BOB RASUL

Sworn to before me this
19 day of April 2019

NOTARY PUBLIC

GIANCARLO ASSANTE
Notary Public - State of New York
NO. 01AS6181808
Qualified in Suffolk County
My Commission Expires Jun 16, 2020

# EXHIBIT A

NETWORK AFFILIATION AGREEMENT

Between

Independent Television ltd.
149-150 Tejgaon I/A
Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Independent Television Ltd. (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.30 per Subscriber, per Month.
Minimum payment first year: $18,000 to be paid quarterly in advance. First payment due immediately after singing this contract in amount of $4,500

Guaranteed Payment
1st year: $18,000 per year.
2nd year: $36,000
3rd year: $54,000

vs.

| Projection payments* | |
|---|---|
| 50,000 subscribers | $180,000 |
| 100,000 subs | $360,000 |
| 150,000 subs | $540,000 |

*As the subs increase payments will increase accordingly. Minimum payment is guaranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system(live data) will be provided on quarterly basis or anytime on written demand from Independent Television ltd.

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 26, 2014 , (the "Effective Date")

Conditions as follows:

1.      Scope. Affiliate shall have the non-exclusive right to distribute the Service via  coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, internet (IPTV Internet Protocol TV) and Mobile TV. (Exception of Radiant IPTV)

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.30 Independent TV will be paid 50% of the monthly fee

per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Independent TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Independent TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.  Term of Agreement. The term shall be for a period of Three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.  License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date"). ·

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and half percent (1.5%) interest per day (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.  Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.  Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a International satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be · distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.     Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill statters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.     Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.     Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.     Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.     Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days. NON-PAYMENT Independent Television ltd. Has right to terminate this contract by giving 60 days writtten notice to cure for non-payment of minimum guarantee payment due or for extra payments due based on actual # of subs.

11.    Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA, that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing. Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out at matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.    Covenants. Affiliate hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to this arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.     Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.     "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.     Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Independent Television Ltd.

Signature:

Printed Name:  M Shamsar Rahman

Title:  Editor In cheif & CEO

Date:  26/11/14

M Shamsur Rahman
Chief Executive Officer

BEXIMCO media ltd.

Affiliate:  StarCable NA Inc.

Signature

Printed Name:  SATIA SOMA L

Title:  Director

Date:  11/26/14

# EXHIBIT B



NETWORK AFFILIATION AGREEMENT

**Jamuna Television Limited**
Jamuna Television Bhaven | Jamuna Future Park Complex
Ka-244, Progoti Sheroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: Info@jamunatv.net
www.jamunatv.net

Between

Jamuna Television
Jamuna Future Park Complex KA-244
Progoti Sharoni, Baridhara
Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.'
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Jamuna Television (the "Service").

Service Description: 24 hour Bangla Channel News and Programmes

License Fees: USD $0.50 per Subscriber per Month.

Minimum payment first year: $18,000 to be paid quarterly in advance. First payment due immediately after singing this contract in amount of $4,500

Guranteed Payment
1st year: $18,000 per year.
2nd year: $36,000
3rd year: $54,000

vs ----- "Projection payments"
50,000 subscribers    $ 300,000
100,000  subs         $ 600,000
150,000  subs         $ 900,000

*As the subs increase payments will increase accordingly. Minimum payment is guranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system will be provided on quarterly basis or anytime on written demand from Jamuna Television.

NON-PAYMENT: Jamuna Television has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guaranteed payment due as above schedule or for extra payments due based on actual number of subs.

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF December 1, 2014, (the "Effective Date")

Conditions as follows:

1.    Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.



**Jamuna Television Limited**
Jamuna Television Bhavan I Jamuna Future Park Complex
Ka-244, Progoti Shoroni I Baridhara I Dhaka-1229 I Bangladesh
Phone +880 2 8416060 I Fax +880 2 8416070
email:info@jamunatv.net
www.jamunatv.net

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributor, above $0.5 Jamuna tv will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Jamuna TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Jamuna TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      Term of Agreement. The term shall be for a period of three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License Fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for channel distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.      Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein,



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Sharoni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +889 2 8416078
email: info@jamunatv.net
www.jamunatv.net

Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.      Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or Controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.      Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing

9S



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Pragoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 84166601 Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11.    Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA, that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.    Covenants. Affiliate hereby covenants and agrees that it will:    (i) continue to carry on its business in substantially



Jamuna Television Limited
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progati Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 84160601 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral text signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progati Shoreni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 84160601 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or desire to or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.     Construction. The words "herein," "hereof," "hereunder" and other similar terms refer to this Agreement as a whole



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Jamuna Television

Signature:

Printed Name:

Title: Managing Director

Date: 01/12/2014

Affiliate: StarCable NA Inc.

Signature

Printed Name: SAS (i) SoHZ

Title: Director

Date: 12/11/14

# EXHIBIT C



A Bangla Satellite TV Channel

# CHANNEL-16
*Insight Telecast*

Ref.

Date: 1/25/2014

NETWORK AFFILIATION AGREEMENT

Between

Channel 16
7-9 Karwanbazar
Dhaka-1215
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 255
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Channel 16 (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum Year 1: $6,000 to be paid quarterly in advance $1,500 due immediately after signing of this contract.
2nd Year: $12,000
3rd Year: $36,000
4th Year: $36,000
5th Year: $48,000
6th Year: $48,000
7th Year: $60,000
8th Year: $60,000

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 25----2014, (the "Effective Date")

Conditions as follows:

1.    Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxial cable television systems, Satellite DTH (direct to house) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributor, above $0.25 Channel 16 will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Channel 16 agrees that any requests that comes to any adding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc.  Star Cable shall provide a direct feed to those systems requiring access to programming. Channel 16 will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a

A Bangla Satellite TV Channel

# CHANNEL-16
*Insight Telecast*
অন্যন্য  তথ্য  খবর  বিনোদন  শিক্ষামূল

**Ref.**                                                                 **Date:**

"person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

**2.** **Term of Agreement.** The term shall be for a period of eight (8) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the Initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

**3.** **License Fees and Payment Terms.** Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of this month for which Payment is being made, divided by two (2). Payment shall be rendered no later than 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

**4.** **Carriage.** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

**5.** **Delivery of Signal.** During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming. Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

**6.** **Ownership.** All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's name and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional materials furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

A Bangla Satellite TV Channel

# CHANNEL-16
*Insight Telecast*

বিসমি    সমাচার    সাংবাদিক    বিনোদন    জীবন

Ref.

Date:

7. Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8. Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or proposed provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9. Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10. Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11. Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not require the rights under (i) any contract, agreement or document to which Network is a party or is; assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not require the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12. Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses

A Bengla Satellite TV Channel

# CHANNEL-16

### *Insight Telecast*

Ref.                                                                                           Date:

(including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers) or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any materials (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (x) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, in like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscribers arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the System in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment or burn-in, or nag tests), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for each other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx, New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator otherwise, it is will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of

$S_2$

A Bangla Satellite TV Channel

# CHANNEL-16

**Insight Telecast**

এনসাইট      থথয      বাংলা      বিবিধিক      হাংলান

---

Ref.                                                                 Date:

competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.      Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either each Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.      Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC,
9839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.      Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.      Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or claim in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, each disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.      Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

A Bangla Satellite TV Channel

**CHANNEL-16**

*Insight Telecast*

Ref.

Date:

23. Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representatives.

Channel 16

Signature:

Printed Name: N.I Munn A

Title:

Date:

Affiliate: SunCable NA Inc.

Signature

Printed Name: SAJIO SOIFAIL

Title: Director

Date: 11/25/2014



*A Bangla Satellite TV Channel*

# CHANNEL-16

*I n s i g h t   T e l e c a s t*

*If you have a dream
you can think and create,
fly for creations..........*

Ref.

Date:

Channel16's others agreement with others party such Jago bd and Radiant IP Tv will be continue after completion the agreement with Star Cable NA Inc.

~~Channel 16 will reserves the right to do others agreement with others party after competition the agreement with Star Cable NA Inc.~~

Star cable NA Inc will not be allowed to broadcast the program of channel 16 by changing its original program and using extra logo.

Star cable NA Inc. should provide required legal papers for immigration purpose and bear other expenditure if anyone needs to go in USA for business purpose.

Channel16 will reserve the right to cancel the agreement if payment is due by declaration of one month prior notice.

~~Both parties can cancel the agreement after declaration three months prior notice.~~

Star cable NA Inc. will have to pay payment through banking channel.

Star Cable NA Inc. will pay yearly subscription payment by two installments.

SAJIN SOHAL
11/25/2014

BTMC Bhaban, 7-9 Kawran Bazar (8th Floor), Dhaka-1215, Bangladesh. Phone: 8189800. Fax: 0142924. Mobile: 01552356468

# EXHIBIT D



গণপ্রজাতন্ত্রী বাংলাদেশ সরকার

৳১০০   ৳১০০

একশত টাকা

কঘ   ২২৬৩৪৪৯

# NETWORK AFFILIATION AGREEMENT

This NETWORK AFFILIATION AGREEMENT is singed and executed on this day ..................... th November, 2014 of the Christian Era.

## B E T W E E N

**My TV**
V.M.International Ltd.
Represented by it's Chairman & MD
**Mr. Nasir Uddin Sathi**
Of- Mujaffar Tower(4th-5th-6th Floor)
55, Bir Uttam C.R.Datta Road
Banglamotor, Dhaka,Bangladesh.  ...............................Party to the First Part(Network).

### -A N D-

**StarCable NA Inc.**
Represented by it's Diretor
SID SOHAIL, 917-348-100
Of-3839 Bell Blvd Suite 233
Bayside NY 11361.  ...................................... Party to the Second Part(Affiliate).

In consideration of the mutual covenants as well as consent set forth in this "NETWORK AFFILIATION AGREEMENT" ("Agreement"), the above-named parties (each sometimes referred to herein as a "PARTY" and collectively as the "Parties") hereby agreed as follows with respect to launch and carriage of the programming service identified below:

* **Programming Service**: My tv (the "Service").
* **Service Description**: 24 hour  Bangla Channel consisting of Dramas, News, music and children's Shows.
* **License Fees**:  USD $0.25 per Subscriber, per Month.
* **Minimum payment first year**: $12,000 to be paid quartely in advance by wire transfer. First payment due immediately after signing of  this contract in amount of $3000.

| GURANTEED PAYMENT | | VS. | PROJECTED PAYMENTS | |
|---|---|---|---|---|
| 1st year: | $12,000 per year. | | 50,000 subs | $150,000 |
| 2nd year: | $24,000 | | 75,000 subs | $225,000 |
| 3rd year: | $36,000 | | 100,000 subs. | $300,000 |
| 4th year: | $48,000 | | 125,000 subs. | $375,000 |
| 5th year: | $60,000 | | 150,000 subs. | $450,000 |
| 6th year: | $72,000 | | 175,000 subs. | $525,000 |
| 7th year: | $84,000 | | 200,000 subs. | $600,000 |
| 8th year: | $96.000 | | 225,000 subs. | $675,000 |
| 9th year: | $108,000 | | 250,000 subs. | $750,000 |





৭৬৯১১৩৮

*As the subscribers will increase day by day the payments will definitely increase accordingly which was shown in the above table .

Number of subscribers report/information have to be submitted by the Party to the Second Part to the Party to the First Part quarterly through which the agreed payment will be calculated / decided as well as the same is guaranteed and adjusted in every quarter of each Calender Month accordingly.

✳ **System Territory**: United States of America, and Canada.

ACCEPTED AND AGREED TERMS AND CONDITIONS ARE AS FOLLOWS :

01. **Scope :** Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

    **Affiliate** may sub-distribute the Service to another service provider with the prior written approval/consent of the Party to the First Part/Network(My TV Authority) or as long as it is under the conditions set forth in this contract. For any fee that is collected from sub-distributer, above U.S $ 0.23 My tv (Party to the First Part) will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Network(Party to the First Part) agrees that any requests that comes to regarding carriage on exclusive platforms (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to the Affiliate,Party to the Second Part(StarCable N.A Inc.) who will provide a direct feed to these systems requiring access to programming. My tv will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

02. **Terms of Agreement :** The term shall be for a period of Nine (9) years commencing on the date of signing this Network Affiliation Agreement including Paying the First Advance Payment . This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.



রেজি   ৭৬৬৮৭২২

03. **License Fees and Payment Terms** :
**i.** Party to the Second Part (Affiliate) have to pay the license fee to the Party to the Second Part in it's Bank Account holding in the Name of V.M International Ltd., bearing S/B Account No.
• 00020210012796 of Jamuna Bank Ltd., Karwan Bazar Branch,Dhaka or any other Account or any other form duly confirmed by the Network(Party to the First Part) for the right to distribute the service (the "License Fee") pursuant to this Agreement.

**(ii)** For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

**(iii)** Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder.   During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.

**(iv)** Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

04. **Carriage :** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way.  If Affiliate chooses to ˙Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

05. **Delivery of Signal:**  During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.




**Ownership :**All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

06. **Audits :** During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit as well as inquary all the records directly related to confirming the accuracy or numbers of the subscribers of License Fee payments made pursuant to Section 3 above.

07. **Confidentiality :** Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity 'pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

08. **Assignment :** This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

09. **Termination:** Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion: or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

10. **Representations and Warranties:** Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming




the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

11. **Indemnification:**   Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

12. **Covenants:**   Ailiate hereby covenants and agrees that it will:
    (i)  continue to carry on its business in substantially the same manner as it has prior to the Effective Date;
    (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and
    (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

13. **Vertical Blanking Interval:** Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

14. **Governing Law:** This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

15. **Arbitration:** All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

16. **Waiver:** Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

17. **Notices :** Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:
    StarCable LLC.
    3839 Bell Blvd Suite 233
    Bayside NY 11361
    Notice shall be deemed given upon proof/confirmation of receipt.

18. **Entire Agreement:** This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.



19. **Relationship:** Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

20. **Counterparts:** This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

21. **Severability:** The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

22. **Construction:** The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

23. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

24. **Marketing Efforts:** The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

My tv(V.M International Ltd.)
Represented by it's Chairman and Managing Director

Signature: _____ Nasir uddin

Printed Name:     (Mr. Nasiruddin Sathi)

Title:  Chairman and Managing Director
Date:   30.11.2014

**Party to the Second Part (Affiliate):**
StarCable NA Inc., Represented by it's Director SID SOHAIL

Signature : _____

Printed Name:     (SID SOHAIL)

Title   :**Director, StarCable NA Inc.**

Date: 30.11.2014.

**Witnesses :**

01. Signature:......................................
    Name: Masud Nazim
    Chief Marketing Executive
    Atlas Umbrella Factory (BD) Ltd.

02. Signature:......................................
    Name: Zeker Uddin Samrat
    Director (News & Broadcast)
    my tv.

03. Signature:......................................
    Name: Major (Retd.) Syed Mokhlesur Rahman Palok
    General Manager
    my tv.

# EXHIBIT E



ক্রম ৭৫৭০২৮০                      NETWORK AFFILIATION AGREEMENT

Between (

Asian TV
House# 60, Block# A Road# 1, Niketon
Gulshan-1 Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Asian TV (the "Service")

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum Per/Year: $25,000 to be paid in quarterly basis in amount of $6,250.00 by wire transfer.
First payment of $6,250 due immediately after signing of contract:
2nd Year: $36,000
3rd Year: $48,000
4th Year: $60,000
5th Year: $72,000
6th Year: $84,000
7th Year: $96,000
8th Year: $108,000

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 25 ------ 2014 , (the "Effective Date")

Conditions as follows:

1.  Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air, Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.



in this this contract. For any fee that is collected from sub-distributer, above $0.25 Asian TV will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Asian TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Asian TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      Term of Agreement. The term shall be for a period of eight (8) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License Fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion than 50%



কথ ৯৫৯০২৮২

5.     Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.     Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.     Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.     Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.     Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

11.    Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.    Covenants. Affiliate hereby covenants and agrees that it will:    (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.    Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.     . Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.  `    Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Asian TV

Signature:

Printed Name:

Title:

Date:

Affiliate:        StarCable NA Inc.

Signature

Printed Name:        SAJID SoHAIL

Title:        Director

Date:        11/24/14

# EXHIBIT F

# NETWORK AFFILIATION AGREEMENT

Between

Shamol Bangla Media Limited, a Bangladeshi company located at Noor Tower, 1/F
Free School Street, 110 Bir Uttam, C R Dutta Road, Dhaka-1205 (Bangla Vision
Television)
Dhaka Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation
Agreement ("Agreement"), the above-named parties (each sometimes referred to
herein as a "Party" and collectively as the "Parties") hereby agree as follows with
respect to launch and carriage of the programming service identified below:

Programming Service: Bangla VisionTV (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and
children's Shows.

License Fees: USD $0.50 per Subscriber, per Month. All Payments will be paid
quarterly in Advance. First payment will be $15,000 due immediately after signing
this contract.

Guaranteed Payment :
1 to 6 months        $5,000/month
7 to 12 months       $7,500/month
13 to 18 months      $10,000/month
19 to 24 months      $12,5000/month

Vs.
Projection Payments:
Year 1: 50,000     Subs.        $300,000
Year 2: 75,000     Subs.        $450,000

Number of subscribers report will be submitted on quarterly basis, and payments
above guaranteed will be adjusted each quarter accodingly. Confidential access to
accounting system will be provided on quarterly basis or anytime on written
demand from Bangla VisionTelevision ltd.

System Territory: United States of America, and Canada and Europe. $SS$ $\mathcal{H}$

$\mathcal{H}$

$S S$

ACCEPTED AND AGREED TO EFFECTIVE AS OF $\mathcal{J}u_{ne}$ 1, 2016 (the "Effective Date")

Conditions as follows:

1.    Scope. Affiliate shall have the exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the Bangla Vision legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.50 Bangla VisionTV will be paid 50% of the monthly fee per subscriber

2.    Term of Agreement. The term shall be for a period of two (2) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.    License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes,

55

restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"),
License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the
first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall
carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service
without delay and shall not edit, alter or modify it, or any of its programming
elements, in any way. If Affiliate chooses to Time Delay programming, then such
programming shall be carried on such fixed time delay, and there shall be an
alternate channel that would Show the Service without time delay. Affiliate's
carriage of the Service shall be consistent with industry standards for content
distribution. If Affiliate chooses to alter or edit any of programming for
advertisement insertion then 50% of all revenues received from advertising shall be
due to network. All advertisement in above territory will be run by Star Cable,
Bangla Vision will give 2 minutes ad per hour between 1 am to 9 am Dhaka
Bangladesh time to promote Star Cable services.

5.  .   Delivery of Signal. During the Term, Network shall provide, to Affiliate, the
Service in its entirety. The Service shall be delivered by Network to each System, in a
digitally compressed mode, by transmitting a signal of the Service via a international
satellite used for transmission of programming, Over the Air or on Fiber.
Notwithstanding anything to the contrary herein, Affiliate, at its own cost and
expense, shall be completely responsible for encoding or formatting the Service so it
can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER
EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights, and interests in the entire content of the
Service and Network's service marks, trademarks and copyrights (collectively, the
"Marks") shall remain fully vested in Network throughout the world. Affiliate only
shall use Marks in the versions and modes expressly authorized by Network.
Network reserves the right to review and approve all materials generated by
Affiliate for marketing purposes which incorporate any Marks. Uses of Network's
names and/or Marks, in routine promotional materials, such as program guides,
program listings and bill stutters, shall be deemed approved unless Network
specifically notifies Affiliate to the contrary. Promotional material furnished by
Network to Affiliate shall be deemed to be automatically approved for use in the
format provided by Network, but Network's prior written consent is required to the
extent Affiliate modifies or otherwise changes such materials. Nothing herein shall
be construed as an assignment or grant by Network to Affiliate of any title in or to
the Marks.  Star cable will have the full authority to enforce or bring lawsuite for
any piracy or unauthorized carriage, of this channel.

7.      Audits. During the Term, renewal Term, if any, and for 36 months thereafter,
Network (on a non- contingent fee basis) shall have the right to audit all records

$$SS$$

                                                                    ltl

directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.      Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11.      Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and

SS                    |H

do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.     Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind,

55          1H

including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:   (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three

55                    IH

(3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.    Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.    Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC,
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.    Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.    Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed



to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.   Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.   Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.   "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.   Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

SS    IH

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Shamol Bangla Media Limited
Bangla VisionTV

Signature:

Printed Name:

Title: I. Hossain, Deputy-Managing Director

Date:

Affiliate: StarCable NA Inc.

Signature

Printed Name: SID Sollah

Title: Director

Date:

Letter of Authorization

This Letter is between Star Cable NA Inc. 3839 Bell Blvd Suite 233 Bayside NY 11361 and Shamol Bangla Media Limited, (Bangla Vision Television) a Bangladeshi company at Noo Tower, 1/F Free School Street, 110, Bir Uttam CR dutta Raod, Dhaka-1205(BanglaVision).

whereas Shamol Bangla Media Limited is provider of certain Bangla programming of which includes BanglaVision Television.

whereas Shamol Bangla Media Limited wants to protect its Television programming from piracy and illegal use.

whereas Shamol Bangla Media has certain contract with Bangla America Entertainment LLC, which Bangla America Entertainment has continued to violate.

Shamol Bangla Media hereby authorizes Star Cable NA Inc. file a lawsuit against Bangla America Entertainment, LLC Bangla Vision to recover all its monies due and any other legal actions against Bangla America Entertainment that maybe required including injunctive relief. Star Cable will pay for all legal fees and it will be paid back from the fees recovered from Bangla America Entertainment.

Shamol Bangla Media hereby additionally authorizes Star Cable NA Inc. to prosecute against any individuals or companies engaged in piracy or illegal use of Shamol Bangla Media content including Bangla Vision channel, and is authorized to file any lawsuit or injunctive.

Bangla Vision will be responsible to send 30 days notice of cancellation to Bangla America Entertainment.

Star Cable will assist Bangla Vision in this regard, or can send it on Shamol Bangla Media's behalf.

The main Contract will become effective soon after 30 days cure period ends and Bangla America Entertainment contact is terminated.

Shamol Bangla Media Limited. (Bangla Vision TV)                     Star Cable NA Inc.

By _____                                        By _____

___Ishreqne__Hossain_____                                         ___S.iD SeHA. L___
Deputy - Managing Director                                        V/P.

# EXHIBIT G

## NETWORK AFFILIATION AGREEMENT

Between

Ekushey Television Limited USA LLC
400 S Willow Ave
Galloway, NJ 08205
The Company wholly owned subsidiary of Ekushey Television Limited 149-150
Tejgaon I/A Dhaka Bangladesh and is authorized by Ekushey Television Limited
Bangladesh to sign this contract.

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation
Agreement ("Agreement"), the above-named parties (each sometimes referred to
herein as a "Party" and collectively as the "Parties") hereby agree as follows with
respect to launch and carriage of the programming service identified below:

Programming Service: Ekushey TV (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and
children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum payment first year: $15,000 to be paid in 3 payments of $5,000 each.

| Guaranteed Payment | vs. | Projection payments* | |
|---|---|---|---|
| 1st year: $15,000 per year. | | 50,000 subscribers | $150,000 |
| 2nd year: $30,000 | | 75,000   subs | $225,000 |
| 3rd year: $45,000 | | 100,000 subs | $300,000 |
| 3rd year: $60,,000 | | 125,000 subs | $375,000 |
| 4th year: $72,000 | | 150,000 subs | $450,000 |
| 5th year: $84,000 | | 175,000 subs | $525,000 |

Number of subscribers report will be submitted on quarterly basis, and payments
above guaranteed will be adjusted each quarter accodingly. Confidential access to
accounting system will be provided on quarterly basis or anytime on written
demand from Ekushey Television ltd.

System Territory: United States of America, Canada, and Europe.

ACCEPTED AND AGREED TO EFFECTIVE AS OF June 1, 2016 (the "Effective Date")

SS

Conditions as follows:

1.    Scope. Affiliate shall have the Exclusive rights to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV

Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the Ekushey legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.50 Ekushey TV will be paid 50% of the monthly fee per subscriber

$1\ year\ SS$

2.    Term of Agreement. The term shall be for a period of ~~five (5)~~ years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.    · License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement. Ekushey Television Limited USA llC will send termination letter to total cable usa and Radiant IPTV.
For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder.  During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels  (collectively referred to herein as "MDUs"),

SS

License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.     Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service.  Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way.  If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.     Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.     Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.     Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

SS

8.    Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.    Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.   Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.
NON-PAYMENT. Ekushey Television ltd. Has right to terminate this contract by giving 60 days writtten notice to cure for non-payment of minimum gurantee payment due or for extra paymnets due based on actual # of subs.

11.   Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or

55

judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms. Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.     Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct

SS

damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:   (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof, however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York.  The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third



arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder.

Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.     Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.     "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.     Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Ekushey TV

Signature:

Printed Name:

Title:

FAURODL ALAM

Date:

06-09-16

Affiliate:

StarCable NA Inc.

Signature

Printed Name:

SATIN SORA L

Title:

Director

Date:

6/9/16

# EXHIBIT H



কথ   0905809

# NETWORK AFFILIATION AGREEMENT

Between
Network: Somoy Media Limited (Somoy Television)
Nasir Trade Center
89, Bir Uttam C. R. Dutta Road, Dhaka-1205
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

**Programming Service:** Somoy Television

Service Description: 24 hour Bangla Language Channel consisting of News and Current Affairs.

Licence Fees: 1st year US$ 15000(fifteen thousand), 2nd year US$ 30000. (thirty thousand),, 3rd year US$ 40000, (forty thousand), 4th year US$ 50000, (fifty thousand), 5th year US$ 60000. (sixty thousand), irrespective of number of customers

System Territory: Exclusively in the United States and Canada and non-exclusively in other countries.

ACCEPTED AND AGREED TO EFFECTIVE AS OF 1st July, 2014 (the "Effective Date")

Conditions as follows:

1. Scope. Affiliate shall have the exclusive right only in the U.S. and Canada to distribute the Service via

the coax cable television systems, Satellite DTH(direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile. Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this contract. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Any requests that comes to Somoy TV regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile) Somoy TV will direct those requests to Star cable Na Inc. Star cable shall provide a direct feed to these systems requiring access to programming. Somoy TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber



কখ  ০৭৩১৮০৫

**2. Term of Agreement.** The term shall be for a period of Five (5) years commencing on the Effective date (the "Term"). This agreement shall prevail unless either Party provides at least 30 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 30 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

**3. License Fees and Payment Terms.**

Affiliate shall pay Somoy TV a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

In five years of agreement, Affiliate will pay Somoy TV full advance payment of 1st year which is US$ 15,000 and half advance payment of 2nd year which is US$ 15,000 totalling the amount to US$ 30,000. On the 10th month of 1st year, affiliate will pay the rest of the amount US$ 15,000. From that onwards, there will be advance payment of one year only.

The payment schedule for the 5 years would be 1st year US$ 15000, 2nd year US$ 30000, 3rd year US$ 40000, 4th year US$ 50000, 5th year US$ 60000.

| Payment Year | Amount in USD | Payment Details | Tentative Payment Date | Amount To Be Paid |
|---|---|---|---|---|
| 1st Year | 15,000 | Full amount of 1st year & 50% of advance of 2nd Years | June 2014 | $30,000/ |
| 2nd Year | 30,000 | Rest 50% of 2nd year | June 2015 | $15,000/ |
| 3rd Year | 40,000 | Full advance payment of 3rd Year | December 2015/January 2016 | $40,000/ |
| 4th Years | 50,000 | Full advance payment of 4th Year | December 2016/January 2017 | $50,000/ |
| 5th Year | 60,000 | Full advance payment of 5th Year | December 2017/January 2018 | $60,000/ |

After receiving the advance payment, If Network (Somoy TV) declares the agreement invalid, for a material cause, it will be bound to Refund the payment upon calculation of the last effective date of this agreement. After making the advance payment, if Affiliate (StarCable) declares the agreement invalid, it will not receive any refund.

If there is no advance payment in due date throughout this five years agreement, Network will provide a written notice to Affiliate within 15 days: If Network does not pay the advance payment within the next 15 days, this agreement will become null and void automatically.

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent(11/2%) Interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, until payment is received by Network. There shall be no tax withholdings from



কর্ম    ০৭৩১৮০৬

4. **Carriage.** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would be without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. Affiliate will never alter or edit any of programming for advertisement insertion under this agreement.

5. **Delivery of Signal.** During the Term, Somoy TV shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Somoy TV to each System, in a digitally compressed mode, by transmitting a signal of the Service via an international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

## SOMOY TELEVISION WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6. **Ownership.** All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7. **Confidentiality.** Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

8. **Assignment.** This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that .... in ..... ..... to assume all assignor's obligations hereunder.

10. **Representations and Warranties.** Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of State of New York, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate in accordance with its terms.

11. **Indemnification.** Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputed between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

12. **Covenants.** Affiliate hereby covenants and agrees that it will:    (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

13. **Vertical Blanking Interval.** Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal



14. **Governing Law.** This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

15. **Arbitration.** All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one

(1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

16. **Waiver.** Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

17. **Notices.** Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

Sid Sohail
Star Cable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

Mohammed Akther Hossain
Somoy Media Limited
Nasir Trade Center .
89, Bir Uttam C. R. Dutta Road, Dhaka-1205
Bangladesh

Notice shall be deemed given upon proof/confirmation of receipt.

18. **Entire Agreement.** This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

19. **Relationship.** Neither Party shall be or hold itself out as the agent of the other Party under this

20. **Counterparts.** This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

21. **Severability.** The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

22. **Construction.** The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

23. **Marketing Efforts.** The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Network: Somoy Media Limited (Somoy Television)

Signature

Name     : Ahmed Jobaer

Title      : Managing Director & CEO

Date      : 10th June, 2014

Affiliate: Star Cable NA Inc.

Signature

Name     : Sid Sohail    ( SAJID )

Title      : Director

Date      : 10th June, 2014

Witness

Signature

Name     : Mohammed Akther Hossain

Title      : Head of Operations

Somoy Media Limited
Nasir Trade Center

# EXHIBIT I



http://totalcableusa.com/                         Go    AUG  SEP  OCT

83 captures                                            ◄ 01 ►
1 Sep 2012 – 31 Jan 2018                             2011  2012 2013

"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- Contact Us



Previous 1 2 3 4 5 Next

## Hindi Plus



- Buy Now
- More

http://www.totalcableusa.com/          Go    DEC  APR  MAY
83 captures                                   ◀ 07 ▶
1 Sep 2012 – 31 Jan 2018                       2012 2013 2014



"Reliable, Affordable!"

**1-212-444-8138** info@totalcableusa.com

* Home
* Packages
* How to
* About us
* Why Total Cable
* Referral
* News
* Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

**Subscriber Login** 

**User Name**

http://totalcableusa.com/index.html   Go   AUG DEC **FEB**

◀ 16 ▶

35 captures
3 Sep 2012 - 29 Sep 2016

2013 2015 2016



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- · Home
- · Packages
- · How to
- · About us
- · Why Total Cable
- ◆ Referral
- · News
- ◆ Contact Us



Previous 1 2 3 4 5 Next

Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

**Subscriber Login**

User Name

4/11/2016
Case 1:16-cv-04067-SJ-CLP   Document 81   Filed 05/06/19   Page 278 of 408 PageID #: 683
Total Cable | Building and delivering broadcast networks worldwide

http://www.totalcableusa.com/index.html      Go   MAY   JUN   JUL
35 captures                                              ◀ 15 ▶
3 Sep 2012 – 15 Sep 2016                                  2014  2015  2016



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



"Reliable, Affordable!"

Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

Subscriber Login

User Name

# EXHIBIT J

📞 1-212-444-8138      ✉ info@totalcableusa.com      Log in (/login)      Service Order (/customerSignup)



(/)

# TOTAL CABLE CHANNELS PACKAGE

## REQUIRES 4MB MINIMUM BANDWIDTH FOR ALL CHANNELS.



SPORTS

Including all European and American Sports.



MOVIES

Including the Latest Movie, Drama a
Comedy.

| | | | | | |
|---|---|---|---|---|---|
| 🏆 জি বাংলা | 🏆 AYM Sports | 🏆 TNT Serie HD | 📺 Boishakhi TV | 📺 SATV | 📺 Al Ramadan |
| 🏆 জি বাংলা সিনেমা | 🏆 Animal Planet | 🏆 FX | 📺 Ekattor TV | 📺 BTV | 📺 Peace TV |
| 🏆 Zee TV HD | 🏆 Discovery Channel | 🏆 Food Network | 📺 Independent | 📺 BTV World | 📺 Peace TV Bangla |
| 🏆 Zee Bollywood | 🏆 National Geographic | 🏆 A&E | 📺 Jamuna TV | 📺 S Bangla | 📺 Guide US TV |
| 🏆 Zee Living | 🏆 One America News | 🏆 Bloomberg Television | 📺 Channel 24 | 📺 ATN Islamic TV | 📺 Iqra TV |
| 🏆 ২৪ ঘন্টা | 🏆 CNN | 🏆 HGTV | 📺 My TV | 📺 ATN News | Bangla |
| 🏆 Disney Channel | 🏆 History | 🏆 Channel i | 📺 ATN Bangla | 📺 TBN 24 | 📺 Huda TV |
| 🏆 Nickelodeon | | 🏆 Rtv | 📺 ATN Music | 📺 TBN Music | 📺 Al Quran |
| 🏆 Cartoon Network | | | 📺 Gaanbangla TV | 📺 TBN Cinema | 📺 Quran Bangla |
| 🏆 Eurosports HD | | | 📺 Asian TV | 📺 TBN Weather | 📺 Al Madina |
| | | | 📺 ATN Bangla UK | 📺 ITV 24 | 📺 Al Mahabba |



NEWS CHANNELS

Always be up-to-date with live news channels from around the world.

Total Cable Building and delivering broadcast networks world wide    Case 1:19-cv-04067-S-J-GLR    Document read also    Filed 05/06/19    Page 281 of 408 Page ID #: 688    https://totalcableusa.com/channels

🔊 ২৪ ঘন্টা        🔊 One        🔊 Fox News        🔊 CNN        🔊 ATN News
🔊 Ekattor TV     America News   Channel
                  🔊 Independent

## ISLAMIC CHANNELS

Lead your life according to the teaching of the Quran and Sunnah.

☆ ITV24        ☆ Quran        ☆ Peace TV      ☆ Al Ramadan    ☆ Al Mahabba    ☆ Iqra TV
☆ Al Quran     Bangla         ☆ Peace TV      ☆ Al Madina                     Bangla
               ☆ Guide US     Bangla

 SERIES

Stay connected with
latest Bengali and English
TV series

 MUSIC CHANNELS

Both Bengali and English
and other other music.

 KID'S CHANNI

Keep your kids
entertained with c
channels.

📹 জি বাংলা        📹 জি বাংলা        ⓔ TBN Music     ⓔ Zee TV HD     ⚽ Cartoon      ⚽ Disney
📹 S Bangla        সিনেমা             ⓔ ATN Music     ⓔ S Bangla      Network        Channel
                   📹 TNT Serie       ⓔ Gaanbangla    ⓔ Zee          ⚽ Nickelodeon
                   HD                 TV              Bollywood

## About us

Total Cable USA is leading IPTV providers
to the Bangladeshi community in the USA
and Canada. The company is
headquartered in the New York City in the
state of New York. Total Cable 's Technology
Provides a Total End to End Solution.
Bangladeshis living in the U.S. try to
connect back to home land by watching
Bangladeshi TV program. Unfortunately, it
gets tricky with monopoly of media

companies and real estate management
companies exclusive contract with certain
providers. More...

## Our Contacts

**Total Cable USA Inc.**

**3719 57TH ST**

**Woodside, New York 11377**

**Phone: 1-212-444-8138**

**Fax: 6312400210**

**Email:**

**info@totalcableusa.com**

**(mailto:info@totalcableusa.com)**

**Website:**

**www.totalcableusa.com (/)**

**File upload: click here to**

**upload your file (/fileUpload)**

TotalCableUSAInc is here to serve you. Total Cable USA Inc. is a company.

f (https://www.facebook.com/TotalCable
(?fref=ts)

# EXHIBIT "K"

Total Cable I: Building and Delivering Broadcast networks worldwide   Filed 05/06/19   Page 284 of 408 PageID #: 689  http://totalcabfcusa.com/channels



(/)

——— দেশী ওটিটি অপারেটর ———

# TOTAL CABLE CHANNELS PACKAGE

### REQUIRES 4MB MINIMUM BANDWIDTH FOR ALL CHANNELS.



## SPORTS

Including all European and American Sports.



## MOVIES

Including the Latest Movie, Drar Comedy.

| | | | | | |
|---|---|---|---|---|---|
| 🏆 জি বাংলা | 🏆 AYM Sports | 🏆 TNT Serie HD | 📹 Boishakhi TV | 📹 SATV | 📹 Al Ramadan |
| 🏆 জি বাংলা সিনেমা | 🏆 Animal Planet | 🏆 FX | 📹 Ekattor TV | 📹 BTV | 📹 Peace TV |
| 🏆 Zee TV HD | 🏆 Discovery Channel | 🏆 Food Network | 📹 | 📹 BTV World | 📹 Peace TV Bangla |
| 🏆 Zee Bollywood | 🏆 National Geographic | 🏆 A&E | Independent | 📹 S Bangla | 📹 Guide US TV |
| 🏆 Zee Living | 🏆 One America News | 🏆 Bloomberg Television | 📹 Jamuna TV | 📹 ATN Islamic TV | 📹 Iqra TV |
| 🏆 ২৪ ঘন্টা | | | 📹 Channel 24 | 📹 ATN News | Bangla |
| 🏆 Disney Channel | 🏆 CNN | 🏆 HGTV | 📹 My TV | 📹 TBN 24 | 📹 Huda TV |
| 🏆 Nickelodeon | 🏆 History | 🏆 Channel ﹐ | 📹 ATN Bangla | 📹 TBN Music | 📹 Al Quran |
| 🏆 Cartoon Network | | 🏆 Rtv | 📹 ATN Music | 📹 TBN Cinema | 📹 Quran Bangla |
| 🏆 Eurosports HD | | | 📹 Gaanbangla TV | 📹 TBN Weather | 📹 Al Madina |
| | | | 📹 Asian TV | 📹 ITV 24 | 📹 Al Mahabba |
| | | | 📹 ATN Bangla UK | | |



## NEWS CHANNELS

Always be up-to-date with live news channels from around the world.



🔊 ২৪ ঘন্টা
📞 1-212-444-8138
🔊 Ekattor TV

🔊 One
✉ info@totalcablebd.com
America News

🔊 Fox News
Channel

🔊 CNN
Log in (/login)

🔊 ATN News
Service Order (/customerSignup)

 (/)

——~ দেশী ওটিটি অপারেটর ——

## ISLAMIC CHANNELS

Lead your life according to the teaching of the Quran and Sunnah.

| ☆ ITV24 | ☆ Quran | ☆ Peace TV | ☆ Al Ramadan | ☆ Al Mahabba | ☆ Iqra TV |
| ☆ Al Quran | Bangla | ☆ Peace TV | ☆ Al Madina | | Bangla |
| | ☆ Guide US | Bangla | | | |



## SERIES

Stay connected with
latest Bengali and
English TV series



## MUSIC CHANNELS

Both Bengali and English
and other other music.



## KID'S CHANN

Keep your kid:
entertained w
cartoons chan

| 📹 জি বাংলা | 📹 জি বাংলা | ⊙ TBN Music | ⊙ Zee TV HD | 👥 Cartoon | 👥 Disney |
| 📹 S Bangla | সিনেমা | ⊙ ATN Music | ⊙ S Bangla | Network | Channel |
| | 📹 TNT Serie | ⊙ Gaanbangla | ⊙ Zee | 👥 | |
| | HD | TV | Bollywood | Nickelodeon | |

## About us

Total Cable USA is leading IPTV providers
to the Bangladeshi community in the USA
and Canada. We are a consumer
technology and Services Company based
in Bangladesh, committed to delivering
Live and On-Demand content to viewers

📞 1-212-444-8138    ✉ info@totalcableusa.com



via our proprietary Internet based set-top box (STB). Total Cable is the leading distributor of Internet based South Asian content, bringing TV, News, Music and more to North America, Bangladesh, Europe and Middle East.

Log in (/login)    Service Order (/customerSignup)

## Our Contacts

### Telephonic Support

Our professional support staffs are available 8:00am – 10:00PM (EST Time) to help you. Please contact us at the following phone numbers:
Phone: 212-444-8138
Fax: 6312400210

### Email Support

Our customers can always email their questions to following email addresses for answers in a timely fashion:
info@totalcableusa.com

File upload: click here to upload your file (/fileUpload)

f (https://www.facebook.com/TotalCable/?fref=ts)

8/17/16, 10:13 AM

# EXHIBIT "L"

# network solutions®

Sorry, someone else already owns this domain, but we can help you get it.

**Backorder for:**
totalcableusa.com ..........................................................

| Backorder |
| --- |

For only $10.00, we can help you get this domain. Here's how it works:

We'll negotiate for you anonymously with whoever currently owns the domain.

If the owner of the domain isn't ready to sell yet, we will watch it every day to see when it becomes available.

If the owner doesn't renew, we'll get it for you before it becomes available to the general public.

totalcableusa.com

Is this your domain name? Renew it now.

```
Domain Name: TOTALCABLEUSA.COM
Registry Domain ID: 1738757417_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2012-08-13T23:24:21Z
Creation Date: 2012-08-13T23:24:21Z
Registrar Registration Expiration Date: 2017-08-13T23:24:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: ok http://www.icann.org/epp#ok
Registry Registrant ID: Not Available From Registry
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: (646) 474-0418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Registry Admin ID: Not Available From Registry
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
Admin Phone: (646) 474-0418
Admin Phone Ext:
Admin Fax:
```

```
Admin Fax Ext:
Admin Email: info@totaltvs.com
Registry Tech ID: Not Available From Registry
Tech Name: Habib Rahman
Tech Organization: Total Tvs
Tech Street: 15 westmoylan ln
Tech City: coram
Tech State/Province: New York
Tech Postal Code: 11727
Tech Country: US
Tech Phone: (646) 474-0418
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: info@totaltvs.com
Name Server: NS73.DOMAINCONTROL.COM
Name Server: NS74.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.inte
>>> Last update of WHOIS database: 2016-08-17T13:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden witho
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In part
you agree not to use this data to allow, enable, or otherwise make poss
dissemination or collection of this data, in part or in its entirety, f
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electr
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record



Search Again

: Search again here...

Search by either

○ Domain Name e.g. networksolutions.com
IP Address e.g. 205.178.187.13



---

| | 12mm Old City Collection Savannah Myth | $1.19 Sq ft | View Now |
|---|---|---|---|

The price includes a one-time, non-refundable set-up fee and annual subscription fee for the Service per each domain name requested for backorder. Network Solutions reserves the right to waive or discount the set-up fee at any time. The price does not include the cost of the actual domain name. If the domain name is acquired, the cost of the one-year domain name registration will be charged to your credit card or other payment method on file. Network Solutions does not guarantee that you will obtain the domain name through this Service.

GoDaddy

  

Promos 

## Search the WHOIS Database

Enter a domain name to search

Private Registration     Local listings

# WHOIS search results

Domain Name: TOTALCABLEUSA.COM
Registry Domain ID: 1738757417_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2017-08-14T14:33:18Z
Creation Date: 2012-08-13T23:24:21Z
Registrar Registration Expiration Date: 2022-08-13T23:24:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: ok http://www.icann.org/epp#ok
Registry Registrant ID: Not Available From Registry
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 14455 N. Hayden Road
Registrant City: Scottsdale
Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599

Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Registry Admin ID: Not Available From Registry
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road
Admin City: Scottsdale
Admin State/Province: Arizona
Admin Postal Code: 85260
Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Registry Tech ID: Not Available From Registry
Tech Name: Registration Private
Tech Organization: Domains By Proxy, LLC
Tech Street: DomainsByProxy.com
Tech Street: 14455 N. Hayden Road
Tech City: Scottsdale
Tech State/Province: Arizona
Tech Postal Code: 85260
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Name Server: NS73.DOMAINCONTROL.COM
Name Server: NS74.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2019-04-11T19:00:00Z <<<

For more information on Whois status codes, please visit

https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Notes:

IMPORTANT: Port43 will provide the ICANN-required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data  |  Contact Domain Holder  |  Report Invalid Whois

## Want to buy this domain?

Get it with our Domain Buy Service.

Go

## Is this your domain?

Add hosting, email and more.

Go

ICANN Confirmation

Browser Code

Product Catalog

GO DO

Sitemap

Partner Programs

Affiliates

Reseller Plans

Go Daddy Pro

Account

My Account

My Renewals

Create Account

Shopping

Domains

Websites

WordPress

Hosting

Web Security

Email & Office

SSL Certificates

Online Marketing

Manage Customers

Agencies

©1999 - 2019 GoDaddy.com




Go Daddy Legal Docs · ESS

# EXHIBIT "M"

Case 1:16-cv-04067-SJ-CLP  Document 81  Filed 05/06/19  Page 299 of 408 PageID #: 704

network
solutions

Sorry, someone else already owns this domain, but we can help you get it.

**Backorder for:**
totalcablebd.com .........................................................    **Backorder**

For only $10.00, we can help you get this domain. Here's how it works:

　　　We'll negotiate for you anonymously with whoever currently owns the domain.

　　　If the owner of the domain isn't ready to sell yet, we will watch it every day to see when it becomes available.

　　　If the owner doesn't renew, we'll get it for you before it becomes available to the general public.

totalcablebd.com

Is this your domain name? Renew it now.

```
Domain Name: TOTALCABLEBD.COM
Registry Domain ID: 1938827466_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2015-06-15T17:08:21Z
Creation Date: 2015-06-15T17:08:21Z
Registrar Registration Expiration Date: 2020-06-15T17:08:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#client
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUp
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRer
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDe
Registry Registrant ID: Not Available From Registry
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: +1.6464740418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Registry Admin ID: Not Available From Registry
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
```

```
Admin Phone: +1.6464740418
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: info@totaltvs.com
Registry Tech ID: Not Available From Registry
Tech Name: Habib Rahman
Tech Organization: Total Tvs
Tech Street: 15 westmoylan ln
Tech City: coram
Tech State/Province: New York
Tech Postal Code: 11727
Tech Country: US
Tech Phone: +1.6464740418
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: info@totaltvs.com
Name Server: NS31.DOMAINCONTROL.COM
Name Server: NS32.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.inte
>>> Last update of WHOIS database: 2016-08-17T13:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden witho
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In part
you agree not to use this data to allow, enable, or otherwise make poss
dissemination or collection of this data, in part or in its entirety, f
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electr
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

Stone Siding - Quartzite Finished
Slate Collection Quartzite
Finished Slate - Bermuda Green /
Ledge Stone 6"x24

# $4.59 Sq ft

View Now

Search Again

Search again here...

Search by either

○ Domain Name e.g. networksolutions.com
IP Address e.g. 205.178.187.13

Case 1:16-cv-04067-SJ-CLP   Document 81   Filed 05/06/19   Page 302 of 408 PageID #: 707





The price includes a one-time, non-refundable set-up fee and annual subscription fee for the Service per each domain name requested for backorder. Network Solutions reserves the right to waive or discount the set-up fee at any time. The price does not include the cost of the actual domain name. If the domain name is acquired, the cost of the one-year domain name registration will be charged to your credit card or other payment method on file. Network Solutions does not guarantee that you will obtain the domain name through this Service.

GoDaddy   

 Promos 

## Search the WHOIS Database

Enter a domain name to search          Search

Private Registration     Local listings

# WHOIS search results

Domain Name: TOTALCABLEBD.COM

Registry Domain ID: 1938827466_DOMAIN_COM~VRSN

Registrar WHOIS Server: whois.godaddy.com

Registrar URL: http://www.godaddy.com

Updated Date: 2015–06–15T17:08:21Z

Creation Date: 2015–06–15T17:08:21Z

Registrar Registration Expiration Date: 2020–06–15T17:08:21Z

Registrar: GoDaddy.com, LLC

Registrar IANA ID: 146

Registrar Abuse Contact Email: abuse@godaddy.com

Registrar Abuse Contact Phone: +1.4806242505

Domain Status: clientTransferProhibited

http://www.icann.org/epp#clientTransferProhibited

Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited

Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited

Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited

Registry Registrant ID: Not Available From Registry

Registrant Name: Registration Private

Registrant Organization: Domains By Proxy, LLC

Registrant Street: DomainsByProxy.com

Registrant Street: 14455 N. Hayden Road

Registrant City: Scottsdale

Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: TOTALCABLEBD.COM@domainsbyproxy.com
Registry Admin ID: Not Available From Registry
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road
Admin City: Scottsdale
Admin State/Province: Arizona
Admin Postal Code: 85260
Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: TOTALCABLEBD.COM@domainsbyproxy.com
Registry Tech ID: Not Available From Registry
Tech Name: Registration Private
Tech Organization: Domains By Proxy, LLC
Tech Street: DomainsByProxy.com
Tech Street: 14455 N. Hayden Road
Tech City: Scottsdale
Tech State/Province: Arizona
Tech Postal Code: 85260
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: TOTALCABLEBD.COM@domainsbyproxy.com
Name Server: NS31.DOMAINCONTROL.COM
Name Server: NS32.DOMAINCONTROL.COM
DNSSEC: unsigned

URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2019-04-11T19:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Notes:

IMPORTANT: Port43 will provide the ICANN-required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data   |   Contact Domain Holder   |   Report Invalid Whois

## Want to buy this domain?

Get it with our Domain Buy Service.

Go

## Is this your domain?

Add hosting, email and more.

Go

About GoDaddy

About

Contact Us

Newsroom

Investor Relations

Careers

Trust Center - Security

Advertising

GoDaddy.co

Legal

Partner - Blog

Support

Product Support

Contact Us

Report Abuse

Resources

Webmail

Tools for Pros

Partner Programs

GoDaddy

Account

My Account

Websites

Websites




Case 1:16-cv-04067-SJ-CLP   Document 81   Filed 05/06/19   Page 308 of 408 PageID #: 713

# EXHIBIT "N"

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through April 10, 2019.

Selected Entity Name: TOTAL CABLE USA LLC
Selected Entity Status Information

|  |  |
|---|---|
| **Current Entity Name:** | TOTAL CABLE USA LLC |
| **DOS ID #:** | 4476270 |
| **Initial DOS Filing Date:** | OCTOBER 22, 2013 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | INACTIVE - Dissolution (May 02, 2016) |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
AHMODUL BAROBHUIYA
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Registered Agent**

NONE

This office does not require or maintain information
regarding the names and addresses of members or
managers of nonprofessional limited liability
companies. Professional limited liability companies
must include the name(s) and address(es) of the original
members, however this information is not recorded and
only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

Entity Information

No Information Available

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| OCT 22, 2013 | Actual | TOTAL CABLE USA LLC |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

.

# EXHIBIT "O"

SHAHID RASUL | Account # ⬛⬛⬛⬛⬛ | September 9, 2017 to October 10, 2017

## Withdrawals and other subtractions - continued

| Date | Description | Amount |
|------|-------------|--------|
| 09/26/17 | CHECKCARD 0924 FIVE BELOW 345 WESTBURY NY 24445007268500204326262 | -128.30 |
| 09/26/17 | CHECKCARD 0925 DUNKIN #330148 Q35 ALBERTSON NY 24431067269838000009800 | -20.98 |
| 09/26/17 | CHECKCARD 0925 DUNKIN #331183 Q35 LONG ISLAND CNY 24431067269838000009289 | -2.18 |
| 09/27/17 | USPS PO 354839 09/27 #000261181 PURCHASE USPS PO 35483907 ASTORIA NY | -47.50 |
| 09/28/17 | CHECKCARD 0926 THE HOME DEPOT #1255 LONG ISLAND CNY 24610437270010186821995 | -22.83 |
| 09/28/17 | CHECKCARD 0927 RS*DOMAINNAME REGISTER 425-2744500 WA 24906417270044855890911 RECURRING | -42.95 |
| 09/29/17 | CHECKCARD 0927 AU BON PAIN LONG ISLAND CNY 24231687271200000300007 | -0.82 |
| 10/02/17 | CHECKCARD 0929 TOTAL CABLE 212-444-8138 NY 24009587272300573714187 | -90.00 |
| 10/02/17 | CHECKCARD 0929 OURPACT PREMIUM 858-888-9168 CA 24492157273637029851369 RECURRING | -4.99 |
| 10/02/17 | CHECKCARD 0930 SARAVANAA BHAVAN HICKSVILLE NY 24431067274838000160952 | -100.35 |
| 10/03/17 | CHECKCARD 1002 COSTELLO'S ACE 140 NEW HYDE PARKNY 24224437276101017997302 | -16.28 |
| 10/05/17 | CHECKCARD 1004 THE UPS STORE 4628 570-420-1101 PA 24692167278100071191681 | -76.32 |
| 10/06/17 | MICRO ELE 655 10/06 #000332119 PURCHASE MICRO ELE 655 Mer Westbury NY | -2.16 |
| 10/10/17 | CHECKCARD 1006 SILVER STAR MOTORS LONG ISLAND CNY 24692167280100109388461 | -17.33 |
| 10/10/17 | CHECKCARD 1009 SMASHBURGER #1563 NEW HYDE PARKNY 24224437283105006385099 | -26.03 |
| Total withdrawals and other subtractions | | -$1,192.83 |

## Service fees

Your Overdraft and NSF: Returned Item fees for this statement period and year to date are shown below.

| | Total for this period | Total year-to-date |
|--|-----------------------|--------------------|
| Total Overdraft fees | $0.00 | $0.00 |
| Total NSF: Returned Item fees | $0.00 | $70.00 |

To help avoid overdraft and returned item fees, you can set up:

Customized alerts – get email or text message alerts (footnote 1) to let you know if your balance is low
Overdraft Protection – enroll to help protect yourself from overdrafts and declined transactions
To enroll, go to bankofamerica.com/online, call us at the number listed on this statement, or come see us at your nearest financial center.

(footnote 1) Alerts received as text messages on your mobile access device may incur a charge from your mobile access service provider. This feature is not available on the Mobile website. Wireless carrier fees may apply.

continued on the next page

# EXHIBIT "P"

## SETTLEMENT TERM SHEET

This term sheet represents the material settlement terms upon which Plaintiff Asia TV USA Ltd. ("ATUL") and Total Cable USA LLC, Lalon TV Inc., Ahmodul Barobhuiya and Habibur Rahman (collectively "Defendants") agree pertaining to, and addressing, each and all of the claims and causes of action set forth in the lawsuit captioned *Asia TV USA Ltd. v. Total Cable USA LLC, et al.*; No. 1:16-cv-6873-AJN-OTW, currently pending in the United States District Court for the Southern District of New York (the "Action"). The terms set forth herein shall be memorialized on the record before the Court at a hearing on August 14, 2018. A long form Settlement Agreement and Release Document also will be entered into by and between ATUL and Defendants (collectively, the "Parties).

The Parties agree as follows:

1. **Settlement Payment to be Made by Defendants to ATUL**

   Defendants shall make a one-time payment to ATUL in the amount of $450,000 ("Settlement Payment"), by wiring that sum to the Rosoff, Schiffres and Barta ("RSB") Client Trust Account (wiring instructions will be provided), within seven (7) business days of the appearance before Judge Wang acknowledging the settlement on the record. The parties will thereafter within ten (10) business days execute a long form settlement and mutual general release agreement formally documenting the terms and conditions of the settlement reflected herein. The Settlement Payment shall represent full and complete satisfaction of any and all monies alleged in the within action as being owed by any party thereto.

2. **Permanent Injunction**

   Defendants stipulate in open Court that they will execute a stipulation for the entry of a permanent injunction prohibiting Defendants from distributing ATUL's content (also referred to as "ZEE Content") unless and until a valid distribution agreement authorizing Defendants and/or any of their affiliates, subsidiaries, related entities or companies is executed by and between the parties. The injunction shall enjoin Defendants from any involvement with any persons or entities who engage in the distribution of ATUL's content without a valid distribution agreement with ATUL. The form of the permanent injunction shall be as attached hereto as Exhibit 1, subject to the Court's approval.

3. **Mutual General Releases.** The long form settlement agreement will contain mutual general releases.

4. **Dismissal of Litigation.** On or before the tenth business day following the delivery of the Settlement Payment, the Parties will file a Joint Stipulation of Dismissal of All Claims with Prejudice and a Proposed Order of Dismissal with Prejudice, and will file such other papers as are necessary to terminate the Action with prejudice and with costs and attorneys' fees taxed against the party incurring same.

## [SIGNATURES ON FOLLOWING PAGE]

**ASIA TV USA LTD.**

By: AKHILESH GUPTA

Its: VICE PRESIDENT

Signed: _Akhilal C-pta_

Date: 08 | 14 | 2018

**TOTAL CABLE USA LLC**

By: AHMODUL BAROBHUIYA

Its: CEO

Signed: _____

Date: 8|14|2018

**AHMODUL BAROBHUIYA**

Signed: _____

Date: 8 | 14 | 2018

**SHAHINUL KARIM**

Signed: S. Karim

Date: 8/14/18

**LALON TV, INC.**

By: SHAHINUL KARIM

Its: PRESIDENT

Signed: S. Karim

Date: 8/19/18

**HABIBUR RAHMAN**

Signed: _____

Date: 08/14/2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

STAR CABLE NA, INC.,                                    16-CV-04067 (SJ)

                    Plaintiff,

     -against-

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                    Defendants.
-------------------------------------------------------------------X

# PLAINTIFF'S LOCAL RULE 56.1(b) STATEMENT IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY TOTAL CABLE USA LLC

HOGAN & CASSELL, LLP
*Attorneys for Plaintiff, Star Cable NA, Inc.*
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
Tel. (516) 942-4700
Fax (516) 942-4705
Email mcassell@hogancassell.com

Pursuant to Rule 56.1 of the Rules of this Court, the plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorneys, Hogan & Cassell, LLP, respectfully submits this Rule 56.1(b) Statement in opposition to the motion for summary judgment filed by Total Cable USA LLC ("Total Cable").

Significantly, in violation of the Local Rules of this Court, Total Cable failed to submit a Rule 56.1(a) statement. Instead, its motion is supported by the March 25, 2019 affirmation of its attorney, Satish Bhatia, Esq. ("Bhatia Aff."). In addition, for the most part, the paragraphs in the Bhatia Aff. are not short and concise as specifically required by Local Rule Civ. P. 56.1(a).

To the extent that the Court considers the Bhatia Aff. as Total Cable's Rule 56.1(a) statement, Star Cable responds as follows.

## FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 1.[1] | Plaintiff neither admits nor denies this statement given that it does not set forth a material fact, but rather, provides background as to Bhatia. | |
| 2. | Disputed. As set forth in detail in the April 19, 2019 affidavit of Shahid Bob Rasul ("Rasul Aff."), there are issues of fact as to whether Total Cable is still operating. | <u>See</u> Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |
| 3. | Not disputed. | |
| 4. | Disputed in part. While the paragraph does set forth what Total Cable alleged in its answer, this does not support the conclusion that the allegations are undisputed facts. | |
| 5. | Disputed to the extent that the referenced motion "speaks for itself" and the motion is not an undisputed material fact. | |

---

[1] Given the length of each statement, they are not retyped herein.

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 6. | Disputed to the extent that the referenced Order "speaks for itself" and the Order is not an undisputed material fact. | |
| 7. | Disputed to the extent that the referenced Order "speaks for itself" and the Order is not an undisputed material fact. | |
| 8. | Not disputed. | |
| 9. | Disputed. As set forth in detail in the Rasul Aff., there are issues of fact as to whether Total Cable is still operating. Plaintiff also notes that Bhatia's opinion as to what the documents produced by Plaintiff show is not an undisputed material fact. | See Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |
| 10. | Disputed. As set forth in detail in the Rasul Aff., there are issues of fact as to whether Total Cable is still operating. | See Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |
| 11. | Disputed. As set forth in detail in the Rasul Aff., there are issues of fact as to whether Total Cable is still operating. | See Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |
| 12. | Disputed. This statement is not a material fact, but rather, Bhatia's interpretation of certain documents. In addition, as set forth in detail in the Rasul Aff., there are issues of fact as to whether Total Cable is still operating. | See Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |
| 13. | Disputed. This statement is not a material fact, but rather, Bhatia's interpretation of certain documents. In addition, as set forth in detail in the Rasul Aff., there are issues of fact as to whether Total Cable is still operating. | See Rasul Aff. ¶¶ 33-43; Exhibits I-P to Rasul Aff. |

## ADDITIONAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 14. Plaintiff is a cable television company that has exclusive rights, in the United States and Canada, to distribute eight individual programming services, via the signal delivery services internet protocol television system ("IPTV"), WiMax Wireless and Mobile TV. The exclusive services originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes hereinafter referred to as the "Exclusive Services"). | See Rasul Aff. ¶ 3. |
| 15. Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. | See Rasul Aff. ¶ 4. |
| 16. Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. | See Rasul Aff. ¶ 5. |
| 17. Prior to October 22, 2013, Total Cable, upon information and belief, operated as a subsidiary of Lalon TV, Inc., an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram New York. Both Total Cable and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya ("Barobhuiya"), who testified that he was the CEO of Total Cable. | See Rasul Aff. ¶ 6. |
| 18. Confirming the extremely close relationship between Total Cable and Lalon TV, Inc., in a bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. a/k/a Total TV, a/k/a Total Cable. | See Rasul Aff. ¶ 7. |
| 19. Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access. | See Rasul Aff. ¶ 8. |
| 20. Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet | See Rasul Aff. ¶ 9. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| Protocol Television (i.e. IPTV). | |
| 21. In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered. So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV. | See Rasul Aff. ¶ 10. |
| 22. In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights"). | See Rasul Aff. ¶ 11. |
| 23. Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted. The encrypted video services are then transmitted via the internet to its customers. | See Rasul Aff. ¶ 12. |
| 24. Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen. The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same. | See Rasul Aff. ¶ 13. |
| 25. The set top box is part of the monthly service charge of a customer's purchase of IPTV service. If a customer wants a second set top box a service charge is added to the customer's bill each month. | See Rasul Aff. ¶ 14. |
| 26. The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted. | See Rasul Aff. ¶ 15. |
| 27. Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service. | See Rasul Aff. ¶ 16. |
| 28. Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services: i) | See Rasul Aff. ¶ 17. |

3

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada. | |
| 29. A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television. | See Rasul Aff. ¶ 18. |
| 30. A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd. Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited. | See Rasul Aff. ¶ 19. |
| 31. More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the exclusive right to broadcast Independent TV in United States and Canada via IPTV. | See Rasul Aff. ¶ 20; Exhibit A to Rasul Aff. |
| 32. With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the exclusive right to broadcast Jamuna TV in United States and Canada via IPTV. | See Rasul Aff. ¶ 21; Exhibit B to Rasul Aff. |
| 33. With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Channel 16 provides Plaintiff with the exclusive right to broadcast Channel 16 in United States and Canada via IPTV. | See Rasul Aff. ¶ 22; Exhibit C to Rasul Aff. |
| 34. With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014. The agreement is for nine years. This agreement is still in effect. The agreement with My TV provides Plaintiff with the exclusive right to broadcast My TV in United States and Canada via IPTV. | See Rasul Aff. ¶ 23; Exhibit D to Rasul Aff. |

4

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 35.  With regard to Asian TV, Plaintiff and Asian TV entered into an agreement on November 25, 2014.  The agreement is for eight years.  This agreement is still in effect.  The agreement with Asian TV provides Plaintiff with the <u>exclusive</u> right to broadcast Asian TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 24; Exhibit E to Rasul Aff. |
| 36.  With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016.  The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement.  This agreement has not been terminated and is still in effect.  The agreement with Bangla Vision provides Plaintiff with the <u>exclusive</u> right to broadcast Bangla Vision in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 25; Exhibit F to Rasul Aff. |
| 37.  With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016.  The agreement is for five years.  This agreement is still in effect.  The agreement with Ekhusey TV provides Plaintiff with the <u>exclusive</u> right to broadcast Ekhusey TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 26; Exhibit G to Rasul Aff. |
| 38.  With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014.  The agreement is for five years.  This agreement is still in effect.  The agreement with Somoy TV provides Plaintiff with the <u>exclusive</u> right to broadcast Somoy TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 27; Exhibit H to Rasul Aff. |
| 39.  Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks.  Defendants' signal delivery system is almost identical to that of Star Cable. | <u>See</u> Rasul Aff. ¶ 28. |
| 40.  Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants. | <u>See</u> Rasul Aff. ¶ 29. |
| 41.  Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming. | <u>See</u> Rasul Aff. ¶ 30. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 42.  In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers.  Said actions of Defendants are an unauthorized divulgence of satellite signals. | See Rasul Aff. ¶ 31. |
| 43.  Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable. | See Rasul Aff. ¶ 32. |
| 44.  The main argument raised by Total Cable in its motion for summary judgment is that the claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating. | See Rasul Aff. ¶ 33. |
| 45.  Total Cable's motion should be denied given that there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD. | See Rasul Aff. ¶ 34. |
| 46.  Specifically, historical website documents pertaining to Total Cable from 2012 to 2016, reflect Total Cable's phone number of (212) 444-8138. | See Rasul Aff. ¶ 35; Exhibit I to Rasul Aff. |
| 47.  The same exact website as Total Cable's website as of May 7, 2016, on August 17, 2016, has the logo changed to Total Cable BD and the email address changed to info@totalcablebd.com.  The phone number of (212) 444-8138 and rest of information is identical on both websites. | See Rasul Aff. ¶¶ 36-37; Exhibits J and K to Rasul Aff. |
| 48.  Before this action was filed, Total Cable and Total Cable BD had its website "who-is" information as publicly available until sometime in 2016.  Both websites "who-is" information shows the same individual Habib Rahman as the registrant with address of 15 Westmoylan Lane, Coram New York. | See Rasul Aff. ¶ 38. |
| 49.  The "who-is" information for Total Cable as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York.  After this suit was commenced, Total Cable changed its "who-is" information to anonymous. | See Rasul Aff. ¶ 39; Exhibit L to Rasul Aff. |
| 50.  Just like Total Cable, the "who-is" information for Total Cable BD | See Rasul Aff. ¶ 40; |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York. Just like Total Cable, after the commencement of this suit, Total Cable BD made its "who-is" information anonymous. | Exhibit M to Rasul Aff. |
| 51. As reflected in information printed from Secretary of State of New York website on April 11, 2019, Total Cable had the same exact address as the address for Total Cable BD, which is 15 Westmoylan Lane, Coram New York. | See Rasul Aff. ¶ 41; Exhibit N to Rasul Aff. |
| 52. While Total Cable claims that after it filed for bankruptcy in 2016, that it had no assets or revenues and dissolved, Rasul's debit card was charged $90.00 on October 2, 2017, by Total Cable. The charge was for a subscription for services that had been active since approximately 2014. This charge was made nearly eleven months after Total Cable filed for bankruptcy and even though Total Cable is claiming that the company was not conducting any business while doing so. The charge depicts the same Total Cable phone number of (212) 444-8138. | See Rasul Aff. ¶ 42; Exhibit O to Rasul Aff. |
| 53. In a suit commenced by Asia TV USA Ltd. against Total Cable and other defendants, the defendants recently settled the action for $450,000. Barobhuiya executed the agreement on behalf of Total Cable in August 2018. | See Rasul Aff. ¶ 43; Exhibit P to Rasul Aff. |

Dated: April 22, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP
Attorneys for Star Cable NA, Inc.

By: _____
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700
(516) 942-4705
mcassell@hogancassell.com

7

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

STAR CABLE NA, INC.,                                   Docket No. 16-cv-04067

                                    Plaintiff,

             vs.

TOTAL CABLE USA LLC. and RADIANT IPTV

                                    Defendants.

-----------------------------------------------------------------x

# REPLY AFFIRMATION AND MEMORANDUM IN OPPOSITION TO THE OPPSITION FILED BY THE PLAINTIFF

SATISH K. BHATIA, ESQ.,
Bhatia & Associates PLLC
*Attorneys for the Defendants*
38 West, 32nd Street, Suite #1511
New York, NY 10001
Tel: 212-239-6898
Fax: 212-594-7980

## TABLE OF AUTHORITIES

Alvarez v. Prospect Hosp.,

68 N.Y.2d 320, 324 (1986)……………………………………………...Page 6

Barthelemy v. Air Lines Pilots Ass'n,

897 F2d 999, 1018 (9th Cir. 1990)……………………………………………Page 3

Block v City of L.A.,

253 F.3d 410, 419 (9th Cir. 2001)……………………………………………Page 3

Carroll v Radoniqi,

105 A.D.3d 493, 494 (1st Dept. 2013)……………………………..……….Page 7

Crossell v Wing Farm, Inc.

79 A.D.3d 1334, 1336 (3d Dept. 2010)……………………………….……Page 7

Hecker v Liebgold,

130 A.D.3d 572, 574(2d Dept. 2015)…………………………….……..……...Page 6

Hlinka v Bethlehem Steel Corp.,

863 F.2d 279, 282 (3d Cir. 1988)…………………………….…………..Page 4

Josendis v Wall to Wall Residence Repairs Inc.,

662 F.3d 1292, 1317 (11th Cir. 2011)……………………………….………...Page 4

Reale v Tsoukas,

146 A.D.3d 833, 835 (2d Dept. 2017)…………………………….……..…….Page 7

Stonehill Capital Management, LLC v

Bank of the W., 28 N.Y.3d 439, 448 (2016)………………………….…….Page 6

**Statutes and Rules:**

FRCP 56(c)(4)……………………………………………………………Pages 3-4

Individual Rules of Honorable

Sterling Johnson Jr. III E……………………………………………………Page 2

### INTRODUCTION

1. The Plaintiff has commenced the present action against the Defendant Total Cable USA
   LLC alleging that the Plaintiff has exclusive rights to broadcast the eight channels
   mentioned in paragraph 1 of the second amended complaint (Docket No. 38). The
   Defendant Total Cable USA LLC in its answer has alleged that Total Cable USA LLC
   was dissolved in May 2016 and has not been in business since it was dissolved. The
   issue to be determined in this case is whether Total Cable USA LLC has been
   broadcasting the channels mentioned in the complaint and whether the Plaintiff is entitled
   to seek damages and injunctive relief against the Defendant Total Cable USA LLC.

### THE OPPOSITION FILED BY THE PLAINITFF IS UNTIMELY AS IT IS IN VIOLATION OF THE INDIVIUAL RULES OF THIS COURT

2. The Court set up deadlines for filing the motion, opposition and reply. The Court ordered
   that the Defendants' motion seeking summary judgment was due by March 14, 2019, the
   Plaintiff's response was due March 21, 2019 and the status conference was scheduled on
   March 26, 2019 (Docket sheet dated March 7, 2019). On March 30, 2019, the Court
   granted extension of time and changed the schedule as ordered on March 7, 2019 (Docket
   No. 78). The Court ordered that the Defendants' motion shall be served by March 25,
   2019; Plaintiff's opposition shall be served by April 9, 2019, the Defendants' reply shall
   be served by April 17, 2019 and all papers would be filed by the end of April 19, 2019.
   On March 25, 2019, the Defendants provided the notice of motion and supporting
   documents as ordered by the Court to the attorney for the Plaintiff. On March 20, 2019, I
   wrote a letter to this Honorable Court requesting to extend the time to file a reply by the
   Defendants by April 25, 2019 since I was on vacation. The letter was written with the

consent of Michael Cassell, the Plaintiff's attorney (Docket No. 79). On April 2, 2019, the Court granted the extension. Subsequently on April 18, 2019, I received an email from the Plaintiff's Counsel indicating therein that he was trying to provide the opposition by the end of April 19, 2019 but he needs a few days extension due to his hectic schedule. I responded to the email that if I received the opposition by April 23, 2019, I would need time to file the reply until May 2, 2019. The Plaintiff's Counsel sent another email indicating that he consents to as much time as I need to provide the reply. The copy of the exchange of emails during the period of April 18-April 22 are annexed with this memorandum as **Exhibit A**.

3. The Plaintiff's Counsel served the opposition and the memorandum of law on April 23, 2019. Though the deadline to file the opposition was April 9, 2019, the Plaintiff's attorney Michael Cassell filed the opposition on April 23, 2019 with my consent. However, the Plaintiff's attorney did not write a letter to the Court for approval of change of schedules to file an opposition as ordered by the Court on April 2, 2019.

4. The individual rules of this Court pertaining to motions III E, provides "Subject to Court approval, parties may agree on briefing schedule. No changes in the approved schedule may be made without Court approval". The opposition filed on April 23, 2019 without Court approval is liable to be rejected.

**THE AFFIDAVIT FILED BY SHAHID BOB RASUL IN OPPOSITION TO THE**

**MOTION FILED BY THE DEFENDANTS FOR SUMMARY JUDGMENT IS**

**NOT BASED ON THE PERSONAL KNOWLEDGE OF SHAHID BOB RASUL**

**AND AS SUCH MR. RASUL'S AFFIDAVIT CANNOT BE CONSIDERED**

5.  Shahid Bob Rasul in his affidavit indicates that he is the Chief Technology Officer of the
    Plaintiff Star Cable NA Inc. and he submitted the affidavit in opposition to the motion for
    summary judgment filed by Total Cable USA LLC. The Chief Technology Officer is
    simply an employee of the Plaintiff and has no personal knowledge about the issues
    involved in the motion for summary judgment. Mr. Rasul does not state in his affidavit
    that he has personal knowledge of the facts of the case and/or source of his knowledge.
    The declaration/affidavit must be based on personal knowledge as mandated in the
    Federal Rule of Civil Procedure 56(c)(4).  FRCP 56(c)(4) provides:

    > "*Affidavits of Declarations.* An affidavit or declaration
    > used to support or oppose a motion must be made on
    > personal knowledge, set out facts that would be
    > admissible in evidence, and show that the affiant or
    > declarant is competent to testify on the matters stated".

An affiant's personal knowledge can be reasonably inferred from his/her position and
from the nature of his/her personal participation in the matters sworn to in the affidavit.
(*See* Barthelemy v. Air Lines Pilots Ass'n, 897 F2d 999, 1018 (9th Cir. 1990). In the
present case, Mr. Rasul's position is only as a Chief Technology Officer and does not
claim that he is the Principal Officer or the President of Star Cable NA Inc. If the
affidavits content makes clear that the affiant relies information from others rather than
first hand participation and experience, the Court may properly refuse to consider the
affidavit as not based on personal knowledge. (*See* Block v City of L.A., 253 F.3d 410,
419 (9th Cir. 2001). A statement by the affiant that he/she believes a fact to be true or
attest to a fact upon information and belief does not satisfy the requirement that a witness

has personal knowledge of the facts. (*See*, e.g., Josendis v Wall to Wall Residence Repairs Inc., 662 F.3d 1292, 1317 (11th Cir. 2011); Hlinka v Bethlehem Steel Corp., 863 F.2d 279, 282 (3d Cir. 1988).  The declaration/affidavit must show that the declarant is competent to testify on the matters stated in the declaration, FRCP 56(c)(4).

## THE COMPLAINT FILED BY STAR CABLE NA INC. AGAINST TOTAL CABLE USA LLC SHOULD BE DISMISSED

6. The Plaintiff concedes that Total Cable USA LLC was dissolved in May 2016.  In paragraph 3 of the complaint, the Plaintiff admits that Total Cable USA LLC operated as NY Registered LLC from October 22, 2013 until May 2, 2016 on which date it was dissolved.  In paragraph 3, the Plaintiff also alleges that upon information and belief, Total Cable USA LLC operated as subsidiary of Lalon TV.  The Plaintiff failed to file any document showing that Total Cable USA LLC was ever operated as a subsidiary of Lalon TV.  Syed Ahmed annexed Exhibit D with his reply affidavit which is a print out taken from the website of the Division of Corporation.  Exhibit D shows that Lalon TV Inc. was incorporated as a Domestic Business Corporation on August 20, 2009.  He also annexed Exhibit E in his reply affidavit which shows that on January 23, 2012, Lalon TV filed a certificate of corporation of assumed name "Total Cable" and obtained an assumed name certificate for "Total Cable."  In paragraph 6 of his affidavit, Mr. Ahmed states that Lalon TV d/b/a Total Cable is an independent and different corporation and Total Cable USA LLC was an independent and different corporation which was dissolved in May 2016.  Mr. Ahmed also annexed Exhibit F, the copy of the complaint filed by Star Cable NA Inc., index no. 17-cv-04469 in the Eastern District, Suffolk County against the Defendants Lalon TV, Total Cable BD and others.  In the complaint, the Plaintiff alleged

violation of the same channels which are the subject matter in the present complaint. The allegations and the complaint against Lalon TV and against Total Cable USA LLC are identical. The Plaintiff has already changed the name of the Defendants. The said action was discontinued by the Plaintiff when Lalon TV showed the agreements executed between the content owners and Lalon TV. The Plaintiff wants the Court to believe that Total Cable USA LLC has been functioning in the name of Total Cable BD after it was dissolved. The Plaintiff was not able to produce any evidence to establish that Total Cable USA LLC has been functioning or broadcasting any channels after it was dissolved in May 2016. The Plaintiff's attorney failed to give any explanation of why the action against Lalon TV and Total Cable BD was discontinued if Total Cable USA LLC was broadcasting channels in the name of Total Cable BD or in the name of Total Cable.

7.  In an attempt to establish that Total Cable USA LLC has been broadcasting channels, Mr. Rasul in his affidavit in opposition to the motion for summary judgment annexed Exhibit O which shows that Mr. Rasul made a payment of $90 on October 2, 2017 from his credit card services, however this only establishes that the payment was made to Total Cable which is the d/b/a of Lalon TV and not to Total Cable USA LLC and the telephone number 212-444-8138 is the telephone number of Lalon TV shown in Exhibit O and does not belong to Total Cable USA LLC. Mr. Ahmed in his affidavit states that Total Cable USA LLC never had any connection with Total Cable, Total Cable USA Inc. or Total Cable BD. Mr. Ahmed in his reply affidavit states that Total Cable USA LLC never conducted any business after it was dissolved on May 2, 2016.

8.  Mr. Ahmed has stated in his affidavit and in his deposition conducted on June 18, 2018 that Total Cable USA LLC has no connection with any corporation starting with the

words "Total Cable" and he did not create any company other than Total Cable USA

LLC. He states in his affidavit that he does not know any company by the name of Total

Cable BD and that Total Cable USA LLC did not have any assets. He also testified that

Total Cable USA LLC did not have any website, Total Cable USA LLC did not maintain

account and did not have any revenue from 2012-2018. The relevant portion of his

deposition has been annexed with the attorney's affirmation in support of notice of

motion as Exhibit F.

9. Mr. Rasul annexed Exhibit E in support of the allegation that Total Cable USA LLC has

been conducting business as Total Cable USA LLC settled the action commenced by

Asia TV USA Ltd. in the sum of $450,000.

## BACKGROUND LAW

10. In order to succeed on a motion for summary judgment, the proponent must demonstrate

prima facie entitlement to judgment as a matter of law and the absence of any material

issues of fact. Stonehill Capital Management, LLC v Bank of the W., 28 N.Y.3d 439,

448 (2016). Once such a showing has been made, "the burden shifts to the party

opposing the motion for summary judgment to procedure evidentiary proof in admissible

from sufficient to establish the existence of material issues of fact which require a trial of

the action." Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324 (1986).

11. Though the facts are viewed in the light most favorable to the non-moving party, "bald,

conclusory assertions or speculation" are "insufficient to defeat summary judgment."

Stonehill, 28 N.Y.3d at 448. The same is true for "merely conclusory claims." Id.; see

also Hecker v Liebgold, 130 A.D.3d 572, 574(2d Dept. 2015) ("Bare conclusory

assertions, such as those contained in [an] affidavit... are insufficient to demonstrate the

absence of any triable issues of fact") (internal quotations omitted); Carroll v Radoniqi, 105 A.D.3d 493, 494 (1st Dept. 2013) (upholding grant of summary judgment for defendant where, "[p]laintiff had no personal knowledge [of certain allegations]... and his remaining allegations were simply too speculative and conclusory to have merit.").

12. "A party who seeks a finding that a summary judgment motion is premature is required to put forth some evidentiary basis to suggest that discovery might lead to relevant evidence or that the facts essential to justify opposition to the motion were exclusively within the knowledge and control of the movany." Reale v Tsoukas, 146 A.D.3d 833, 835 (2d Dept. 2017). If the party opposing the motion cannot meet that burden, summary judgment is properly granted. Crossell v Wing Farm, Inc. 79 A.D.3d 1334, 1336 (3d Dept. 2010) (granting summary judgment for defendant where plaintiff's claims were "were completely unsupported with evidence or specific factual references.").

## MR. RASUL FAILED TO ATTACH THE COMPLETE DOCUMENTS SHOWING THAT THE TELEPHONE NUMBER AND WEBSITE BELONGS TO LALON TV AND NOT TOTAL CABLE USA LLC

13. Mr. Rasul did not attach the complete documents with Exhibit I and intentionally withheld the last pages of the documents annexed as Exhibit I. Mr. Ahmed searched the website shown on page 1 in Exhibit I (https://web.archive.org/web/20120901204045/http://totalcableusa.com) website and found that the site belongs to Lalon TV Inc. He printed all three pages and on the third page it clearly shows that the website belongs to Lalon TV Inc. as it shows the copyright mark of © 2011-2012 Lalon TV Inc. and also shows the telephone number 212-444-8138. Similarly, Mr. Ahmed searched the website shown on page two of Exhibit I

(https://web.archive.org/web/20130407081754/http://www.totalcableusa.com) and page 2
also clearly shows the trademark of © 2011-2012 Lalon TV Inc. indicating that the
website belongs to  Lalon TV Inc along with the same phone number 212-444-8138.
Again Mr. Ahmed searched the websites shown on pages 3 and 4 of Exhibit I,
(https://web.archive.org/web/20141216112528/http://www.totalcableusa.com/index.html)
and
(https://web.archive.org/web/20150615055148/http://www.totalcableusa.com:80/index.ht
ml) and when searching both websites they also show the trademark of © 2011-2012
Lalon TV Inc. of the last pages (second pages) again indicating that the website belongs
to Lalon TV Inc and again with the same phone number 212-444-8138.

## **CONCLUSION**

14. In view of above, Total Cable USA LLC requests that the opposition filed by the Plaintiff
be rejected being untimely and the motion seeking summary judgment by Total Cable
USA LLC be granted.

Dated: May 1, 2019

Respectfully submitted,

SATISH K. BHATIA, ESQ.,
Bhatia & Associates PLLC
38 West, 32nd Street, Suite #1511
New York, NY 10001
Tel: 212-239-6898
Fax: 212-594-7980

# EXHIBIT A

Apr 22 at 11:00 AM

**Michael Cassell** <mcassell@hogancassell.com>
**To:** 'satish bhatia'

I will have the opposition to you tomorrow. I consent to as much time as you need for the reply. I appreciate the additional time.

Mike

Hide original message

**From:** satish bhatia [mailto:satishbhatiaus@yahoo.com]
**Sent:** Friday, April 19, 2019 3:59 PM
**To:** Michael Cassell
**Subject:** Re: Star Cable v Total Cable USA LLC

Michael,

I am on vacation right now and I will be back on April 22, 2019. If I receive the opposition by April 23, 2019, I will need time until May 2, 2019 to file a reply to your opposition.

Regards,

Satish K Bhatia, Esq.
Bhatia & Associates PLLC
38W 32nd Street Suite # 1511
New York NY 10001
Phone: (212) 239-6898
Fax: (212) 594-7980

Disclaimer:

This email is intended only for the use of the individual to whom or the entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please notify us immediately by collect telephone.

On Thursday, April 18, 2019, 8:53:02 PM EDT, Michael Cassell <mcassell@hogancassell.com> wrote:

I am trying to provide you with the opposition by the end of the day tomorrow, but I will most likely need a few-day extension. Most significantly, my partner has been out all week on a personal issue, leaving me to handle everything. In addition, I just got notice that I have to be in Kings Supreme Court tomorrow morning to respond to an Order to Show Cause. I should be able to get you the opposition by the end of the day on Monday (Tuesday at the latest). Obviously, I will agree to provide you with as much time as you need for the reply. Please advise.

Michael Cassell

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

STAR CABLE NA, INC.,                                    Docket No. 16-cv-04067

**Plaintiff,**

vs.

**TOTAL CABLE USA LLC. and RADIANT IPTV**          **REPLY AFFIDAVIT OF SYED AHMED**

**Defendants.**

-----------------------------------------------------------------x

I Syed Ahmed, do swear under penalty of perjury as follows:

1.  I was the managing member of Total Cable USA LLC, which was dissolved in May 2016 and I, as the former managing member of Total Cable USA LLC had filed for Bankruptcy under Chapter 7 on behalf of Total Cable USA LLC.  The Bankruptcy Court passed the Final Decree in January 2017.  The copy of the dissolution of the corporation is annexed as Exhibit N with the affidavit of Shahid Bob Rasul in opposition to the motion filed by Total Cable USA LLC.  The copy of the Final Decree is annexed as **Exhibit A**.  The list of creditors shown in schedule E/F is annexed as **Exhibit B**.

2.  The Bankruptcy Court notified all of the Creditors of the Bankruptcy Petition including Star Cable NA Inc.  Star Cable NA Inc. did not appear in the Bankruptcy Court nor did they file any adversary proceedings.  Now in the affidavit of Shahid Bob Rasul, Mr. Rasul in paragraph 6 states that prior to October 22, 2013, Total Cable USA LLC, upon information and belief operated as a subsidiary of Lalon TV.  In paragraph 34 of said affidavit, Mr. Rasul states that Total Cable USA LLC's motion should be denied, given that there is a clear issue of fact as of whether Total Cable USA LLC  is still operating

albeit now under the name of Total Cable BD.  Mr. Rasul attached Exhibit I, J, K, L and M to prove that Total Cable USA LLC has been operating under the name of Total Cable BD.

3.  Mr. Rasul did not attach the complete documents with Exhibit I and intentionally withheld the last pages of the documents annexed as Exhibit I.  I have searched the website shown on page 1 in Exhibit I (https://web.archive.org/web/20120901204045/http://totalcableusa.com)  website and found that the site belongs to Lalon TV Inc.  I printed all three pages and on the third page it clearly shows that the website belongs to Lalon TV Inc. as it shows the copyright mark of © 2011-2012 Lalon TV Inc. and also shows the telephone number 212-444-8138.  Similarly, I searched the website shown on page two of Exhibit I (https://web.archive.org/web/20130407081754/http://www.totalcableusa.com) and page 2 also clearly shows the trademark of © 2011-2012 Lalon TV Inc. indicating that the website belongs to  Lalon TV Inc along with the same phone number 212-444-8138. Again I searched the websites shown on pages 3 and 4 of Exhibit I, (https://web.archive.org/web/20141216112528/http://www.totalcableusa.com/index.html) and (https://web.archive.org/web/20150615055148/http://www.totalcableusa.com:80/index.html) and when searching both websites they also show the trademark of © 2011-2012 Lalon TV Inc. of the last pages (second pages) again indicating that the website belongs to Lalon TV Inc and again with the same phone number 212-444-8138.  I am annexing the complete documents of which Mr. Rasul has attached only the first pages of the documents as Exhibit I as **Exhibit C** with this reply affidavit.

4. Lalon TV Inc. was incorporated as a Domestic Business Corporation on August 25, 2009. The print out taken from the NYS Division of Corporation shows that the DOS process of Lalon TV Inc. is 1 W Prospect Ave., Suite 1004, Mount Vernon, New York, 10550 and the Chief Executive Officer is Shahinul Karim whose address is 15 Westmoylan Lane, Coram, New York 11727. The copy of the print out taken from the website of the Division of Corporation is annexed with this reply affidavit as **Exhibit D**.

5. On or about January 23, 2012, Lalon TV Inc. filed a Certificate of Corporation of Assumed Name "Total Cable" and got an Assumed Name Certificate of the assumed name "Total Cable." The copy of the assumed name certificate of "Total Cable" is annexed with this reply affidavit as **Exhibit E**.

6. The Plaintiff and his Counsel Michael Cassell, Esq. are fully aware that Lalon TV Inc. d/b/a Total Cable is an independent and different corporation and Total Cable USA LLC was an independent and different corporation which was dissolved on May 2, 2016 and was discharged by the Bankruptcy Court in January 2017. In fact, the Plaintiff Star Cable NA Inc. had commenced an action against Lalon TV Inc., Total Cable BD, Habibur Rahman, Shahinul Karim, Shahidul Bari, Ahmodul Barobhuiya and Syed S. Ahmed (myself) in the Eastern District, Suffolk County on July 28, 2017. In paragraph 3 of the complaint, Star Cable NA Inc. alleged that the Defendant Lalon TV Inc. is an individual corporation that has principal place of business and in paragraph 9 of the complaint, the Plaintiff alleges that Total Cable BD.com is an individual business that has principal business of 15 Westmoylan Lane, Coram, New York 11727. In paragraph 1 of the complaint, Star Cable NA Inc. alleges that Star Cable NA Inc. has exclusive rights in respect of the channels Independent TV, Jamuna TV, Channel 16, My TV, Asian TV,

Bangla Vision, Ekushey TV, Somoy TV and Boishakhi Television. The copy of the complaint filed by Star Cable NA Inc., index no. 17-cv-04469 is annexed with this reply affidavit as **Exhibit F**.

7. On or about August 30, 2017, the Defendants filed the answer and also raised various counterclaims. The Defendants stated in paragraph 64 to 67 of the answer that the Defendant Lalon TV enjoys its rights and privileges directly from the overseas television channels who are the content owners. In paragraph 68 of the answer the Defendants stated that on information and belief, overseas content owners have terminated their agreements with the Plaintiff to broadcast various channels and/or were in the process of terminating the agreements with the Plaintiff. The copy of the verified answer is annexed with this reply affidavit as **Exhibit G**.

8. During the pendency of the action, the Honorable Sandra J. Feuerstein suggested that the copy of the agreement between the Defendant Lalon TV Inc. and the content owners be shown to Michael Cassell, the attorney for Star Cable NA Inc. The Defendant showed the agreements to the Plaintiff's attorney, Mr. Cassell. One for the agreements with the content owners shown to the Plaintiff's attorney is annexed as **Exhibit H**.

9. After going through the various agreements between Lalon TV Inc. and the various owners of the content owners, the Plaintiff's attorney Michael Cassell, stated that the Plaintiff Star Cable NA Inc. intend to discontinue the action against Lalon TV Inc., Total Cable BD and the other Defendants alleging violation of the Plaintiff's copyrights. The Plaintiff's and the Defendants entered into stipulation of dismissal. On January 24, 2018, the Court directed the Clerk of the Court to close the case. The copy of the stipulation of dismissal is annexed with this affidavit as **Exhibit I**.

10. Mr. Rasul has also annexed Exhibit O showing that Mr. Rasul made a payment of $90 on October 2, 2017 from his credit card for services that has been active since 2017. In paragraph 42 of his affidavit, he claims that the charge of $90 shows that Total Cable USA LLC was conducting business as the charge depicts that the Total Cable phone number is 212-444-8138. This phone number does not belong to Total Cable USA LLC as Total Cable USA LLC did not have a phone number and never functioned except for entering into an affiliation agreement with Asia TV for Zee Channel. Exhibit O shows that payment was made to Total Cable which is a d/b/a of Lalon TV Inc. and not to Total Cable USA LLC and the telephone number 212-444-8138 is of Total Cable which is d/b/a Lalon TV Inc. and not Total Cable USA LLC. Exhibit O does not show that Total Cable USA LLC has ever conducted any business. In fact, Total Cable USA LLC did not have any connection with the company Total Cable, Total Cable USA Inc. and Total Cable BD. Total Cable USA LLC never conducted any business after it was dissolved on May 2, 2016.

11. My deposition was conducted on June 18, 2018. During my deposition I clarified that Total Cable USA LLC has no connection with any other corporation starting with the words "Total Cable" and I did not create any other company other than Total Cable USA LLC. I testified during my deposition that I do not know any company by the name of Total Cable BD and that Total Cable USA LLC did not have any assets. I also testified that Total Cable USA LLC did not have a website prior to filing for bankruptcy. I also testified that Total Cable USA LLC did not maintain any account and Total Cable USA LLC did not have any revenue during the years 2012-2018. Total Cable USA LLC never provided any set up boxes to anyone. The relevant portions of my deposition has already

been provided in paragraph 10 of our attorney's affirmation in support of notice of
motion and the relevant portions of my deposition is also annexed as Exhibit F with our
attorney's affirmation.

12. Mr. Rasul also annexed Exhibit P alleging therein that Total Cable and the other
Defendants settled the action commenced by Asia TV USA Ltd. in sum of $450,000.
However, it transpired that Mr. Barobhuiya was still the CEO of Total Cable USA LLC
and therefore could sign and the signing of Mr. Barobhuiya on the settlement agreement
on behalf of Total Cable USA LLC was just a formality. A sum of $450,000 was paid
directly by Lalon TV and not by Total Cable USA LLC and nor could it have been paid
as Total Cable USA LLC did not have any bank account or assets to pay as it was
dissolved and never functioned. The payment of $450,000 was not made by Total Cable
USA LLC but was paid by Lalon TV as Asia TV USA Ltd., the Plaintiff, agreed to grant
rights to broadcast Zee TV to Lalon TV. The document showing the wiring from Capital
One Bank of Lalon TV Inc. of $450,000 to the attorney for Asia TV USA Ltd. in his trust
account is annexed as **Exhibit J** with this reply affidavit. The settlement to pay $450,000
signed by Mr. Barobhuiya as CEO of Total Cable USA LLC was only a formality. In
fact, the action was settled between the Plaintiff Asia TV USA Ltd. and Lalon TV Inc.
and as such the stipulation cannot prove that Total Cable USA LLC was functioning.

13. Syed Ahmed in his reply affidavit also stated that Total Cable USA LLc was not a party
to the vankruptcy petition filed by World Cable Inc. in the case no. 14-10379. Mr. Rasul
states in paragraph 7 of his affidavit that Lalon TV Inc. entered an appearance by the
Counsel as Lalon TV aka Total TV aka Total Cable. The allegations do not show that
Lalon TV appeared on behalf of Total Cable USA LLC.

14. In response to discovery request, the Plaintiff's attorney provided the documents which have been annexed with the affirmation in support of motion for summary judgment. None of the documents relate to Total Cable USA LLC.

15. Mr. Rasul in his affidavit in opposition stated in his affidavit that upon information and belief, Total Cable operated as a subsidiary of Lalon TV. Mr. Rasul does not state in paragraph 6 of the affidavit that Total Cable USA LLC was operated as subsidiary of Lalon TV. Total Cable USA LLC was incorporated on October 22, 2013 and as such it cannot operate as subsidiary of Lalon TV prior to it's incorporation. Moreover, the allegations contained in paragraph 6 of the affidavit is upon information and belief and is not upon his personal knowledge and therefore cannot be considered.

16. In paragraph 7 of the affidavit of Mr. Rasul, it is stated that in the bankruptcy petition commenced by World Cable Inc., case no. 14-10379, Lalon TV Inc. entered an appearance by the Counsel as Lalon TV Inc. aka Total TV aka Total Cable. The allegations in paragraph 7 are totally irrelevant and do not show that Total Cable USA LLC made any appearance through Lalon TV Inc. Total Cable USA LLC was not a party in the bankruptcy petition commenced by World Cable Inc.

17. Plaintiff failed to file any document showing that Total Cable USA LLC has ever broadcasted the channels. Total Cable USA LLC entered into agreement with Asia TV USA Ltd. but never paid any amount to Asia TV USA Ltd. The other members of Total Cable USA LLC and I used our personal money to pay rent and for other expenses of Total Cable USA LLC as Total Cable USA LLC had any bank account and never used any checks. I filed the bankruptcy petition as the managing member of Total Cable USA LLC. Star Cable NA Inc. was one of the creditors and never appeared in the action.

**WHEREFORE**, I request that the motion filed by the Defendant Total Cable USA LLC be granted along with any other just and proper relief.

Syed Ahmed

Verified On: May 1, 2019

In the County of New York

In the State of New York

(Notary Public)

SATISH KUMAR BHATIA
Notary Public, State Of New York
No. 02BH6345050
Certified In New York County
Commission Expires 05/31/2020

# EXHIBIT A

| Information to identify the case: | | |
|---|---|---|
| Debtor 1 | **Total Cable USA LLC** | Social Security number or ITIN  _ _ _ _ |
| | First Name   Middle Name   Last Name | EIN  46-3928159 |
| Debtor 2 (Spouse, if filing) | First Name   Middle Name   Last Name | Social Security number or ITIN  _ _ _ _ |
| | | EIN  _ _ _ _ _ _ _ _ _ |
| United States Bankruptcy Court   Eastern District of New York 290 Federal Plaza Central Islip, NY 11722 | | |
| Case number:    8-16-75603-ast | | Chapter:    7 |

# FINAL DECREE

The estate of the above named debtor(s) has been fully administered.

**IT IS ORDERED THAT:**

- Robert L. Pryor (Trustee) is discharged as trustee of the estate of the above–named debtor(s).
- The Chapter 7 case of the above–named debtor(s) is closed.

s/ Alan S. Trust
United States Bankruptcy Judge

Dated: January 25, 2017

# EXHIBIT B

**Fill in this information to identify the case:**

Debtor _Total Cable USA LLC_

United States Bankruptcy Court for the: _Eastern_ District of _NY_
(State)

Case number _8-16-75003_
(If known)

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims                12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1: List All Creditors with PRIORITY Unsecured Claims

1. Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).
   ☐ No. Go to Part 2.
   ☒ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address<br>_Level 3 Communications LLC._<br>_PO Box 910162_<br>_Denver, CO 80291-0162_ | As of the petition filing date, the claim is:  $ _85,000_<br>Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☒ Disputed | $ _85,000_ | $ __ |

Date or dates debt was incurred _____

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☒ No  ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

| | | | |
|---|---|---|---|
| **2.2** Priority creditor's name and mailing address<br>_Asia TV USA, LTD._<br>_200 Middlesex Essex_<br>_Turnpike, Suite 202, Iselin, NJ_  08830 | As of the petition filing date, the claim is:  $ _200,000_<br>Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☒ Disputed | $ _200,000_ | $ __ |

Date or dates debt was incurred  _08830_

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☒ No  ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

| | | | |
|---|---|---|---|
| **2.3** Priority creditor's name and mailing address<br>_Star Cable NA Inc._<br>_36-39 Bell Blvd, Suite 233_<br>_Bayside, NY 11361_ | As of the petition filing date, the claim is:  $ _200,000_<br>Check all that apply.<br>☐ Contingent<br>☐ Unliquidated<br>☒ Disputed | $ _200,000_ | $ __ |

Date or dates debt was incurred _____

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
☒ No  ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

Debtor <u>Total Cable USA LLC</u>
Name

Case number *(if known)* <u>8-16-75203</u>

**Part 1.**    **Additional Page**

| Copy this page if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional PRIORITY creditors exist, do not fill out or submit this page. | Total claim | Priority amount |
|---|---|---|

**2.__**   Priority creditor's name and mailing address

$ _____    $ _____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

---

**2.__**   Priority creditor's name and mailing address

$ _____    $ _____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

---

**2.__**   Priority creditor's name and mailing address

$ _____    $ _____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

---

**2.__**   Priority creditor's name and mailing address

$ _____    $ _____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

Date or dates debt was incurred

Basis for the claim: _____

Last 4 digits of account number ___ ___ ___ ___

Is the claim subject to offset?
- ☐ No
- ☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (____)

---

Debtor    Total Cable USA LLC
     Name

Case number *(if known)*   8-16-75603

## Part 2:   List All Creditors with NONPRIORITY Unsecured Claims

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | Amount of claim |
|---|---|---|

**3.1** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.2** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.3** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.4** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.5** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

**3.6** Nonpriority creditor's name and mailing address

_____

_____

_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred   _____

Last 4 digits of account number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Debtor _TOTAL CABLE USA LLC_
Name

Case number *(if known)* _8-16-76003_

**Part 2:**   **Additional Page**

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

3.___   **Nonpriority creditor's name and mailing address**

_____

_____

_____

_____

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed
☐ Liquidated and neither contingent nor
  disputed

**Basis for the claim:** _____

$ _____

**Date or dates debt was incurred**    _____

**Last 4 digits of account number**    ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

3.___   **Nonpriority creditor's name and mailing address**

_____

_____

_____

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

$ _____

**Date or dates debt was incurred**    _____

**Last 4 digits of account number**    ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

3.___   **Nonpriority creditor's name and mailing address**

_____

_____

_____

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

$ _____

**Date or dates debt was incurred**    _____

**Last 4 digits of account number**    ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

3.___   **Nonpriority creditor's name and mailing address**

_____

_____

_____

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

$ _____

**Date or dates debt was incurred**    _____

**Last 4 digits of account number**    ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

3.___   **Nonpriority creditor's name and mailing address**

_____

_____

_____

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

$ _____

**Date or dates debt was incurred**    _____

**Last 4 digits of account number**    ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

Debtor <u>Thai Cadie USA LLC</u> 
Name

Case number (if known) <u>8-16-75003</u>

## Part 3:    List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.1. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.2. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.3. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.4. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.1. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.5. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.6. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.7. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.8. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.9. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.10. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |
| 4.11. | Line _____ <br> ☐ Not listed. Explain _____ | ___ ____ ____ ____ |

Debtor  Total Cable USA LLC
Name

Case number (if known)  8-16-75003

## Part 3: Additional Page for Others to Be Notified About Unsecured Claims

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |
| 4.___ | Line ___ ☐ Not listed. Explain _____ | ___ ___ ___ ___ |

Debtor  Total Cable USA LLC
Name

Case number (if known) 8-16-75603

## Part 4: Total Amounts of the Priority and Nonpriority Unsecured Claims

6. Add the amounts of priority and nonpriority unsecured claims.

Total of claim amounts

5a. Total claims from Part 1                5a.      $ 465,000

5b. Total claims from Part 2                5b.   +  $ _____

5c. Total of Parts 1 and 2                  5c.      $ 465,000
    Lines 5a + 5b = 5c.

# EXHIBIT C

4/28/2019
Total Cable | Building and delivering broadcast networks worldwide





"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- Contact Us



## Hindi Plus

  

- Buy Now
- More

http://totalcableusa.com/ [Go]

AUG SEP OCT
◄ 01 ►
2011 2012 2013

83 captures
1 Sep 2012 - 31 Jan 2018

## Bangladeshi



- Buy Now
- More

## Urdu / Pakistani



### Coming soon...

- Buy Now
- More

Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...


Subscriber Login

**User Name**

**Password**

Forgot Password ?

[Submit →]

## New User REGISTER Now !

http://totalcableusa.com/          Go     AUG  SEP  **OCT**

**83 captures**                                                       ◀ **01** ▶

1 Sep 2012 - 31 Jan 2019                                          2011  2012  **2013**

## What we offer:

- 16 Bangladeshi channels
- 10 Hindi Channels
- 6 Cartoon Channels
- 6 Religious Channels
- 22 American Channels



24x7 Call Center Support :

Call at  **1-212-444-8138**

Email:  **info@totaltvs.com**

**ISSUE RESOLUTIONS** :  We guarantee next day technician at customer premises

**NO CONTRACT** :  We do not require subscribers to sign a lengthy contract.

Sitemap | Terms and Conditions | Privacy Policy | Group Sites

© 2011-12 Lalon TV Inc.

SHARE

4/28/2019   Total Cable | Building and delivering broadcast networks worldwide



**"Reliable, Affordable!"**

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable, has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...



**User Name**

http://www.totalcableusa.com/          Go    DEC  APR  **MAY**
                                              ◀ 07 ▶
83 captures                                   2012 2013 **2014**
1 Sep 2012 - 31 Jan 2018

**New User REGISTER Now !**

# What we offer:

- 16 Bangladeshi channels
- 10 Hindi Channels
- 6 Cartoon Channels
- 6 Religious Channels
- 22 American Channels



24x7 Call Center Support :

Call at   **1-212-444-8138**

Email:   **info@totaltvs.com**

**ISSUE RESOLUTIONS**
:                    We guarantee next day technician at customer premises

**NO CONTRACT :**  We do not require subscribers to sign a lengthy contract.

Sitemap | Terms and Conditions | Privacy Policy | Group Sites                    © 2011-12 Lalon TV Inc.

   ☼ SHARE 

http://www.totalcableusa.com/index.html    Go    AUG   DEC   FEB

35 captures     ◀ 16 ▶
3 Sep 2012 - 19 Sep 2016    2013   2014   2016



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...



**User Name**

http://www.totalcableusa.com/index.html                                    Go   AUG  DEC  FEB

35 captures                                                                      ◀ 16 ▶
1 Sep 2012 - 19 Sep 2016                                                        2013 2014 2016

**New User REGISTER Now !**

# What we offer:

- 16 Bangladeshi channels
- 10 Hindi Channels
- 6 Cartoon Channels
- 6 Religious Channels
- 22 American Channels



**24x7 Call Center Support :**

Call at   **1-212-444-8138**

Email:   **info@totaltvs.com**

**ISSUE RESOLUTIONS** :   We guarantee next day technician at customer premises

**NO CONTRACT :**   We do not require subscribers to sign a lengthy contract.

Sitemap | Terms and Conditions | Privacy Policy | Group Sites          © 2011-12 Lalon TV Inc.

SHARE

4/28/2019  Total Cable | Building and delivering broadcast networks worldwide

http://www.totalcableusa.com/index.html  Go  MAY JUN JUL

35 captures
3 Sep 2012 - 19 Sep 2016  ◀ 15 ▶
2014 2015 2016



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...



**User Name**

4/28/2019

Total Cable | Building and delivering broadcast networks worldwide

http://www.totalcableusa.com/index.html    Go    MAY  JUN  JUL

35 captures                                  ◄  15  ►
1 Sep 2012 - 29 Sep 2016                     2014  2015  2016

**New User REGISTER Now !**

# What we offer:

- 16 Bangladeshi channels
- 10 Hindi Channels
- 6 Cartoon Channels
- 6 Religious Channels
- 22 American Channels



**24x7 Call Center Support :**

📞 Call at  **1-212-444-8138**

✉ Email:  **info@totaltvs.com**

**ISSUE RESOLUTIONS** :  We guarantee next day technician at customer premises

**NO CONTRACT** :  We do not require subscribers to sign a lengthy contract.

Sitemap | Terms and Conditions | Privacy Policy | Group Sites

© 2011-12 Lalon TV Inc.

   SHARE 

# EXHIBIT D

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through April 30, 2019.

Selected Entity Name: LALON TV INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | LALON TV INC. |
| **DOS ID #:** | 3848817 |
| **Initial DOS Filing Date:** | AUGUST 25, 2009 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

LALON TV INC.
1 W PROSPECT AVENUE
SUITE 1004
MOUNT VERNON, NEW YORK, 10550

**Chief Executive Officer**

SHAHINUL KARIM
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Principal Executive Office**

LALON TV INC.
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Registered Agent**

NONE

# EXHIBIT E

```
N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS                        ALBANY, NY  12231-0001
                           FILING  RECEIPT
===============================================================================
ENTITY NAME : LALON TV INC.

DOCUMENT TYPE : ASSUMED NAME CERTIFICATE
===============================================================================
  FILER:                                   FILED:  01/23/2012
  ------                                   CASH#:  273206
                                           FILM#:  20120123104
  SHAHINUL KARIM
  15 WESTMOYLAN LN

  CORAM              NY     11727

  PRINCIPAL LOCATION
  ------------------

  15 WESTMOYLAN LN

  CORAM
  NY     11727

  COMMENT:

  ASSUMED NAME
  ------------
  TOTAL CABLE
```

```
-------------------------------------------------------------------------------
SERVICE COMPANY  :      +++  NO SERVICE COMPANY  +++            CODE:
                                                               BOX :

FEES        60.00                          PAYMENTS:   60.00
----                                       --------
FILING :    25.00                          CASH    :
COUNTY :    25.00                          CHECK   :  60.00
COPIES :    10.00                          C CARD  :
MISC   :     .00
HANDLE :     .00
                                           REFUND  :
                                           ------
```

This office does not record information regarding the
names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include the
name(s) and address(es) of the initial officers, directors,
and shareholders in the initial certificate of
incorporation, however this information is not recorded
and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| AUG 25, 2009 | Actual | LALON TV INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS
Homepage   |   Contact Us

# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
STAR CABLE NA, INC.,

                                  Plaintiff,

        -against-                                              **COMPLAINT**

LALON TV, INC., HABIBUR RAHMAN,
SHAHINUL KARIM, SHAHIDUL BARI,
SYED S. AHMED, AHMODUL BAROBHUIYA
and TOTAL CABLE BD.COM,

                                  Defendants.
-------------------------------------------------------------------X

        The plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorneys Hogan

& Cassell, LLP, as and for its Complaint against the defendants, alleges the following:

## NATURE OF THE ACTION

        1.      The defendants in this action, Lalon TV, Inc., Habibur Rahman, Shahinul

Karim, Shahidul Bari, Syed S. Ahmed, Ahmodul Barobhuiya and Total Cable BD.com

(collectively referred to as "Defendants") are involved in the sale and distribution of cable

television services and devices to assist their customers to gain access to various programming

to which they are not entitled.  The programming originates in Bangladesh via an internet

protocol television system ("IPTV").   Plaintiff is an IPTV television company that has

exclusive rights, in the United States and Canada, to distribute nine individual programming

services via the signal delivery services IPTV, WiMax Wireless and Mobile TV.  The exclusive

services originate in Bangladesh and include:  i) Independent TV; ii) Jamuna TV; iii) Channel

16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; viii) Somoy TV; and ix)

Boishakhi Television (collectively the "Exclusive Services").  This is an action based upon the

discovery that Defendants, in direct violation of Plaintiff's exclusive rights, are receiving, using, divulging and retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. Defendants also distribute devices to their customers to primarily assist in the unauthorized access to the Exclusive Services. Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), 47 U.S.C. § 605(e)(4) and New York Law. In this action, Star Cable seeks declaratory and injunctive relief and monetary damages, costs and attorneys' fees.

## PARTIES

2.      Star Cable is a New York corporation that has its principal place of business at 3 Grace Avenue, Suite 120, Great Neck, New York 11021.

3.      Defendant Lalon TV, Inc. ("Lalon TV") is a New York corporation that has its principal place of business at 15 Westmoylan Lane, Coram, New York 11727.

4.      Defendant Habibur Rahman ("Rahman") is an individual residing at 164-10 84th Avenue, Jamaica, New York 11432. Rahman is the Chief Technology Officer of Lalon TV.

5.      Defendant Shahinul Karim ("Karim") is an individual residing at 15 Westmoylan Lane, Coram, New York 11727. Karim is the President of Lalon TV.

6.      Defendant Shahidul Bari ("Bari") is an individual residing at 200 Dey Street, Harrison, New Jersey 07028. Bari is the Director of Lalon TV.

7.      Defendant Syed S. Ahmed ("Ahmed") is an individual residing at 15 Westmoylan Lane, Coram, New York 11727. Ahmed is the Director of Operations for Lalon TV.

8.      Defendant Ahmodul Barobhuiya ("Barobhuiya") is an individual residing at 61-15 171st Street, Fresh Meadows, New York 11365.  Barobhuiya is the Chief Executive Officer of Lalon TV.

9.      Upon information and belief, Defendant Total Cable BD.com is a New York business that has its principal place of business at 15 Westmoylan Lane, Coram, New York 11727.

## JURISDICTION AND VENUE

10.      This action arises under 47 U.S.C. § 605(a), 47 U.S.C. § 605(e)(4) and supplemental state law claims.

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as there is a Federal question.  Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) as Defendants reside in the District and/or do business in this District and a substantial part of the events giving rise to the claim occurred in the District.

## FACTUAL BACKGROUND

12.      Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are the Exclusive Services. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access.  Star Cable transmits its signals from its headend located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television.

13.      In order to provide the Exclusive Services, Star Cable negotiated and contracted with each programming service provider in multi-year Network Affiliation Agreements (the "Agreements").  The Agreements grant Plaintiff the exclusive distribution rights for WiMax

wireless, IPTV and Mobile TV for the nine individual programming services (i.e. the Exclusive Services) within the United States and Canada.  In exchange for the exclusive rights, Star Cable pays the programming service provider's license fees, which generally increase annually in accordance with the terms of the Agreements.  Such annual increases are often double and/or triple the previous year's license fee.  As such, Star Cable pays significant amounts for its exclusive rights.

14.     Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted.  The encrypted video services are then transmitted via the internet to its customers.

15.     Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen.  The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same.  The set top box is part of the monthly service charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a service charge is added to the customer's bill each month.

16.     The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server.  Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television.  The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.

17.    Star Cable, through IPTV, has essentially identical functionality of a satellite delivery service or a cable television service.

18.    At all times pertinent to this Complaint, Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services:   i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; viii) Somoy TV and ix) Boishakhi Television for all regions within the United States and Canada.

19.    A representative of Star Cable traveled to Bangladesh to sign, and did sign, the Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television.   A representative of Star Cable met in New York with a representative officer of Ekhusey Television, Ltd. and Shamol Bangla Media Ltd.  Similar exclusive Agreements were executed by mail between Star Cable, Somoy Media and Boishakhi Television Limited.  Payments have been made by Star Cable on each of these Agreements.

20.    Defendants are telecommunications distribution companies, or the officers, directors and shareholders of the companies, that sell telephony services, high speed data services and which operate a television signal distribution business.  They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods over the internet through broadband internet access networks.  Defendants' signal delivery system is almost identical to that of Star Cable.

21.    Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants.

22.    Despite not having any rights to the Exclusive Services, Defendants intercept the

signals for the Exclusive Services and then, often via the use of the website Total Cable BD.com, offer and provide the Exclusive Services to their customers.

23.  Despite not having any rights to the Exclusive Services, Defendants actively advertise the Exclusive Services to their customers and market themselves as having the rights to distribute these services to customers who desire to watch Bangladeshi programming.

24.  Defendants distribute a set top device to their paying customers to assist the customers to receive the improper signal to the Exclusive Services so that it becomes intelligible on a television screen.

25.  Defendants do not have rights to transmit or sell the nine channels (i.e. the Exclusive Services) over an IPTV delivery system in any part of the United States or Canada or to provide their customers with a device that assists in receiving the improper signal.

26.  Despite not having rights to transmit the Exclusive Services and in direct derogation of the exclusive rights of Star Cable, Defendants use, divulge and redistribute said communications to their customers.  Defendants are not authorized to redistribute said communications over their IPTV systems in the United States or Canada.  Said actions of Defendants are an unauthorized divulgence of satellite signals.  Defendants use wire to transmit the Exclusive Services to their customers and the signals at issue are radio communications.

27.  Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Count I
## 47 U.S.C. § 605(a)

28.     Plaintiff incorporates the preceding paragraphs as if each allegation was fully set forth herein.

29.     Plaintiff is a person aggrieved as defined by 47 U.S.C. § 605, since it has proprietary rights in the Exclusive Services and has the exclusive rights, in the United States and Canada, to distribute the Exclusive Services via the signal delivery services IPTV, WiMax Wireless and Mobile TV.

30.     Through the transmitting, retransmitting, use, divulgement and sale of the Exclusive Services, Defendants have violated various provisions of 47 U.S.C. § 605(a).

31.     The Exclusive Services are transmitted via radio and Defendants use wire to transmit the Exclusive Services to their customers.

32.     Defendants' use of the signals of the Exclusive Services in a manner in which they are not entitled, including effectuating the unauthorized receipt in the United States and transmitting, retransmitting, using, selling and divulging said Exclusive Services to persons not entitled to the Exclusive Services for the purposes of commercial advantage and private financial gain is violative of 47 U.S.C. § 605.

33.     Defendants' conduct is designed to injure, and will continue to injure Star Cable and cause it financial damage and irreparable harm.

34.     Defendants knew or should have known and had reason to know that assisting a third person in the reception and use of the Exclusive Services without authorization, was and is illegal and prohibited and in violation of Plaintiff's rights.

35.     Pursuant to 47 U.S.C. § 605(e)(3), Plaintiff is entitled to:  equitable relief; either

statutory damages per violation or actual damages plus any profits realized by Defendants for each violation of 47 U.S.C. § 605(a); reasonable attorneys' fees; and costs.

## Count II
## 47 U.S.C. § 605(e)(4)

36.    Plaintiff incorporates the preceding paragraphs as if each allegation was fully set forth herein.

37.    Defendants have violated 47 U.S.C. § 605(e)(4) through the distribution of a device or equipment knowing that the device or equipment is primarily intended for the transmitting, retransmitting, use, divulgement and sale of the Exclusive Services in violation of provisions of 47 U.S.C. § 605(a).

38.    Defendants' distribution of devices to assist in the reception of the Exclusive Services is for the purposes of commercial advantage and private financial gain and is designed to injure, and will continue to injure Star Cable and cause it financial damage and irreparable harm.

39.    Defendants knew or should have known and had reason to know that providing a device to their customers that is used to assist in the reception and use of the Exclusive Services is without authorization, illegal and prohibited by 47 U.S.C. § 605(a).

40.    Defendants' conduct is willful and for purposes of direct or indirect commercial advantage or private financial gain.

41.    Pursuant to 47 U.S.C. § 605(e)(3), Plaintiff is entitled to:  equitable relief; either statutory damages per violation or actual damages plus any profits realized by Defendants for each violation of 47 U.S.C. § 605(a); reasonable attorneys' fees; and costs.

## Count III
## UNJUST ENRICHMENT

42.   Plaintiff hereby incorporates the preceding paragraphs as if set forth fully herein.

43.   Through the re-broadcasting scheme described above Defendants have received a financial benefit by, among other things, receiving subscription fees from each of Defendants' customers that have subscribed to the Exclusive Services.

44.   The financial benefit to Defendants is to the detriment of Plaintiff in that Defendants' customers who purchase the Exclusive Services would have had to acquire them from Star Cable rather than Defendants, thereby depriving Star Cable of subscription fees.

45.   Defendants have been unjustly enriched through these actions, and equity and good conscience requires restitution to Plaintiff.

46.   Star Cable has been damaged through the unjust enrichment of Defendants and seeks remedy for the same.

## Count IV
## CONVERSION

47.   Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

48.   Through the rebroadcasting scheme described above Defendants exercised and assumed unauthorized dominion and control over the signal of the Exclusive Services and disseminated and divulged said communications signals to third parties for payment and without the authorization of Plaintiff.

49.   Star Cable was excluded from exercising any control over the dissemination and divulgement of the signals of the Exclusive Services to third parties and received no income from this unauthorized use and divulgement.

50.     Plaintiff has been damaged through the unauthorized conversion of the signals of the Exclusive Services for which Star Cable seeks remedy.

## Count V
## UNFAIR COMPETITION

51.     Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

52.     Through the rebroadcasting scheme described above Defendants misappropriated the product of Star Cable, namely the licensed Exclusive Services.

53.     Defendants' misappropriation of the Exclusive Services was undertaken in bad faith and without the authorization of or payment to Star Cable for the sale and divulgement of the Exclusive Services.

54.     Plaintiff has been damaged through Defendants' unfair competition with reference to Plaintiff's Exclusive Services and seeks remedy for the same.

**WHEREFORE,** Plaintiff requests that this Court grant the following relief:

(1)     Declare that Defendants' unauthorized interception, transmittal, publishing, sale, use and divulgement of the Exclusive Services without authorization violated 47 U.S.C. § 605(a) and that such violations were committed willfully, intentionally and for the purposes of commercial advantage and private financial gain;

(2)     Declare that Defendants' distribution of a device or equipment knowing that the device or equipment was used to assist in the reception of Exclusive Services in violation of 47 U.S.C. § 605(a) violated 47 U.S.C. § 605(e)(4).

(3)     In accordance with 47 U.S.C. § 605(e)(3), permanently enjoin Defendants, their agents, servants, employees, and those controlled directly or indirectly by any of them

from the interception, distribution, sale, rebroadcast or divulgement of the Exclusive Services;

(4)    In accordance with 47 U.S.C. § 605(e)(3), award Plaintiff against Defendants, damages for all losses incurred as a result of Defendants' violations:

(a)    The actual damages that Plaintiff has suffered, together with any additional profits earned by Defendants, or alternatively at Plaintiff's election,

(b)    Statutory damages in an amount between $1,000 and $10,000 for each of the customers to which the Exclusive Services were sold and/or distributed by Defendants.

(5)    In accordance with 47 U.S.C. § 605(e)(4), award Plaintiff statutory damages in the amount of $100,000 per violation.

(6)    Order an accounting of all profits and expenses realized by Defendants in violation of 47 U.S.C. § 605, together with Defendants' production of all records reflecting sales of the Exclusive Services;

(7)    Impose a constructive trust based upon Defendants' unjust enrichment derived from profits on sales of the Exclusive Services, and based upon their conversion of profits diverted from and properly due to Star Cable by reason of theft of its product;

(8)    Order an assessment of damages, to be determined at trial, based upon the New York Law of Unfair Competition;

(9)    In accordance with 47 U.S.C. § 605 award Plaintiff its reasonable attorneys' fees and costs of this action; and

(10)    Grant such other and further relief as is just.

Dated:  July 28, 2017

HOGAN & CASSELL, LLP
Attorneys for Plaintiff

By: _____

Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
Tel.  516-942-4700
mcassell@hogancassell.com

# **EXHIBIT G**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————— — — — — — — — — — — — — — — — — —X
STAR CABLE NA, INC.,

               Plaintiff,          **CASE NUMBER:** 2:17-cv-04469

    -against-                **ANSWER TO COMPLAINT**

LALON TV, INC., HABIBUR RAHMAN,
SHAHINUL KARIM, SHAHIDUL BARI,
SYED S. AHMED, AHMODUL BAROBHUIYA
and TOTALCABLEBD.COM,

               Defendants.
—————— — — — — — — — — — — — — — — — — — —X

The defendants Lalon TV, Inc., Habibur Rahman, Shahinul Karim, Shahidul Bari, Syed S. Ahmed,
and Ahmodul Barobhuiya by their attorneys Bhatia and Associates PLLC interpose the following
answer to the above complaint.

## NATURE OF THE ACTION

1.  The allegations contained in paragraph number one of the complaint are that defendant

    Lalon TV, Inc. is involved in the sale and distribution of cable television services and

    devices to assist its customers to gain access to various programming are denied.

    Defendant Lalon TV, Inc. denies that it is not entitled to the sale and services. Defendant

    Lalon TV, Inc. also denies that programming originates in Bangladesh via Internet

    Protocol Television System (IPTV). The defendants admit that the services mentioned in

    paragraph one of the complaint originate in Bangladesh. Defendants deny that they are

    receiving, using, divulging, and retransmitting such communication services for which

    they are not entitled, for the purposes of illegally selling said programming to customers

    of their businesses who subscribe to their exclusive services. The allegations that the

    defendants distribute devices to their customers to primarily assist in the unauthorized

access to the exclusive services are denied. Defendants also deny that conduct of Lalon TV, Inc. is in violation of the Communications Act of 1934, 47 U.S.C § 605 (a), 47 U.S.C § 605(e)(4) and New York Law. The defendants submit that Star Cable is not entitled to seek declaratory and injunctive relief and monetary damages, costs and attorneys' fees.

## PARTIES

2. Answering defendants deny the allegations due to lack of knowledge and information sufficient to form belief as to the truth of the allegations contained in paragraph 2.

3. Allegations contained in paragraph 3 of the complaint are admitted.

4. Allegations contained in paragraph number 4 are admitted to the extent that the defendant Habibur Rahman is the Chief Technology Officer (CTO) of Lalon TV, Inc. The rest of the allegations contained in paragraph under reply are denied.

5. Allegation contained in paragraph 5 of the complaint are admitted.

6. Allegation contained in paragraph 6 of the complaint are admitted.

7. Allegation contained in paragraph 7 of the complaint are denied.

8. Allegations contained in paragraph 8 are admitted to the extent that the defendant Ahmodul Barobhuiya is the Chief Executive Officer of the defendant Lalon TV Inc. The rest of the allegations contained in the paragraph under reply are denied

9. In reply to paragraph number 9 of the complaint, the answering defendants submit that the defendant TotalCableBD.Com is a website only and is not a legal entity. As such, the action cannot be commenced against TotalCableBD.Com

## JURISDICTION AND VENUE

10. Allegations contained in paragraph 10 of the complaint state conclusions of law to which no answer is required.

11. Allegations contained paragraph 11 of the complaint state conclusions of the law to which no answer is required. To the extent an answer is required, the answering defendants admit that court has jurisdiction and venue is proper. Except as expressly admitted herein, answering defendants deny the allegations contained in paragraph eleven of the complaint.

## FACTUAL BACKGROUND

12. The allegations contained in paragraph 12 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

13. The allegations contained in paragraph 13 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

14. The allegations contained in paragraph 14 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

15. The allegations contained in paragraph 15 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

16. The allegations contained in paragraph 16 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

17. The allegations contained in paragraph 17 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

18. The allegations contained in paragraph 18 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

19. The allegations contained in paragraph 19 of the complaint are denied due to lack of knowledge sufficient to form belief as to the truth of the allegations contained therein.

20. Allegations contained in paragraph 20 are admitted to the extent that defendant Lalon TV, Inc. is currently distributing its television signals through an IPTV distribution system through which channels are delivered using the architecture and network methods over the internet to broadband internet access networks. Any other allegations contained in paragraph under reply contradictorily to above reply are denied.

21. Allegations contained in paragraph 21 of the complaint are admitted.

22. Allegations contained in paragraph 22 of the complaint are denied.

23. Allegations contained in paragraph 23 of the complaint are denied.

24. Allegations contained in paragraph 24 of the complaint are denied.

25. Allegations contained in paragraph 25 of the complaint are denied.

26. Allegations contained in paragraph 26 of the complaint are denied.

27. Allegations contained in paragraph 27 of the complaint are denied.

### Count I

### 47 U.S.C § 605(a)

28. Answering defendants reiterate and reallege the averments contained in paragraphs number 1-27 of the answer as fully set forth herein.

29. Allegations contained in paragraph 29 of the complaint are denied.

30. Allegations contained in paragraph 30 of the complaint are denied.

31. Allegations contained in paragraph 31 of the complaint are denied.

32. Allegations contained in paragraph 32 of the complaint are denied.

33. Allegations contained in paragraph 33 of the complaint are denied.

34. Allegations contained in paragraph 34 of the complaint are denied.

35. Allegations contained in paragraph 35 of the complaint are denied.

<div align="center">

**Count II**

**47 U.S.C § 605(e)(4)**

</div>

36. Answering defendants reiterate and reallege the averments contained in paragraphs number 1-35 of the answer as fully set forth herein.

37. Allegations contained in paragraph 37 of the complaint are denied.

38. Allegations contained in paragraph 38 of the complaint are denied.

39. Allegations contained in paragraph 39 of the complaint are denied.

40. Allegations contained in paragraph 40 of the complaint are denied.

41. Allegations contained in paragraph 41 of the complaint are denied.

<div align="center">

**Count III**

**UNJUST ENRICHMENT**

</div>

42. Answering defendants reiterate and reallege the averments contained in paragraphs number 1-41 of the answer as fully set forth herein.

43. Allegations contained in paragraph 43 of the complaint are admitted to the extent that defendant Lalon TV, Inc. through the rebroadcasting system scheme have received a financial benefit by, among other things, receiving subscription fees from each of the customers of Lalon TV, Inc. The rest of the allegations contained in the paragraph under reply are denied.

44. Allegations contained in paragraph 44 of the complaint are denied.

45. Allegations contained in paragraph 45 of the complaint are denied.

46. Allegations contained in paragraph 46 of the complaint are denied.

## Court IV

## <u>CONVERSION</u>

47. Answering defendants reiterate and reallege the averments contained in paragraphs number 1-46 of the answer as fully set forth herein.

48. Allegations contained in paragraph 48 of the complaint are denied.

49. Allegations contained in paragraph 49 of the complaint are denied.

50. Allegations contained in paragraph 50 of the complaint are denied.

## Count V

## <u>UNFAIR COMPETITION</u>

51. Answering defendants reiterate and reallege the averments contained in paragraphs number 1-50 of the answer as fully set forth herein.

52. Allegations contained in paragraph 52 of the complaint are denied.

53. Allegations contained in paragraph 53 of the complaint are denied.

## <u>FIRST AFFIRMATIVE DEFENSE</u>

54. Complaint fails to disclose any cause of action upon which the relief may be granted.

## <u>SECOND AFFIRMATIVE DEFENSE</u>

55. No cause of action ever accrued to the plaintiff to commence the present action against the answering defendants.

## <u>THIRD AFFIRMATIVE DEFENSE</u>

56. The plaintiff's claims are barred by the doctrine of unclean hands.

## <u>FOURTH AFFIRMATIVE DEFENSE</u>

57. The plaintiff's claims are barred by the doctrine of fair use.

## FIFTH AFFIRMATIVE DEFENSE

58. The plaintiff's claims are barred by the doctrine of latches.

## SIXTH AFFIRMATIVE DEFENSE

59. The present action is barred by statute of limitations.

## SEVENTH AFFIRMATIVE DEFENSE

60. Plaintiff has not registered its copyright in the U.S Patent and Trade office and as such, the present action is not maintainable.

## EIGHTH AFFIRMATIVE DEFENSE

61. The present action is liable to be dismissed due to misjoinder of parties. The individual defendants are not the necessary or proper parties. TotalCableBD.Com is not a legal entity and cannot be joined as one of the defendants in the present action.

## NINTH AFFIRMATIVE DEFENSE

62. On information and belief Independent Television, Bangla Vision, and Jamuna TV have sent letters of cancellation to the plaintiff. The alleged agreement between the plaintiff and Boishakhi TV was not exclusive. The owners of Ekhusey TV and Channel 16 never signed any contract with the plaintiff.

## FIRST COUNTER CLAIM ON BEHALF OF LALON TV, INC.

63. Defendant Lalon TV, Inc. reiterates and realleges the averments contained in paragraph 1-62 of the answer as fully set forth herein.

64. The defendant Lalon TV, Inc. enjoys its rights and privileges directly from the overseas television channels who are the content owners. The defendant Lalon TV, Inc. is a corporation duly organized and existing under by virtue of laws of State of New York, with its principal place of business at 15 Westmoylan Lane, Coram, New York 11727.

65. The defendant Lalon TV, Inc. is engaged in the media and entertainment business, and has rights to distribute certain premium television programming in the United States of America and Canada via IPTV.

66. Defendant Lalon TV, Inc. is filing this counterclaim to recover money damages from the plaintiff due to tortious business interference by the plaintiff.

67. In addition to channels mentioned in paragraph one of the Complaint, except Somoy TV, the defendant Lalon TV, Inc. also has legal right to broadcast channels, which includes: Channel TBN24 Television, Channel TBN Music, Channel TBN Cinema, Channel I, Channel ATN Bangla, Channel Boishakhi TV, Channel SATV, Channel ATN News, Channel Ekattor Television, Channel Independent Television, Channel S, Channel DBC News, Channel Asian TV, Channel Bangla Vision, Channel MY TV, Channel Ekhusey TV, Channel Jamuna TV, Channel Deepto TV, Channel 24, Channel News 24, BTV, Channel I EU, Channel Gaan Bangla, Channel RTV, Channel ATN UK, Channel BTV World, Channel Ad-Deen, Channel Peace TV Bangla, Channel Guide US, Channel Al Ramadan, Channel Al Muhabba, Channel Iqra Bangla, and Channel 16. The defendant Lalon TV, Inc. is not involved in the sale and distribution of Channel Somoy TV.

68. On information and belief, the overseas content owners have terminated the agreement with the plaintiff to broadcast various channels and/or are in process of terminating the agreements with the plaintiff's right to broadcast channels.

69. The plaintiff's unauthorized access in transmission and use of various channels in respect of which the defendant Lalon TV, Inc. has been granted rights to distribute by the overseas channel owners is likely to confuse, mislead, and deceive the members of the public and cause them to believe that the plaintiff is the authorized distributors of the

channels despite the channel owners have terminated or in process of terminating the right of plaintiff to distribute the channels.

70. The plaintiff's acts have been deliberate, willful, intentional, and purposeful, in reckless disregard and with indifference to the rights of the defendant Lalon TV, Inc.

71. On informational belief, the plaintiff is approaching to the overseas channel owners who have already granted rights to defendant Lalon TV, Inc. to distribute various channels. The conduct of the Plaintiff amount to tortious business interference of the defendant Lalon TV, Inc. agreements with the overseas channel owners.

72. The tortious conduct of the Plaintiff has caused substantial pecuniary damages to the defendant Lalon TV, Inc.

73. The defendant Lalon TV, Inc. demands a judgement in favor of the defendant Lalon TV, Inc. against the Plaintiff in sum of one million dollars.

## SECOND COUNTERCLAIM ON BEHALF OF LALON TV, INC.

74. Defendant Lalon TV, Inc. reiterates and realleges the averments contained in paragraph 1-73 of the answer as fully set forth herein.

75. The plaintiff's acts and conduct are causing, and unless restrained by this court, will continue to cause irreparable harm to the defendant Lalon TV, Inc. The defendant Lalon TV, Inc. has already suffered pecuniary losses due to the tortious business interference by the plaintiff.

76. The defendant Lalon TV, Inc. seeks a judgement for injunctive relief restraining the Plaintiff from distributing and transmitting the channels to which they have no right to distribute and transmit.

## THIRD COUNTERCLAIM

77. Answering defendants reiterate and reallege the averments contained in paragraph 1-76 of the answer as fully set forth herein.

78. The Plaintiff has dragged the answering defendants in a false, frivolous, and vexatious litigation. The answering defendants have incurred and will continue to incur attorney's fees and other legal incidental expenses. The answering defendants claim a judgement for statutory damages, attorney's fees, and other incidental expenses.

WHEREFORE, the answering defendants request that the complaint be dismissed and the judgement as requested in the first to third counterclaims be granted along with any other just and proper relief.

Dated: August 30th, 2017

_____s/d_____

Satish K. Bhatia (SB9222)
Bhatia & Associates PLLC
38W 32nd St., Suite 1511
New York, NY 10001
T: (212)239-6898
F: (212) 594-7980
satishbhatiaus@yahoo.com

# EXHIBIT H

৳১০০                                                                 ৳১০০

একশত টাকা

০৬৮৮২৮৬

# BROADCAST RIGHTS AGREEMENT



BROADCAST RIGHTS AGREEMENT ("Agreement") as of this 20 day of March 2013 by and between LALON TV INC. DBA TOTAL TVs [New York Corporation ("Distributor")] Whose principal place of business is at 15 Westmoylan ln. Coram, NY 11727 (hereinafter referred to as "LALON TV," and Independent Television Limited, 149-150 Tejgaon I/A, Dhaka - 1208, Bangladesh

## RECITALS

WHEREAS, "LALON TV" is an operator of cable, broadband, IPTV and satellite television channels in the North America including United States and Canada;.



WHEREAS, "INDEPENDENT" is a SATELLITE television CHANNEL and production company serving the domestic and international Bangladeshi community.

WHEREAS, "LALON TV" desires to acquire the non-exclusive broadcast rights of INDEPENDENT TELEVISION LIMITED for all media including cable, broadband, IPTV, satellite and mobile media in the North America including United States and Canada (the "Territory")

WHEREAS, Independent desires to grant LALON TV non-exclusive rights in the Territory for all media including cable, broadband, IPTV, satellite and mobile media.

NOW, THEREFORE, in consideration of ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. Broadcast Rights.

(a) Independent hereby grants LALON TV non-exclusive broadcast rights of Independent Media Programming for all media within the Territory

(b) The INDEPENDENT's program shall at all time remains the property of Independent subject to Independent's obligations hereunder.

(c) LALON TV's broadcasts of the Independent shall display Independent's logotype, which logotype shall remain the sole and exclusive property of Independent.

(d) In addition to the Independent programming Lalon TV shall have the right to



স ২ Terms ৭০৭০৮১৮

   (a) The term of this Agreement (the "Term") initially shall be for a period of 03 (three) years but this must be annual renewal basis. It will commence on March 20, 2013. Any party can terminate the agreement with a 90 days prior notice and if there is no termination letter issued by any party the agreement will renewed automatically. The agreement will be extended for the next year based on the good business upon the terms and conditions set forth herein.

   (b) Notwithstanding anything contained in clause (1) the Agreement may be renewed by mutual discussion by the Parties on terms and conditions as may be determined by them.

## 3. Revenue Share:

Independent will receive the following percentage of Gross Revenue through content distribution to other providers, for example: content delivered to Direct TV, Dish Network or any other cable operators etc.; and Net Advertising (Net Agency Commissions, if any) Revenue

| Year | Independent | Lalon Tv Inc |
|---|---|---|
| From initial phase, if collected by Lalon TV | 50% | 50% |
| If ad. be collected by Independent own self or its' representatives) | 100% | 0% |



| Year | Lalon TV will pay to Independent TV |
|---|---|
| April'13 to October'13 | US $0.0 dollars |
| November'2013 to continue | The minimum guarantee US $.50 (Fifty Cents) dollars/per subscriber as a value added package. Detail Annexure-I attached. |

   A. For bundled services, for any media, payment will be in direct proportion which the bundled revenue per subscriber bears to the a-la-carte revenue per subscriber.

   B. For broadcast of Independent's Programming through any media in Canada, the above payments will be in Canadian Dollars.

   C. Both parties acknowledge and agree that there may be a free preview period up

## 4. Duties of Independent:

(a) Throughout the Term Independent shall provide first quality programming on a continual basis to Lalon TV and make the same available by transmission feed to Lalon TV in Bangladesh, Singapore or Hong Kong.

(b) Independent will provide an electronic programming guide (EPG) at least two weeks in advance of the first day of each month. Any changes or updates to the EPG will be immediately emailed to Lalon TV.

## 5. Duties of Lalon TV:

(a) Lalon Tv shall use best efforts to maximize the distribution of the Independent and its subscriber base in the Territory throughout the term.

(b) Lalon Tv will pick-up signal from Bangladesh or Singapore or Hong Kong or London or any other convenient place and delivers the same to each and every platform after PAL to NTSC conversion.

(c) Lalon Tv will be responsible for the cleanup of the feed including any time delay, when needed and economically feasible.

(d) Lalon TV Inc. will rebroadcast to any media without making any modification to content provided by Independent Programming.



(f) LALON TV will bear all cost to bring Independent s'.single from Bangladesh to North America

(g) LALON TV will provide and bear coast for all legal protection of Independent's content in North America.

## 6. Representations and Warranties:

(a) **Representations by Independent .**
   Independent hereby represents and warrants to Lalon Tv as follows:

(i) Due Incorporation, etc. Independent has the corporate power and authority and all necessary governmental approvals to enter into the transactions covered by this Agreement.
Authorization, No Conflicts. etc. This Agreement has been duly and validly executed and delivered by Independent and constitutes a valid and binding agreement of same, enforceable against Independent in accordance with its terms.

(ii) Consents and approvals, To Independent 's knowledge, no consent, approval or authorization, declaration, filing, or registration with, any United States or Bangladeshi governmental or regulatory authority is required to be made or obtained by Independent in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

(iii) Survival. The representations and warranties made by Independent herein shall expire on the termination or expiration of this Agreement.

## (b) **Representations by Lalon Tv**

Lalon Tv here by represents and warrants to Independent as follows:

(iii) Consents and Approvals. To Lalon Tv's knowledge, no consent, approval or authorization, or, or declaration, filing, or registration with, any other source, federal or state governmental or regulatory -authority, or any other patty, is required to be made or obtained by Lalon Tv in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

(iv) Survival. The representations and warranties made by Lalon Tv herein shall expire on the termination or expiration of this Agreement.

## 7. Cooperation.

The parties shall -deal with each other fairly and in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement.

## 8. Exclusivity.

The parties agree that it's a non-exclusive broadcast rights and Independent shall engage or enter into any partnerships, broker relationships or other similar agreements with third parties with respect to the Independent in the territory.



## 9. Notices

All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission (with confirmation by recognized international courier such as Federal Express or DHL, which provides service between the United States and Bangladesh), or by registered international courier such as DHL or Federal Express or some other reputable overnight carrier which provides service between the United States and Bangladesh (or when delivery is rejected or refused), to the parties at the following addresses and facsimile numbers:

If to INDEPENDENT., addressed to

Independent Television Limited
149-150, Tejgaon I/A, Dhaka- 1208
Bangladesh
Attn: Bankim Chandra Roy

If to Lalon Tv Inc., addressed to:
Lalon Tv Inc.
34-27 Steinway ST
Astoria, NY 11101
Attn: Ahmodul Barobhuiya
CEO

Or to such other place and with such other copies as many designate by written notice to all other parties provided in the manner set forth herein.

parties - the parties shall try resolving the issue on mutual discussion between the representatives of the parties concerned. But in case the disagreement, misunderstanding or dispute cannot be resolved mutually, the matter shall be referred to an Arbitrator who will be selected by mutual consent of both the parties concerned. The opinion /verdict of the Arbitrator shall be binding on both the parties.

## 11. Severability.

If any provision of this Agreement is held to be illegal, invalid,. or unenforceable under any present or future law, rule, or regulation. such provision shall be fully sever able and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof. The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance here from Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as Similar in terms to such illegal invalid, or unenforceable provision as maybe possible.

## 12. Entire Agreement.

This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and this Agreement, including the schedules and exhibits hereto contains the sole and entire Agreement between the parties hereto with respect to the subject matter hereof. This Agreement may be modified or amended only in a writing duly executed by or on behalf of ach of the parties hereto.

## 13. Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

## 14. Headings, Gender etc.

The headings used in this Agreement have inserted .for convenience. do not modify the terms of this Agreement and do not constitute matter be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number, respectively, (c) references to "hereof," .'Herein," "hereby" and similar terms shall refer to this entire Agreement and (d) the words - "include" and "including" shall be construed as incorporating but not limited to" or "Without. limitation."' The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express that mutual intent and no rule of strict construction shall be applied against any person. References to Schedules and Exhibits of this Agreement shall be, deemed to refer to such Schedules and Exhibits as supplemented or amended as applicable.

## 15. Employees.

hereto and their respective successors and assigns, except that neither Lalon TV nor Independent may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the and date first written above.

INDEPENDENT TELEVISION LTD.
By: M. Shamsur Rahman

LALON CABLE TV INC.
By: Ahmedul Barobhuiya

Its: Managing Editor

Its: CEO

# EXHIBIT I

Case 1:16-cv-04067-SJ-CLP Document 81 Filed 05/06/19 Page 405 of 408 PageID #: 810
Case 2:17-cv-04469-SJF-AYS Document 17 Filed 01/24/18 Page 1 of 2 PageID #: 54

Case 2:17-cv-04469-SJF-AYS Document 16 Filed 01/23/18 Page 1 of 2 PageID #: 52

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ IJAN 24 2018 ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LONG ISLAND OFFICE

-------------------------------------------------------------------X

STAR CABLE NA, INC.,

                                        17-CV-004469(SJF)

                                    Plaintiff,

        -against-

LALON TV, INC., HABIBUR RAHMAN,
SHAHINUL KARIM, SHAHIDUL BARI,
SYED S. AHMED, AHMODUL BAROBHUIYA
and TOTAL CABLE BD.COM,

                                    Defendants.

-------------------------------------------------------------------X

## STIPULATION OF DISMISSAL WITHOUT PREJUDICE

        IT IS HEREBY STIPULATED AND AGREED, by and between the plaintiff, Star Cable

NA, Inc. ("Plaintiff"), and the defendants, Lalon TV, Inc., Habibur Rahman, Shahinul Karim,

Shahidul Bari, Syed S. Ahmed, Ahmodul Barobhuiya and Total Cable BD.com ("Defendants"),

in accordance with Rule 41(a)(1)(A) of the Federal Rules of Civil Procedure, that this action is

hereby dismissed without prejudice and without costs and attorney's fees.

        This stipulation may be filed with the Clerk of the Court without further notice.

        **IT IS FURTHER STIPULATED AND AGREED** that a fax or PDF copy of this

Stipulation shall have the same force and effect as an original.

Case 1:16-cv-04067-SJ-CLP   Document 81   Filed 05/06/19   Page 406 of 408 PageID #: 811
Case 2:17-cv-04469-SJF-AYS   Document 17   Filed 01/24/18   Page 2 of 2 PageID #: 55

Case 2:17-cv-04469-SJF-AYS   Document 16   Filed 01/23/18   Page 2 of 2 PageID #: 53

Dated: January 22, 2018

**HOGAN & CASSELL, LLP**

Attorneys for Plaintiff, Star Cable
NA, Inc.

By: _____

Michael Cassell, Esq.
500 North Broadway, Suite 153
Jericho, New York 11753
516-942-4700

**BHATIA & ASSOCIATES, PLLC**

Attorneys for Defendants, Lalon TV, Inc., Habibur
Rahman, Shahinul Karim, Shahidul Bari, Syed S.
Ahmed, Ahmodul Barobhuiya and Total Cable
BD.com

By: _____

Satish K. Bhatia, Esq.
38 W 32nd Street, Suite 1511
New York, New York 10001
212-239-6898

The Clerk of Court is directed to close This case

**SO ORDERED**

/s/ Sandra J. Feuerstein

United States District Judge
Sandra J. Feuerstein

Date: January 24, 2018
Central Islip, New York

2

# EXHIBIT J



## OUTGOING WIRE FUNDS TRANSFER

| | |
|---|---|
| REGION: | |
| WIRE TYPE: Domestic | COUNTRY CODE: |
| AMOUNT OF WIRE: | $450,000.00 |
| ACCOUNT BALANCE PRIOR TO WIRE: | $ |
| ACCOUNT NO. TO DEBIT: | ▓▓▓151 |
| TITLE/ADDRESS: | LALON TV INC |
| | DBA TOTAL TVS-OPERATING |
| | DBA TOTAL CABLE |

BRANCH/DEPT: ASTORIA BROADWAY

| | |
|---|---|
| OFFICER: | NB611 |
| CASE NO: | 84125222 |
| FEE: | $0.00 |
| COST CENTER: | 46454 |

CUSTOMER PHONE NO:
CUSTOMER REQUESTING TRANSFER: ▓▓▓▓▓▓▓▓▓

### TRUE ORIGINATOR/3RD PARTY SENDER

TRUE ORIGINATOR NAME:
ADDRESS:
ADDRESS:
ADDRESS:
TRUE ORIGINATOR ACCOUNT NO.

### BENEFICIARY INFORMATION

BENEFICIARY ACCOUNT NO: ▓▓▓0911
BENEFICIARY NAME: BARTA CLIENT TRUST ACCOUNT
BENEFICIARY ADDRESS: 1801 CENTURY PARK EAST SUITE 1200
LOS ANGELES, CA 90067

ADDITIONAL INFO:
(ORIG TO BENE)

### FINANCIAL INSTITUTION INFORMATION

RECEIVING BANK NAME: FIRST REPUBLIC
BENEFICIARY BANK ID:
BENEFICIARY BANK NAME:
BENEFICIARY BANK ADDRESS:

ROUTING NO: ▓▓▓1689
BENEFICIARY
BANK ID CODE:

INTERMEDIARY BANK ID:
INTERMEDIARY BANK NAME:
INTERMEDIARY BANK ADDRESS:

INTERMEDIARY
BANK ID CODE:

BANK TO BANK INFO: Asia TV USA Ltd. v. Lalon TV Inc.
et al; Case No. 1:16-cv-6873-AJN-OTW

REFERENCE #: