# BHATIA & ASSOCIATES PLLC

ATTORNEYS & COUNSELORS AT LAW
Satishbhatiaus@yahoo.com

Satish K Bhatia

Joseph F. Kasper*
*of counsel

38 West 32nd St., Ste. 1511
New York, New York 10001
T: (212) 239-6898
F: (212)594-7980

May 6, 2019

By ECF
Hon. Judge Sterling Johnson, Jr.
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

Hon. Judge Cheryl L. Pollak
Eastern District of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

**Re:**   **Star Cable NA, Inc. v. Total Cable USA LLC and 1StopMedia and Entertainment;**
      **Fully Briefed Motion for Summary Judgment**
      **Case No.: 16-CV-04067**

Dear Hon. Judge Johnson & Hon. Judge Pollak,

Enclosed please find the fully briefed motion for summary judgment filed by the

Defendants Total Cable USA LLC and 1stop Media & Entertainment Inc. The motion for

summary judgment was served on March 25, 2019 on the Plaintiff's attorney. The opposition

was received on April 23, 2019 beyond the date provided in the briefing schedule, though I

consented in the change of briefing schedule, no Court approval was obtained by the Plaintiff's

Counsel. The Defendant's reply to the opposition was served on May 4, 2019. Also enclosed is

the covering letter for the serving the motion for summary judgment on the Plaintiff on March

25, 2019.

Respectfully Submitted,


_____/s/_____
Satish K. Bhatia (SB9222)

To: Michael Cassell, Esq.
Via: ECF

# BHATIA & ASSOCIATES PLLC

### ATTORNEYS & COUNSELORS AT LAW
Satishbhatiaus@yahoo.com

Satish K Bhatia

Joseph F. Kasper*
*of counsel

38 West 32nd St., Ste. 1511
New York, New York 10001
T: (212) 239-6898
F: (212)594-7980

By: Email mcassell@hogancassell.com & FedEx

March 25, 2019

Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753

**RE: Star Cable v Total Cable USA LLC; Index No. 16-cv-4067**

Dear Michael,

    Enclosed is the notice of motion and supporting documents as ordered by the Honorable Judge.

Yours Truly,

_____/s/_____

Satish K. Bhatia, Esq. (Sb9222)

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

STAR CABLE NA, INC.,                                    Docket No. 16-cv-04067

                              Plaintiff,

        vs.


TOTAL CABLE USA LLC. and RADIANT IPTV


                              Defendants.

-----------------------------------------------------------------x

## AMENDED NOTICE OF MOTION SEEKING SUMMARY JUDGMENT TO DISMISS THE COMPLAINT AGAINST 1STOPMEDIA & ENTERTAINMENT INC. d/b/a RADIANT IPTV

**PLEASE TAKE NOTICE** that on May 7, 2019, or as soon as counsel can be heard, at the United States District Court, 225 Cadman Plaza East, Brooklyn, NY 11201, before the Honorable Sterling Johnson Jr., U.S.D.J., the Defendant 1Stopmedia & Entertainment Inc. by its attorneys Bhatia & Associates PLLC, will move this Court seeking summary judgment to dismiss the complaint against the Defendant 1Stopmedia & Entertainment Inc. by along with any other just and proper relief. The opposition to the motion is due on April 9, 2019 and the response to the opposition is due on April 25, 2019.


Dated: April 3, 2019

                                        Respectfully submitted,

                                        _____/s/_____

                              SATISH K. BHATIA, ESQ.(SB9222),
                                    Bhatia & Associates PLLC
                              38 West, 32nd Street, Suite #1511
                                        New York, NY 10001
                                        Tel: 212-239-6898
                                        Fax: 212-594-7980

To:     Michael Cassell
        500 North Broadway, Suite 153
        Jericho, New York 11753
        (516) 942-4700

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

STAR CABLE NA, INC.,

                                               **Plaintiff,**

**vs.**

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10

                                      **Defendants.**

--------------------------------------------------------------------------x

Docket No 16-cv-04067
Assigned Judge Hon. Pollak

**AFFIRMATION IN
SUPPORT OF NOTICE
OF MOTION SEEKING
SUMMARY JUDGMENT
TO DISMISS THE
COMPLAINT**

Satish K. Bhatia, the attorney of record for Total Cable USA LLC and 1Stopmedia &

Entertainment Inc. d/b/a Radiant IPTV who is associated with Bhatia & Associates PLLC

affirms under penalty of perjury as follows:

1. I am associated with Bhatia & Associates PLLC, the attorney of the record for the

    Defendants Total Cable USA LLC and 1Stopmedia & Entertainment Inc. d/b/a Radiant

    IPTV and as such I am familiar with the facts and circumstances of this case.

2. I am making this affirmation in support of the Defendant 1Stopmedia & Entertainment

    Inc. d/b/a Radiant IPTV's motion seeking summary judgment to dismiss the complaint

    inter alia on the ground that the Defendant 1Stopmedia & Entertainment Inc. d/b/a

    Radiant IPTV has been broadcasting channels with the consent and on the basis of the

    written agreements with the content owners and the Plaintiff Star Cable NA, Inc. has no

exclusive rights to broadcast channels as alleged in paragraph 1 of the second amended complaint.

3. On or about July 22, 2016, the Plaintiff Star Cable NA Inc. had commenced the present action against the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV alleging copyright violations of various channels in which the Plaintiff has alleged exclusive rights to broadcast (Docket No. 1, July 26, 2016). Subsequently, on or about July 6, 2017, the Plaintiff Star Cable NA Inc. filed a second amended complaint (Docket No. 38, July 6, 2017). In paragraph 1 of the complaint, the Plaintiff alleged that the Plaintiff has exclusive rights in the United States and Canada to distribute the programming services including i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Banglavision; vii) Ekushey TV viii) Somoy. The copy of the second amended complaint is annexed with this affirmation as **Exhibit A**.

4. On or about August 28, 2017, the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV filed an answer to the second amended complaint. In paragraph 1 of the answer, the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV is not involved in the sale and distribution of Somoy TV. Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV denied the allegations in paragraph 1 of the complaint, that the Defendant is in violation of the Plaintiff's exclusive rights. In paragraph 51 of the first counterclaim, Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that Defendant enjoys its rights and privileges directly from the overseas television channels who are the content owners. In paragraph 55 of the answer, Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that in addition to the channels

mentioned in paragraph 1 of the second amended complaint, except Somoy TV, the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV also has legal rights to broadcast Channel 16, Asian TV, Channel 1 TV, Boishakhi TV, ATN & Bangla and ATN & News. In paragraph 6 of the answer, 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that on information and belief, the overseas content owners have terminated the agreements with the Plaintiff to broadcast various channels and/or is in the process of terminating the agreements with the Plaintiff's right to broadcast channels.

5. During discovery, 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV requested the Plaintiff's attorney to provide responses to the request for documents by the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV. In response to request #1, the Plaintiff provided the agreements with Independent TV, Jamuna TV, Channel 16, MyTV, Asian TV, Banglavision, Ekushey, Boishakhi TV and Somoy TV. The agreement between Star Cable NA, Inc. and Boishakhi TV was executed on June 16, 2015, signed by Tipu Alam on behalf of Boishakhi TV. The copy of the said agreement is annexed with this affirmation as **Exhibit A1**. The Court will note that clause 1 of the agreement provides that affiliate shall have non-exclusive rights to distribute the services. In addition, Tipu Alam, who signed the agreement on behalf of Boishakhi TV sent a letter to Star Cable NA, Inc. on March 8, 2017 dismissing the letter of agreement. Tipu Alam also filed a declaration on December 14, 2017 in which he alleged in paragraph 3 of the declaration that terms of the agreement were not renewed as Star Cable NA, Inc. did not honor their part of the agreement. In paragraph 4 of the declaration, Tipu Alam alleged that Star Cable NA, Inc. has no right to distribute the services of Boishakhi TV. The

copy of the letter dated March 8, 2017 and the copy of the declaration dated December 14, 2017 are collectively annexed as **Exhibit B**.

6. In response to the request to production of documents, the Plaintiff also provided an agreement between Star Cable NA, Inc. and Independent TV Ltd. dated November 26, 2014 for a period of three years. This agreement expired in 2017. Star Cable NA, Inc. has not provided any other agreement showing that the agreement dated November 26, 2104 was ever renewed or a new agreement was executed between the parties. The copy fop the agreement dated November 26, 2014 is annexed with this affirmation as **Exhibit C**.

7. The Plaintiff also provided an agreement between Star Cable NA, Inc. and Jamuna TV dated December 1, 2014. The agreement was for three years and Star Cable NA, Inc. did not provide any agreement showing that this agreement was ever renewed or that a new agreement was executed between the parties. The copy of the agreement with Jamuna TV is annexed with this affirmation as **Exhibit D**. Saiful Siddique in his affidavit stated that Channel 16 is no longer in circulation and it is not broadcasting. In addition, Channel 16 also entered into agreement with Lalon TV on July 9, 2012 for a term of ten years. The copy of the agreement between Star Cable NA, Inc. and Channel 16 and the agreement between Lalon TV and Channel 16 are annexed with this affirmation as **Exhibit E** and **Exhibit F**.

8. The various content owners have entered into agreement with the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV. Jamuna TV provided a certification dated January 10, 2017 in which Jamuna TV certified that 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV is their client and Jamuna TV provided rights to broadcast Jamuna

TV in North America and Canada.  In the certification, Jamuna TV specified that no other organization has any valid exclusive rights with Jamuna TV.  Said certification was signed by ASM Arifur Rahman, head of broadcasting operations of Jamuna TV.  The copy of said certification is annexed with this affirmation as **Exhibit G**.

9.   On January 9, 2017, Shamol Bangla Media Ltd. provided a certification that Star Cable NA, Inc. had no valid agreement to broadcast Banglavision.  The copy of the certification signed by the managing director of Banglavision is annexed with this affirmation as **Exhibit H**.

10.  On September 1, 2017, MyTv provided a certificate that Star Cable NA, Inc. has no valid legal agreement with V.M. International Ltd. (mytv) and Star Cable NA, Inc. has absolutely no rights to broadcast or represent MyTV channel anywhere in the world.  The copy of said certification is annexed with this affirmation as **Exhibit I**.

11.  On August 23, 2016, Fakrool Alam of Ekushey TV wrote a letter to Sajid Sohail, the director of Star Cable NA, Inc. terminating the channel partnership agreement with Star Cable NA, Inc. The copy of the said letter is annexed with this affirmation as **Exhibit J**.

12.  On or about June 6, 2016, an agreement was made between Asian Telecast Ltd. (Asian TV) and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV granting distribution rights to 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a minimum of three years with automatic renewal for the next three years.  The copy of the said agreement is annexed with this affirmation as **Exhibit K**.

13.  On or about November 20, 2014, a business agreement (exclusive) was executed between Asian Telecast Ltd. (Asian TV) and 1Stopmedia & Entertainment Inc. d/b/a Radiant

IPTV for a term of three years with automatic renewal for the next three years. The copy

of said agreement is annexed with this affirmation as **Exhibit L.**

14. On or about September 23, 2014, an agreement was made between ATN Bangla Ltd. and

1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a minimum period of three

years with an automatic renewal for another three years. The copy of the said agreement

is annexed with this affirmation as **Exhibit M.**

15. On or about December 1, 2014, an agreement was executed between ATN News TV and

1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a period of one year with

automatic renewal. The copy of the said agreement is annexed with this affirmation as

**Exhibit N.**

16. On June 1, 2015, an agreement was made between Boishakhi Media Ltd. (Boishakhi) and

1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a period of four years. The

copy of the said agreement is annexed with this affirmation as **Exhibit O.**

17. On or about May 25, 2014 an agreement was executed between International TV and

1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV. The copy of the agreement is

annexed with this affirmation as **Exhibit P.**

18. On or about September 12, 2013 an agreement was executed between Independent TV

and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV. The copy of the agreement is

annexed with this affirmation as **Exhibit Q.**

19. All of the agreements executed between the various content owners and 1Stopmedia &

Entertainment Inc. d/b/a Radiant IPTV have already been provided to the attorney of the

Plaintiff in response to the Plaintiff's request for discovery. The agreement provided by

the Plaintiff in response to the Defendant's request for discovery do not establish that the

agreements with Star Cable NA, Inc. were exclusive.  Moreover, those agreements have already been terminated.

20. Saiful Siddique during his deposition has already testified that the various agreements have been executed between he content owners and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV and those agreements are still in force.

21. Sajid Sohail appeared in the deposition on behalf of the Plaintiff.  During the deposition, the Defendant's attorney Joseph F. Kasper specifically confronted all of the agreements executed between the content owners and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV, Mr. Sohail did not deny the execution of the agreements between 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV and the content owners and his response was simply that he was not aware of the agreements.

22. There is no triable issues of facts to be determined that Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV has been broadcasting channels based on the agreements they have with the content owners with the permission of the content owners. On the contrary, the agreements, if any, with the content owners and the Plaintiff Star Cable NA, Inc. have been terminated and Star Cable NA, Inc. has not rights to broadcast the various channels.

**WHEREFORE,** the Defendants 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV request that the motion for summary judgment seeking dismissal of the complaint be granted along with any other just and proper relief.

Dated: March 25, 2019

_____/s/_____
Satish K. Bhatia, Esq.(Sb9222)
Bhatia & Associates PLLC
38W 32nd St., Suite 1511
New York, NY 10001
T: (212)239-6898
F: (212) 594-7980
satishbhatiaus@yahoo.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

STAR CABLE NA, INC.,                                    16-CV-04067 (SJ)

                          Plaintiff,

                                                        **SECOND**
        -against-                                       **AMENDED COMPLAINT**

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                          Defendants.

-------------------------------------------------------------------X

        The plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorney, as and

for its Second Amended Complaint herein against the defendants, alleges the following:

## NATURE OF THE ACTION

        1.       The defendants in this action, Total Cable USA LLC. ("Total Cable") and

1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("Radiant") (Total Cable and Radiant

will collectively be referred to as "Defendants") are involved in the sale and distribution of

cable television services to their customers, which include various programming, to which they

are not entitled. The programming originates in Bangladesh via an internet protocol television

system ("IPTV"). Plaintiff is an IPTV cable television company that has exclusive rights, in

the United States and Canada, to distribute eight individual programming services, via the

signal delivery services IPTV, WiMax Wireless and Mobile TV. The exclusive services

originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My

TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes

hereinafter referred to as the "Exclusive Services"). This is an action, based upon the discovery

that Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using,

divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. This is true with respect to each of the Exclusive Services except exclusive rights are shared with Radiant for Independent TV, in which Radiant may have some rights. Otherwise, Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. In this action, Star Cable seeks declaratory and injunctive relief and monetary damages, costs and attorneys' fees.

## PARTIES

2.    Star Cable NA, Inc. is a New York corporation that has its principal place of business at 3839 Bell Boulevard, Bayside, New York 11361.

3.    Total Cable USA is a New York business that has its principal place of business at 37-19 57th Street, Woodside, New York 11377, and which operated as a NY registered LLC from October 22, 2013 until May 2, 2016, on which date it was dissolved. Prior to October 22, 2013, Total Cable USA, upon information and belief, operated as a subsidiary of Lalon TV, Inc. an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram NY. Both Total Cable USA, LLC and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya, who upon information and belief is the principal of Total Cable USA. Moreover, in a Bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. A/K/A Total TV, A/K/A Total Cable.

4.    1Stop Media and Entertainment, Inc. ("1Stop") is an Illinois corporation with headquarters located at 3833 Gladston Drive, Naperville, Illinois 60565. On the FCC Form

499, which identifies certain communication business data, 1Stop lists "other trade names" to include Radiant IPTV. Further the CEO of 1Stop, Saiful Siddique, lists himself as the COO of Radiant IPTV. Mr. Siddique identifies himself as having addresses in Naperville, Illinois, for the purposes of his FCC filing and Brunswick, New Jersey for the purposes of 1Stop's Secretary of State incorporation data. 1Stop also does business as Radiant IPTV.  On its Facebook page Radiant IPTV lists its parent corporation as 1Stop.

5.      1Stop d/b/a Radiant IPTV appears to operate from 150-47 Hillside Avenue, Jamaica, New York 11432.  1 Stop d/b/a Radiant appears to operate out of the second floor of that two story building, however the second floor is entirely occupied by Marvel Cable and Broadcasting, LLC, a New York LLC with its principal place of business at 150-47 Hillside Avenue.  When a customer pays for Radiant IPTV services by credit card, the payment is received by 1Stop.

6.      ABC, INC., XYZ CORP. and JOHN DOES 1-10 are fictitious names of persons and entities that are the persons or corporate owners of Defendants.  Although Plaintiff exercised its best efforts in discovering the true names and ownership interest of said named defendants, defendants seem to be engaged in a scheme to evade detection of their proper name and ownership.  As such, Plaintiff reserves its right to amend this Second Amended Complaint upon discovery of true names and ownership of Total Cable USA LLC and 1Stop d/b/a Radiant IPTV, whether held in corporate or individual form.

## JURISDICTION AND VENUE

7.      This action arises under 47 U.S.C. §605 (a) and supplemental law claims.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and/or 28 U.S.C. § 1332 as there is a Federal question and/or dispute in excess of the jurisdictional

limits, and supplemental jurisdiction over the state law claims. Venue is properly established in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) and 1400(a), as Defendants reside in the District, do business in this District and a substantial part of the events giving rise to the claim occurred in the District.

## FACTUAL BACKGROUND

9.      Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access.  Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, NY to its subscribers via the internet in the process known as Internet Protocol Television.

10.     In order to provide the Exclusive Services, Star Cable negotiated and contracted with  each  Exclusive  Service  in  multi-year  Network  Affiliation  Agreements  (the "Agreements").  The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered.  So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV.  In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights").  In exchange for the Exclusive Rights, Star Cable continues to pay the programming service provider's license fees, which generally increase annually in accordance with the terms of these multi-year agreements.  Such annual increases are often double and/or triple the previous year's license fee.  As such, Star Cable pays significant amounts for its Exclusive Rights.

11.    The Agreements are part of the marketing scheme of the Exclusive Services.

12.    Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted.  The encrypted video services are then transmitted via the internet to its customers.

13.    Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen.  The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same.  The set top box is part of the monthly service charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a service charge is added to the customer's bill each month.

14.    The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server.  Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television.  The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.

15.    Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service.

16.    At all times pertinent to this Complaint, Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services:   i)

Independent TV (as it applies to Total Cable); ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV for all regions within the United States and Canada.

17.    A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Televison.   A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd.    Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited.  Payments have been made by Star Cable on each of these Agreements.

## DEFENDANTS

18.    Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable.

19.    Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants.

20.    Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming.

21.     Defendants do not have rights to transmit or sell the eight channels over an IPTV delivery system in any part of the United States or Canada.

22.     Despite not having rights to transmit the Exclusive Services and in direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Defendants are not authorized to redistribute said communications over their IPTV systems in the United States or Canada.  Said actions of Defendants are an unauthorized divulgence of satellite signals.

23.     Defendants' violations of said exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Count I
## 47 U.S.C. § 605

24.     Plaintiff incorporates the preceding paragraphs as if each allegation was fully set forth herein.

25.     Through the transmitting, retransmitting, use, divulgement and sale of the Exclusive Services Defendants have violated various provisions of 47 U.S.C. § 605.

26.     The use of the signals of the Exclusive Services in a manner in which they are not entitled, including effectuating the unauthorized receipt in the United States and transmitting, retransmitting, use, sale and divulging said Exclusive Services, which are radio communications,

to persons not entitled to the Exclusive Services for the purposes of commercial advantage and private financial gain is designed to injure, and will continue to injure Star Cable and cause it financial damage and irreparable harm.

27.     Defendants knew or should have known and had reason to know that assisting a third person in the reception and use of the Exclusive Services without authorization, was and is illegal and prohibited.

28.     Pursuant to 47 U.S.C. § 605(e)(3), Plaintiff is entitled to:  equitable relief, either statutory damages of $1,000.00 to $10,000.00 per violation (each customer of Defendants' receiving each or all such Exclusive Services) or actual damages plus any profits realized by Defendants for each violation of 47 U.S.C. § 605(a), reasonable attorneys' fees and costs.

## Count II
## UNJUST ENRICHMENT

29.     Plaintiff hereby incorporates the preceding paragraphs as if set forth fully herein.

30.     Through the re-broadcasting scheme described above Defendants have received a financial benefit by, among other things, receiving subscription fees from each of Defendants' customers that have subscribed to the Exclusive Services.

31.     The financial benefit to Defendants was to the detriment of Plaintiff in that Defendants' customers who purchase the Exclusive Services would have had to acquire them from Star Cable rather than Defendants, thereby depriving Star Cable of subscription fees.

32.     Defendants have been unjustly enriched through these actions, and equity and good conscience requires restitution to Plaintiff.

33.     Star Cable has been damaged through the unjust enrichment of Defendants and

seeks remedy for the same.

## Count III
## CONVERSION

34.     Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

35.     Through the rebroadcasting scheme described above Defendants exercised and assumed unauthorized dominion and control over the signal of the Exclusive Services and disseminated and divulged said communications signals to third parties for payment and without the authorization of Plaintiff.

36.     Star Cable was excluded from exercising any control over the dissemination and divulgement of the signals of the Exclusive Services to third parties and received no income from this unauthorized use and divulgement.

37.     Plaintiff has been damaged through the unauthorized conversion of the signals of the Exclusive Services for which Star Cable seeks remedy.

## Count IV
## UNFAIR COMPETITION

38.     Plaintiff hereby incorporates the preceding paragraphs as if each were set forth fully herein.

39.     Through the rebroadcasting scheme described above Defendants misappropriated the product of Star Cable, namely the licensed Exclusive Services.

40.     Defendants' misappropriation of the Exclusive Services was undertaken in bad faith and without the authorization of or payment to Star Cable for the sale and divulgement of the Exclusive Services.

41.    Plaintiff has been damaged through Defendants' unfair competition with reference to Plaintiff's Exclusive Services and seeks remedy for the same.

**WHEREFORE,** Plaintiff requests that this Court grant the following relief:

(1)    Declare that Defendants' unauthorized sale, use and divulgement of the Exclusive Services without authorization violated 47 U.S.C. § 605(a) and that such violations were committed intentionally and for the purposes of commercial advantage and private financial and commercial gain;

(2)    In accordance with 47 U.S.C. § 605(e)(3), permanently enjoin Defendants, their agents, servants, employees, and those controlled directly or indirectly by any of them from the distribution, sale, rebroadcast or divulgement of the Exclusive Services;

(3)    In accordance with 47 U.S.C. § 605(e)(3), award Plaintiff against Defendants, damages for all losses incurred as a result of Defendants' violations:

(a)    The actual damages that Plaintiff has suffered, together with any additional profits earned by Defendants, or alternatively at Plaintiff's election,

(b)    Statutory damages in an amount between $1,000 and $10,000 for each of the customers to which the Exclusive Services were sold and/or distributed by Defendants.

(4)    An accounting of all profits and expenses realized by Defendants in violation of 47 U.S.C. § 605, together with Defendants' production of all records reflecting sales of the Exclusive Services;

(5)    An Order imposing a constructive trust based upon Defendants' unjust

enrichment derived from profits on sales of the Exclusive Services, and based upon their conversion of profits diverted from and properly due to Star Cable by reason of theft of its product;

(6)    An assessment of damages, to be determined at trial, based upon the New York Law of Unfair Competition;

(7)    In accordance with 47 U.S.C. § 605 an award of all of Plaintiff's reasonable attorneys' fees and costs of this action; and

(8)    Grant such other and further relief as is just.

Dated: July 6, 2017

HOGAN & CASSELL, LLP
Attorneys for Plaintiff

By: _____
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
Tel. 516-942-4700
mcassell@hogancassell.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| | | |
|---|---|---|
| STAR CABLE NA, INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 16-CV-04067 (SJ) |
| TOTAL CABLE USA, LLC. and 1STOPMEDIA AND | ) | |
| ENTERTAINMENT, INC. d/b/a RADIANT IPTV, ABC, | ) | |
| INC., XYZ CORP. and JOHN DOES 1-10 | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* 1StopMedia and Entertainment, Inc., 3833 Gladston Drive, Naperville, Illinois 60565

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Michael Cassell, Esq.
Hogan & Cassell, LLP
500 North Broadway, Suite 153
Jericho, NY 11753

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

# EXHIBIT A1



# NETWORK AFFILIATION AGREEMENT

Between
BOISHAKHI TELEVISION
32 Mohakhali C/A, Level 4-8
Dhaka, Bangladesh
And
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Boishakhi TV (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.

Minimum payment first year: $15,000 to be paid yearly in advance. First payment due immediately after singing this contract in amount of $15,000.00

Guranteed Payment vs. Projection payments*

| | | |
|---|---|---|
| 1st year: $15,000 per year. | 50,000 subscribers | $150,000 |
| 2nd year: $30,000 | 75,000 subs | $225,000 |
| 3rd year: $45,000 | 100,000 subs | $300,000 |
| 3rd year: $60,,000 | 125,000 subs | $375,000 |
| 4th year: $72,000 | 150,000 subs | $450,000 |
| 5th year: $84,000 | 175,000 subs | $525,000 |
| 6th year: $96,000 | 200,000 subs | $600,000 |
| 7th year: $108,000 | 225,000 subs | $675,000 |
| 8th year: $120,000 | 250,000 subs | $750,000 |

*As the subs increase payments will increase accordingly. Minimum payment is guaranteed 10% of projections.

Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system will be provided on quarterly basis or anytime on written demand from Boishakhi Television.

NON- PAYMENT: Boishakhi Television has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guaranteed payment

*P-1*

STAR CABLE 0001

8043348



55

due as above schedule  or for extra payments due based on actual number of subs.
System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF June 01, 2015  (the "Effective Date")
Conditions as follows:

1. ·Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxial cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributor, above $0.25 Boishakhi TV will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Boishakhi TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Boishakhi TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2. Term of Agreement. The term shall be for a period of two (02) years commencing on the Effective Date (the "Term"). This Agreement shall renew after conclusion of the contract. Any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3. License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

P. 2

STAR CABLE 0002

8045564



Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder.    During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels  (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.  Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service.  Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution.  If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.  Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.  Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional

8043588



material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7. Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8. Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9. Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10. Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation

*P_4*

STAR CABLE 0004

8093369

 55

of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11. **Representations and Warranties.** Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12. **Indemnification.** Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties,

representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13. **Covenants.** Affiliate hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14. **Vertical Blanking Interval.** Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video

STAR CABLE 0006



programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15. Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, as newly as existing laws of Bangladesh without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the competent court underwhere jurisdiction the cause of action arose whole or in part. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16. Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in a place/ country, due to dispute regarding to breach of this agreement, where any breach of this agreement is caused or occured, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17. Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18. Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.

3839 Bell Blvd Suite 233

Bayside NY 11361

P-7

STAR CABLE 0007

Notice shall be deemed given upon proof/confirmation of receipt.

19. Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20. Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21. Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23. Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between

the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

26. This is a Non-Exclusive Agreement. If BOISHAKHI come to an agreement with any other party The Star Cable will not be a party on it, neither they will raise any objection on that.

27. The Payment would be made on the Account Name: Boishakhi Media Limited, Current Account No. 13211060000567, Bank Name: **Prime Bank Limited**, Banani Branch, Dhaka-1213, Bangladesh.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

**Boishakhi TV**

Signature: _____

Printed Name: **Tipu Alam**

Title: Deputy Managing Director

Date:

Affiliate: **StarCable NA Inc.**

Signature: _____

Printed Name:

Title: Director

Date: 6/16/1

Signature of Witness:

2.

3.

Signature of Witness:

1.

2.

3.

P-9

# EXHIBIT B



**boishakhi tv**
মুক্তিযুদ্ধের চেতনায়

Date: 03.08.2017

To
Star Cable NA Inc.
3839 Bell Blvd suit 233
Bayside NY 11361.

### Subject: Agreement dismissal letter

Dear Mr.Sohail,

We have a business agreement in between your organization and Boishakhi Media Ltd. The agreement started on June 1, 2015. We must give you thanks for being our good partner towards the progress we achieved.

According to the agreement you were supposed to pay US$15000 for first Year. We appreciate you did it accordingly. Unfortunately after first year we are not receiving any payment from your side. We have communicated with you for several times. We are too unlucky to get any reply from your side.

You know, we consider you as our good business partner. That's why we have waited for a quite long time. Unfortunately it should not be for indefinite of time. So, keeping a hope to work together again, we are going to dismiss the agreement we have. Consider this email as the dismissal letter of our agreement.

Till 31st July 2017 the minimum due payment is US$37500. So we requesting you to pay us the due amount as early as possible.

Thank you for being our partner of progress for a quite good amount of time.

Regards,

Tipu Alam
DMD & Chief Editor
Boishakhi Media Ltd.

---

# Boishakhi Media Limited
32 Mohakhali C/A, Level 4, 5, 6, 7 & 8, Dhaka-1212, Bangladesh. Tel : +88 02 8837081-5, Fax : +88 02 8837541-2
E-mail : info@boishakhi.tv, Website : www.boishakhi.tv



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STAR CABLE NA, INC.,

                         Plaintiff,          **CASE NUMBER: 2:17-cv-04469**

      -Against-                        **Declaration of Tipu Alam**

LALON TV, INC., HABIBUR RAHMAN,
SHAHINUL KARIM, SHAHIDUL BARI,
SYED S. AHMED, AHMODUL
BAROBHUIYA and
TOTALCABLEBD.COM,

                        Defendants.
------------------------------------------------------------x

I Tipu Alam resident of Bangladesh declare under penalty of perjury as follow:

1) I am Deputy Managing Director of Boishakhi Television whose principal place of business is located at 32 Mohakhali C/A, Level 4-8 Dhaka, Bangladesh.

2) On June 16, 2015, Network Affiliation Arrangement was executed between Boishakhi Television and Star Cable NA Inc. for a period of two years commencing form the date of agreement. The Clause pertaining the term of agreement provided that the agreement shall renew after conclusion of the agreement subject to good faith negotiations between the parties, if Network serves at least 120 days notice before the end of applicable term in which the Network shall provide the proposed license fee for the next renewal.

3) The term of agreement was not renewed as Star Cable NA Inc. did not honor their part of agreement.





ATTESTED

Md. Rafiqul Islam
M.A.LL.B, Advocate
Notary Public Whole of Bangladesh
Room 7, 16/3, Court House Street (Ground Floor)
Rajardewry, Dhaka-1100, Tel: 02 7115676
Mobile: 01951883003

1 4 DEC 2017

4) Star Cable NA Inc. has no rights to distribute the service of Boishakhi Television and has no right to involve any other entity in any law suit as Boishakhi Television has also entered Affiliation Agreements with other entities including Lalon TV.

5) Lalon Tv has full authority to distribute Boishakhi TV via IPTV (Internet Protocol TV).

6) Lalon TV has been complying the terms and condition of the Agreement with Boishakhi Television.

Boishakhi TV, Bangladesh
Date: December 14, 2017





Tipu Alam
DMD
Boishakhi TV
32 Mohakhali C/A, Level 4-8
Dhaka, Bangladesh

ATTESTED

Md. Rafiqul Islam
M.A.LL.B, Advocate
Notary Public Whole of Bangladesh
Room:7, 183, Court House Street (Ground Floor)
Rajardewry, Dhaka-1100, Tel: 02 7115676
Mobile: 01951883003

1 4 DEC 2017



# EXHIBIT C

NETWORK AFFILIATION AGREEMENT


Between


Independent Television ltd.
149-150 Tejgson I/A
Dhaka
Bangladesh


And:
Affiliate: StarCable NA Inn
3839 Bail Blvd Suite 233
Bayside NY 11361


In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Independent Television Ltd. (the "Service").

Service Description: 24 hour  Bangla Channel consisting of Dramas, News, music and children's Shows

License Fees: USD $0.30 per Subscriber, per Month.
Minimum payment first year: $18,000 to be paid quarterly in advance. First payment due immediately after signing this contract in amount of $4,500

| Guaranteed Payment | vs. | Projection payments* | | |
|---|---|---|---|---|
| 1st year: $18,000 per year. | | 50,000 subscribers | $180,000 | |
| 2nd year: $36,000 | | 100,000 subs | $360,000 | |
| 3rd year: $44,000 | | 150,000 subs | $540,000 | |


*As the subs increase payments will increase accordingly. Minimum payment is guaranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system(live data)  will be provided on quarterly basis or anytime on written demand from Independent Television ltd.


System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 26, 2014 , (the "Effective Date")

Conditions as follows:


1.      Scope. Affiliate shall have the non-exclusive right to distribute the Service on  coaxial cable television systems, Satellite DTH (direct to home) or Over the Air Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV, (Exception of Radiant IPTV)

Affiliate may sub-distribute the Service to another service provider so long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distribute, above $0.30 Independent TV will be paid 50% of the monthly fee

per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Independent TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to those systems requiring access to programming. Independent TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statute. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.  **Term of Agreement.** This term shall be for a period of Three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the Initial Term or any subsequent renewal Term, of its desire to terminate this Agreement provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.  **License Fees and Payment Terms.** Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessments of a late fee of one and half percent (1.5%) interest per day (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License Fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.  **Carriage.** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay and there shall be an absence channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.  **Delivery of Signal.** During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a International satellite feed for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service as it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's name and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.      Audits. During the Term, renewal Term, if any, and for 26 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder in writing, agrees to assume all assignor's obligations hereunder.

10.     Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days. NON-PAYMENT. Independent Television Ltd. Has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guarantee payment due or for extra payments due based on actual # of subs.

11.  Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under: (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under: (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.  Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and the Service Subscriber); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or laws; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.  Covenants. Affiliate hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.



14. Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral text signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purposes, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however in no event is Affiliate required to carry any such additional programming or material.

15. Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16. Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in the Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17. Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any either obligation of a defaulting Party hereunder.

18. Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 229
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.    Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.    Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.    Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together contain signatures of each Party.

22.    Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.    Construction. The words "herein," "hereof," "hereunder" and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.    "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.    Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.


55

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Independent Television Ltd.

Signature:

Printed Name:   M Shamsar Rahman

Title:   Editor In cheif & CEO

Date:   26/11/14

M Shamsur Rahman
Chief Executive Officer

Affiliate:   StarCable NA Inc.

DISHWORLD media ltd.

Signature:

Printed Name:   SAJID SOMRA L.

Title:   Director

Date:   11/26/14

# EXHIBIT D



**Jamuna Television Limited**
Jamuna Television Bhevan | Jamuna Future Park Complex
Ka-244, Progoti Sharoni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416040 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

NETWORK AFFILIATION AGREEMENT

Between

Jamuna Television
Jamuna Future Park Complex Ka-244
Progoti Sharoni, Baridhara
Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
38-39 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with regard to launch and carriage of the programming service identified below:

Programming Service: Jamuna Television ("the "Service").

Service Description: 24 hour Bangla Channel News and Programmes

License Fees: USD $0.00 per Subscriber per Month.

Minimum payment first year: $10,000 to be paid quarterly in advance. First payment due immediately after signing this contract in amount of $2,500

Guaranteed Payment                    vs            "Projection payments"
1st year: $10,000 per year.                 50,000 subscribers    $ 200,000
2nd year: $36,000                           100,000   subs        $ 400,000
3rd year: $54,000                           150,000   subs        $ 600,000

"As the subscriber payments will increase accordingly, Minimum payment is guaranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system will be provided on quarterly basis or monthly as written demand from Jamuna Television.
NON-PAYMENT: Jamuna Television has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guaranteed payment due as above schedule or for extra payments due based on actual number of subs.

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF December 1, 2014, (the "Effective Date")

Conditions as follows:

1.      Affiliate shall have exclusive rights for Wilstar Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

STAR CABLE 0017



**Jamuna Television Limited**
Jamuna Television Bhaban | Jamuna Future Park Complex
Ka-244, Progoti Sharani | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 84160561 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this Contract. For any fee that is collected from sub-distributor, above 20.5 Jamuna tv will be paid 50% of the monthly fee per subscription Affiliate shall not knowingly allow unauthorized taping or receipt of this Service. Jamuna TV agrees that any requests that comes as regarding carriage on exclusive platforms, (DISHes, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Jamuna TV will not incur any costs for such feeds. Affiliate's technical support in hooking the Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" for claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to counter any illegal carriage or piracy of the Service.

1. Term of Agreement. The term shall be for a period of three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the Initial Term or any subsequent renewal Term, of its desire to terminate this Agreement provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3. License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network the Service Subscriber Number for each month shall be equal to the total number of Service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.5/25%) interest per month (or, if lower, the maximum rate allowed by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no withholdings from any sums owing to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private hotels, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License Fees on each distribution shall be per subscriber. Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4. Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on each fixed time delay and there shall be an alternate channel that would show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of program rising for advertisement insertion then 30% of all revenues received from advertising shall be due to network.

5. Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or get fiber. Notwithstanding anything to the contrary herein,

STAR CABLE 0018



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Pragoti Sharoni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416401 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

Affiliate, at its own cost and expense, shall be completely responsible for securing or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights and interests in the entire content of the Service and Network's service marks, tradenames and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and works expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Use of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.      Audits. During the Term, renewal Term, if any, and for 24 months thereafter Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except as a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the extent that doing so furnishes the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.     Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences in cure the default within the time and diligently pursues such cure to completion or (ii) on 60 days' written notice in the event of any force majeure (e.g. fire, flood, governmental decree) causing

STAR CABLE 0019



Jamuna Television Limited
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progati Sharani | Baridhara ( Dhaka-1229 ) Bangladesh
Phone +880 2 84162601 | Fax +880 2 8416670
email: info@jamunatv.net
www.jamunatv.net

non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 96 days.

11.    Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA, that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities (claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choosing) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the course of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); to the extent Affiliate's distribution of the Service is a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any materials (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the Rotary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (i) Affiliate's use of the Service or any programming material in a manner that is not in accordance with this Agreement, or (ii) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of a contract other than content of the Service, (ii) Liabilities arising out of any of the Service in breach of this Agreement and/or for any defects or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption. It being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.    Covenants. Affiliate hereby covenants and agrees that it will:    (i) continue to carry on its business in substantially

STAR CABLE 0020



Jamuna Television Limited
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416076
email: info@jamunatv.net
www.jamunatv.net

this same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers [and any other portions of the bandwidth that may be created as a result of digital transmission technology provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact], and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) V-chip and Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television links or other triggers, and/or (v) vertical images/ text signals (for systems and equipment appropriate on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of the State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of these courts for the purposes of such suit, action or proceeding.

16.     Arbitration. Any dispute which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA or such other location agreed to by the Parties. The Parties to the arbitration they agree on an arbitrator otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, either intellectual property or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

STAR CABLE 0001



**Jamuna Television Limited**
Jamuna Television Bhaban | Jamuna Future Park Complex
Ka-244, Progati Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416561 | Fax +880 2 8418070
email.info@jamunatv.net
www.jamunatv.net

18.   Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier addressed, postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
2839 Roll Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.   Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No publication shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.   Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or claim to or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the persons, subsidiaries, partnerships or other controlled companies or the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.   Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.   Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole



**Jamuna Television Limited**
Jamuna Television Sharan I Jamuna Future Park Complex
Ka-244, Progoti Shoroni I Baridhara I Dhaka-1229 I Bangladesh
Phone +880 2 8416070 I Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System Launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Jamuna Television

Signature:

Printed Name:

Title: Managing Director

Date: 07/12/2014

Affiliate: StarCable USA Inc.

Signature

Printed Name: SAJID SOHEL

Title: Director

Date: 12/11/14

STAR CABLE 0023

# EXHIBIT E




Date: 1/25/2014

NETWORK AFFILIATION AGREEMENT

Channel 16
Yak Enterprises
Dhaka 1215
Bangladesh

And
Affiliate StarCable NA Inc.
3636 Hall Blvd Suite 200
Bayside NY 11201

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to Insight's distribution of the programming service identified below.

Programming Service: Channel 16 (the "Service").

Service Description: 24 hour Bangla Channel consisting of Drama, Films, music, and children's shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum Year 1: $5,000 to be paid quarterly in advance $2,500 due immediately after signing of this contract
2nd Year $12,000
3rd Year $24,000
4th Year $36,000
5th Year $48,000
6th Year $60,000
7th Year $60,000
8th Year $60,000

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 25 ___ 2014 . (the "Effective Date")

Conditions as follows:

1.    Bangla Affiliate shall have the non-exclusive rights to distribute the Service via      cable television systems, Mobile, IPTV, Direct to Home Dish Network also Affiliate shall have exclusive rights for Wireless Telecom (WTV Internet Protocol TV) and Mobile TV.

Affiliate may sub-distribute the Service to smaller service providers as long as it is under the conditions set forth in this Agreement. Insofar that it is collected from sub-distribution, Bangla MUST Channel 16 will be paid 50% of the monthly fee for subscribers. Affiliate shall not knowingly allow unauthorized taping or dubbing of the Service. Channel 16 agrees that any requests that comes in regarding tapings or exclusive platforms, (Wireless, Mobile, IPTV or Mobile TV) will may come for such feeds. Affiliate is licensed exclusively in Territory as Service distributor. Channel 16 will purchase WTV or DVRs, shall not be deemed a violation of this Agreement. Affiliate will not unreasonably reasonable claim to publish or any unauthorized receipt or recording of the Service in conjunction with any System. Affiliate shall have standing and the independent legal right to prosecution in court shall be a

STAR CABLE 0024



STAR CABLE 0025



Ref.                                                                 Date:

7.     Audits. During the Term ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ shall have the right to audit all records directly related to confirming the accuracy of License Fee payments Made pursuant to Section 5 above.

8.     Confidentiality. Neither Party ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ of any agreement particulars, neither Party shall disclose or reveal, to any third party ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ provider, without a need to know and ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ the specific terms and conditions of this Agreement, or any information provided in connection herewith, without the prior written consent of the other Party ___ ___ ___ ___ ___ ___ ___ information to the entity that owns or controls the Service. Neither Party shall have any ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ this Agreement without first obtaining written approval of such and unconditionally from the other Party.

9.     Assignment. This Agreement including both its obligations and benefits shall pass to and be binding on the respective heirs, successors and permitted assigns of this Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to any successor entity resulting from a merger, acquisition or consolidation by other Party; (ii) assignment to an entity under common control with, controlled by or in control of, either Party; or (iii) assignment to any entity which owns or controls the Service; provided that any assignee hereunder, in writing, agrees to assume all such party's obligations hereunder.

10.    Termination. Except as otherwise expressly provided herein, the otherwise affected Party of any breach of this Agreement (i) (if the other Party fails to remedy breach of this Agreement and observed (thirty) (30) days such material breach, within 30 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, that the Party shall not be in default if it commences to cure the default within ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ (30) an (30) days' written notice in the event of any force majeure (e.g. fire, flood, governmental decree) continues for a continuous period of 90 days.

11.    Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of ___ ___ ___ ___ ___ ___ ___ ___ ___ the business of Broadcast in the Network has all necessary power and authority to carry on and perform its ___ ___ ___ ___ ___ ___ of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate any provision of, will not constitute a default under or breach of, will not conflict with the ___ ___ ___ ___ ___ ___ ___ ___ ___ document to which Network is a party or is otherwise bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ is necessary to authorize the execution and delivery of this Agreement and performance of the transactions contemplated hereby; and that this Agreement has been duly executed on behalf of Network, and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA, that Affiliate has all necessary power and authority to carry on and perform the transactions of this Agreement and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of, will not conflict with the ___ ___ ___ ___ ___ any contract, agreement or document to which Affiliate is a party or is otherwise bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and hold harmless the other Party the other Party's affiliates managers and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses ___ ___ ___

STAR CABLE 0026



A Single Satellite TV Channel

# CHANNEL-16
### Insight Telecast

Ref:                                                                                           Date:

[including without limitation reasonable bona fide exercise of the other Party's distinct jurisdiction ("Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Networks shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Services (or that excluding any disputes between Affiliate or a System and its Service Subscribers) or out of a dispute, distribution of the Service(s) in a manner consistent with this Agreement, but not limited to, any claims that the Service programming contains any content (i) that is obscene or defamatory (ii) which violates the rights of privacy or publicity (iii) which infringes any copyright or intellectual property rights, including music performance rights (iv) which infringes the literary right of any person or party or (v) which violates any other applicable rule, regulation or law provided, however, that the indemnification will not cover Liabilities resulting from (x) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (y) the alteration of the Service or promotional material by Affiliate without Networks' prior written consent. Affiliate shall in like manner, indemnify and hold Networks and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscribers arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party by reason of breach or violation, for any special, indirect, consequential or incidental damages of any kind, including without limitation, any lost profit, loss of use, or business interruption of losing performance if that any indemnification obligations shall be compiled of in connection. The provisions of this Section 14 shall survive the expiration of this Agreement.

23.     Covenants. Affiliate hereby covenants and agrees that it will: (i) ... to the Effective Date (ii) keep the Systems in good order, repair and condition throughout the term and promptly and adequately repair all damages ... (ii) comply with all applicable laws, Networks hereby covenants and agrees that it will: (i) ... for the Service and (ii) comply with all applicable laws.

24.     Verbal Working Interest. Except as otherwise set forth herein, Networks owns and reserves all rights to the verbal licensing interval ("VBL"), audio submission (and any other portion of the transmitted line may be contained as a result of digital transmission technology provided that all private video feeds transmitted with audio as licensed by Networks from programs provided under kind), and all other digital rights, the other digital distribution capacity of the Service digital. Networks shall notify Affiliate a writing of any and all information and data in place in the VBL and including, without limitation (i) closed captioning for the hearing impaired, (ii) channel Audio Program (SAP), (iii) identification and voting of video material, that Affiliate shall be made of such programming data from all Systems. In the event Networks desires to use any portion of the bandwidth for any other program, Networks shall notify ... for such feeds. However, in no event of Affiliate required to carry any such Additional programming or material.

25.     Governing Law. This Agreement and all matters in issue relating thereto shall be governed by the laws of New York, USA, without regard to make governing conflict of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York, county of Queens, New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

26.     Arbitration. All disputes which cannot be resolved mutually between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may appoint an arbitrator otherwise, then will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 30 days after other Party serves a notice of arbitration on the other Party on request. If the process thereunder formulated in this Agreement or arbitration with other Party may serve on an arbitrator. The view of the arbitration imposed by the arbitrator and the terms of the arbitration shall be binding on both Parties and judgment thereon may be entered and enforced in any court of...

STAR CABLE 0027



# CHANNEL 16
### Insight Telecast

**Ref:**                                                  **Date:**

foreign jurisdiction, Notwithstanding the foregoing, the neither or either or shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

27.     Waiver. Any waiver must be in writing and signed by the Party (whose rights are being waived). Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights from a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

28.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier charges prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to ABLink shall be to:

Star Cable LLC,
5525 Bell Blvd Suite 224
Bayside NY 11361

Notices shall be deemed given upon receipt (date/time of receipt).

29.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

30.     Relationship. Neither Party shall be or be deemed not to be the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of joint venture or joint venturers or agents or between Affiliates of Network and neither Party is authorized to or shall act as agent of the other Party or to the public in any manner which would indicate any such relationship. Hereunder, as supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any software of Affiliate, and the present, subscribers, proceedings or joint venture or assembling the System or which the Service is transmitted, notwithstanding being to understanding that neither affiliate nor the ownership facilities of the System (nor the transmitted) nor carriers service.

31.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterpart or other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

32.     Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be subject to the maximum extent provided under the law. Both Parties, however, shall negotiate in good faith, with respect to an equitable substitution for of the provision, or the application thereof, to the invalid or unenforceable.



Ref:                                                          Date:

23.    Construction. The words "hereto," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is hereby incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.    "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed fully hereof, all of which terms are hereby the the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.    Affiliate Efforts. The Parties shall each use good faith to develop joint plans for the promotion and marketing of the Services in each System hereunder. Each to mutually use good faith to develop joint plans for the promotion and marketing of the Services in each System hereunder. Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the correct provision of the Service.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized representative.

Channel 16

Signature

Printed Name:    N. I Mann A

Title:

Date:



Affiliate:    Star Cable USA, Inc.

Signature

Printed Name:    SAJID SOHAIL

Title:    Director

Date:    11/25/2014

STAR CABLE 0029




Ref.                                                                    Date:

Channel16's others agreement with others party such Jego bd and Radiant IP Tv will be continue after completion the agreement with Star Cable NA Inc.

~~Channel-16-will-reserve-the-right-to-do-others-agreement-with-others-party-after-competition-the agreement-with-Star-Cable-NA-Inc~~

Star cable NA Inc will not be allowed to broadcast the program of channel 16 by changing its original program and using extra logo.

Star cable NA Inc. should provide required legal papers for immigration purpose and bear other expenditure if anyone needs to go in USA for business purpose.

Channel16 will reserve the right to cancel the agreement if payment is due by declaration of one month prior notice.

~~Both parties can cancel the agreement after declaration three months prior notice.~~

Star cable NA Inc. will have to pay payment through banking channel.

Star Cable NA Inc. will pay yearly subscription payment by two installments.

SAJIN SOHAL
11/25/2014

STAR CABLE 0030

# EXHIBIT F



## BROADCAST RIGHTS AGREEMENT

২৬৪৭৫৬৮

BROADCAST RIGHTS AGREEMENT ("Agreement") as of this 09 day of July 2013 by and between LALON TV INC. DBA TOTAL TVs [New York Corporation ("Distributor")]. Whose principal place of business is at 34-27 Steinway St. Astoria NY 11101 (hereinafter referred to as "LALON TV," and Channel-16 TV Insight Telecast Company Limited. B.T.M.C. Bhaban, 7-9 Kawran Bazar 5th floor. Dhaka-1215, Bangladesh.

## RECITALS

WHEREAS, "LALON TV" is an operator of cable, broadband, IPTV and satellite television channels in the North America including United States, Canada and Europe;

WHEREAS, "CHANNEL-16 TV" is a television network and production company serving the domestic and international Bangladeshi community,

WHEREAS, "LALON TV" desires to acquire the exclusive broadcast rights to CHANNEL-16 TV for all media including cable, broadband, IPTV, satellite and mobile media in the North America including United States, Canada and Europe (the "Territory")

WHEREAS, Channel-16 TV desires to grant LALON TV the exclusive rights to utilize the Channel-16 TV in the Territory for all media including cable, broadband, IPTV, satellite and mobile media;

NOW, THEREFORE, in consideration of ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. Broadcast Rights.

(a)   Channel-16 TV hereby grants LALON TV the exclusive broadcast rights to Channel-16 TV Media Programming for all media within the Territory

(b)   The CHANNEL-16 TV's program shall at all time remains the property of Channel-16 TV subject to Channel-16 TV's obligations hereunder.

(c)   LALON TV's broadcasts of the Channel-16 TV shall display Channel-16 TV's logotype, which logotype shall remain the sole and exclusive property of Channel-16 TV.

(d)   In addition to the Channel-16 TV programming Lalon Tv shall have the right to broadcast its own produce local commercial material/programs with the prior approval of Channel-16 TV.

(e)   Anything to the contrary contained herein notwithstanding, Lalon TV shall not permit any third party to utilize the Channel-16 TV Programming or Channel-16 TV's logotype, without Channel-16 TV's prior written consent.



**2. Term**

(a) The term of this Agreement (the "Term") shall be for a period of 10 (Ten) years and shall commence on July 9th 2012 on the date of the launch on the territory, whichever is later and shall continue until August 6th 2022 or the 10th anniversary of the launch, whichever is later.  In the event neither party provides notice of termination of this Agreement in accordance with Article 9 hereof 180 days before the expiry date, the agreement shall be deemed renewed for another ten (10) years upon the term and conditions set forth herein.

(b) Notwithstanding anything contained in clause (1) the Agreement may be renewed by mutual discussion by the Parties on terms and conditions as may be determined by them.

**3. Revenue Share:**

Channel-16 TV will receive the following percentage of Gross Revenue through content distribution to other providers, for example: content delivered to Direct TV, Dish Network or any other cable operators etc. ; and Net Advertising (Net Agency Commissions, if any) Revenue

| Year | Channel-16 TV | Lalon Tv Inc |
|------|---------------|--------------|
| 1-2  | 40%           | 60%          |
| 2-10 | 50%           | 50%          |

A. For bundled services, for any media, payment will be in direct proportion which the bundled revenue per subscriber bears to the a-la-carte revenue per subscriber.

B. For broadcast of Channel-16 Tv's Programming through any media in Canada and Europe the above payments will be in Canadian Dollars and Euro.

C. Lalon TV Inc will not share any revenue with Channel-16 TV for LalonTV Inc. own subscribers (for example: individual customers).

D. Both parties acknowledge and agree that there may be a free preview period up to sixty (60) days, as determined by the platform provider, in which case no payment will be due for that period

**4. Duties of Channel-16 TV:**

(a) Throughout the Term Channel-16 TV shall provide first quality programming on a continual basis to Lalon Tv and make the same available by transmission feed to Lalon Tv in Bangladesh, Singapore or Hong Kong.

(b) Channel-16 TV will provide a secure space with minimum 2 Mbps of internet (upload and download) speed and un-interrupt power supply to feed providing server to Lalon Tv in the Channel-16 TV office.

(e) Channel-16 TV will provide an electronic programming guide (EPG) at least two weeks in advance of the first day of each month. Any changes or updates to the EPG will be immediately emailed to Lalon Tv.



## 5. Duties of Lalon Tv:

(a)   Lalon Tv shall use best efforts to maximize the distribution of the Channel-16 TV and its subscriber base in the Territory throughout the term.

(b)   Lalon Tv will pick-up signal from Bangladesh or Singapore or Hong Kong or London or any other convenient place and delivers the same to each and every platform after PAL to NTSC conversion.

(c)   Lalon Tv will be responsible for the cleanup of the feed including any time delay, when needed and economically feasible.

(d)   Lalon TV Inc. will rebroadcast to any media without making any modification to content provided by Channel-16 TV Programming.

(e)   Lalon TV Inc. will be granted permission to add local advertising commercial. Time will follow international standards, such as there will be no more than 12 minutes of commercial advertising per hour of air time.

Advertisement shall only be local to territory and not general for all subscribers. For example, advertise from New York shall only be shown in New York reason, advertise for California shall only be available for subscribers in California.

## 6. Representations and Warranties:

(a)   **Representations by Channel-16 TV.**
Channel-16 TV hereby represents and warrants to Lalon Tv as follows:

(i) Due Incorporation, etc. Channel-16 TV has the corporate power and authority and all necessary governmental approvals to enter into the transactions covered by this Agreement.

Authorization. No Conflicts. etc. This Agreement has been duly and validly executed and delivered by Channel-16 TV and constitutes a valid and binding agreement of same, enforceable against Channel-16 TV in accordance with its terms.

(ii) Consents and approvals. To Channel-16 TV's knowledge, no consent, approval or authorization, declaration. filing. or registration with, any United States or Bangladeshi governmental or regulatory authority is required to be made or obtained by Channel-16 TV in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

(iii) Survival. The representations and warranties made by Channel-16 TV herein shall expire on the termination or expiration of this Agreement.

(b)   **Representations by Lalon Tv.**
Lalon Tv here by represents and warrants to Channel-16 TV as follows:



(i) **Due Incorporation etc.** Lalon Tv shall be duly organized validly existing and, in good standing under the laws of the State of its information.

(ii) **Authorization, No Conflicts, etc.** This Agreement has been duly and validly executed and delivered by Lalon Tv and constitutes the valid and binding agreement of Lalon Tv, enforceable against Lalon Tv in accordance with its terms.

(iii) **Consents and Approvals.** To Lalon Tv's knowledge, no consent, approval or authorization, of, or declaration, filing, or registration with, any United States federal or state governmental or regulatory ·authority, or any other party, is required to be made or obtained by Lalon Tv in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

(iv) **Survival.** The representations and warranties made by Lalon Tv herein shall expire on the termination or expiration of this Agreement.

## 7. Cooperation.

The parties shall ·deal with each other fairly and in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement.

## 8. Exclusive Dealing.

The parties agree that Lalon Tv has exclusive broadcast rights and Channel-16 TV shall not engage or enter into any partnerships, broker relationships or other similar agreements with third parties with respect to the Channel-16 TV in the territory.

## 9. Notices

All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if and when delivered personally, or sent by facsimile transmission (with confirmation by recognized international courier such as Federal Express or DHL, which provides service between the United States and Bangladesh), or by registered international courier such as DHL or Federal Express or some other reputable overnight carrier which provides service between the United States and Bangladesh (or when delivery is rejected or refused), to the parties at the following addresses and facsimile numbers:

If to Channel-16 TV., addressed to

Channel-16 TV Insight Telecast Company Limited
B.T.M.C. Bhaban,
7-9 Kawran Bazar 5ᵗʰ floor,
Dhaka-1215, Bangladesh
Attn: Md. Sayem Faroky
Managing Director (International Affairs)

If to Lalon Tv Inc., addressed to:
Lalon Tv Inc.
15 Westmoylan ln
Coram, NY 11727
Attn: Ahmodul Barobhuiya
CEO



or to such other place and with such other copies as many designate by written notice to all other parties provided in the manner set forth herein.

**10. Arbitration.**

In case of any disagreement, misunderstanding or dispute arises between the parties - the parties shall try resolve the issue on mutual discussion between the representatives the parties concern. But in case the disagreement, misunderstanding or dispute cannot be resolved mutually, the matter shall be referred to an Arbitrator who will be selected by mutual consent of both the parties concern. The opinion /verdict of the Arbitrator shall be binding on both the parties.

**11. Severability.**

If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, rule, or regulation, such provision shall be fully sever able and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof. The remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance here from Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as Similar in terms to such illegal invalid, or unenforceable provision as maybe possible.

**12. Entire Agreement.**

This Agreement supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and this Agreement, including the schedules and exhibits hereto contains the sole and entire Agreement between the parties hereto with respect to the subject matter hereof. This Agreement may be modified or amended only in a writing duly executed by or on behalf of ach of the parties hereto.

**13. Counterparts.**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile and facsimile signatures hereof shall be deemed effective and binding as original signatures.

**14. Headings, Gender etc.**

The headings used in this Agreement have inserted .for convenience, do not modify the terms of this Agreement and do not constitute matter be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender shall be deemed to include each other gender, (b) words using the singular or plural number, respectively, (c) references to "hereof," "herein," "hereby" and similar terms shall refer to this entire Agreement and (d) the words - "include" and "including" shall be construed as incorporating, but not limited to" or "Without. limitation ." The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express that mutual intent and no rule of strict construction shall be applied against any person. References to Schedules and Exhibits of this Agreement shall be. deemed to refer to such Schedules and Exhibits as supplemented or amended as applicable.

15. **Employees.**

    Neither party shall be deemed an employer of the other or its employees and neither party shall have any obligation to pay wages or benefits (or to fund any pension plan) or to employ any employee of the other.

16. **Binding Effect.**

    This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that neither Lalon Tv nor Channel-16 TV may assign this Agreement without the prior written consent of the other, which consent shall not be unseasonably withheld.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the  and date first written above.

Channel-16 TV.
By: Md. Sayem Faroky

Its: Director (International Affairs)
Saye

LALON CABLE TV INC.
By: Ahmedul Barobhuiya

Its: CEO

# EXHIBIT G



**Jamuna Television Limited**

Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progati Sharoni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

January 10, 2017

## TO WHOM IT MAY CONCERN

This is to certify that *1Stop Media & Entertainment Inc.* (Radiant IPTV) is our client to operate IPTV & CDN (Content Distribution Network) business. This provider grants right to broadcast Jamuna TV in North America (USA & Canada). No other organization has any valid exclusive rights with Jamuna Television Ltd. (JTV) to broadcast Jamuna Television anywhere in the world at the present.

If you have any additional questions or require further clarification, please, do not hesitate to contact with us to the following address.

Thanking You,

-------------------------------
**A S M Arifur Rahman**
Head of Broadcast Operation Engineering & ICT
Cell: +880 1777778888
Email: arif@jamunatv.net

# EXHIBIT H



**BANGLA VISION**
 মুক্তি যুদ্ধের দেশ
A Satellite TV Channel

## Shamol Bangla Media Ltd.

Date: 9th January 2017

### To Whom It May Concern:

This is to certify that Star Cable NA have no valid agreement or the rights to broadcast/represent BANGLAVISION, a satellite TV channel owned by '**Shamol Bangla Media Ltd**' in Bangladesh.

'**Banglavision North America Inc**', a subsidiary of Shamol Bangla Media Ltd, owns all rights and representation of BANGLAVISION in the North America region.

Should you have any queries regarding this matter please feel free to contact me.

**Ishraque Hossain,**
Deputy-Managing Director
Shamol Bangla Media Ltd (BANGLAVISION )

Noor Tower, 110 Bir Uttam CR Dutta Road,
Dhaka - 1205, Bangladesh.

Phone: 880-2-9669408
Pabx: 880-2-9632030-45
email: i.hossain@banglavision.tv

# EXHIBIT I



excellence in innovation

## To Whom It May Concern

This is to certify that Star Cable NA, INC. has no valid legal agreement with V.M. International Limited (**mytv**) and Star Cable NA, INC. has absolutely no rights to broadcast or represent **mytv** channel anywhere in the world.

Should you have any question, you may contact with the following address.

Thank You

09.01.17

**ZEKER UDDIN SAMRAT**
Director (News & Broadcast)
mytv Bangladesh

www.mytvbd.tv
+8801766333333

Zeker Uddin Samrat
Director (News & Broadcast)
mYtv
160/3, 155, East Ulon, Hatirjheel, Dhaka-1219

*Sister Concern of*
**V.M. INTERNATIONAL LTD.** | **Head office** : mytv Bhaban, 155, 150/3 East Ullan, Hatirjheel, Dhaka-1219,
Tel : 02-55128896-8, Fax : 02-55128899, Web : mytvbd.tv, E-mail : info@mytvbd.tv
Corporate office : SS Pir Uttam C.R. Datta Road, Muieffar Tower (5th & 6th Floor), Banglamotor, Dhaka-1000

# EXHIBIT J



একুশে টেলিভিশন

Committed to Change

23rd August, 2016

Mr. Sajid Sohail
Director
Star Cable NA INC
3839 Bell Blvd.
Suite# 233
Bayside, N.Y. 11361

### Sub: Termination of Channel Partnership Agreement

Dear Mr. Sohail,

The Channel partnership Agreement dated 6th June, 2016 signed and executed between Ekushey Television Limited USA and Star Cable NA INC is hereby terminated with immediate effect.

Thanking you,

Fakrool Alam
T. Coordinator (USA)

# EXHIBIT K



YOUR CHANNEL

## Business Agreement for TV Channel & Content Distribution Right (NON-EXCLUSIVE) of Asian Telecast Limited (Asian TV)

This agreement made on this 06 day of June, 2016 by and between Asian Telecast Limited ("Provider") having its registered address at House # 60, Block # A, Road # 1, Niketon, Gulshan-1, Dhaka, Bangladesh and *1Stop Media & Entertainment Inc.* (dba Radiant IPTV) (http://www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, United States ("Client") has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

a) Client has decided to launch an IPTV service under the brand name of "Radiant IPTV" by delivering Bangla, Hindi & English TV channels over Internet Protocol without being restricted by any geographic boundary.

b) Territory: Provider grants right to Client to show Asian TV Radiant IPTV .

c) This deed of agreement is valid for Non-Exclusive rights only.

d) Client will receive the Asian TV Live feed through Satellite (Free to the Air) only.

e) Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

f) Client will offer viewing Asian TV channel via Set Top Boxes, Mobile apps & web sites.

## Financials, Reporting & Settlement:

a. Client will provide per month net fifty thousand (50,000) Taka with advance six (6) months payment system.

b. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third parties/TV channels/competitors without prior permission of the Client.

1 | P a g e

Private & Confidential





YOUR CHANNEL

**Length of agreement:**

This business agreement will be valid for a minimum three (03) year as initial term, unless it is terminated by both client and provider with advance notice of six (6) months by showing reasonable grounds in writing. After initial term ends, the agreement will be renewed automatically for next 3 years unless each party has full rights to get out of the contract by advance notice.

a. Neither parties may assign, nor otherwise transfer any rights under this agreement.

b. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

c. Provider agrees to offer distribution right of broadcasting / rebroadcasting / stream live channel over IP network during the validity of this agreement duration mainly through any streaming set top box and mobile devices.

d. Radiant IPTV also act as one of the advertising agents in overseas by agreeing upon fees set forth by Provider for airing third party advertisement clips on TV channel.

e. Provider gives authority to Client to use exact logo without any modification for sells & marketing purposes both in the print and electronic forms. Also, Provider agrees to allow the use of logo on websites, marketing flyers, posters, leaflets as well as within IPTV system & sub-systems, STBs etc.

f. The client will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the provider.

g. Provider will help & co-operate Client to take down illegal operator's stream/feed of Asian TV by demand of the Client's notice. It's imperative that Provider also agrees to give take down notice upon mutual discussion with Client.

h. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the courts of State of Illinois & state of New York of the United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.



Private & Confidential



YOUR CHANNEL

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
*Asian Telecast Limited.*
(Asian TV)

Name: K M Abdullah

Title: Executive Director

Date: June 06, 2016

Tel: +880 1711 544997

Email: info@asiantvbd.com

For,
*1Stop Media & Entertainment Inc.*

Name: Atiqur Rahman

Title: Operations Manager

Date: June 06, 2016

Tel: +880 1755 078100

Email: arahman@radiantiptv.com

*Private & Confidential*

# EXHIBIT L



# Business Agreement for IPTV Channel & Content Distribution Right (Exclusive) of Asian Telecast Ltd.(Asian TV)

This agreement made on this 20 day of November, 2014 by and between **Asian Telecast Ltd.(Asian TV)** *("Provider")* having its registered address at **House-60,Road-1,Block –A,Niketon, Gulshan-1, Dhaka-1212** and *IStop Media & Entertainment / DBA Radiant IPTV* (http://www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, USA **("Client")** has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

1. Client has decided to launch an IPTV service under the brand name of "Radiant IPTV" by delivering Bangla, Hindi & English TV channels over Internet Protocol without being restricted by any geographic boundary.

2. Provider will give 24/7/365 feeds of Asian Telecast Ltd. (Asian TV) channels.

3. Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

4. Client has put together the necessary documentation and operational plans to bring the ideas and concepts to market & sell services mainly to Bangladeshi community worldwide.

5. Client and Provider agree to share the revenue from selling the VOD content via IPTV/CDN platform. The live channel feed will be offered by the Provider. Provider shall focus more on specialized content offerings and gain revenue in periodic basis (for every purchase) from selling VOD content such as dramas, movies, news footage, especial shows, events etc.

6. Client's marketing team will determine the value of every media contents that is to be offered by the Provider and place in VOD library with an appropriate dollar value. Based on the demand and popularity of individual media content, Client will determine for how long it will be offered/shown for selling and those to be offered to IPTV subscribers.

YOUR CHANNEL    Asian Telecast Limited (Asian tv) House-60, Road-1, Block-A, Niketon, Gulshan-1, Dhaka-1212, Bangladesh
Tel: + 88 02 9852960 4 | Fax: 9852964 | e-mail: info@asiantvhd.tv | Web: www.asiantvbd.tv



7. Client will also setup a B2B online CDN (Content Distribution Network) and delivery platform to sell all content of Provider via e-commerce enabled websites/hosting platforms or via designated third parties as whole or partially deems appropriate for the business interest of the Client. Here also, the revenue will be shared again by both Client & Provider.

7. Client will offer viewing Asian Tv IPTV channels via Set Top Boxes, Mobile apps & web sites.

### 8. Financials, Reporting & Settlement:

a) Client agrees to pay Provider for its Subscription as per following table:

---

*Payment:*
1. *1Stop Media & Entertainment Inc / DBA Radiant IPTV will provide 30,000 (Thirty Thousand) Per Month in the First year.*

2. *Payment terms will be reviewed every 12 Months (1 Year).*

---

9. Client will designate an associate who will collect new content from Provider in weekly basis by DVD, HDD, Pen Drive etc. and Client will upload and index the same in VOD server immediately.

10. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third parties/TV channels/competitors without prior permission of the Client.

11. Length of agreement - This business agreement will be valid for a minimum **three (03) year** as initial term, unless it is terminated by the Client with advance notice of twelve (12) month by showing reasonable grounds in writing. After initial term ends, the agreement will be renewed automatically for next 3 years unless each parties have full rights to get out of the contract by advance notice.



12. Provider agrees to play client's sales promotional TV Scroll 24 hours and also air promotional/sales video clips of Radiant IPTV FREE of cost time-to-time based on mutual plan set forth with Client.

13. Neither parties may assign, nor otherwise transfer any rights under this agreement.

14. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

15. Provider agrees to offer EXCLUSIVE worldwide distribution right of broadcasting / rebroadcasting / stream live channel over IP networks during the validity of this agreement duration.

16. 1Stop Media also intends to act as one of the advertising agents in overseas by agreeing upon fees set forth by Provider for airing third party advertisement clips on TV channel.

17. Provider gives authority to Client to use exact logo without any modification for sells & marketing purposes both in the print and electronic forms. Also, Provider agrees to allow the use of logo within IPTV system & sub-systems, STBs etc.

18. The client will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the provider.

19. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the courts of State of Illinois of United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.

*Private & Confidential*

Asian Telecast Limited (Asian.tv) House: 60, Road: 1, Block: A, Niketon, Gulshan-1, Dhaka-1212, Bangladesh
Tel: + 88 02 9852980-4 | Fax: 9852964 | e-mail: info@asiantvbd.tv | Web: www.asiantvbd.tv

YOUR CHANNEL



By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
*Asian Telecast Ltd.(AsianTV)*

Name: A.M.Mahammud(Lipon)

Title: Deputy Manager

Date:20-11-1014

Tel:0198-2275-809

Email:lipon.mahmud@gmail.com

For,
*1Stop Media & Entertainment Inc.*
(Radiant IPTV)

Name: Atiqur Rahman,MBA

Title: Operations Manager

Date:20-11-14

Tel:0175-5078-100

Email:arahman@radiantiptv.com

4 | P a g e

*Private & Confidential*



# EXHIBIT M



৳৫০০          ৳৫০০

একশত টাকা

ᴊᴹ    ৫৭১১১১৫

# Business Agreement for Mobile Apps
## (Non-Exclusive)



This agreement made on this 23th day of September, 2014 by and between ATN Bangla Ltd. ( Multi Media Production Co. Ltd. ) having its registered address at WASA Bhabon, 1st Floor, 98 Kazi Nazrul Islam Avenue, Kawran Bazar, Dhaka 1215, Bangladesh and *1Stop Media & Entertainment Inc / DBA Radiant IPTV* (http://www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, USA ("Client") has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

1. Client (*1Stop Media & Entertainment Inc.*) has decided to launch Mobile Apps – Android and iPhone under the brand name of "Radiant IPTV" by delivering Bangla TV channels over mobile device without being restricted by any geographic boundary.

2. Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

3. Client has put together the necessary documentation and operational plans to bring the ideas and concepts to market & sell services mainly to Bangladeshi community.

### 7. Financials, Reporting & Settlement:

In the mobile world, standard business models are to charge between $1-$10 for an application, which is then shared between the application owner and the distribution platform. Radiant IPTv is proposing to work with your TV channel to share the revenue in periodic basis by the best in live streaming via Apps.

Contd....Page : 2



৫৭২১১১৬

Page : 2

The following number of subscription monthly fees through Mobile Apps:

| *Payment: 1 Stop Media will share and will generate report to ATN Bangla in monthly basis individually and will settle the payment within next 15 days.* | Start-ups 3 Months Free<br>Per Subscriber/Month - $0.10c |
| --- | --- |



8. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third parties/TV channels/competitors without prior permission of the Client.

9. Length of agreement - This business agreement will be valid for a minimum three (03) year as initial term, unless it is terminated by the Client with advance notice of three (3) months by showing reasonable grounds in writing. After initial term ends, the agreement will be renewed automatically for next 3 years unless each parties have full rights to get out of the contract by advance notice.

10. Provider agrees to air promotional/sales video clips of Radiant IPTV FREE of cost time-to-time based on mutual plan set forth with Client.

11. Neither parties may assign, nor otherwise transfer any rights under this agreement.

12. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

13. Provider gives authority to Client to use exact logo without any modification for sells & marketing purposes both in the print and electronic forms.

Contd....Page : 3



৳১০০                ৳১০০

একশত টাকা

৫৭২১৯১৭

Page : 3

14. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the courts of State of Illinois of United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
Atn Bangla Ltd.

Name: G.M Md. Shamsul Huda

Title: Advisor   Sales & Marketing

Date: September 23, 2014

Tel: 01713064411

Email:mshuda atnbangla@gmail.com

Witness :

(Moniruzzaman Monir)
Senior Vice President
Finance & Accounts

For,
*1Stop Media & Entertainment Inc.*

Name: Atiqur Rahman

Title: Operations Manager

Date: September 23, 2014

Tel: 01755078100

Email: arahman@radiantiptv.com

Witness :

# EXHIBIT N



৭৮ - ৬৩৮৩৯২১

## Business Agreement for ATN NEWS TV
## Channel & Content
## Distribution Rights (Non Exclusive)

This agreement made on this 1st day of December 2014 by and between ATN News Limited (*"Provider"*) having its registered address at Hassan Plaza, 53 Karwan Bazar C/A, Dhaka # 1215 and *1Stop Media & Entertainment Inc / DBA Radiant IPTV* (http: www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, USA **("Client")** has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

1. Client has decided to launch an IPTV service under the brand name of "Radiant IPTV" by delivering Bangla, Hindi & English TV channels over Internet Protocol without being restricted by any geographic boundary.

2. Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

3. Client has put together the necessary documentation and operational plans to bring the ideas and concepts to market & sell services mainly to Bangladeshi community.

4. Client and Provider agree to share the revenue from selling the VOD content via IPTV/CDN platform. Provider shall focus more on specialized content offerings and gain revenue in periodic basis (for every purchases) from selling VOD content such as dramas, movies, news footage, especial shows, events etc.

Cont....Page : 2



ক্রম ৬৬৪৬৩৯২২

Page : 2

5. **Financials, Reporting & Settlement:**

*Payment:*

*1. 1Stop Media & Entertainment Inc / DBA Radiant IPTV will track the following payment system:*

| Month 1-3 | BD Tk. 25000/month |
|-----------|--------------------|
| Month 4-6 | BD Tk. 30,000/month |
| Month 7-12 | BD Tk. 35,000/month |

6. Client will designate an associate who will collect new content from Provider in weekly basis by DVD, HDD, Pen Drive etc. and Client will upload and index the same in VOD server immediately.

7. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third parties/TV channels/competitors without prior permission of the Client.

8. Length of agreement - This business agreement will be valid for a minimum One (01) year as initial term, unless it is terminated by the Client with advance notice of twelve (12) months by showing reasonable grounds in writing. After initial term ends, the agreement may be reviewed for a longer-term contract. If both the parties under this agreement is satisfied mutually about last one year performance.

9. Provider agrees to air promotional/sales video clips of Radiant IPTV FREE of cost time-to-time based on mutual plan set forth with Client.

10. Neither parties may assign, nor otherwise transfer any rights under this agreement.

11. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

Cont....Page : 3



৳১০০     ৳১০০

একশত টাকা

ণম ৬৩৪৩৯২৩

Page : 3

12. Provider agrees to offer distribution right of broadcasting / rebroadcasting stream live channel over IP network during the validity of this agreement duration.

13. 1Stop Media also intends to act as one of the advertising agents in overseas by agreeing upon fees set forth by Provider for airing third party advertisement clips on TV channel

14. Provider gives authority to Client to use exact logo without any modification for sells & marketing purposes both in the print and electronic forms. Also, Provider agrees to allow the use of logo within IPTV system & sub-systems, STBs etc

15. The client will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the provider.

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,

MENKUSTV

01-12-2014

Name: Dr. Mahfuzur Rahman
Title: Chairman
Date: 01/12/2014
Tel: 8189630
Email:

For,

*1Stop Media & Entertainment Inc.*
(Radiant IPTV)

Rahman

Name: Atiqur Rahman
Title: Operations Manager
Date: 1st December, 2014
Tel: 01755078100
Email: arahmana/radiantipty.com

# EXHIBIT O



## BUSINESS AGREEMENT FOR TV & CONTENT

Between

Distribution Right (Non-Exclusive) of

BOISHAKHI TV

This agreement made on this 01 June, 2015 by and between *Boishakhi Media Ltd. ('Provider')* having its registered address at 32, Mohakhali C/A, Level (4-8), Dhaka-1212 and *Marvel Cable And Broadcasting LLC / 1Stop Media & Entertainment Inc.* (dba Radiant IPTV) (http://www.radiantiptv.com) having its registered address at 150-47 Hillside Avenue, Jamaica, NY 11432, United States ("Client") has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

1. Client has decided to launch an IPTV service under the brand name of "Radiant IPTV" by delivering Bangla, Hindi & English TV channels over Internet Protocol without being restricted by any geographic boundary.

2. Territory: Provider grants right to Client to show Live Boishakhi TV in USA.

3. This deed of agreement is valid for Non-Exclusive rights only.

4. Client will received the Boishakhi TV Live feed through Satellite (Free to the Air) only.

5. Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality

P-1



ক৮    ৮১০০০৪২

Bangla content viewing. But BOISHAKHI TV will not take any responsible as far as content, quality and any financial matter is concerned.

6. Client will offer viewing Boishakhi TV channel via Set Top Boxes, Mobile apps & web sites.

7. **Financials, Reporting & Settlement:**

a) Client agrees to pay Provider for its content as per following table for Content Sold:

> *Payment:*
>
> *1. Client will track the following payment system:*
>
> | | |
> |---|---|
> | *1ˢ Year* | *$800/month* |
> | *2ⁿᵈ Year* | *$1000/month* |
> | *3ʳᵈ Year* | *$1200/month* |
> | *4ᵗʰ Year* | *$1500/month* |
>
> *2. 1st Year first 6 months in advanced $4800 payment.*
>
> *3. Payment will be made in advance 6 month basis.*

8. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third parties/TV channels/ competitors without prior permission of the Client.

9. Length of agreement - This business agreement will be valid for a minimum **two (02) year** as initial term, unless it is terminated by both client and provider with advance notice of six (6) months by showing reasonable grounds in writing. After initial term



₹ ১১০৬৫৪১

ends, the agreement will be renewed for next 2 years with mutual discussion and agreement.

10. Neither parties may assign, nor otherwise transfer any rights under this agreement.

11. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

12. Provider agrees to offer distribution right of broadcasting / rebroadcasting / stream live channel over IP network during the validity of this agreement duration.

13. Radiant IPTV also intends to act as one of the advertising agents in overseas by agreeing upon fees set forth by Provider for airing third party advertisement clips on TV channel.

14. The client will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the provider.

15. Provider will help & cooperate Client to take down illegal operator's stream/feed of Boishakhi TV by demand of the Client's notice. It's imperative that Provider also agrees to give take down notice upon mutual discussion with Client.

16. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the court of State of Illinois & state of New York of the United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.

17. This is a Non-Exclusive Agreement. If BOISHAKHI come to an agreement with any other party **Marvel Cable And Broadcasting LLC** be a party on it, neither they will raise any objection on that.

P-3



19. The Payment would be made on the Account Name: Boishakhi Media Limited, Current Account No. 13211060000567, Bank Name: **Prime Bank Limited**, Banani Branch, Dhaka-1213, Bangladesh.

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
*Boishakhi Media Ltd*

For,
*Marvel Cable And Broadcasting LLC*
*1Stop Media & Entertainment*
(Radiant IPTV)

Name : **Tipu Alam**
Title : Deputy Managing Director
Date :
Tel : 88 02 8837081
Email: tipuboishakhi@gmail.com

Name : **Atiqur Rahman**
Title: Operations Manager
Date:
Tel: 01755078100
Email: arahman@radiantiptv.com

Signature of Witness :

1.
2. S.R.A.Rovt

3.

Signature of Witness :

1.

2.

3.

P.-1

# EXHIBIT P



কং    ৭২৬২২৭৫

## Business Agreement for TV Channel & Content
## Distribution Right (Non-Exclusive)

This agreement made on this 25th day of May, 2014 by and between International Television Channel Ltd (NTV) *("Provider")* having its registered address at BSEC Bhavan (level 7), 102, Kazi Nazrul Islam Avenue, Karwan Bazar. Dhaka,-1215  and *1Stop Media & Entertainment Inc / DBA Radiant IPTV* (http://www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, USA **("Client")** has decided to operate IPTV & Mobile Apps business by agreeing mutually below terms:

1. Client has decided to launch an IPTV service under the brand name of **"Radiant IPTV"**.

2. Provider has given the broadcast right (Non-Exclusive) to the client over Internet Protocol of its channel called "NTV" and its content for *all over the world except USA & Canada.*

3. Client has the marketing and promotional experience that would compliment the ideas and concepts that Client has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

4. Client has put together the necessary documentation and operational plans to bring the ideas and concepts to market & sell services mainly to Bangladeshi community.

5. Financials, Reporting & Settlement:

a) Client agrees to pay Provider for its Subscription as per following table:

---

*Payment:*
1. *1Stop Media & Entertainment Inc / DBA Radiant IPTV will provide $5000 (Five Thousand US dollar) in the First year.*
2. *Profit sharing will be reviewed every 12 Months (1 Year) for determining amount of increment to the yearly payment of $5000.*

---

6. Both the Client & Provider agree to co-operate with each other to make this venture a success. Same time, Provider shall not disclose the technology/know how to any third



এক শত টাকা

৯ ২ ৮ ২ ২ ৭ ৬

7. This business agreement will be valid for a minimum three (03) year as initial term, unless it is terminated by the Client or Provider with advance notice of three (3) months by showing reasonable grounds in writing. After initial term ends, the agreement will be renewed automatically. Both parties have full rights to get out of the contract by giving advance notice.

8. The commencement date of this agreement shall effectively be from June 01, 2014.

9. Provider agrees to air promotional TV ticker of Radiant IPTV FREE of cost time-to-time based on mutual plan set forth with Client.

10. Neither parties may assign, nor otherwise transfer any rights under this agreement.

11. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

12. Provider can offer distribution right of broadcasting / rebroadcasting / stream live channel over IP network during the validity of this agreement duration.

13. The client will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the provider.

14. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the courts of State of Illinois of United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.



৳১০০

একশত টাকা

৭২৮২২৯১

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
International Television Channel Ltd. (NTV)


Name: **Alhaj Mohammad Mosaddak Ali**

Title: Chairman & Managing Director

Date: 25th May, 2014

Tel: 9143381-5

Email: info@ntvbd.com

For,
**IStop Media & Entertainment Inc.**
(Radiant IPTV)


Name: **Atiqur Rahman**

Title: Operations Manager

Date: 25th May, 2014

Tel:+88 01755078100

Email: arahman@radiantiptv.com

# EXHIBIT Q



৳ ৫০০  ৳ ৫০০

একশত টাকা

শ  ৬৬৮৮২৬৯

# Business Agreement for TV Channel & Content
# <u>Distribution Right (Non-Exclusive)</u>



This agreement made on this 12th day of September, 2013 by and between **Independent Television Limited** *("ITV")* having its registered address at 149-150, Tejgaon I/A, Dhaka-1208 and *1Stop Media & Entertainment Inc (DBA Radiant IPTV )*, web: (http://www.radiantiptv.com) having its registered address at 3833 Gladstone Drive, Naperville, IL 60565, USA ("**Radiant**") has decided to operate IPTV & CDN (Content Distribution Network) business by agreeing mutually below terms:

1. Radiant has decided to launch an IPTV service under the brand name of "Radiant IPTV" by delivering Bangla, Hindi & English TV channels over Internet Protocol without being restricted by any geographic boundary.

2. Radiant has the marketing and promotional experience that would complement the ideas and concepts that Radiant has created to serve Bengali community to meet the growing demand of quality Bangla content viewing.

3. Radiant has put together the necessary documentation and operational plans to bring the ideas and concepts to market & sell services mainly to Bangladeshi community.

4. Radiant and ITV agree to share the revenue from selling the VOD content via IPTV/CDN platform. The live channel feed will be offered by the ITV as per table mentioned below. ITV shall focus more on specialized content offerings and gain revenue in periodic basis (for every purchase) from selling VOD content such as news footage, especial shows, events etc.

5. Radiant's marketing team will determine the value of every media contents that is to be offered by the ITV and place in VOD library with an appropriate dollar value. Based on the demand and popularity of individual media content, Radiant will determine for how long it will be offered/shown for selling and those to be offered to IPTV subscribers.

6. Radiant will also setup a B2B online CDN (Content Distribution Network) and delivery platform to sell all content of ITV via e-commerce enabled



৳০১২০২৬

websites/hosting platforms or via designated third parties as whole or partially deems appropriate for the business interest of the Radiant. Here also, the revenue will be shared again by both Radiant & ITV.

7. Financials, Reporting & Settlement:
a) Radiant agrees to pay ITV for its content as per following table for Content Sold:
1. For Year -01, ITV will get 25% from every download (i.e: if Radiant charge $10 per download, ITV will get $2.5 United States Dollar per download)
2. For Year -02, both parties will commence a meeting to settle a new rate on 11th month of the first year. If parties fail to settle new rate then the first year rate will be continue till the settlement done.

b) Radiant agrees to pay ITV $ .50 (Fifty United States Cents) for its Subscription fee and Apps download per subscriber per month.
c) Independent Television will not charge radiant for any subscription fee on any format till December 2013. The revenue sharing will start from January'2014 onwards.

On first day of each month, Radiant will provide itemized report to the ITV of the contents sold by Radiant and will settle the payment within next seven (7) working days. If the total monthly amount is payable is less than $100, then Radiant may withheld the payment till thresh hold may reach. Radiant will also allow to excess their servers to generate MIS and VOD hits and download details.

8. Radiant will designate an associate who will collect new content from ITV in weekly basis by DVD, HDD, Pen Drive etc. and Radiant will upload and index the same in VOD server immediately. Radiant will allow ITV to send contents through FTP server.

9. Radiant & ITV agree to co-operate with each other to make this venture a success. Same time, ITV shall not disclose the technology/know how to any third parties/TV channels/competitors without prior permission of the Radiant.

10. Length of agreement - This business agreement will be valid for a minimum three (03) year as initial term ( yearly renewal basis), unless it is terminated by the Radiant with advance notice of Three (3) month by showing reasonable grounds in writing. After initial term ends, the agreement will be renewed automatically for next 1 year unless each party has full rights to get out of the contract by advance notice.

11. ITV agrees to air promotional/sales video clips of Radiant IPTV FREE of cost time-to-time based on mutual plan set forth with Radiant.

12. Neither parties may assign, nor otherwise transfer any rights under this agreement.

13. This agreement may be revised from time to time by both the parties to update any changes that may take place upon mutual discussion.

14. ITV agrees to offer the rights of broadcasting / rebroadcasting / stream live channel over IP network during the validity of this agreement duration.

15. Radiant also intends to act as one of the advertising agents in overseas by agreeing upon fees set forth by ITV for airing third party advertisement clips on TV channel.

16. ITV gives authority to Radiant to use exact logo without any modification for sells & marketing purposes both in the print and electronic forms. Also, ITV agrees to allow the use of logo within IPTV system & sub-systems, STBs etc.

17. The Radiant will not be allowed to modify, change or alter the contents of drama etc. with our prior written consent of the ITV.

18. In case of any dispute or violation of the terms stated in this agreement, the parties will have the rights to go for arbitration in the courts of State of Illinois of United States of America or International Arbitration Center in Dhaka, Bangladesh subject to mutual understanding.

By signing below, both the parties agree to abide by the terms & conditions above as a binding to each other for the business scopes set forth.

For,
*Independent Television Ltd.*

For,
*IStop Media & Entertainment Inc.*
(Radiant IPTV)

Name: M. Shamsur Rahman

Name: Atiqur Rahman, - on behalf

Title: Managing Editir
Date: 12, 09, 2013
Tel: +880 8879000
Email: distribution@independent24.tv

Title: Operations Manager
Date: 12-09-2013
Tel: +8801755078100
Email: arahmanraradiantmix.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

STAR CABLE NA, INC.,

Docket No 16-cv-04067
Assigned Judge Hon. Pollak

Plaintiff,

**AFFIDAVIT IN SUPPORT
OF NOTICE OF MOTION
SEEKING SUMMARY
JUDGMENT TO DISMISS
THE COMPLAINT**

vs.

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10

**Defendants.**

--------------------------------------------------------------------------x

I Saiful Siddique as follows:

1. I am the President of 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV.

2. I am making this affidavit in support of the Defendant 1Stopmedia & Entertainment Inc.
   d/b/a Radiant IPTV's motion seeking summary judgment to dismiss the complaint on the
   ground that the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV has
   been broadcasting channels with the consent and on the basis of the written agreements

with the content owners and the Plaintiff Star Cable NA, Inc. has no exclusive rights to broadcast channels as alleged in paragraph 1 of the second amended complaint.

3.  On or about July 22, 2016, the Plaintiff Star Cable NA Inc. had commenced the present action against the Defendants Total Cable USA LLC and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV alleging copyright violations of various channels in which the Plaintiff has alleged exclusive rights to broadcast (Docket No. 1, July 26, 2016). Subsequently, on or about July 6, 2017, the Plaintiff Star Cable NA Inc. filed a second amended complaint (Docket No. 38, July 6, 2017). In paragraph 1 of the complaint, the Plaintiff alleged that the Plaintiff has exclusive rights in the United States and Canada to distribute the programming services including i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Banglavision; vii) Ekushey TV viii) Somoy.

4.  On or about August 28, 2017, the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV filed an answer to the second amended complaint. In paragraph 1 of the answer, the Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV is not involved in the sale and distribution of Somoy TV. Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV denied the allegations in paragraph 1 of the complaint, that the Defendant is in violation of the Plaintiff's exclusive rights. In paragraph 51 of the first counterclaim, Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV submitted that Defendant enjoys its rights and privileges directly from the overseas television channels

who are the content owners.  In paragraph 55 of the answer, Defendant 1Stopmedia &

Entertainment Inc. d/b/a Radiant IPTV submitted that in addition to the channels

mentioned in paragraph 1 of the second amended complaint, except Somoy TV, the

Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV also has legal rights to

broadcast Channel 16, Asian TV, Channel 1 TV, Boishakhi TV, ATN & Bangla and

ATN & News.  In paragraph 6 of the answer, 1Stopmedia & Entertainment Inc. d/b/a

Radiant IPTV submitted that on information and belief, the overseas content owners have

terminated the agreements with the Plaintiff to broadcast various channels and/or is in the

process of terminating the agreements with the Plaintiff's right to broadcast channels.

5. During discovery 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV requested the

   Plaintiff's attorney to provide responses to the request for documents by the Defendant

   1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV.  In response to request #1, the

   Plaintiff provided the agreements with Independent TV, Jamuna TV, Channel 16, MyTV,

   Asian TV, Banglavision, Ekushey, Boishakhi TV and Somoy TV.  The agreement

   between Star Cable NA, Inc. and Boishakhi TV was executed on June 16, 2015, signed

   by Tipu Alam on behalf of Boishakhi TV.  Clause 1 of the agreement provides that

   affiliate shall have non-exclusive rights to distribute the services.  In addition, Tipu Alam,

   who signed the agreement on behalf of Boishakhi TV sent a letter to Star Cable NA, Inc.

   on March 8, 2017 dismissing the letter of engagement.  Tipu Alam also filed a

   declaration on December 14, 2017 in which he alleged in paragraph 3 of the declaration

   that terms of the agreement were not renewed as Star Cable NA, Inc. did not honor their

part of the agreement. In paragraph 4 of the declaration, Tipu Alam alleged that Star

Cable NA, Inc. has no right to distribute the services of Boishakhi TV.

6. In response to the request to production of documents, the Plaintiff also provided an

   agreement between Star Cable NA, Inc. and Independent TV Ltd. dated November 26,

   2014 for a period of three years. This agreement expired in 2017. Star Cable NA, Inc.

   has not provided any other agreement showing that the agreement dated November 26,

   2104 was ever renewed or a new agreement was executed between the parties.

7. The Plaintiff also provided an agreement between Star Cable NA, Inc. and Jamuna TV

   dated December 1, 2014. The agreement was for three years and Star Cable NA, Inc. did

   not provide any agreement showing that this agreement was ever renewed or that a new

   agreement was executed between the parties. Channel 16 is no longer in circulation and

   it is not broadcasting. In addition, Channel 16 also entered into agreement with Lalon

   TV on July 9, 2012 for a term of ten years.

8. The various content owners have entered into agreement with the Defendant 1Stopmedia

   & Entertainment Inc. d/b/a Radiant IPTV. Jamuna TV provided a certification dated

   January 10, 2017 in which Jamuna TV certified that 1Stopmedia & Entertainment Inc.

   d/b/a Radiant IPTV is their client and Jamuna TV provided rights to broadcast Jamuna

   TV in North America and Canada. In the certification, Jamuna TV specified that no

other organization has any valid exclusive rights with Jamuna TV. Said certification was signed by ASM Arifur Rahman, head of broadcasting operations of Jamuna TV.

9. On January 9, 2017, Shamol Bangla Media Ltd. provided a certification that Star Cable NA, Inc. had no valid agreement to broadcast Banglavision.

10. On September 1, 2017, MyTv provided a certificate that Star Cable NA, Inc. has no valid legal agreement with V.M. International Ltd. (mytv) and Star Cable NA, Inc. has absolutely no rights to broadcast or represent MyTV channel anywhere in the world.

11. On August 23, 2016, Fakrool Alam of Ekushey TV wrote a letter to Sajid Sohail, the director of Star Cable NA, Inc. terminating the channel partnership agreement with Star Cable NA, Inc.

12. On or about June 6, 2016, an agreement was made between Asian Telecast Ltd. (Asian TV) and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV granting distribution rights to 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a minimum of three years with automatic renewal for the next three years.

13. On or about November 20, 2014, a business agreement (exclusive) was executed between Asian Telecast Ltd. (Asian TV) and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a term of three years with automatic renewal for the next three years.

14. On or about September 23, 2014, an agreement was made between ATN Bangla Ltd. and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a minimum period of three years with an automatic renewal for another three years.

15. On or about December 1, 2014, an agreement was executed between ATN News TV and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a period of one year with automatic renewal.

16. On June 1, 2015, an agreement was made between Boishakhi Media Ltd. (Boishakhi) and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV for a period of four years.

17. On or about May 25, 2014 an agreement was executed between International TV and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV.

18. On or about September 12, 2013 an agreement was executed between Independent TV and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV.

19. All of the agreements executed between the various content owners and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV have already been provided to the attorney of the

Plaintiff in response to the Plaintiff's request for discovery. The agreement provided by the Plaintiff in response to the Defendant's request for discovery do not establish that the agreements with Star Cable NA, Inc. were exclusive. Moreover, those agreements have already been terminated.

20. The various agreements have been executed between the content owners and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV and those agreements are still in force.

21. Sajid Sohail appeared in the deposition on behalf of the Plaintiff. During the deposition, the Defendant's attorney Joseph F. Kasper specifically confronted all of the agreements executed between the content owners and 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV, Mr. Sohail did not deny the execution of the agreements between 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV and the content owners and his response was simply that he was not aware of the agreements.

22. Defendant 1Stopmedia & Entertainment Inc. d/b/a Radiant IPTV has been broadcasting channels based on the agreements they have with the content owners with the permission of the content owners. On the contrary, the agreements, if any, with the content owners and the Plaintiff Star Cable NA, Inc. have been terminated and Star Cable NA, Inc. has not rights to broadcast the various channels.

WHEREFORE, 1stopmedia & Entertainment Inc. d/b/a Radiant IPTV requests that the relief

requested in the notice of motion by 1stopmedia &Entertainment Inc. d/b/a Radiant IPTV be

granted along with any other just and proper relief.

Saiful Siddique

President of 1stopmedia & Entertainment Inc.

d/b/a Radiant IPTV

Verified On: March 25, 2019

In the County of New York

In the State of New York

(Notary Public)

SATISH KUMAR BHATIA
Notary Public, State Of New York
No. 02BH6343050
Certified In New York County
Commission Expires 05/31/2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

STAR CABLE NA, INC.,                                    16-CV-04067 (SJ)

                         Plaintiff,

         -against-

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                         Defendants.

----------------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY 1STOPMEDIA AND ENTERTAINMENT, INC. D/B/A RADIANT IPTV

HOGAN & CASSELL, LLP
*Attorneys for Plaintiff, Star Cable NA, Inc.*
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
Tel. (516) 942-4700
Fax (516) 942-4705
Email mcassell@hogancassell.com

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.    RELEVANT FACTS.............................................................................................2

       A.      Nature of Plaintiff's Claims in this Action................................................2

       B.      Defendants' Improper Conduct..................................................................7

       C.      1StopMedia's Motion Should Not be Granted..........................................8

III.   ARGUMENT........................................................................................................11

       A.      1StopMedia's Motion is Procedurally Defective.....................................11

       B.      1StopMedia's Motion is Substantively Defective...................................13

             1.     Legal Standard............................................................................13

             2.     Summary Judgment is Not Warranted
                  because there are Issues of Fact as to Whether
                  Defendant is Violating Star Cable's Rights................................14

IV.   CONCLUSION....................................................................................................16

## TABLE OF AUTHORITIES

*Decisions:*                                                                                     *Page:*

Brezler v. Mills, 220 F. Supp. 3d (E.D.N.Y. 2016)..............................................................................13

Byrd v. NYS Fingerlakes Developmental Disabilities Servs., 2018 U.S. Dist. LEXIS 111950,
2018 WL 3305423 (W.D.N.Y. July 5, 2018)..................................................................................14

Cea v. Access 23 TV, 2015 U.S. Dist. LEXIS 123585,
2015 WL 5474070 (S.D.N.Y. Sep. 15, 2015)................................................................................12

Corbley v. County of Suffolk, 45 F. Supp. 3d 276 (E.D.N.Y. 2014)............................................11

Entm't by J&J v. Al-Waha Enters., 219 F. Supp. 2d 769 (S.D. Texas 2002)................................15

Garden City Boxing Club, Inc. v. Vinson, 2003 U.S. Dist. LEXIS 26180
(N.D. Texas Sept. 3, 2003)..............................................................................................................15

Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming,
2013 U.S. Dist. LEXIS 110236, 2013 WL 4011052 (N.D. Ill. Aug. 6, 2013)........................14-15

Kloner v. United States, 196 F. Supp. 3d 375 (E.D.N.Y. 2016)...................................................13

Miller v. Nassau Cnty., 2015 U.S. Dist. LEXIS 164580
(E.D.N.Y. Oct. 22, 2015) (Report & Recommendation)................................................................14

Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900 (6th Cir. 2001)....................................15

Oladokun v. Ryan, 2010 U.S. Dist. LEXIS 1033814,
2010 WL 3910578 (S.D.N.Y. Sept. 30, 2010)...............................................................................13

Pinto v. Allstate Ins. Co., 221 F.3d 394 (2d Cir. 2000)................................................................13

Price v. Oropallo, 2014 U.S. Dist. LEXIS 116019 (N.D.N.Y. June 18, 2014)
(Report & Recommendation)...........................................................................................................14

United States v. Katz, 2011 U.S. Dist. LEXIS 59159,
2011 WL 2175787 (S.D.N.Y. June 2, 2011)..................................................................................12

Wenzhou Wanli Food Co. v. Hop Chong Trading Co., 2000 U.S. Dist. LEXIS 9554,
2000 WL 964944 (S.D.N.Y. July 11, 2000)...................................................................................12

*Statutes:*                                                                                          *Page*

Local Rule Civ. P. 7.1...............................................................................................................11-12

Local Rule Civ. P. 56.1...........................................................................................................*passim*

47 U.S.C. § 605........................................................................................................................14-15

# I. **INTRODUCTION**

The plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorneys, Hogan & Cassell, LLP, respectfully submits this Memorandum of Law in Opposition to the motion for summary judgment filed by the defendant, 1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("Defendant" or "1StopMedia").

By way of background, Plaintiff alleges in this action that Defendant is involved in the sale and distribution of cable television services and devices to assist its customers to gain access to various programming to which it is not entitled. The programming at issue originates in Bangladesh via an internet protocol television system ("IPTV"). Star Cable is an IPTV television company that has **exclusive** rights, in the United States and Canada, to distribute the eight individual programming services at issue in this action via the signal delivery services IPTV (sometimes hereinafter referred to as the "Exclusive Services"). Defendant, in direct violation of Plaintiff's exclusive rights, is receiving, using, divulging and retransmitting the Exclusive Services to its own customers.

1StopMedia's motion for summary judgment should be denied since it is procedurally and substantively defective.

It is well settled that a motion for summary judgment has to be supported by a memorandum of law and a statement pursuant to Local Rule Civ. P. 56.1(a) ("Rule 56.1"). 1StopMedia's motion, however, does not include a memorandum of law and does not include a Rule 56.1 statement. Thus, the motion should be denied on its face.

Even if the Court was to overlook these significant procedural deficiencies, there is still no basis to grant the motion.

In its motion, 1StopMedia does not dispute that it is also broadcasting the Exclusive

1

Services.  According to 1StopMedia, however, its conduct is not improper because Plaintiff supposedly does not have the exclusive rights to the eight programming services that comprise the Exclusive Services and/or 1StopMedia supposedly has rights to broadcast the Exclusive Services.

For two main reasons, 1StopMedia's position does not lead to the conclusion that its motion should be granted.

First, almost all of the documents relied upon by 1StopMedia are unauthenticated and uncertified.  Such documents are not sufficient to support a motion for summary judgment.

Second, even if the Court considers the documents, they do not support the relief sought by 1StopMedia.  In fact, Plaintiff has submitted documentation herein that directly refutes Defendant's allegations.  Therefore, there are undeniably issues of fact.

## II. **RELEVANT FACTS**[1]

### A.     **Nature of Plaintiff's Claims in this Action**

Plaintiff is a cable television company that has exclusive rights, in the United States and Canada, to distribute eight individual programming services, via the signal delivery services internet protocol television system (i.e. IPTV), WiMax Wireless and Mobile TV.  The exclusive services originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (i.e. the Exclusive Services).  See Plaintiff's Rule 56.1 ¶ 23; Rasul Aff. ¶ 3.

The defendants in this action, Total Cable USA LLC and 1StopMedia (collectively "Defendants"), in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the

---

[1] All of the relevant facts set forth herein are taken from Plaintiff's Local Rule 56.1(b) Statement ("Plaintiff's Rule 56.1") and the accompanying affidavit of Shahid Bob Rasul ("Rasul Aff.").

2

purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. See Plaintiff's Rule 56.1 ¶ 24; Rasul Aff. ¶ 4.

Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. See Plaintiff's Rule 56.1 ¶ 25; Rasul Aff. ¶ 5.

Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access. See Plaintiff's Rule 56.1 ¶ 26; Rasul Aff. ¶ 8.

Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television (i.e. IPTV). See Plaintiff's Rule 56.1 ¶ 27; Rasul Aff. ¶ 9.

In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered. So, for example, there might be exclusive distribution rights for the United States for a satellite delivery service such as Direct TV. See Plaintiff's Rule 56.1 ¶ 28; Rasul Aff. ¶ 10.

In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights"). See Plaintiff's Rule 56.1 ¶ 29; Rasul Aff. ¶ 11.

Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is

3

dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted. The encrypted video services are then transmitted via the internet to its customers. See Plaintiff's Rule 56.1 ¶ 30; Rasul Aff. ¶ 12.

Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen. The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for same. See Plaintiff's Rule 56.1 ¶ 31; Rasul Aff. ¶ 13.

The set top box is part of the monthly service charge of a customer's purchase of IPTV service. If a customer wants a second set top box a service charge is added to the customer's bill each month. See Plaintiff's Rule 56.1 ¶ 32; Rasul Aff. ¶ 14.

The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted. See Plaintiff's Rule 56.1 ¶ 33; Rasul Aff. ¶ 15.

Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service. See Plaintiff's Rule 56.1 ¶ 34; Rasul Aff. ¶ 16.

Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada. See Plaintiff's Rule 56.1 ¶ 35; Rasul Aff. ¶ 17.

4

A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television. See Plaintiff's Rule 56.1 ¶ 36; Rasul Aff. ¶ 18.

A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd.    Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited. See Plaintiff's Rule 56.1 ¶ 37; Rasul Aff. ¶ 19.

More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the exclusive right to broadcast Independent TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 38; Rasul Aff. ¶ 20.

With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the exclusive right to broadcast Jamuna TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 39; Rasul Aff. ¶ 21.

With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The

5

agreement with Channel 16 provides Plaintiff with the exclusive right to broadcast Channel 16 in United States and Canada via IPTV.  See Plaintiff's Rule 56.1 ¶ 40; Rasul Aff. ¶ 22.

With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014.  The agreement is for nine years.  This agreement is still in effect.  The agreement with My TV provides Plaintiff with the exclusive right to broadcast My TV in United States and Canada via IPTV.  See Plaintiff's Rule 56.1 ¶ 41; Rasul Aff. ¶ 23.

With regard to Asian TV, Plaintiff and Asian TV entered into an agreement on November 25, 2014.  The agreement is for eight years.  This agreement is still in effect.  The agreement with Asian TV provides Plaintiff with the exclusive right to broadcast Asian TV in United States and Canada via IPTV.  See Plaintiff's Rule 56.1 ¶ 42; Rasul Aff. ¶ 24.

With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016.  The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement.  This agreement has not been terminated and is still in effect.  The agreement with Bangla Vision provides Plaintiff with the exclusive right to broadcast Bangla Vision in United States and Canada via IPTV.  See Plaintiff's Rule 56.1 ¶ 43; Rasul Aff. ¶ 25.

With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016.  The agreement is for five years.  This agreement is still in effect.  The agreement with Ekhusey TV provides Plaintiff with the exclusive right to broadcast Ekhusey TV in United States and Canada via IPTV.  See Plaintiff's Rule 56.1 ¶ 44; Rasul Aff. ¶ 26.

With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014.  The agreement is for five years.  This agreement is still in effect.  The agreement with

6

Somoy TV provides Plaintiff with the exclusive right to broadcast Somoy TV in United States and Canada via IPTV. See Plaintiff's Rule 56.1 ¶ 45; Rasul Aff. ¶ 27.

**B.    Defendants' Improper Conduct**

Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable. See Plaintiff's Rule 56.1 ¶ 46; Rasul Aff. ¶ 28.

Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants. See Plaintiff's Rule 56.1 ¶ 47; Rasul Aff. ¶ 29.

Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming. See Plaintiff's Rule 56.1 ¶ 48; Rasul Aff. ¶ 30.

In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Said actions of Defendants are an unauthorized divulgence of satellite signals. See Plaintiff's Rule 56.1 ¶ 49; Rasul Aff. ¶ 31.

Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective

7

business relationships of Star Cable.  See Plaintiff's Rule 56.1 ¶ 50; Rasul Aff. ¶ 32.

**C.     1StopMedia's Motion Should Not be Granted**

In its motion, 1StopMedia does not dispute that it is also broadcasting the Exclusive Services.  According to 1StopMedia, however, its conduct is not improper because Plaintiff supposedly does not have the exclusive rights to the eight programming services that comprise the Exclusive Services and 1StopMedia supposedly has rights to broadcast the Exclusive Services.  See Plaintiff's Rule 56.1 ¶ 51; Rasul Aff. ¶ 45.

Almost all of the documents relied upon by 1StopMedia are unauthenticated and uncertified.  See Plaintiff's Rule 56.1 ¶ 52; Rasul Aff. ¶ 46.

The documents do not support the relief sought by 1StopMedia.  See Plaintiff's Rule 56.1 ¶ 53; Rasul Aff. ¶ 47.

In the March 25, 2019 Affirmation of Satish K. Bhatia in support of 1StopMedia's motion ("Bhatia Aff."), Bhatia claims that 1StopMedia is not broadcasting Somoy TV, just because it so alleged in its answer to the Complaint.  See Bhatia Aff. ¶ 4.  This is insufficient to find as a matter of law that 1StopMedia is not broadcasting Somoy TV.  See Plaintiff's Rule 56.1 ¶ 54; Rasul Aff. ¶ 48.

Bhatia next states in his affirmation that Plaintiff has no rights to broadcast Boishaki TV. See Bhatia Aff. ¶ 5.  Boishaki TV, however, is not part of the claims in this action.  See Plaintiff's Rule 56.1 ¶ 55; Rasul Aff. ¶¶ 49-50.

The only issue raised in the Bhatia Aff. that concerns Independent TV is the claim that Plaintiff's agreement with Independent TV expired because it was for a period of three years and Plaintiff never demonstrated that the agreement was renewed.  See Bhatia Aff. ¶ 6.  The Independent TV agreement, however, specifically states that the agreement automatically renews

8

after the three years. The agreement has never been terminated and Star Cable still retains the exclusive rights to broadcast Independent TV in the United States and Canada over IPTV. See Plaintiff's Rule 56.1 ¶ 56; Rasul Aff. ¶¶ 51-52.

1StopMedia does not deny broadcasting Independent TV -- which is in clear contravention of Star Cable's exclusive rights. See Plaintiff's Rule 56.1 ¶ 57; Rasul Aff. ¶ 53.

With regard to Jamuna TV, Bhatia argues that 1StopMedia is entitled to summary judgment because: 1) there is no showing that Star Cable's agreement with Jamuna TV was ever renewed; and 2) Jamuna TV has certified that 1StopMedia has rights to broadcast Jamuna TV in North America and that no other entity has exclusive rights to broadcast Jamuna TV anywhere in the world. See Bhatia Aff. ¶¶ 7, 8; Exhibit G to Bhatia Aff. The agreement between Star Cable and Jamuna TV automatically renews. Thus, the mere fact that there is no additional documentation showing that the agreement was extended after the first time (which expired on December 1, 2017), does not lead to the conclusion that the agreement is no longer in effect. See Plaintiff's Rule 56.1 ¶ 58; Rasul Aff. ¶¶ 54-55.

The document attached as Exhibit G to the Bhatia Aff. is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that no other organization has the exclusive rights with Jamuna TV to broadcast Jamuna TV anywhere in the world is belied by the exclusive agreement between Star Cable and Jamuna TV. See Plaintiff's Rule 56.1 ¶ 59; Rasul Aff. ¶ 56.

Bhatia next asserts that Star Cable's claim against 1StopMedia pertaining to Channel 16 is deficient because Channel 16 is supposedly no longer broadcasting and because Channel 16 has an agreement with Lalon TV. See Bhatia Aff. 7. Even assuming that Channel 16 has an agreement with Lalon TV, 1StopMedia does not put forth anything to demonstrate that this

9

would insulate it from liability in this matter. Moreover, the only support for the statement that Channel 16 is no longer broadcasting is the unsupported assertion made by the president of 1StopMedia, Saiful Siddique ("Siddique"). See Plaintiff's Rule 56.1 ¶¶ 60-61; Rasul Aff. ¶¶ 57-58.

Similar to its position with Jamuna TV, with regard to My TV, 1StopMedia argues that based upon a "certification" Star Cable does not have the right to broadcast My TV. See Bhatia Aff. ¶ 10; Exhibit I. As with Jamuna TV, the alleged certification is nothing more than a letter "To Whom it May Concern" that is not authenticated, not certified and not notarized. And, the letter is directly contradicted by the exclusive agreement between Star Cable and My TV. See Plaintiff's Rule 56.1 ¶ 62; Rasul Aff. ¶ 59.

With regard to Ekhusey TV, Bhatia claims that Ekhusey TV terminated its agreement with Star Cable by sending a letter to Star Cable on August 23, 2016. See Bhatia Aff. ¶11; Exhibit J. 1StopMedia's reliance upon this letter fails. The agreement between Star Cable and Ekhusey TV only permits the termination of the agreement prior to the expiration of the five-year term, which does not expire until June 2021, if there is a material breach of the agreement and the breach is not cured within sixty days. Even assuming that the letter attached as Exhibit J to the Bhatia Aff. is authentic, the letter does not come close to complying with the language in the agreement for a proper termination of the agreement. In fact, the letter does not even mention paragraph 10 of the agreement, which, if the letter was authentic, one would expect to see in the letter. See Plaintiff's Rule 56.1 ¶¶ 63-65; Rasul Aff. ¶¶ 60-61.

With regard to Bangla Vision, 1StopMedia claims that it cannot be liable for its broadcasting of this service because it entered into an agreement with Bangla Vision on September 23, 2014. See Bhatia Aff. ¶ 14; Exhibit M. Most notably, however, the referenced

agreement is for mobile apps, not for broadcasting over IPTV. Thus, this agreement is irrelevant. See Plaintiff's Rule 56.1 ¶ 66; Rasul Aff. ¶¶ 62-63.

Finally, 1StopMedia claims that it entered into an agreement with Asia TV on November 20, 2014, for exclusive rights and then entered into another agreement with Asia TV on June 6, 2016, for non-exclusive rights to broadcast Asia TV. See Bhatia Aff. ¶¶ 12-13; Exhibits K and L. Highlighting that there are issues of fact as to the authenticity of these documents, 1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from Asia TV in November 20, 2014 it would then enter into an agreement less than two years later for non-exclusive rights. See Plaintiff's Rule 56.1 ¶ 67; Rasul Aff. ¶¶ 64-65.

## III.  ARGUMENT

### A.    1StopMedia's Motion is Procedurally Defective

Pursuant to this Court's Local Rules 7.1 and 56.1, a motion for summary judgment has to be supported by a memorandum of law and a Rule 56.1 statement. As courts have held, a party's failure to comply with these Rules is a sufficient basis to deny a motion for summary judgment on its face.

For example, in Corbley v. County of Suffolk, 45 F. Supp. 3d 276 (E.D.N.Y. 2014), the court denied the plaintiff's cross-motion on its face because the plaintiff did not submit a Rule 56.1 statement with the cross-motion:

> Yet, as argued by the Defendant, Plaintiff failed to submit a Local Rule 56.1 Statement outlining the undisputed facts. The Court has discretion to deny a motion for summary judgment when it does not include a Rule 56.1 Statement. "Failure to submit such a statement may constitute grounds for denial of the motion." Local Civil Rule 56.1(a). The Court finds that Plaintiff's failure to provide a statement of undisputed facts is fatal to its motion for summary judgment, and therefore the motion is denied on this basis.

45 F. Supp. 3d at 284 (citation omitted).

11

In United States v. Katz, 2011 U.S. Dist. LEXIS 59159, 2011 WL 2175787 (S.D.N.Y. June 2, 2011), the defendant, Stanley Katz, filed a motion for summary judgment seeking to dismiss the complaint of the United States. Instead of submitting a statement consistent with Local Rule 56.1, Katz submitted affidavits. The affidavits contained arguments in support of Katz's position. In denying the motion on its face, the court explained that courts in the Southern District and Eastern District of New York are empowered to deny a motion for summary judgment just because the motion fails to comply with Rule 56.1. The court found that the affidavits were an insufficient substitute for a Rule 56.1 statement, finding that the affidavits were unhelpful since they contained arguments and subjective characterizations of the facts. 2011 U.S. Dist. LEXIS 59159, at *12-*14.

And, in Wenzhou v. Wanli Food Co. v. Hop Chong Trading Co., 2000 U.S. Dist. LEXIS 9554, 2000 WL 964944 (S.D.N.Y. July 11, 2000), the defendant, Hop Chong, moved for summary judgment. Instead of submitting a memorandum of law in support of the motion, Hop Chong relied upon an affidavit. The affidavit did not cite to any statutes or case law. The court denied the motion on its face, explaining that the motion failed to comply with Local Rule 7.1. In addition, the court explained that a party's failure to provide the court with authorities, improperly places the burden on the court to conduct the initial legal analysis. The court denied Hop Chong's motion because if failed to submit a memorandum of law in support of its motion. 2000 U.S. Dist. LEXIS 9554, at *11-*13. See also Cea v. Access 23 TV, 2015 U.S. Dist. LEXIS 123585, at *2-*3, 2015 WL 5474070 (S.D.N.Y. Sep. 15, 2015) ("The 'failure to submit a memorandum of law, standing alone, is sufficient cause for granting or denying a motion. It is not necessary to reach the merits.'").

12

As in the above cases, it is evident that Defendant's motion should be denied. Significantly, the motion is not supported by a memorandum of law and does not cite to any cases or statutes in support of its position. While the motion is "supported" by the affirmation of its counsel, as the above cases make clear, this is patently insufficient. In addition, the motion is not supported by a Rule 56.1 statement.

Therefore, 1StopMedia's motion should be denied on its face.

## B.     1StopMedia's Motion is Substantively Defective

### 1.     Legal Standard

It is axiomatic that on a motion for summary judgment that the court must interpret all of the material facts in the light most favorable to the non-moving party.  Summary judgment is inappropriate if a reasonable jury could find for the nonmoving party. See, e.g., Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000) (explaining that in deciding a motion for summary judgment that a court should resolve all ambiguities and draw all inferences in favor of the non-moving party); Brezler v. Mills, 220 F. Supp. 3d 303, 320-21 (E.D.N.Y. 2016) (explaining that at the summary judgment stage, the court is required "'to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'"); Oladokun v. Ryan, 2010 U.S. Dist. LEXIS 1033814, at *11-*12, 2010 WL 3910578 (S.D.N.Y. Sept. 30, 2010) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of truth"); Kloner v. United States, 196 F. Supp. 3d 375, 381 (E.D.N.Y. 2016) ("A genuine issue of fact exists when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'").

13

Moreover, it is black letter law that a court can only consider admissible evidence on a motion for summary judgment. Thus, a court should not consider unauthenticated documents and documents such as unsworn letters. See, e.g., Price v. Oropallo, 2014 U.S. Dist. LEXIS 116019, at *22 (N.D.N.Y. June 18, 2014) (Report & Recommendation) (stating that "'[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment'" and noting that cases have held that unsworn letters could not be considered in connection with a motion for summary judgment); Miller v. Nassau Cnty., 2015 U.S. Dist. LEXIS 164580, at *19 (E.D.N.Y. Oct. 22, 2015) (Report & Recommendation) (holding that factual assertions made in certain letters were not admissible for purposes of a motion for summary judgment); Byrd v. NYS Fingerlakes Developmental Disabilities Servs., 2018 U.S. Dist. LEXIS 111950, at *3, 2018 WL 3305423 (W.D.N.Y. July 5, 2018) ("Defendant relies heavily on various documents, including reports, emails, and letters.   However, these documents are not in admissible evidentiary form because none of them has been properly authenticated through deposition testimony or an affidavit from its author.").

In this matter, when viewing the evidence in the light most favorable to Plaintiff, it is evident that Defendant is not entitled to summary judgment.

### 2.       Summary Judgment is Not Warranted because there are Issues of Fact as to Whether Defendant is Violating Star Cable's Rights

Significantly, it is well settled that a party holding the exclusive rights to programming services such as those at issue in this action has standing to sue pursuant to the Communications Act, 47 U.S.C. § 605 ("Section 605") for violation of those rights.

Intercom Ventures, LLC v. City Media Plus Ex-Yu Streaming, 2013 U.S. Dist. LEXIS 110236, 2013 WL 4011052 (N.D. Ill. Aug. 6, 2013), is instructive.  In Intercom Ventures, LLC,

14

the court held that the defendant's distribution, to its customers in the United States via the internet, of programming that the defendant obtained in Europe was violative of Section 605 because the plaintiff held the exclusive rights to the programming. The court found that the plaintiff was a "person aggrieved" as set forth in Section 605 because it entered into agreements to obtain the exclusive license to distribute the programming in the United States.

Notably, numerous other courts have held that a licensee has standing to assert a claim pursuant to Section 605 against a defendant who engages in the unauthorized distribution of programming that the plaintiff is licensed to distribute. See, e.g., Nat'l Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 911-14 (6th Cir. 2001) (holding that the plaintiff, who was the exclusive licensee of a boxing match, had standing to sue under Section 605); Entm't by J&J v. Al-Waha Enters., 219 F. Supp. 2d 769, 771-75 (S.D. Texas 2002) (same); Garden City Boxing Club, Inc. v. Vinson, 2003 U.S. Dist. LEXIS 26180, at *5 (N.D. Texas Sept. 3, 2003) ("As the exclusive licensee of the closed-circuit distribution rights to the Lewis-Tyson fight, plaintiff is an 'aggrieved person' under the statute and can bring a private right of action").

Defendant's main argument in its motion is that it cannot be liable for broadcasting the Exclusive Services because Star Cable supposedly does not have the exclusive rights to broadcast the Exclusive Services and/or 1StopMedia supposedly has rights to broadcast the Exclusive Services.

Defendant's motion is legally and factually without merit.

As explained above, a motion for summary judgment must be supported by admissible evidence. Here, however, many of the key documents that 1StopMedia relies upon to attempt to demonstrate that Star Cable no longer has the rights to certain of the Exclusive Services are inadmissible. See Plaintiff's Rule 56.1 ¶¶ 8, 9, 10, 59, 62. Simply put, Defendant does not come

15

close to establishing as a matter of law that Star Cable does not have the exclusive rights for any of the eight programming services at issue in this action.

Moreover, summary judgment is not appropriate given the numerous disputed questions of fact. Indeed, almost all of the allegations set forth in the Bhatia Aff. are directly disputed by the Rasul Aff. and the documents attached thereto. See Plaintiff's Rule 56.1 ¶¶ 2, 5-22, 51-67; Rasul Aff. ¶¶ 45-66.

Accordingly, 1StopMedia's motion for summary judgment should be denied.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment.

Dated:   April 23, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP
Attorneys for Star Cable NA, Inc.

By:

Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700
(516) 942-4705
mcassell@hogancassell.com

16

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

STAR CABLE NA, INC.,

                                                              16-CV-04067 (SJ)

                        Plaintiff,

         -against-                                            **AFFIDAVIT OF**
                                                              **BOB RASUL IN**
                                                              **OPPOSITION TO**
TOTAL CABLE USA LLC. and 1STOPMEDIA AND                       **DEFENDANTS'**
ENTERTAINMENT, INC. d/b/a RADIANT IPTV.                       **MOTIONS FOR**
ABC, INC., XYZ CORP. and JOHN DOES 1-10,                      **SUMMARY JUDGMENT**

                        Defendants.

------------------------------------------------------------------------X

STATE OF NEW YORK          )
                           )         ss:
COUNTY OF NASSAU           )

         SHAHID BOB RASUL, being duly sworn, deposes and states the following under
penalty of perjury:

## Introduction

1.       I am the Chief Technology Officer of the plaintiff in this action, Star Cable NA,
Inc. ("Plaintiff" or "Star Cable"). I submit this affidavit in opposition to the motion for summary
judgment filed by Total Cable USA LLC ("Total Cable") and the motion for summary judgment
filed by 1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("1StopMedia") (Total Cable
and 1StopMedia will collectively be referred to as "Defendants").

2.       As set forth below, neither motion has merit.

## Nature of Plaintiff's Claims in this Action

3.       Plaintiff is a cable television company that has exclusive rights, in the United
States and Canada, to distribute eight individual programming services, via the signal delivery
services internet protocol television system ("IPTV"), WiMax Wireless and Mobile TV.  The

exclusive services originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes hereinafter referred to as the "Exclusive Services").

4.     Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services.

5.     Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law.

6.     Prior to October 22, 2013, Total Cable, upon information and belief, operated as a subsidiary of Lalon TV, Inc., an active New York business corporation with principal place of business at 15 Westmoylan Lane in Coram NY. Both Total Cable and Lalon TV, Inc. list their Department of State process to be served upon Ahmodul Barobhuiya ("Barobhuiya"), who testified that he was the CEO of Total Cable.

7.     Confirming the extremely close relationship between Total Cable and Lalon TV, Inc., in a bankruptcy proceeding in the Southern District of New York (In Re: World Cable, Inc Case No: 14-10379 (MG)) Lalon TV, Inc. entered an appearance by counsel as Lalon TV, Inc. a/k/a Total TV, a/k/a Total Cable.

8.     Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service

otherwise known as internet access.

9.     Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television (i.e. IPTV).

10.     In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered.  So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV.

11.     In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights").

12.     Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted.  The encrypted video services are then transmitted via the internet to its customers.

13.     Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen.  The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same.

14.     The set top box is part of the monthly service charge of a customer's purchase of IPTV service.  If a customer wants a second set top box a service charge is added to the

customer's bill each month.

15.     The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted.

16.     Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service.

17.     Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada.

18.     A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television.

19.     A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd.   Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited.

20.     More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not

been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the exclusive right to broadcast Independent TV in United States and Canada via IPTV. See agreement between Plaintiff and Independent TV (attached hereto as Exhibit A).

21.     With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the exclusive right to broadcast Jamuna TV in United States and Canada via IPTV. See agreement between Plaintiff and Jamuna TV (attached hereto as Exhibit B).

22.     With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Channel 16 provides Plaintiff with the exclusive right to broadcast Channel 16 in United States and Canada via IPTV. See agreement between Plaintiff and Channel 16 (attached hereto as Exhibit C).

23.     With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014. The agreement is for nine years. This agreement is still in effect. The agreement with My TV provides Plaintiff with the exclusive right to broadcast My TV in United States and Canada via IPTV. See agreement between Plaintiff and My TV (attached hereto as Exhibit D).

24.     With regard to Asian TV. Plaintiff and Asian TV entered into an agreement on November 25, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Asian TV provides Plaintiff with the exclusive right to broadcast Asian TV in

United States and Canada via IPTV. See agreement between Plaintiff and Asian TV (attached hereto as Exhibit E).

25.     With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016. The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Bangla Vision provides Plaintiff with the exclusive right to broadcast Bangla Vision in United States and Canada via IPTV. See agreement between Plaintiff and Bangla Vision (attached hereto as Exhibit F).

26.     With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016. The agreement is for five years. This agreement is still in effect. The agreement with Ekhusey TV provides Plaintiff with the exclusive right to broadcast Ekhusey TV in United States and Canada via IPTV. See agreement between Plaintiff and Ekhusey TV (attached hereto as Exhibit G).

27.     With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014. The agreement is for five years. This agreement is still in effect. The agreement with Somoy TV provides Plaintiff with the exclusive right to broadcast Somoy TV in United States and Canada via IPTV. See agreement between Plaintiff and Somoy TV (attached hereto as Exhibit H).

<div align="center">

**Defendants' Improper Conduct**

</div>

28.     Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system

through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks. Defendants' signal delivery system is almost identical to that of Star Cable.

29.     Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants.

30.     Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming.

31.     In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Said actions of Defendants are an unauthorized divulgence of satellite signals.

32.     Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable.

## Total Cable's Motion Should Not be Granted

33.     The main argument raised by Total Cable in its motion for summary judgment is that the claims against it should be dismissed because it was dissolved in May 2016, and it is no longer operating.

34.     Total Cable's motion should be denied given that there is a clear issue of fact as to whether Total Cable is still operating, albeit now under the name Total Cable BD.

35.     Specifically, attached hereto as Exhibit I are historical website documents

pertaining to Total Cable from 2012 to 2016. These documents reflect Total Cable's phone number of (212) 444-8138.

36.     Attached hereto as Exhibit J is a printout from Total Cable's website as it existed on May 7, 2016.

37.     Attached hereto as Exhibit K is a printout from the same exact website on August 17, 2016. Notably, the website now has the logo changed to Total Cable BD and the email address changed to info@totalcablebd.com. Most significantly, the phone number of (212) 444-8138 and rest of information is identical on both websites.

38.     Before this action was filed, Total Cable and Total Cable BD had its website "who-is" information that shows the owners as publicly available until sometime in 2016. Both websites "who-is" information shows the same individual Habib Rahman as the registrant with address of 15 Westmoylan Lane, Coram New York.

39.     Exhibit L hereto, shows the "who-is" information for Total Cable as of August 17, 2016. The information shows the address of 15 Westmoylan Lane, Coram New York. After this suit was commenced, Total Cable changed its "who-is" information to anonymous, as depicted in Exhibit L.

40.     Just like Total Cable, the "who-is" information for Total Cable BD as of August 17, 2016, shows the address of 15 Westmoylan Lane, Coram New York. Just like Total Cable, after the commencement of this suit, Total Cable BD made its "who-is" information anonymous. See Exhibit M.

41.     Notably, as reflected in information printed from Secretary of State of New York website on April 11, 2019, Total Cable had the same exact address as the address for Total Cable BD, which is 15 Westmoylan Lane, Coram New York. See Exhibit N.

42.     While Total Cable claims that after it filed for bankruptcy in 2016, that it had no assets or revenues and dissolved, Exhibit O, shows a transaction from my debit card dated October 2, 2017, for $90.00 This is for a subscription for services that have been active since approximately 2014.   This charge was nearly eleven months after Total Cable filed for bankruptcy and even though Total Cable is claiming that the company was not conducting any business while doing so.  Notably, the charge depicts the same Total Cable phone number of (212) 444-8138.

43.     Interestingly, in a suit commenced by Asia TV USA Ltd. against Total Cable and other defendants, the defendants recently settled the action for $450,000.  Barobhuiya executed the agreement on behalf of Total Cable in August 2018.  See Exhibit P.

44.     In sum, this Court should reject Total Cable's claims that it is not operating and that it has no affiliation with Total Cable BD and deny its motion for summary judgment.

## 1StopMedia's Motion Should Not be Granted

45.     In its motion, 1StopMedia does not dispute that it is also broadcasting the Exclusive Services.  According to 1StopMedia, however, its conduct is not improper because Plaintiff supposedly does not have the exclusive rights to the eight programming services that comprise the Exclusive Services and that 1StopMedia supposedly has rights to broadcast the Exclusive Services.

46.     As set forth below, for two main reasons, 1StopMedia's position does not lead to the conclusion that its motion should be granted.

47.     First, almost all of the documents relied upon by 1StopMedia are unauthenticated and uncertified.

48.     Second, even if the Court considers the documents, they do not support the relief

sought by 1StopMedia.

49.     Specifically, in the March 25, 2019 Affirmation of Satish K. Bhatia in support of 1StopMedia's motion ("Bhatia Aff."), Bhatia claims that 1StopMedia is not broadcasting Somoy TV, just because it so alleged in its answer to the Complaint. See Bhatia Aff. ¶ 4. I submit that this is insufficient to find as a matter of law that 1StopMedia is not broadcasting Somoy TV.

50.     Bhatia next states in his affirmation that Plaintiff has no rights to broadcast Boishaki TV. See Bhatia Aff. ¶ 5. Given that Boishaki TV is not part of the claims in this action, I fail to see the relevance of 1StopMedia's reference to Boishaki TV.

51.     The only issue raised in the Bhatia Aff. that concerns Independent TV is the claim that Plaintiff's agreement with Independent TV expired because it was for a period of three years and Plaintiff never demonstrated that the agreement was renewed. See Bhatia Aff. ¶ 6.

52.     As noted above, however, the Independent TV agreement specifically states that the agreement automatically renews after the three years. Given, as explained above, that the agreement has never been terminated, Star Cable still retains the exclusive rights to broadcast Independent TV in the United States and Canada over IPTV.

53.     Moreover, since 1StopMedia does not deny broadcasting Independent TV --- which would be in clear contravention of Star Cable's exclusive rights -- it is evident that 1StopMedia is not entitled to summary judgment as to Star Cable's claims against it.

54.     With regard to Jamuna TV, Bhatia argues that 1StopMedia is entitled to summary judgment because: 1) there is no showing that Star Cable's agreement with Jamuna TV was ever renewed; and 2) Jamuna TV has certified that 1StopMedia has rights to broadcast Jamuna TV in North America and that no other entity has exclusive rights to broadcast Jamuna TV anywhere in the world. See Bhatia Aff. ¶¶ 7, 8; Exhibit G to Bhatia Aff.

55.     With regard to the first claim, as explained above, the agreement between Star Cable and Jamuna TV automatically renews. Thus, the mere fact that there is no additional documentation showing that the agreement was extended after the first time (which expired on December 1, 2017), does not lead to the conclusion that the agreement is no longer in effect.

56.     With regard to the "certification," notably this document is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that no other organization has the exclusive rights with Jamuna TV to broadcast Jamuna TV anywhere in the world is undeniably false given that it is belied by the exclusive agreement between Star Cable and Jamuna TV. See Exhibit B.

57.     Bhatia next asserts that Star Cable's claim against 1StopMedia pertaining to Channel 16 is deficient because Channel 16 is supposedly no longer broadcasting and because Channel 16 has an agreement with Lalon TV. See Bhatia Aff. 7.

58.     Even assuming that Channel 16 has an agreement with Lalon TV, 1StopMedia does not put forth anything to demonstrate that this would insulate it from liability in this matter. Moreover, the only support for the statement that Channel 16 is no longer broadcasting is the unsupported assertion made by the president of 1StopMedia, Saiful Siddique ("Siddique"). Star Cable submits that Siddique's unsupported claim is not sufficient for this Court to find as a matter of law that Channel 16 is no longer broadcasting.

59.     Similar to its position with Jamuna TV, with regard to My TV, 1StopMedia argues that based upon a "certification" Star Cable does not have the right to broadcast My TV. See Bhatia Aff. ¶ 10; Exhibit I. As with Jamuna TV, the alleged certification is nothing more than a letter "To Whom it May Concern" that is not authenticated, not certified and not notarized. And, the letter is directly contradicted by the exclusive agreement between Star Cable

and My TV. See Exhibit D.

60.     With regard to Ekhusey TV, Bhatia claims that Ekhusey TV terminated its agreement with Star Cable by sending a letter to Star Cable on August 23, 2016. See Bhatia Aff. ¶11; Exhibit J.

61.     1StopMedia's reliance upon this letter fails. The agreement between Star Cable and Ekhusey TV only permits the termination of the agreement prior to the expiration of the five-year term, which does not expire until June 2021, if there is a material breach of the agreement and the breach is not cured within sixty days. See agreement ¶ 10 (Exhibit G). Even assuming that the letter attached as Exhibit J to the Bhatia Aff. is authentic, the letter does not come close to complying with the language in the agreement for a proper termination of the agreement. In fact, the letter does not even mention paragraph 10 of the agreement, which, if the letter was authentic, one would expect to see in the letter.

62.     With regard to Bangla Vision, 1StopMedia claims that it cannot be liable for its broadcasting of this service because it entered into an agreement with Bangla Vision on September 23, 2014. See Bhatia Aff. ¶ 14; Exhibit M.

63.     Most notably, however, the referenced agreement is for mobile apps, not for broadcasting over IPTV. Thus, this agreement is irrelevant.

64.     Finally, 1StopMedia claims that it entered into an agreement with Asia TV on November 20, 2014, for exclusive rights and then entered into another agreement with Asia TV on June 6, 2016, for non-exclusive rights to broadcast Asia TV. See Bhatia Aff. ¶¶ 12-13; Exhibits K and L.

65.     Highlighting that there are issues of fact as to the authenticity of these documents, 1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from

Asia TV in November 20, 2014 it would then enter into an agreement less than two years later for non-exclusive rights.

66.     1StopMedia's motion should be denied

## Conclusion

67.     Accordingly, this Court should deny Defendants' motions for summary judgment.

SHAHID BOB RASUL

Sworn to before me this
1ª day of April 2019

NOTARY PUBLIC

GIANCARLO ASSANTE
Notary Public   State of New York
NO. 01A5614B808
Qualified in Suffolk County
My Commission Expires Jun 16, 2020

# EXHIBIT A

NETWORK AFFILIATION AGREEMENT

Between

Independant Television ltd.
149-150 Tejgaon I/A
Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Independent Television Ltd. (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.30 per Subscriber, per Month.
Minimum payment first year: $18,000 to be paid quarterly in advance. First payment due immediately after singing this contract in amount of $4,500

| Guaranteed Payment | vs. | Projection payments* | |
|---|---|---|---|
| 1st year: $18,000 per year. | | 50,000 subscribers | $180,000 |
| 2nd year: $36,000 | | 100,000 subs | $360,000 |
| 3rd year: $54,000 | | 150,000 subs | $540,000 |

*As the subs increase payments will increase accordingly. Minimum payment is guaranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guaranteed will be adjusted each quarter accordingly. Confidential access to accounting system(live data) will be provided on quarterly basis or anytime on written demand from Independent Television ltd.

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 26, 2014, (the "Effective Date")

Conditions as follows:

1.      Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV. (Exception of Radiant IPTV)

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.30 Independent TV will be paid 50% of the monthly fee

per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Independent TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Independent TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      Term of Agreement. The term shall be for a period of Three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date"). ·

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and half percent (1.5%) interest per day (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.      Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be · distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.      Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder in writing, agrees to assume all assignor's obligations hereunder.

10.      Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g. fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days. NON-PAYMENT Independent Television ltd. Has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guarantee payment due or for extra payments due based on actual # of subs.

11.      Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.      Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement

13.      Covenants. Affiliate hereby covenants and agrees that it will:  (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14. Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral text signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15. Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16. Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17. Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18. Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3939 Bell Blvd Suite 238
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.     Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.     "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.     Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

55

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Independent Television Ltd.

Signature:

Printed Name: M Shamsar Rahman

Title: Editor In cheif & CEO

Date: 26/11/14

M Shamsur Rahman
Chief Executive Officer

BEXIMCO media ltd.

Affiliate: StarCable NA Inc.

Signature

Printed Name: SATIA SOMA L

Title: Director

Date: 11/26/14

# EXHIBIT B



**Jamuna Television Limited**
Jamuna Television Bhaven | Jamuna Future Park Complex
Ka-244, Progoti Sharoni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

NETWORK AFFILIATION AGREEMENT

Between

Jamuna Television
Jamuna Future Park Complex KA-244
Progoti Sharoni, Baridhara
Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Jamuna Television (the "Service").

Service Description: 24 hour Bangla Channel News and Programmes

License Fees: USD $0.50 per Subscriber per Month.

Minimum payment first year: $18,000 to be paid quarterly in advance. First payment due immediately after singing this contract in amount of $4,500

Guranteed Payment
1st year: $18,000 per year.         vs    Projection payments*
2nd year: $36,000                    50,000 subscribers    $ 300,000
3rd year: $54,000                   100,000  subs         $ 600,000
                                    150,000  subs         $ 900,000

*As the subs increase payments will increase accordingly. Minimum payment is guranteed 10% of projections. Number of subscribers report will be submitted on quarterly basis, and payments above guranteed will be adjusted each quarter accordingly. Confidential access to accounting system will be provided on quarterly basis or anytime on written demand from Jamuna Television.

NON- PAYMENT: Jamuna Television has right to terminate this contract by giving 60 days written notice to cure for non-payment of minimum guaranteed payment due as above schedule or for extra payments due based on actual number of subs.

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF December 1, 2014 , (the "Effective Date")

Conditions as follows:

1.  Affiliate shall have exclusive rights for WiMax Wireless Internet (IPTV Internet Protocol TV) and Mobile TV.



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.5 Jamuna tv will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Jamuna TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Jamuna TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      Term of Agreement. The term shall be for a period of three (3) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month [ot; if lower, the maximum rate allowable by law] on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, barn, hotels and motels (collectively referred to herein as "MDUs"). License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.      Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming. Over the Air or on Fiber. Notwithstanding anything to the contrary herein,



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Boridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416076
email: info@jamunatv.net
www.jamunetv.net

Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.    Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.    Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.    Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.    Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.    Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure each material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g, fire, flood, government decree) causing



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11.     Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA, that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.     Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities,") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, in like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:  (i) continue to carry on its business in substantially



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416040 | Fax +880 2 8416070
email:info@jamunatv.net
www.jamunatv.net

the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any Systems, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio are licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of these courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be asserted against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.



**Jamuna Television Limited**
Jamuna Television Bhavan | Jumuna Future Park Complex
Ka-244, Progoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 84160601 Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3639 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or desire in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.     Construction. The words "herein," "hereof," "hereunder" and other similar terms refer to this Agreement as a whole



**Jamuna Television Limited**
Jamuna Television Bhavan | Jamuna Future Park Complex
Ka-244, Pragoti Shoroni | Baridhara | Dhaka-1229 | Bangladesh
Phone +880 2 8416060 | Fax +880 2 8416070
email: info@jamunatv.net
www.jamunatv.net

and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Jamuna Television

Signature:

Printed Name:

Title:        Managing Director

Date:        01/12/2014

Affiliate:    StarCable NA Inc.

Signature

Printed Name:    SAJ in Sohz

Title:        Director

Date:        12/11/14

Jamuna Television | The Bangladesh Broadcast Network (BBN)

# EXHIBIT C

A Bangla Satellite TV Channel

# CHANNEL-16
## Insight Telecast

Ref.

Date: 11/25/2014

**NETWORK AFFILIATION AGREEMENT**

Between

Channel 16
7-9 Kawranbazar
Dhaka-1215
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 253
Bayside NY 11561

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Channel 16 (the "Service").

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum Year 1: $6,000 to be paid quarterly in advance $1,500 due immediately after signing of this contract.
2nd Year: $12,000
3rd Year: $36,000
4th Year: $36,000
5th Year: $48,000
6th Year: $48,000
7th Year: $60,000
8th Year: $60,000

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 25——2014, (the "Effective Date")

Conditions as follows:

1.    Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for Wifdss Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributor, above $0.25 Channel 16 will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Channel 16 agrees that any requests that comes to any ending carriage on exclusive platforms, (Wifdss, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to those systems requiring access to programming. Channel 16 will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf as a

A Bangla Satellite TV Channel

# CHANNEL-16
## Insight Telecast

**Ref.**                                                                 **Date:**

"person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statute. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      **Term of Agreement.** The term shall be for a period of eight (8) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      **License Fees and Payment Terms.** Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later than 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"). License Fees to such distribution shall be per subscriber.

Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      **Carriage.** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on a set fixed time delay and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.      **Delivery of Signal.** During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite mode of programming. Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      **Ownership.** All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's name and/or Marks, in routine promotional materials, such as program guides, program listings and bill stuffers, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

A Bangla Satellite TV Channel

# CHANNEL-16
## Insight Telecast

Ref.

Date:

7.   Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.   Confidentiality. Other than as required by applicable Law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or programs provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.   Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.   Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) a 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11.   Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision; that Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.   Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses

A Bangla Satellite TV Channel

# CHANNEL-16

### Insight Telecast

**Ref.**                                                                 **Date:**

(including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers) or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any materials (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (x) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligation shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.    Covenants. Affiliate hereby covenants and agrees that it will (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the System in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.    Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from programs providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical interval test signals (for system and equipment and) stored on hardware, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for each other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.    Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.    Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties and judgment thereon may be entered and enforced in any court of

$S\sum_{1}$

A Bangla Satellite TV Channel

# CHANNEL-16
*Insight Telecast*

Ref.                                                                                    Date:

competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either each Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC,
8439 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint ventures or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint ventures controlling the Systems on which the Service is transmitted, each disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.     Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.



A Bangla Satellite TV Channel

# CHANNEL-16

*Insight Telecast*

এবেক্সন  খবর  বাংলা  বিনোদন  ভারতান

Ref.

Date:

23.  Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.  "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.  Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Channel 16

Signature:

Printed Name:    N. I Munn A

Title:

Date:

Affiliate:    StarCable NA Inc.

Signature

Printed Name:    SAJID SOHAIL

Title:    Director

Date:    11/25/2014



A Bangla Satellite TV Channel

# CHANNEL-16

*Insight Telecast*

*If you have a dream you can think and create, fly for creations...........*

Ref.

Date:

Channel16's others agreement with others party such Jago bd and Radiant IP Tv will be continue after completion the agreement with Star Cable NA Inc.

~~Channel 16 will reserve the right to do others agreement with others party after competition the agreement with Star Cable NA Inc.~~

Star cable NA Inc will not be allowed to broadcast the program of channel 16 by changing its original program and using extra logo.

Star cable NA Inc. should provide required legal papers for immigration purpose and bear other expenditure if anyone needs to go in USA for business purpose.

Channel16 will reserve the right to cancel the agreement if payment is due by declaration of one month prior notice.

~~Both parties can cancel the agreement after declaration three months prior notice.~~

Star cable NA Inc. will have to pay payment through banking channel.

Star Cable NA Inc. will pay yearly subscription payment by two installments.

SAJIN SOHAL
11/25/2014

BTMC Bhaban, 7-9 Kawran Bazar (6th Floor), Dhaka-1215, Bangladesh. Phone: 8189800 Fax: 9142924 Mobile: 01552388468

# EXHIBIT D



কর্তৃক   ২২৬০৪৪১

# NETWORK AFFILIATION AGREEMENT

This NETWORK AFFILIATION AGREEMENT is singed and executed on this day ....................... th November, 2014 of the Christian Era.

## BETWEEN

**My TV**
V.M.International Ltd.
Represented by it's Chairman & MD
**Mr. Nasir Uddin Sathi**
Of- Mujaffar Tower(4th-5th-6th Floor)
55, Bir Uttam C.R.Datta Road
Banglamotor, Dhaka,Bangladesh.   ................................Party to the First Part(Network).

### -A N D-

**StarCable NA Inc.**
Represented by it's Diretor
SID SOHAIL, 917-348-100
Of-3839 Bell Blvd Suite 233
Bayside NY 11361.       ....................................... Party to the Second Part(Affiliate).

·     In consideration of the mutual covenants as well as consent set forth in this "NETWORK AFFILIATION AGREEMENT" ("Agreement"), the above-named parties (each sometimes referred to herein as a "PARTY" and collectively as the "Parties") hereby agreed as follows with respect to launch and carriage of the programming service identified below:

✻   **Programming Service**: My tv (the "Service").

✻   **Service Description**: 24 hour  Bangla Channel consisting of Dramas, News, music and children's Shows.

✻   **License Fees**: USD $0.25 per Subscriber, per Month.

✻   **Minimum payment first year**: $12,000 to be paid quartely in advance by wire transfer. First payment due immediately after signing of this contract in amount of $3000.

| GURANTEED PAYMENT | | VS. | PROJECTED PAYMENTS | |
|---|---|---|---|---|
| 1st year: | $12,000 per year. | | 50,000 subs | $150,000 |
| 2nd year: | $24,000 | | 75,000 subs | $225,000 |
| 3rd year: | $36,000 | | 100,000 subs. | $300,000 |
| 4th year: | $48,000 | | 125,000 subs. | $375,000 |
| 5th year: | $60,000 | | 150,000 subs. | $450,000 |
| 6th year: | $72,000 | | 175,000 subs. | $525,000 |
| 7th year: | $84,000 | | 200,000 subs. | $600,000 |
| 8th year: | $96,000 | | 225,000 subs. | $675,000 |
| 9th year: | $108,000 | | 250,000 subs. | $750,000 |





৭৬৯১৩৮

*As the subscribers will increase day by day the payments will definitely increase accordingly which was shown in the above table .

Number of subscribers report/information have to be submitted by the Party to the Second Part to the Party to the First Part quarterly through which the agreed payment will be calculated / decided as well as the same is guaranteed and adjusted in every quarter of each Calender Month accordingly.

&#42; **System Territory**: United States of America, and Canada.

## ACCEPTED AND AGREED TERMS AND CONDITIONS ARE AS FOLLOWS :

01. **Scope :** Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

    **Affiliate** may sub-distribute the Service to another service provider with the prior written approval/consent of the Party to the First Part/Network(My TV Authority) or as long as it is under the conditions set forth in this contract. For any fee that is collected from sub-distributer, above U.S $ 0.23 My tv (Party to the First Part) will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Network(Party to the First Part) agrees that any requests that comes to regarding carriage on exclusive platforms (WiMax, Wireless, IPTV or Mobile TV) will direct those requests to the Affiliate,Party to the Second Part(StarCable N.A Inc.) who will provide a direct feed to these systems requiring access to programming. My tv will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

02. **Terms of Agreement :** The term shall be for a period of Nine (9) years commencing on the date of signing this Network Affiliation Agreement including Paying the First Advance Payment . This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.



৭৬৩৮৭২২

03. **License Fees and Payment Terms** :
  **i.** Party to the Second Part (Affiliate) have to pay the license fee to the Party to the Second Part in it's Bank Account holding in the Name of V.M International Ltd., bearing S/B Account No.
• 00020210012796 of Jamuna Bank Ltd., Karwan Bazar Branch,Dhaka or any other Account or any other form duly confirmed by the Network(Party to the First Part) for the right to distribute the service (the "License Fee") pursuant to this Agreement.

  **(ii)** For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

  **(iii)** Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder.   During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.

  **(iv)** Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

04.  **Carriage :** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way.  If Affiliate chooses to ˙ Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

05. **Delivery of Signal:**  During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

  WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.




**Ownership :** All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

06. **Audits :** During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit as well as inquary all the records directly related to confirming the accuracy or numbers of the subscribers of License Fee payments made pursuant to Section 3 above.

07. **Confidentiality :** Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

08. **Assignment :** This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

09. **Termination:** Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion: or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

10. **Representations and Warranties:** Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming 

the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

11. **Indemnification:** Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

12. **Covenants:** Ailiate hereby covenants and agrees that it will:
    (i)   continue to carry on its business in substantially the same manner as it has prior to the Effective Date;
    (ii)  keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and
    (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

13. **Vertical Blanking Interval:** Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

14. **Governing Law:** This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

15. **Arbitration:** All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

16. **Waiver:** Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

17. **Notices :** Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:
StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361
Notice shall be deemed given upon proof/confirmation of receipt.

18. **Entire Agreement:** This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.



19. **Relationship:** Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

20. **Counterparts:** This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

21. **Severability:** The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

22. **Construction:** The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

23. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

24. **Marketing Efforts:** The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

My tv(V.M International Ltd.)
Represented by it's Chairman and Managing Director

Signature:_____  Nasir uddin

Printed Name:        (Mr. Nasiruddin Sathi)

Title:   Chairman and Managing Director
Date:   30.11.2014

**Party to the Second Part (Affiliate):**
StarCable NA Inc., Represented by it's Director SID SOHAIL

Signature :_____

Printed Name:        (SID SOHAIL)

Title   :**Director, StarCable NA Inc.**
Date: 30.11.2014.

**Witnesses :**

01. Signature:..............................
    Name: Masud Nazim
    Chief Marketing Executive
    Atlas Umbrella Factory (BD) Ltd.

02. Signature:..............................
    Name: Zeker Uddin Samrat
    Director (News & Broadcast)
    my tv.

03. Signature:..............................
    Name: Major (Retd.) Syed Mokhlesur Rahman Palok
    General Manager
    my tv.

# EXHIBIT E



৳১০০     ৳১০০

কম   ৭৫৭০২৮০

## NETWORK AFFILIATION AGREEMENT

Between (

Asian TV
House# 60, Block# A Road# 1, Niketon
Gulshan-1 Dhaka
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

Programming Service: Asian TV (the "Service")

Service Description: 24 hour Bangla Channel consisting of Dramas, News, music and children's Shows.

License Fees: USD $0.25 per Subscriber, per Month.
Minimum Per/Year: $25,000 to be paid in quarterly basis in amount of $6,250.00 by wire transfer.
First payment of $6,250 due immediately after signing of contract:
2nd Year: $36,000
3rd Year: $48,000
4th Year: $60,000
5th Year: $72,000
6th Year: $84,000
7th Year: $96,000
8th Year: $108,000

System Territory: United States of America, and Canada.

ACCEPTED AND AGREED TO EFFECTIVE AS OF November 25 ------2014 , (the "Effective Date")

Conditions as follows:

1.  Scope. Affiliate shall have the non-exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.



in this this contract. For any fee that is collected from sub-distributer, above $0.25 Asian TV will be paid 50% of the monthly fee per subscriber. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Asian TV agrees that any requests that comes to regarding carriage on exclusive platforms, (WIMax, Wireless, IPTV or Mobile TV) will direct those requests to StarCable NA Inc. Star Cable shall provide a direct feed to these systems requiring access to programming. Asian TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the independent legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

2.      Term of Agreement. The term shall be for a period of eight (8) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term. Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder. During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"), License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion above 50%

ক্রম ৭৫৯০২৮২

5. Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming. Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6. Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7. Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non-contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8. Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9. Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

11.     Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.     Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:     (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the

15. Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16. Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17. Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18. Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19. Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20. Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21. Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application

24.   "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.   Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Asian TV

Signature:

Printed Name:

Title:

Date:


Affiliate:          StarCable NA Inc.

Signature

Printed Name:          $SAJID$ $SoHAIL$

Title:          Director

Date:          11/24/14

# EXHIBIT F

NETWORK AFFILIATION AGREEMENT

Between

Shamol Bangla Media Limited, a Bangladeshi company located at Noor Tower, 1/F
Free School Street, 110 Bir Uttam, C R Dutta Road, Dhaka-1205 (Bangla Vision
Television)
Dhaka  Bangladesh


And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation
Agreement ("Agreement"), the above-named parties (each sometimes referred to
herein as a "Party" and collectively as the "Parties") hereby agree as follows with
respect to launch and carriage of the programming service identified below:

Programming Service: Bangla VisionTV (the "Service").

Service Description: 24 hour  Bangla Channel consisting of Dramas, News, music and
children's Shows.

License Fees: USD $0.50 per Subscriber, per Month. All Payments will be paid
quarterly in Advance. First payment will be $15,000 due immediately after signing
this contract.


Guaranteed Payment :
1 to 6 months           $5,000/month
7 to 12 months          $7,500/month
13 to 18  months        $10,000/month
19 to 24 months         $12,5000/month

Vs.
Projection Payments:
Year 1: 50,000      Subs.        $300,000
Year 2: 75,000      Subs.        $450,000


Number of subscribers report will be submitted on quarterly basis, and payments
above guaranteed will be adjusted each quarter accodingly.  Confidential access to
accounting system will be provided on quarterly basis or anytime on written
demand from Bangla VisionTelevision ltd.

System Territory: United States of America, and Canada and Europe.   55  |H

|H

SS

ACCEPTED AND AGREED TO EFFECTIVE AS OF June 1, 2016 (the "Effective Date")

Conditions as follows:

1.    Scope. Affiliate shall have the exclusive right to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV.

Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the Bangla Vision legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.50 Bangla VisionTV will be paid 50% of the monthly fee per subscriber

2.    Term of Agreement. The term shall be for a period of two  (2) years commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.    License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owning to Network hereunder.  During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes,

55

restaurants, bars, hotels and motels (collectively referred to herein as "MDUs"),
License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the
first page hereof.

4.      Carriage. Except as otherwise specifically permitted herein, Affiliate shall
carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service
without delay and shall not edit, alter or modify it, or any of its programming
elements, in any way. If Affiliate chooses to Time Delay programming, then such
programming shall be carried on such fixed time delay, and there shall be an
alternate channel that would Show the Service without time delay. Affiliate's
carriage of the Service shall be consistent with industry standards for content
distribution. If Affiliate chooses to alter or edit any of programming for
advertisement insertion then 50% of all revenues received from advertising shall be
due to network. All advertisement in above territory will be run by Star Cable,
Bangla Vision will give 2 minutes ad per hour between 1 am to 9 am Dhaka
Bangladesh time  to promote Star Cable services.

5.  .   Delivery of Signal. During the Term, Network shall provide, to Affiliate, the
Service in its entirety. The Service shall be delivered by Network to each System, in a
digitally compressed mode, by transmitting a signal of the Service via a international
satellite used for transmission of programming, Over the Air or on Fiber.
Notwithstanding anything to the contrary herein, Affiliate, at its own cost and
expense, shall be completely responsible for encoding or formatting the Service so it
can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER
EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.      Ownership. All licenses, rights, and interests in the entire content of the
Service and Network's service marks, trademarks and copyrights (collectively, the
"Marks") shall remain fully vested in Network throughout the world. Affiliate only
shall use Marks in the versions and modes expressly authorized by Network.
Network reserves the right to review and approve all materials generated by
Affiliate for marketing purposes which incorporate any Marks. Uses of Network's
names and/or Marks, in routine promotional materials, such as program guides,
program listings and bill stutters, shall be deemed approved unless Network
specifically notifies Affiliate to the contrary. Promotional material furnished by
Network to Affiliate shall be deemed to be automatically approved for use in the
format provided by Network, but Network's prior written consent is required to the
extent Affiliate modifies or otherwise changes such materials. Nothing herein shall
be construed as an assignment or grant by Network to Affiliate of any title in or to
the Marks.  Star cable will have the full authority to enforce or bring lawsuite for
any piracy or unauthorized carriage, of this channel.

7.      Audits. During the Term, renewal Term, if any, and for 36 months thereafter,
Network (on a non- contingent fee basis) shall have the right to audit all records

55                        

directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.     Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof; provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.

11.     Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and

SS        IH

do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms. Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind,

5 5

1H

including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:    (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof; however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three

S S                        14

(3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.    Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.   . Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC,
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.    Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.    Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed

SS        1H

to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder. Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21. Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23. Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24. "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25. Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

55   1H

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Shamol Bangla Media Limited
Bangla VisionTV

Signature:

Printed Name:

Title:  I Hossain , Deputy-Managing Director

Date:


Affiliate:  StarCable NA Inc.

Signature

Printed Name:  S I D S ollAL

Title:  Director

Date:

Letter of Authorization

This Letter is between Star Cable NA Inc. 3839 Bell Blvd Suite 233 Bayside NY 11361 and Shamol Bangla Media Limited, (Bangla Vision Television) a Bangladeshi company at Noo Tower, 1/F Free School Street, 110, Bir Uttam CR dutta Raod, Dhaka-1205(BanglaVision).

whereas Shamol Bangla Media Limited is provider of certain Bangla programming of which includes BanglaVision Television.
whereas Shamol Bangla Media Limited wants to protect its Television programming from piracy and illegal use.

whereas Shamol Bangla Media has certain contract with Bangla America Entertainment LLC, which Bangla America Entertainment has continued to violate.

Shamol Bangla Media hereby authorizes Star Cable NA Inc. file a lawsuit against Bangla America Entertainment, LLC Bangla Vision to recover all its monies due and any other legal actions against Bangla America Entertainment that maybe required including injunctive relief. Star Cable will pay for all legal fees and it will be paid back from the fees recovered from Bangla America Entertainment.

Shamol Bangla Media hereby additionally authorizes Star Cable NA Inc. to prosecute against any individuals or companies engaged in piracy or illegal use of Shamol Bangla Media content including Bangla Vision channel, and is authorized to file any lawsuit or injunctive.

Bangla Vision will be responsible to send 30 days notice of cancellation to Bangla America Entertainment.

Star Cable will assist Bangla Vision in this regard, or can send it on Shamol Bangla Media's behalf.

The main Contract will become effective soon after 30 days cure period ends and Bangla America Entertainment contact is terminated.

Shamol Bangla Media Limited. (Bangla Vision TV)

By

Ishreque Hossain

Deputy - Managing Director

Star Cable NA Inc.

By

SID Sotta L
VP.

# EXHIBIT G

NETWORK AFFILIATION AGREEMENT

Between

Ekushey  Television Limited USA LLC
400 S Willow Ave
Galloway, NJ 08205
The Company wholly owned subsidiary of Ekushey Television Limited 149-150
Tejgaon I/A Dhaka  Bangladesh and is authorized by Ekushey Television Limited
Bangladesh to sign this contract.

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation
Agreement ("Agreement"), the above-named parties (each sometimes referred to
herein as a "Party" and collectively as the "Parties") hereby agree as follows with
respect to launch and carriage of the programming service identified below:

Programming Service: Ekushey TV (the "Service").

Service Description: 24 hour  Bangla Channel consisting of Dramas, News, music and
children's Shows.

License Fees:  USD $0.25 per Subscriber, per Month.
Minimum payment first year: $15,000 to be paid in 3 payments of  $5,000 each.

| Guaranteed Payment | vs. | Projection payments* | |
|---|---|---|---|
| 1st year: $15,000 per year. | | 50,000 subscribers | $150,000 |
| 2nd year: $30,000 | | 75,000    subs | $225,000 |
| 3rd year: $45,000 | | 100,000 subs | $300,000 |
| 3rd year: $60,,000 | | 125,000 subs | $375,000 |
| 4th year: $72,000 | | 150,000  subs | $450,000 |
| 5th year: $84,000 | | 175,000  subs | $525,000 |

Number of subscribers report will be submitted on quarterly basis, and payments
above guaranteed will be adjusted each quarter accodingly.  Confidential access to
accounting system will be provided on quarterly basis or anytime on written
demand from Ekushey Television ltd.

System Territory: United States of America,  Canada, and Europe.

ACCEPTED AND AGREED TO EFFECTIVE AS OF  June 1,  2016 (the "Effective Date")

SS

Conditions as follows:

1.      Scope. Affiliate shall have the Exclusive rights to distribute the Service via coaxil cable television systems, Satellite DTH (direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV

Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber recording of the Service off VCRs or DVRs, shall not be deemed a violation of this Agreement. Affiliate will use commercially reasonable efforts to minimize any unauthorized receipt or recording of the Service in connection with any System. Affiliate also shall have standing and the Ekushey legal right to prosecute on its own behalf, as a "person aggrieved" or one with similar standing, that has suffered an "injury in fact" the claims of which arising out of unauthorized reception or use would fall within the "zone of interests" to be protected by any applicable statutes. Affiliate may also authorize another entity or individual to combat any illegal carriage or piracy of the Service.

Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this this contract. For any fee that is collected from sub-distributer, above $0.50 Ekushey TV will be paid 50% of the monthly fee per subscriber

2.      Term of Agreement. The term shall be for a period of ~~five (5)~~ years 1 year SS commencing on the Effective Date (the "Term"). This Agreement automatically shall renew for additional three-year Terms, unless either Party provides at least 90 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 120 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3.      · License Fees and Payment Terms. Affiliate shall pay Network a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement. Ekushey Television Limited USA lLC will send termination letter to total cable usa and Radiant IPTV.
For purpose of determining the monthly amount of License Fees due and owing to Network, the Service Subscriber Number for each month shall be equal to the total number of service Subscribers on the first and last day of the month for which Payment is being made, divided by two (2). Payment shall be rendered no later 30 days after the end of each calendar month during the term ("Due Date").

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent (1.1/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, calculated from the Due Date until payment is received by Network. There shall be no tax withholdings from any sums owing to Network hereunder.  During the Term, Affiliate and each System shall have the right to exhibit and distribute the Service to multiple dwelling units-and commercial establishments, including, without limitation, apartment complexes, condominiums, private homes, cooperatives, hospitals, nursing homes, restaurants, bars, hotels and motels  (collectively referred to herein as "MDUs"),

SS

License Fees to such distribution shall be per subscriber.
Payment of the License Fee shall be rendered to Network at the address listed on the first page hereof.

4.    Carriage. Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would Show the Service without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. If Affiliate chooses to alter or edit any of programming for advertisement insertion then 50% of all revenues received from advertising shall be due to network.

5.    Delivery of Signal. During the Term, Network shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Network to each System, in a digitally compressed mode, by transmitting a signal of the Service via a international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6.    Ownership. All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7.    Audits. During the Term, renewal Term, if any, and for 36 months thereafter, Network (on a non- contingent fee basis) shall have the right to audit all records directly related to confirming the accuracy of License Fee payments made pursuant to Section 3 above.

8.      Confidentiality. Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

9.      Assignment. This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that any assignee hereunder, in writing, agrees to assume all assignor's obligations hereunder.

10.      Termination. Except as otherwise expressly provided herein, the adversely affected Party may terminate this Agreement if: (i) the other Party is in material breach of this Agreement and does not fully cure such material breach within 60 days after receiving notice thereof, provided, however, if such breach is not reasonably capable of being cured within that time, then the Party shall not be in default if it commences to cure the default within the time and diligently pursues such cure to completion; or (ii) on 60 days' written notice in the event of any force majeure (e.g., fire, flood, government decree) causing non-operation of facilities or non-furnishing of the Service hereunder which continues for a continuous period of 90 days.
NON-PAYMENT. Ekushey Television ltd. Has right to terminate this contract by giving 60 days writtten notice to cure for non-payment of minimum gurantee payment due or for extra paymnets due based on actual # of subs.

11.      Representations and Warranties. Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or

SS Fa

judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms. Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of New York State, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

12.    Indemnification. Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct

damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

13.     Covenants. Affiliate hereby covenants and agrees that it will:   (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

14.     Vertical Blanking Interval. Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal distribution capacity contained within the bandwidth of the Service signal prior to receipt by Affiliate. Network shall notify Affiliate in writing of any and all information and data it places in the VBI and other signal distribution capacity of the Service signal. If Network uses one (1) line of bandwidth of the signal for any purpose related to the programming, including, without limitation (i) closed-captioning for the hearing impaired, (ii) a Second Audio Program (SAP), (iii) identification and rating of video programming, (iv) web television icons or other triggers, and/or (v) vertical integral test signals (for system and equipment adjustment on headends, as needed), then Affiliate shall transmit all such programming data from a System to Service Subscribers. In the event Network desires to use any portion of the bandwidth for any other purpose, Network and Affiliate agree to negotiate in good faith for such other use, including the terms and conditions thereof, however, in no event is Affiliate required to carry any such additional programming or material.

15.     Governing Law. This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

16.     Arbitration. All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one (1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third



arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

17.     Waiver. Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

18.     Notices. Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

StarCable LLC.
3839 Bell Blvd Suite 233
Bayside NY 11361

Notice shall be deemed given upon proof/confirmation of receipt.

19.     Entire Agreement. This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

20.     Relationship. Neither Party shall be or hold itself out as the agent of the other Party under this Agreement. Nothing contained herein shall be deemed to create, and the Parties do not intend to create, any relationship of partners or joint venturers or agents as between Affiliate and Network, and neither Party is authorized to or shall act toward third parties or the public in any manner which would indicate any such relationship. Likewise, no supplier of advertising or programming or anything else included in the Service by Network shall be deemed to have any privity of contract or direct contractual or other relationship with Affiliate by virtue of this Agreement or Affiliate's carriage of the Service hereunder.

Network disclaims any present or future right, interest or estate in or to the transmission facilities of Affiliate, any affiliate of Affiliate, and the parents, subsidiaries, partnerships or joint venturers controlling the Systems on which the Service is transmitted, such disclaimer being to acknowledge that neither Affiliate nor the transmission facilities of the Systems (nor the owners thereof) are common carriers.

21.    Counterparts. This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

22. Severability. The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

23.    Construction. The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

24.    "Standard Terms" shall mean the Standard Terms and Conditions attached hereto as Exhibit A and deemed a part hereof, all of which terms are binding on the parties hereto and incorporated herein. In the case of any conflict between the terms of this agreement and the Standard Terms, the terms of this Agreement shall govern.

25.    Marketing Efforts. The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Ekushey TV

Signature:

Printed Name:

Title:

Date:

_FAKROOL ALAM_

_06-09-16_

Affiliate:

StarCable NA Inc.

Signature

Printed Name:

_SAJIA. SOHEL_

Title:          Director

Date:

_6/9/16_

# EXHIBIT H



কখ  ০৭০১৮০৭

# NETWORK AFFILIATION AGREEMENT

Between
Network: Somoy Media Limited (Somoy Television)
Nasir Trade Center
89, Bir Uttam C. R. Dutta Road, Dhaka-1205
Bangladesh

And:
Affiliate: StarCable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

In consideration of the mutual covenants set forth in this Network Affiliation Agreement ("Agreement"), the above-named parties (each sometimes referred to herein as a "Party" and collectively as the "Parties") hereby agree as follows with respect to launch and carriage of the programming service identified below:

**Programming Service:** Somoy Television

Service Description: 24 hour Bangla Language Channel consisting of News and Current Affairs.

Licence Fee: 1ˢᵗ year US$ 15000(fifteen thousand), 2ⁿᵈ year US$ 30000, (thirty thousand),, 3ʳᵈ year US$ 40000, (forty thousand), 4ᵗʰ year US$ 50000, (fifty thousand), 5ᵗʰ year US$ 60000. (sixty thousand), irrespective of number of customers

System Territory: Exclusively in the United States and Canada and non-exclusively in other countries.

ACCEPTED AND AGREED TO EFFECTIVE AS OF 1ˢᵗ July, 2014 (the "Effective Date")

Conditions as follows:

1. Scope. Affiliate shall have the exclusive right only in the U.S. and Canada to distribute the Service via

the coax cable television systems, Satellite DTH(direct to home) or Over the Air. Affiliate shall have exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile. Affiliate may sub-distribute the Service to another service provider as long as it is under the conditions set forth in this contract. Affiliate shall not knowingly allow unauthorized taping or receipt of the Service. Any requests that comes to Somoy TV regarding carriage on exclusive platforms, (WiMax, Wireless, IPTV or Mobile) Somoy TV will direct those requests to Star cable Na Inc. Star cable shall provide a direct feed to these systems requiring access to programming. Somoy TV will not incur any costs for such feeds. Affiliate's technical support in hooking up Service Subscribers' VCRs or DVRs, and Service Subscriber



কথ ০৭০১৮০৫

2. **Term of Agreement.** The term shall be for a period of Five (5) years commencing on the Effective date (the "Term"). This agreement shall prevail unless either Party provides at least 30 days written notice to the other Party, prior to the end of the initial Term or any subsequent renewal Term, of its desire to terminate this Agreement; provided that the proposed License Fee applicable to any renewal Term is subject to good faith negotiations between the Parties, and at least 30 days before the end of the then applicable Term, Network shall provide written notice to Affiliate of the proposed License Fee for the next renewal.

3. **License Fees and Payment Terms.**

Affiliate shall pay Somoy TV a license fee for the right to distribute the service (the "License Fee") pursuant to this Agreement.

In five years of agreement, Affiliate will pay Somoy TV full advance payment of 1st year which is US$ 15,000 and half advance payment of 2nd year which is US$ 15,000 totalling the amount to US$ 30,000. On the 10th month of 1st year, affiliate will pay the rest of the amount US$ 15,000. From that onwards, there will be advance payment of one year only.

The payment schedule for the 5 years would be 1st year US$ 15000, 2nd year US$ 30000, 3rd year US$ 40000, 4th year US$ 50000, 5th year US$ 60000.

| Payment Year | Amount in USD | Payment Details | Tentative Payment Date | Amount To Be Paid |
|---|---|---|---|---|
| 1st Year | 15,000 | Full amount of 1st year & 50% of advance of 2nd Years | June 2014 | $30,000/ |
| 2nd Year | 30,000 | Rest 50% of 2nd year | June 2015 | $15,000/ |
| 3rd Year | 40,000 | Full advance payment of 3rd Year | December 2015/January 2016 | $40,000/ |
| 4th Years | 50,000 | Full advance payment of 4th Year | December 2016/January 2017 | $50,000/ |
| 5th Year | 60,000 | Full advance payment of 5th Year | December 2017/January 2018 | $60,000/ |

After receiving the advance payment, If Network (Somoy TV) declares the agreement invalid, for a material cause, it will be bound to Refund the payment upon calculation of the last effective date of this agreement. After making the advance payment, if Affiliate (StarCable) declares the agreement invalid, it will not receive any refund.

If there is no advance payment in due date throughout this five years agreement, Network will provide a written notice to Affiliate within 15 days. If Network does not pay the advance payment within the next 15 days, this agreement will become null and void automatically.

Any License Fees that are unpaid by the Due Date shall result in the assessment of a late fee of one and one-half percent(11/2%) interest per month (or, if lower, the maximum rate allowable by law) on such unpaid balance, ... ... from the Due Date until payment is received by Network. There shall be no tax withholdings from



Case 1:19-cv-06622-XXX-YYY Document 67 Filed 00/00/00 Page 215 of 330 PageID #: XXXX

কর্য   0905806

4. **Carriage.** Except as otherwise specifically permitted herein, Affiliate shall carry the Service full-time as part of Basic Service. Affiliate shall deliver the Service without delay and shall not edit, alter or modify it, or any of its programming elements, in any way. If Affiliate chooses to Time Delay programming, then such programming shall be carried on such fixed time delay, and there shall be an alternate channel that would be without time delay. Affiliate's carriage of the Service shall be consistent with industry standards for content distribution. Affiliate will never alter or edit any of programming for advertisement insertion under this agreement.

5. **Delivery of Signal.** During the Term, Somoy TV shall provide, to Affiliate, the Service in its entirety. The Service shall be delivered by Somoy TV to each System, in a digitally compressed mode, by transmitting a signal of the Service via an international satellite used for transmission of programming, Over the Air or on Fiber. Notwithstanding anything to the contrary herein, Affiliate, at its own cost and expense, shall be completely responsible for encoding or formatting the Service so it can be distributed over the System.

SOMOY TELEVISION WILL NOT PAY ANYTHING TOWARD CARRIAGE, ENCODING OR FOR ANY OTHER EQUIPMENT REQUIRED TO PROVIDE SERVICES.

6. **Ownership.** All licenses, rights, and interests in the entire content of the Service and Network's service marks, trademarks and copyrights (collectively, the "Marks") shall remain fully vested in Network throughout the world. Affiliate only shall use Marks in the versions and modes expressly authorized by Network. Network reserves the right to review and approve all materials generated by Affiliate for marketing purposes which incorporate any Marks. Uses of Network's names and/or Marks, in routine promotional materials, such as program guides, program listings and bill stutters, shall be deemed approved unless Network specifically notifies Affiliate to the contrary. Promotional material furnished by Network to Affiliate shall be deemed to be automatically approved for use in the format provided by Network, but Network's prior written consent is required to the extent Affiliate modifies or otherwise changes such materials. Nothing herein shall be construed as an assignment or grant by Network to Affiliate of any title in or to the Marks.

7. **Confidentiality.** Other than as required by applicable law, governmental order or regulation, or decree of a court of competent jurisdiction, neither Party shall divulge or reveal, to any third party (except to a Party's attorney, consultant, accountant, majority shareholder, potential investor or program provider, who have a need to know and agree to be bound by the same obligations of confidentiality), the specific terms and conditions of this Agreement, or any information provided in connection therewith, without the prior written consent of the other Party, except that either Party may divulge or reveal such information to the entity that owns or controls the Service. Neither Party shall issue any press release or other similar publicity pertaining to the existence of this Agreement without first obtaining written approval of such release or publicity from the other Party.

8. **Assignment.** This Agreement, including both its obligations and benefits, shall pass to and be binding on the respective transferees, successors and permitted assigns of the Parties. This Agreement may not be assigned, in whole or in part, by either Party without the prior written consent of the other Party, which such consent shall not be unreasonably delayed or denied; provided, however, that no consent shall be necessary in the event of (i) assignment to a successor entity resulting from a merger, acquisition or consolidation by either Party; (ii) assignment to an entity under common control with, controlled by, or in control of, either Party; or (iii) assignment to an entity which owns or controls the Service, provided that ... in writing agrees to assume all assignor's obligations hereunder.

10. **Representations and Warranties.** Network represents and warrants to Affiliate that Network is an entity duly organized and validly existing under the laws of Bangladesh and is qualified to do business in Bangladesh; that Network has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Network will not violate or conflict with any provision of, will not constitute a default under or breach of, and do not impair the rights under (i) any contract, agreement or document to which Network is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Network is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Affiliate, that this Agreement has been duly executed on behalf of Network and constitutes a valid and binding agreement of Network, enforceable against Network in accordance with its terms.

Affiliate represents and warrants to Network that Affiliate is an entity duly organized and validly existing under the laws of State of New York, USA., that Affiliate has all necessary power and authority to enter into and perform the terms of this Agreement; that the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Affiliate will not violate or conflict with any provision of, will not constitute a default under or breach of and do not impair the rights under (i) any contract, agreement or document to which Affiliate is a party or its assets are bound, (ii) any order, writ, injunction, decree or judgment of any court or governmental agency, or (iii) any law, rule or regulation of any foreign, federal, state or local government or any political subdivision thereof; that no additional action on the part of Affiliate is necessary to authorize the execution and delivery of this Agreement; and, assuming the due authorization, execution, and delivery hereof by Network, that this Agreement has been duly executed on behalf of Affiliate and constitutes a valid and binding agreement of Affiliate, enforceable against Affiliate in accordance with its terms.

11. **Indemnification.** Each Party shall indemnify, defend and forever hold harmless the other Party, the other Party's affiliated companies and their respective officers, directors, employees and partners (collectively "Representatives"), against and from all liabilities, claims, costs, damages and expenses (including, without limitation, reasonable fees for counsel of the other Party's choice) (collectively, "Liabilities") arising out of any breach of any of its warranties, representations or obligations pursuant to this Agreement. Without limiting the foregoing, Network shall indemnify and hold Affiliate and its Representatives harmless from and against any and all Liabilities arising out of the content of the Service (but excluding any disputes between Affiliate or a System and its Service Subscribers); or out of Affiliate's distribution of the Service in a manner consistent with this Agreement, including, but not limited to, any claims that the Service programming contains any material: (i) that is obscene or defamatory; (ii) which violates the right of privacy or publicity; (iii) which infringes copyright or intellectual property rights, including music performance rights; (iv) which infringes the literary right of any person or party; or (v) which violates any other applicable rule, regulation or law; provided, however, that this indemnification will not cover Liabilities resulting from (a) Affiliate's use of the Service or any promotional material in a manner that is not in accordance with this Agreement, or (b) the alteration of the Service or promotional material by Affiliate without Network's prior written consent. Affiliate shall, to like extent, indemnify and hold Network and its Representatives harmless for (i) Liabilities between Affiliate or a System and its Service Subscriber arising out of matters other than content of the Service, (ii) Liabilities arising out of use of the Service in breach of this Agreement and/or for any deletion or addition to the Service by Affiliate, which deletion or addition gives rise to Liabilities, and/or (iii) Liabilities arising out of promotional materials provided by Affiliate. Notwithstanding anything in this Agreement to the contrary, in no event will either Party be liable to the other Party, by indemnification or otherwise, for any special, indirect, consequential or incidental damages of any kind, including, without limitation, any loss of profit, loss of use, or business interruption; it being understood that any indemnification obligations shall be considered direct damages. The provisions of this Section 12 shall survive the expiration of this Agreement.

12. **Covenants.** Affiliate hereby covenants and agrees that it will:      (i)  continue  to  carry  on  its business in substantially the same manner as it has prior to the Effective Date; (ii) keep the Systems in good order, repair and condition throughout the Term and promptly and adequately repair all damage it causes to any System, other than ordinary wear and tear; and (iii) comply with all applicable laws. Network hereby covenants and agrees that it will: (i) continue to carry on its business in substantially the same manner as it has prior to the Effective Date; (ii) continue to invest in creating quality programming for the Service; and (iii) comply with all applicable laws.

13. **Vertical Blanking Interval.** Except as otherwise set forth herein, Network retains and reserves all rights to the vertical blanking interval ("VBI"), audio subcarriers (and any other portions of the bandwidth that may be created as a result of digital transmission technology, provided that all primary video feeds synchronized with audio as licensed by Network from program providers remain intact), and all other signal



14. **Governing Law.** This Agreement and all matters or issues collateral thereto shall be governed by the laws of State of New York, USA, without regard to rules governing conflicts of law. Any suit, action or proceeding with respect to this Agreement shall be brought in the courts of New York in the county of Bronx New York. The Parties hereby accept the exclusive jurisdiction of those courts for the purpose of such suit, action or proceeding.

15. **Arbitration.** All disputes which cannot be resolved amicably between the Parties shall be submitted to binding arbitration. Arbitration proceedings will be held in New York, USA, or such other location agreed to by the Parties. The Parties to the arbitration may agree on an arbitrator; otherwise, there will be a panel of three (3) arbitrators, one
(1) arbitrator named in writing by each Party within 20 days after either Party serves a notice of arbitration on the other Party, and the third arbitrator named in writing by the two (2) arbitrators so appointed by the Parties, within 10 days after the two (2) arbitrators selected by the Parties are named. No person financially interested in this Agreement or affiliated with either Party may serve as an arbitrator. The costs of the arbitration imposed by the arbitrator or arbitrators and the fees of the arbitrator or arbitrators shall be assessed against the losing Party in the arbitration. The decision of the arbitrator or arbitrators will be final and conclusive and binding on both Parties, and judgment thereon may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, the arbitrator or arbitrators shall have no jurisdiction over disputes relating to the ownership, validity, use or registration of any Mark, other intellectual property, or proprietary or confidential information of Network without Network's prior written consent.

16. **Waiver.** Any waiver must be in writing and signed by the Party whose rights are being waived. Waiver by either such Party of any rights for any default of the other Party shall not constitute a waiver of any rights for either a prior or a subsequent breach of the same obligation or for any prior or subsequent breach of any other obligation of a defaulting Party hereunder.

17. **Notices.** Any notice shall be in writing and shall be hand delivered, sent by telecopy or facsimile or sent by express courier adequate postage prepaid to the addresses for the Parties set forth on the first page of this Agreement. Notices to Affiliate shall be to:

Sid Sohail
Star Cable NA Inc.
3839 Bell Blvd Suite 233
Bayside NY 11361

Mohammed Akther Hossain
Somoy Media Limited
Nasir Trade Center
89, Bir Uttam C. R. Dutta Road, Dhaka-1205
Bangladesh

Notice shall be deemed given upon proof/confirmation of receipt.

18. **Entire Agreement.** This Agreement contains the entire understanding of the Parties, and supersedes all prior understandings of the Parties, relating to the subject matter hereof. No provision shall be construed against a Party because such Party drafted such provision. This Agreement may not be amended or modified except in writing and signed by both Parties.

19. **Relationship.** Neither Party shall be or hold itself out as the agent of the other Party under this

**20. Counterparts.** This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by each Party at such time as counterparts shall have been executed and delivered by each Party, regardless of whether each Party has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of each Party.

**21. Severability.** The determination that any provision of this Agreement is invalid or unenforceable will not affect the validity or unenforceability of the remaining provisions under other circumstances. Any invalid or unenforceable provision will be enforced to the maximum extent permitted under the law. Both Parties, however, shall negotiate, in good faith, with respect to an equitable modification of the provision, or the application thereof, to be invalid or unenforceable.

**22. Construction.** The words "herein," "hereof," "hereunder," and other similar terms refer to this Agreement as a whole and not any particular Section or provision (unless the context clearly requires otherwise). Each Schedule referred to in this Agreement is incorporated herein by reference. The headings contained in this Agreement are included for convenience of reference only and shall in no way affect the construction or interpretation of any of the terms or provisions of this Agreement.

**23. Marketing Efforts.** The Parties shall work in good faith to develop joint plans for the promotion and marketing of the Service and each System launch hereunder. Prior to each such System launch, Affiliate shall use its best efforts to provide Network the opportunity to train its personnel with respect to the overall provision of the Service.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

Network: Somoy Media Limited (Somoy Television)

Signature

Name    : Ahmed Jobaer

Title    : Managing Director & CEO

Date    : 10th June, 2014

Affiliate: Star Cable NA Inc.

Signature

Name    : Sid Sohail    ( SAJID )

Title    : Director

Date    : 10th June, 2014

Witness

Signature

Name    : Mohammed Akther Hossain

Title    : Head of Operations

Somoy Media Limited
Nasir Trade Center

# EXHIBIT I



http://totalcableusa.com/

Go   AUG  SEP  **OCT**

83 captures
7 Sep 2012 - 31 Jan 2018

2011  **2013**



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- Contact Us



Previous  1  2  3  4  ≥  Next

## Hindi Plus



- Buy Now
- More

4/7/2018
Case 1:16-cv-04067-SJ-CLP   Document 82   Filed 05/06/19   Page 221 of 330 PageID #: 1034
Total Cable: Building and delivering broadcast networks worldwide

http://www.totalcableusa.com/   Go   DEC APR **MAY**   ◀ 07 ▶   2012 **2013** 2014

83 captures
1 Sep 2012 – 31 Jan 2018



"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Previous | 1 | 2 | 3 | 4 | 5 | Next

Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

**Subscriber Login** 

**User Name**

4/11/2019                    Total Cable | Building and delivering broadcast networks worldwide

http://totalcableusa.com/index.html                          Go    AUG DEC FEB
35 captures                                                        ◀ 16 ▶
3 Sep 2012 - 29 Sep 2016                                          2013 2014 2016


"Reliable, Affordable!"

1-212-444-8138 info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

**Subscriber Login**  

**User Name**

http://www.totalcableusa.com/index.html    Go    MAY   JUN   **JUL**

35 captures
3 Sep 2012 – 19 Sep 2016          2014  2015  2016



"Reliable, Affordable!"

**1-212-444-8138** info@totalcableusa.com

- Home
- Packages
- How to
- About us
- Why Total Cable
- Referral
- News
- Contact Us



Welcome to Total Cable USA.

Total Cable has begun its operation in 2009 and has been in production since January, 2011. The inspiration of the company is the realization that there is a need for a company that can provide a wide variety of international channels to the Bangladeshi community in the USA. The company is headquartered in the New York City in the state of New York.

Total Cable. has developed a highly innovative product/solution for the IPTV/Cable product sector. Our research indicates that our technology is unique and will offer significant advantage over all available similar and competing products/services.

Read more...

**Subscriber Login**

**User Name**

# EXHIBIT J

Total Cable | Building and delivering broadcast networks worldwide    https://totalcableusa.com/channels

📞 1-212-444-8138    ✉ info@totalcableusa.com    Log in (/login)    Service Order (/customerSignup)



(/)

# TOTAL CABLE CHANNELS PACKAGE

REQUIRES 4MB MINIMUM BANDWIDTH FOR ALL CHANNELS.



## SPORTS
Including all European and American Sports.



## MOVIES
Including the Latest Movie, Drama a Comedy.

| | | | | | |
|---|---|---|---|---|---|
| 🏆 জি বাংলা | 🏆 AYM Sports | 🏆 TNT Serie HD | 📺 Boishakhi TV | 📺 SATV | 📺 Al Ramadan |
| 🏆 জি বাংলা সিনেমা | 🏆 Animal Planet | 🏆 FX | 📺 Ekattor TV | 📺 BTV | 📺 Peace TV |
| 🏆 Zee TV HD | 🏆 Discovery Channel | 🏆 Food Network | 📺 Independent | 📺 BTV World | 📺 Peace TV Bangla |
| 🏆 Zee Bollywood | 🏆 National Geographic | 🏆 A&E | 📺 Jamuna TV | 📺 S Bangla | 📺 Guide US TV |
| 🏆 Zee Living | 🏆 One America News | 🏆 Bloomberg Television | 📺 Channel 24 | 📺 ATN Islamic TV | 📺 Iqra TV Bangla |
| 🏆 ২৪ ঘন্টা | | 🏆 HGTV | 📺 My TV | 📺 ATN News | 📺 Huda TV |
| 🏆 Disney Channel | 🏆 CNN | 🏆 Channel i | 📺 ATN Bangla | 📺 TBN 24 | 📺 Al Quran |
| 🏆 Nickelodeon | 🏆 History | 🏆 Rtv | 📺 ATN Music | 📺 TBN Music | 📺 Quran Bangla |
| 🏆 Cartoon Network | | | 📺 Gaanbangla TV | 📺 TBN Cinema | 📺 Al Madina |
| 🏆 Eurosports HD | | | 📺 Asian TV | 📺 TBN Weather | 📺 Al Mahabba |
| | | | 📺 ATN Bangla UK | 📺 ITV 24 | |



## NEWS CHANNELS
Always be up-to-date with live news channels from around the world.

🔊 ২৪ ঘন্টা    🔊 One    🔊 Fox News    🔊 CNN    🔊 ATN News
🔊 Ekattor TV    America News    Channel
   🔊 Independent

## ISLAMIC CHANNELS

Lead your life according to the teaching of the Quran and Sunnah.

☆ ITV24    ☆ Quran    ☆ Peace TV    ☆ Al Ramadan    ☆ Al Mahabba    ☆ Iqra TV
☆ Al Quran    Bangla    ☆ Peace TV    ☆ Al Madina    Bangla
   ☆ Guide US    Bangla



## SERIES

Stay connected with latest Bengali and English TV series



## MUSIC CHANNELS

Both Bengali and English and other other music.



## KID'S CHANNI

Keep your kids entertained with c channels.

📹 জি বাংলা    📹 জি বাংলা    ⊙ TBN Music    ⊙ Zee TV HD    👪 Cartoon    👪 Disney
📹 S Bangla    সিনেমা    ⊙ ATN Music    ⊙ S Bangla    Network    Channel
   📹 TNT Serie    ⊙ Gaanbangla    ⊙ Zee    👪 Nickelodeon
   HD    TV    Bollywood

## About us

Total Cable USA is leading IPTV providers to the Bangladeshi community in the USA and Canada. The company is headquartered in the New York City in the state of New York. Total Cable 's Technology Provides a Total End to End Solution. Bangladeshis living in the U.S. try to connect back to home land by watching Bangladeshi TV program. Unfortunately, it gets tricky with monopoly of media

companies and real estate management
companies exclusive contract with certain
providers. More...

## Our Contacts

**Total Cable USA Inc.**
3719 57TH ST
Woodside, New York 11377
Phone: 1-212-444-8138
Fax: 6312400210
Email:
info@totalcableusa.com
(mailto:info@totalcableusa.com)
Website:
www.totalcableusa.com (/)
File upload: click here to
upload your file (/fileUpload)

Total Cable USA Inc.: Building and delivering broadcast networks worldwide. Copyright 2015, all rights reserved

f (https://www.facebook.com/TotalCable
/?ref=ts)

# EXHIBIT "K"

📞 1-212-444-8138  ⋮  ✉ info@totalcablebd.com          Log in (/login)    Service Order (/customerSignup)

 (/)

# TOTAL CABLE CHANNELS PACKAGE

### REQUIRES 4MB MINIMUM BANDWIDTH FOR ALL CHANNELS.

## SPORTS

Including all European and American Sports.

## MOVIES



Including the Latest Movie, Drar Comedy.

| | | | | | |
|---|---|---|---|---|---|
| 🏆 জি বাংলা | 🏆 AYM Sports | 🏆 TNT Serie HD | 📹 Boishakhi TV | 📹 SATV | 📹 Al Ramadan |
| 🏆 জি বাংলা সিনেমা | 🏆 Animal Planet | 🏆 FX | 📹 Ekattor TV | 📹 BTV | 📹 Peace TV |
| 🏆 Zee TV HD | 🏆 Discovery Channel | 🏆 Food Network | 📹 | 📹 BTV World | 📹 Peace TV Bangla |
| 🏆 Zee Bollywood | 🏆 National Geographic | 🏆 A&E | Independent | 📹 S Bangla | 📹 Guide US |
| 🏆 Zee Living | | 🏆 Bloomberg | 📹 Jamuna TV | 📹 ATN Islamic TV | TV |
| 🏆 ২৪ ঘন্টা | 🏆 One America News | Television | 📹 Channel 24 | 📹 ATN News | 📹 Iqra TV |
| 🏆 Disney Channel | 🏆 CNN | 🏆 HGTV | 📹 My TV | 📹 TBN 24 | Bangla |
| 🏆 Nickelodeon | 🏆 History | 🏆 Channel i | 📹 ATN Bangla | 📹 TBN Music | 📹 Huda TV |
| 🏆 Cartoon Network | | 🏆 Rtv | 📹 ATN Music | 📹 TBN Cinema | 📹 Al Quran |
| 🏆 Eurosports HD | | | 📹 Gaanbangla TV | 📹 TBN Weather | 📹 Quran Bangla |
| | | | 📹 Asian TV | 📹 ITV 24 | 📹 Al Madina |
| | | | 📹 ATN Bangla UK | | 📹 Al Mahabba |

## NEWS CHANNELS



Always be up-to-date with live news channels from around the world.

◀» ২৪ ঘন্টা
📞 1-212-444-8138
◀» Ekattor TV

◀» One
✉ info@totalcablebd.com
America News

◀» Fox News
Channel

◀» CNN
Log in (/login)

◀» ATN News
Service Order (/customerSignup)




— দেশী এটিটি অপারেটর —

☽ ISLAMIC CHANNELS

Lead your life according to the teaching of the Quran and Sunnah.

| | | | | | |
|---|---|---|---|---|---|
| ☆ ITV24 | ☆ Quran | ☆ Peace TV | ☆ Al Ramadan | ☆ Al Mahabba | ☆ Iqra TV |
| ☆ Al Quran | Bangla | ☆ Peace TV | ☆ Al Madina | | Bangla |
| | ☆ Guide US | Bangla | | | |

 SERIES
Stay connected with
latest Bengali and
English TV series

 MUSIC CHANNELS
Both Bengali and English
and other other music.

 KID'S CHANN
Keep your kid:
entertained w
cartoons chan

| | | | | | |
|---|---|---|---|---|---|
| ▇◀ জি বাংলা | ▇◀ জি বাংলা | ⊙ TBN Music | ⊙ Zee TV HD | 👥 Cartoon | 👥 Disney |
| ▇◀ S Bangla | সিনেমা | ⊙ ATN Music | ⊙ S Bangla | Network | Channel |
| | ▇◀ TNT Serie | ⊙ Gaanbangla | ⊙ Zee | 👥 | |
| | HD | TV | Bollywood | Nickelodeon | |

## About us

Total Cable USA is leading IPTV providers
to the Bangladeshi community in the USA
and Canada. We are a consumer
technology and Services Company based
in Bangladesh, committed to delivering
Live and On-Demand content to viewers

Total Cable - Building and delivering broadcast networks worldwide

📞 1-212-444-8138    ✉ info@totalcableusa.com    Log in (/login)    Service Order (/customerSignup)



via our proprietary Internet based set-top box. Total Cable is the leading distributor of Internet based South Asian content, bringing News, Music and more to India, Bangladesh, Europe and Middle East.

দেশী ওটিটি অপারেটর

## Our Contacts

### Telephonic Support

Our professional support staffs are available 8:00am – 10:00PM (EST Time) to help you. Please contact us at the following phone numbers:
Phone: 212-444-8138
Fax: 6312400210

### Email Support

Our customers can always email their questions to following email addresses for answers in a timely fashion:
info@totalcableusa.com

File upload: click here to upload your file (/fileUpload)

f (https://www.facebook.com/TotalCable/?refers)

# EXHIBIT "L"

# network solutions®

**Sorry, someone else already owns this domain, but we can help you get it.**

Backorder for:

totalcableusa.com .........................................................

**Backorder**

For only $10.00, we can help you get this domain. Here's how it works:

We'll negotiate for you anonymously with whoever currently owns the domain.

If the owner of the domain isn't ready to sell yet, we will watch it every day to see when it becomes available.

If the owner doesn't renew, we'll get it for you before it becomes available to the general public.

---

totalcableusa.com

Is this your domain name? Renew it now.

```
Domain Name: TOTALCABLEUSA.COM
Registry Domain ID: 1738757417_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2012-08-13T23:24:21Z
Creation Date: 2012-08-13T23:24:21Z
Registrar Registration Expiration Date: 2017-08-13T23:24:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: ok http://www.icann.org/epp#ok
Registry Registrant ID: Not Available From Registry
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: (646) 474-0418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Registry Admin ID: Not Available From Registry
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
Admin Phone: (646) 474-0418
Admin Phone Ext:
Admin Fax:
```

```
                Admin Fax Ext:
                Admin Email: info@totaltvs.com
                Registry Tech ID: Not Available From Registry
                Tech Name: Habib Rahman
                Tech Organization: Total Tvs
                Tech Street: 15 westmoylan ln
                Tech City: coram
                Tech State/Province: New York
                Tech Postal Code: 11727
                Tech Country: US
                Tech Phone: (646) 474-0418
                Tech Phone Ext:
                Tech Fax:
                Tech Fax Ext:
                Tech Email: info@totaltvs.com
                Name Server: NS73.DOMAINCONTROL.COM
                Name Server: NS74.DOMAINCONTROL.COM
                DNSSEC: unsigned
                URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.inte
                >>> Last update of WHOIS database: 2016-08-17T13:00:00Z <<<

                For more information on Whois status codes, please visit
                https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

                The data contained in GoDaddy.com, LLC's WhoIs database,
                while believed by the company to be reliable, is provided "as is"
                with no guarantee or warranties regarding its accuracy.  This
                information is provided for the sole purpose of assisting you
                in obtaining information about domain name registration records.
                Any use of this data for any other purpose is expressly forbidden witho
                permission of GoDaddy.com, LLC.  By submitting an inquiry,
                you agree to these terms of usage and limitations of warranty.  In part
                you agree not to use this data to allow, enable, or otherwise make poss
                dissemination or collection of this data, in part or in its entirety, f
                purpose, such as the transmission of unsolicited advertising and
                and solicitations of any kind, including spam.  You further agree
                not to use this data to enable high volume, automated or robotic electr
                processes designed to collect or compile this data for any purpose,
                including mining this data for your own personal or commercial purposes

                Please note: the registrant of the domain name is specified
                in the "registrant" section.  In most cases, GoDaddy.com, LLC
                is not the registrant of domain names listed in this database.
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record



Search Again

: Search again here...

Search by either

○ <u>Domain Name</u> e.g. networksolutions.com
   <u>IP Address</u> e.g. 205.178.187.13



| | 12mm Old City Collection Savannah Myth | $1.19 Sq ft | View Now |

The price includes a one-time, non-refundable set-up fee and annual subscription fee for the Service per each domain name requested for backorder. Network Solutions reserves the right to waive or discount the set-up fee at any time. The price does not include the cost of the actual domain name. If the domain name is acquired, the cost of the one-year domain name registration will be charged to your credit card or other payment method on file. Network Solutions does not guarantee that you will obtain the domain name through this Service.

GoDaddy'   

 Promos 

## Search the WHOIS Database

Enter a domain name to search

Search

Private Registration    Local listings

# WHOIS search results

Domain Name: TOTALCABLEUSA.COM
Registry Domain ID: 1738757417_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2017-08-14T14:33:18Z
Creation Date: 2012-08-13T23:24:21Z
Registrar Registration Expiration Date: 2022-08-13T23:24:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: ok http://www.icann.org/epp#ok
Registry Registrant ID: Not Available From Registry
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 14455 N. Hayden Road
Registrant City: Scottsdale
Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599

Case 1:16-cv-04067-SJ-CLP   Document 82   Filed 05/06/19   Page 238 of 330 PageID #: 1051

Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Registry Admin ID: Not Available From Registry
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road
Admin City: Scottsdale
Admin State/Province: Arizona
Admin Postal Code: 85260
Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Registry Tech ID: Not Available From Registry
Tech Name: Registration Private
Tech Organization: Domains By Proxy, LLC
Tech Street: DomainsByProxy.com
Tech Street: 14455 N. Hayden Road
Tech City: Scottsdale
Tech State/Province: Arizona
Tech Postal Code: 85260
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: TOTALCABLEUSA.COM@domainsbyproxy.com
Name Server: NS73.DOMAINCONTROL.COM
Name Server: NS74.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2019-04-11T19:00:00Z <<<

For more information on Whois status codes, please visit

https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Notes:

IMPORTANT: Port43 will provide the ICANN-required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data  |  Contact Domain Holder  |  Report Invalid Whois

## Want to buy this domain?

Get it with our Domain Buy Service.



## Is this your domain?

Add hosting, email and more.



About GoDaddy

Agency

Corporate

Newsroom

Investor Relations

Careers

Trademark Copyright Policy

GoDaddy Blog

Trust Center

Jobs

Site Map / Help

Resources

Webmail Login

Community

GoDaddy

Help Center

Policy

Shop

Product Catalog

ICANN Confirmation

Tools for Pros

Case 1:16-cv-04067-SJ-CLP   Document 82   Filed 05/06/19   Page 241 of 330 PageID #: 1054




# EXHIBIT "M"

network
solutions

Sorry, someone else already owns this domain, but we can help you get it.

**Backorder for:**
# totalcablebd.com .......................................................    **Backorder**

For only $10.00, we can help you get this domain. Here's how it works:

We'll negotiate for you anonymously with whoever currently owns the domain.

If the owner of the domain isn't ready to sell yet, we will watch it every day to see when it becomes available.

If the owner doesn't renew, we'll get it for you before it becomes available to the general public.

totalcablebd.com

Is this your domain name? Renew it now.

```
Domain Name: TOTALCABLEBD.COM
Registry Domain ID: 1938827466_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Update Date: 2015-06-15T17:08:21Z
Creation Date: 2015-06-15T17:08:21Z
Registrar Registration Expiration Date: 2020-06-15T17:08:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited http://www.icann.org/epp#client
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUp
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRer
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDe
Registry Registrant ID: Not Available From Registry
Registrant Name: Habib Rahman
Registrant Organization: Total Tvs
Registrant Street: 15 westmoylan ln
Registrant City: coram
Registrant State/Province: New York
Registrant Postal Code: 11727
Registrant Country: US
Registrant Phone: +1.6464740418
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: info@totaltvs.com
Registry Admin ID: Not Available From Registry
Admin Name: Habib Rahman
Admin Organization: Total Tvs
Admin Street: 15 westmoylan ln
Admin City: coram
Admin State/Province: New York
Admin Postal Code: 11727
Admin Country: US
```

```
Admin Phone: +1.6464740418
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: info@totaltvs.com
Registry Tech ID: Not Available From Registry
Tech Name: Habib Rahman
Tech Organization: Total Tvs
Tech Street: 15 westmoylan ln
Tech City: coram
Tech State/Province: New York
Tech Postal Code: 11727
Tech Country: US
Tech Phone: +1.6464740418
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: info@totaltvs.com
Name Server: NS31.DOMAINCONTROL.COM
Name Server: NS32.DOMAINCONTROL.COM
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.inte
>>> Last update of WHOIS database: 2016-08-17T13:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

The data contained in GoDaddy.com, LLC's WhoIs database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy.  This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden withc
permission of GoDaddy.com, LLC.  By submitting an inquiry,
you agree to these terms of usage and limitations of warranty.  In part
you agree not to use this data to allow, enable, or otherwise make poss
dissemination or collection of this data, in part or in its entirety, i
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam.  You further agree
not to use this data to enable high volume, automated or robotic electr
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes

Please note: the registrant of the domain name is specified
in the "registrant" section.  In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.
```

The previous information has been obtained either directly from the registrant or a registrar of the domain name other than Network Solutions. Network Solutions, therefore, does not guarantee its accuracy or completeness.

Show underlying registry data for this record

Stone Siding - Quartzite Finished
Slate Collection Quartzite
Finished Slate - Bermuda Green /
Ledge Stone 6"x24

# $4.59 Sq ft

| View Now |

Search Again

Search again here...

Search by either

○ Domain Name e.g. networksolutions.com
  IP Address e.g. 205.178.187.13

totalcablebd.com WHOIS domain registration information fro...                    http://www.networksolutions.com/whois/results.jsp?domain=tot...





$0.79 Sq ft

View Now

The price includes a one-time, non-refundable set-up fee and
annual subscription fee for the Service per each domain name
requested for backorder. Network Solutions reserves the right
to waive or discount the set-up fee at any time. The price does
not include the cost of the actual domain name. If the domain
name is acquired, the cost of the one-year domain name
registration will be charged to your credit card or other
payment method on file. Network Solutions does not
guarantee that you will obtain the domain name through this
Service.

   

**Promos** 

## Search the WHOIS Database

Enter a domain name to search

Private Registration     Local listings

# WHOIS search results

Domain Name: TOTALCABLEBD.COM
Registry Domain ID: 1938827466_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: http://www.godaddy.com
Updated Date: 2015-06-15T17:08:21Z
Creation Date: 2015-06-15T17:08:21Z
Registrar Registration Expiration Date: 2020-06-15T17:08:21Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited
http://www.icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited http://www.icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited http://www.icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited http://www.icann.org/epp#clientDeleteProhibited
Registry Registrant ID: Not Available From Registry
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 14455 N. Hayden Road
Registrant City: Scottsdale

Registrant State/Province: Arizona
Registrant Postal Code: 85260
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: TOTALCABLEBD.COM@domainsbyproxy.com
Registry Admin ID: Not Available From Registry
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 14455 N. Hayden Road
Admin City: Scottsdale
Admin State/Province: Arizona
Admin Postal Code: 85260
Admin Country: US
Admin Phone: +1.4806242599
Admin Phone Ext:
Admin Fax: +1.4806242598
Admin Fax Ext:
Admin Email: TOTALCABLEBD.COM@domainsbyproxy.com
Registry Tech ID: Not Available From Registry
Tech Name: Registration Private
Tech Organization: Domains By Proxy, LLC
Tech Street: DomainsByProxy.com
Tech Street: 14455 N. Hayden Road
Tech City: Scottsdale
Tech State/Province: Arizona
Tech Postal Code: 85260
Tech Country: US
Tech Phone: +1.4806242599
Tech Phone Ext:
Tech Fax: +1.4806242598
Tech Fax Ext:
Tech Email: TOTALCABLEBD.COM@domainsbyproxy.com
Name Server: NS31.DOMAINCONTROL.COM
Name Server: NS32.DOMAINCONTROL.COM
DNSSEC: unsigned

URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2019-04-11T19:00:00Z <<<

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en

Notes:

IMPORTANT: Port43 will provide the ICANN-required minimum data set per
ICANN Temporary Specification, adopted 17 May 2018.
Visit https://whois.godaddy.com to look up contact data for domains
not covered by GDPR policy.

The data contained in GoDaddy.com, LLC's Whois database,
while believed by the company to be reliable, is provided "as is"
with no guarantee or warranties regarding its accuracy. This
information is provided for the sole purpose of assisting you
in obtaining information about domain name registration records.
Any use of this data for any other purpose is expressly forbidden without the prior written
permission of GoDaddy.com, LLC. By submitting an inquiry,
you agree to these terms of usage and limitations of warranty. In particular,
you agree not to use this data to allow, enable, or otherwise make possible,
dissemination or collection of this data, in part or in its entirety, for any
purpose, such as the transmission of unsolicited advertising and
and solicitations of any kind, including spam. You further agree
not to use this data to enable high volume, automated or robotic electronic
processes designed to collect or compile this data for any purpose,
including mining this data for your own personal or commercial purposes.

Please note: the registrant of the domain name is specified
in the "registrant" section. In most cases, GoDaddy.com, LLC
is not the registrant of domain names listed in this database.

See Underlying Registry Data  |  Contact Domain Holder  |  Report Invalid Whois

Case 1:16-cv-04067-SJ-CLP   Document 82   Filed 05/06/19   Page 251 of 330 PageID #: 1064

## Want to buy this domain?

Get it with our Domain Buy Service.

Go

## Is this your domain?

Add hosting, email and more.

Go

About GoDaddy

About Us

Contact Us

Newsroom

Investor Relations

Careers

Corporate Responsibility

Legal

Policies

GoDaddy Blog

Support

Help Center

Call Us

Sign In

Resources

Webmail

Case 1:16-cv-04067-SJ-CLP  Document 82  Filed 05/06/19  Page 252 of 330 PageID #: 1065
4/15/2019
WHOIS search results

WHOIS

Get the Mobile App

WHOIS Information

Tools for Pros

Support (24/7)

Help & Tools

Site Map

Legal

Partner Programs

Affiliates

Reseller Programs

GoDaddy

Account

My Account

My Renewals

Create Account

Shopping

Shopping

Websites

Hosting

Email

Web Security

Domains

WordPress

SSL Certificates

Get the GoDaddy App




United States - English - USD

# EXHIBIT "N"

Case 1:16-cv-04067-SJ-CLP   Document 82   Filed 05/06/19   Page 255 of 330 PageID #: 1068

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through April 10, 2019.

Selected Entity Name: TOTAL CABLE USA LLC
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | TOTAL CABLE USA LLC |
| **DOS ID #:** | 4476270 |
| **Initial DOS Filing Date:** | OCTOBER 22, 2013 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | INACTIVE - Dissolution (May 02, 2016) |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
AHMODUL BAROBHUIYA
15 WESTMOYLAN LANE
CORAM, NEW YORK, 11727

**Registered Agent**

NONE

This office does not require or maintain information
regarding the names and addresses of members or
managers of nonprofessional limited liability
companies. Professional limited liability companies
must include the name(s) and address(es) of the original
members, however this information is not recorded and
only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

Case 1:16-cv-04067-SJ-CLP  Document 82  Filed 05/06/19  Page 256 of 330 PageID #: 1069

No Information Available

*Stock information is applicable to domestic business corporations.

## Name History

**Filing Date**   **Name Type**        **Entity Name**

OCT 22, 2013  Actual        TOTAL CABLE USA LLC

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

# EXHIBIT "O"

SHAHID RASUL  |  Account #⬛⬛⬛⬛⬛⬛⬛  |  September 9, 2017 to October 10, 2017

## Withdrawals and other subtractions - continued

| Date | Description | Amount |
|------|-------------|--------|
| 09/26/17 | CHECKCARD  0924 FIVE BELOW 345 WESTBURY   NY 24445007268500204326262 | |
| 09/26/17 | CHECKCARD  0925 DUNKIN #330148 Q35 ALBERTSON   NY 24431067269838000009800 | -128.30 |
| 09/26/17 | CHECKCARD  0925 DUNKIN #331183 Q35 LONG ISLAND CNY 24431067269838000009289 | -20.98 |
| 09/27/17 | USPS PO 354839 09/27 #000261181 PURCHASE USPS PO 35483907  ASTORIA     NY | -2.18 |
| 09/28/17 | CHECKCARD  0926 THE HOME DEPOT #1255 LONG ISLAND CNY 24610437270010186821995 | -47.50 |
| 09/28/17 | CHECKCARD  0927 RS*DOMAINNAME REGISTER 425-2744500 WA 24906417270044855890911 RECURRING | -22.83 |
| 09/29/17 | CHECKCARD  0927 AU BON PAIN LONG ISLAND CNY 24231687271200000300007 | -42.95 |
| 10/02/17 | CHECKCARD  0929 TOTAL CABLE 212-444-8138 NY 24009587272300573714187 | -0.82 |
| 10/02/17 | CHECKCARD  0929 OURPACT PREMIUM 858-888-9168 CA 24492157273637029851369 RECURRING | -90.00 |
| 10/02/17 | CHECKCARD  0930 SARAVANAA BHAVAN HICKSVILLE   NY 24431067274838000160952 | -4.99 |
| 10/03/17 | CHECKCARD  1002 COSTELLO'S ACE 140 NEW HYDE PARKNY 24224437276101017997302 | -100.35 |
| 10/05/17 | CHECKCARD  1004 THE UPS STORE 4628 570-420-1101 PA 24692167278100071191681 | -16.28 |
| 10/06/17 | MICRO ELE 655  10/06 #000332119 PURCHASE MICRO ELE 655 Mer  Westbury     NY | -76.32 |
| 10/10/17 | CHECKCARD  1006 SILVER STAR MOTORS LONG ISLAND CNY 24692167280100109388461 | -2.16 |
| 10/10/17 | CHECKCARD  1009 SMASHBURGER #1563 NEW HYDE PARKNY 24224437283105006385099 | -17.33 |
| Total withdrawals and other subtractions | | -26.03 |
| | | **-$1,192.83** |

## Service fees

**Your Overdraft and NSF: Returned Item fees for this statement period and year to date are shown below.**

| | Total for this period | Total year-to-date |
|------|------|------|
| Total Overdraft fees | $0.00 | $0.00 |
| Total NSF: Returned Item fees | $0.00 | $70.00 |

**To help avoid overdraft and returned item fees, you can set up:**

Customized alerts – get email or text message alerts (footnote 1) to let you know if your balance is low

Overdraft Protection – enroll to help protect yourself from overdrafts and declined transactions

To enroll, go to bankofamerica.com/online, call us at the number listed on this statement, or come see us at your nearest financial center.

(footnote 1) Alerts received as text messages on your mobile access device may incur a charge from your mobile access service provider. This feature is not available on the Mobile website. Wireless carrier fees may apply.

continued on the next page

# EXHIBIT "P"

## SETTLEMENT TERM SHEET

This term sheet represents the material settlement terms upon which Plaintiff Asia TV USA Ltd. ("ATUL") and Total Cable USA LLC, Lalon TV Inc., Ahmodul Barobhuiya and Habibur Rahman (collectively "Defendants") agree pertaining to, and addressing, each and all of the claims and causes of action set forth in the lawsuit captioned *Asia TV USA Ltd. v. Total Cable USA LLC, et al.*; No. 1:16-cv-6873-AJN-OTW, currently pending in the United States District Court for the Southern District of New York (the "Action"). The terms set forth herein shall be memorialized on the record before the Court at a hearing on August 14, 2018. A long form Settlement Agreement and Release Document also will be entered into by and between ATUL and Defendants (collectively, the "Parties).

The Parties agree as follows:

1. **Settlement Payment to be Made by Defendants to ATUL**

    Defendants shall make a one-time payment to ATUL in the amount of $450,000 ("Settlement Payment"), by wiring that sum to the Rosoff, Schiffres and Barta ("RSB") Client Trust Account (wiring instructions will be provided), within seven (7) business days of the appearance before Judge Wang acknowledging the settlement on the record. The parties will thereafter within ten (10) business days execute a long form settlement and mutual general release agreement formally documenting the terms and conditions of the settlement reflected herein. The Settlement Payment shall represent full and complete satisfaction of any and all monies alleged in the within action as being owed by any party thereto.

2. **Permanent Injunction**

    Defendants stipulate in open Court that they will execute a stipulation for the entry of a permanent injunction prohibiting Defendants from distributing ATUL's content (also referred to as "ZEE Content") unless and until a valid distribution agreement authorizing Defendants and/or any of their affiliates, subsidiaries, related entities or companies is executed by and between the parties. The injunction shall enjoin Defendants from any involvement with any persons or entities who engage in the distribution of ATUL's content without a valid distribution agreement with ATUL. The form of the permanent injunction shall be as attached hereto as Exhibit 1, subject to the Court's approval.

3. **Mutual General Releases.** The long form settlement agreement will contain mutual general releases.

4. **Dismissal of Litigation.** On or before the tenth business day following the delivery of the Settlement Payment, the Parties will file a Joint Stipulation of Dismissal of All Claims with Prejudice and a Proposed Order of Dismissal with Prejudice, and will file such other papers as are necessary to terminate the Action with prejudice and with costs and attorneys' fees taxed against the party incurring same.

**[SIGNATURES ON FOLLOWING PAGE]**

**ASIA TV USA LTD.**

By: _AKHILESH   GUPTA_

Its: _VICE   PRESIDENT_

Signed: _Akhiled C. Gta_

Date: _03|14|2018_

**TOTAL CABLE USA LLC**

By: _AHMODUL BAROBHUIYA_

Its: _CEO_

Signed: _[signature]_

Date: _8|14|2018_

**LALON TV, INC.**

By: _SHAHINUL   KARIM_

Its: _PRESIDENT_

Signed: _S. Karim_

Date: _8/19/18_

**AHMODUL BAROBHUIYA**

Signed: _[signature]_

Date: _8|14|2018_

**HABIBUR RAHMAN**

Signed: _[signature]_

Date: _08/14/2018_

**SHAHINUL KARIM**

Signed: _S. Karim_

Date: _8/14/18_

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
STAR CABLE NA, INC.,                                                    16-CV-04067 (SJ)

                           Plaintiff,

            -against-

TOTAL CABLE USA LLC. and 1STOPMEDIA AND
ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
ABC, INC., XYZ CORP. and JOHN DOES 1-10,

                           Defendants.
-----------------------------------------------------------------------X

# PLAINTIFF'S LOCAL RULE 56.1(b) STATEMENT IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY 1STOPMEDIA AND ENTERTAINMENT, INC. D/B/A RADIANT IPTV

HOGAN & CASSELL, LLP
*Attorneys for Plaintiff, Star Cable NA, Inc.*
Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
Tel.  (516) 942-4700
Fax  (516) 942-4705
Email  mcassell@hogancassell.com

Pursuant to Rule 56.1 of the Rules of this Court, the plaintiff, Star Cable NA, Inc. ("Plaintiff" or "Star Cable"), by its attorneys, Hogan & Cassell, LLP, respectfully submits this Rule 56.1(b) Statement in opposition to the motion for summary judgment filed by 1StopMedia and Entertainment, Inc. d/b/a Radiant IPTV ("1StopMedia").

Significantly, in violation of the Local Rules of this Court, 1StopMedia failed to submit a Rule 56.1(a) statement. Instead, its motion is supported by the March 25, 2019 affirmation of its attorney, Satish Bhatia, Esq. ("Bhatia Aff."). In addition, for the most part, the paragraphs in the Bhatia Aff. are not short and concise as specifically required by Local Rule Civ. P. 56.1(a).

To the extent that the Court considers the Bhatia Aff. as 1StopMedia's Rule 56.1(a) statement, Star Cable responds as follows.

## FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 1.[1] | Plaintiff neither admits nor denies this statement given that it does not set forth a material fact, but rather, provides background as to Bhatia. | |
| 2. | Disputed. As set forth in detail in the April 19, 2019 affidavit of Shahid Bob Rasul ("Rasul Aff."), there are issues of fact as to whether 1StopMedia is entitled to summary judgment. | See Rasul Aff. ¶¶ 11-32, 45-66; Exhibits A-H to Rasul Aff. |
| 3. | Not disputed. | |
| 4. | Disputed in part. While the paragraph does set forth what 1StopMedia alleged in its answer, this does not support the conclusion that the allegations are undisputed facts. In addition, Plaintiff disputes the claim by 1StopMedia that it is not broadcasting Somoy TV. | See Rasul Aff. ¶ 49. |
| 5. | Disputed. The referenced agreement provides | See Rasul Aff. ¶ 50; |

---

[1] Given the length of each statement, they are not retyped herein.

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | Plaintiff with the "exclusive rights for WiMax Wireless, Internet (IPTV Internet Protocol TV) and Mobile TV. In addition, this paragraph is not a material fact given that Boishaki TV is not part of the Complaint in this action. | Exhibit A to Bhatia Aff. at STAR CABLE 0002. |
| 6. | Disputed. The Independent TV agreement specifically states that the agreement automatically renews after the three years. Since the agreement has never been terminated, Star Cable still retains the exclusive rights to broadcast Independent TV in the United States and Canada over IPTV. | See Rasul Aff. ¶¶ 20, 51-53; Exhibit A to Rasul Aff. |
| 7. | Disputed. With regard to Jamuna TV, the agreement between Star Cable and Jamuna TV automatically renews. Thus, the mere fact that there is no additional documentation showing that the agreement was extended after the first time (which expired on December 1, 2017), does not lead to the conclusion that the agreement is no longer in effect. With regard to Channel 16, Star Cable submits that Siddique's unsupported claim is not sufficient for this Court to find as a matter of law that Channel 16 is no longer broadcasting. | See Rasul Aff. ¶¶ 21, 22, 54-55, 57-58; Exhibits B and C to Rasul Aff. |
| 8. | Disputed. The "certification" is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that no other organization has the exclusive rights with Jamuna TV to broadcast Jamuna TV anywhere in the world is undeniably false given that it is belied by the exclusive agreement between Star Cable and Jamuna TV. | See Rasul Aff. ¶¶ 21, 54, 56; Exhibit B to Rasul Aff. |
| 9. | Disputed. The "certification" is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that Star Cable does not have a valid agreement with Bangla Vision is undeniably false given that it is belied by the exclusive agreement between Star Cable and Bangla Vision. | See Rasul Aff. ¶ 25; Exhibit F to Rasul Aff. |

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
| --- | --- | --- |
| 10. | Disputed. The "certification" is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the letter is directly contradicted by the exclusive agreement between Star Cable and My TV. | See Rasul Aff. ¶¶ 23, 59; Exhibit D to Rasul Aff. |
| 11. | Disputed. The agreement between Star Cable and Ekhusey TV only permits the termination of the agreement prior to the expiration of the five-year term, which does not expire until June 2021, if there is a material breach of the agreement and the breach is not cured within sixty days. Even assuming that the letter attached as Exhibit J to the Bhatia Aff. is authentic, the letter does not come close to complying with the language in the agreement for a proper termination of the agreement. In fact, the letter does not even mention paragraph 10 of the agreement, which, if the letter was authentic, one would expect to see in the letter. | See Rasul Aff. ¶¶ 26, 60-61; Exhibit G to Rasul Aff. |
| 12. | Disputed. Plaintiff disputes the authenticity of these documents. 1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from Asian TV in November 20, 2014, it would then enter into an agreement less than two years later for non-exclusive rights. In addition, Plaintiff and Asian TV entered into an agreement on November 25, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Asian TV provides Plaintiff with the exclusive right to broadcast Asian TV in United States and Canada via IPTV. | See Rasul Aff. ¶¶ 24, 64-65; Exhibit E to Rasul Aff. |
| 13. | Disputed. Plaintiff disputes the authenticity of the referenced documents. 1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from Asian TV in November 20, 2014, it would then enter into an agreement less than two years later for non-exclusive rights. In addition, Plaintiff and Asian TV entered into an agreement on November 25, 2014. The agreement is for eight years. This agreement is still in effect. | See Rasul Aff. ¶¶ 24, 64-65; Exhibit E to Rasul Aff. |

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| | The agreement with Asian TV provides Plaintiff with the <u>exclusive</u> right to broadcast Asian TV in United States and Canada via IPTV. | |
| 14. | Disputed in part. The referenced agreement is for mobile apps, not for broadcasting over IPTV. Thus, this agreement is irrelevant. In addition, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016. The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Bangla Vision provides Plaintiff with the <u>exclusive</u> right to broadcast Bangla Vision in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶¶ 25, 62-63; Exhibit F to Rasul Aff. |
| 15. | Disputed in part. This paragraph is not a material fact given that ATN News TV is not part of the Complaint in this action. | <u>See</u> Rasul Aff. ¶ 3. |
| 16. | Disputed in part. This paragraph is not a material fact given that Boishakhi is not part of the Complaint in this action. | <u>See</u> Rasul Aff. ¶ 3. |
| 17. | Disputed in part. This paragraph is not a material fact given that International TV is not part of the Complaint in this action. | <u>See</u> Rasul Aff. ¶ 3. |
| 18. | Disputed. Plaintiff disputes the authenticity of the referenced document. Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the <u>exclusive</u> right to broadcast Independent TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶¶ 20, 51-53; Exhibit A to Rasul Aff. |

3

| TOTAL CABLE'S STATEMENT | PLAINTIFF'S RESPONSE | SUPPORT FOR RESPONSE |
|---|---|---|
| 19. | Disputed. The agreements at issue are all exclusive agreements as it pertains to IPTV and none of the agreements have been terminated. | See Rasul Aff. ¶¶ 17-27; Exhibits A-H. |
| 20. | Disputed. Even assuming that such statement was made it is unsupported and contradicted by the statements made by Rasul and the documents attached thereto. | See Rasul Aff. ¶¶ 17-27, 45-66; Exhibits A-H. |
| 21. | Disputed. Even assuming that such statement was made it is unsupported and contradicted by the statements made by Rasul and the documents attached thereto. | See Rasul Aff. ¶¶ 17-27, 45-66; Exhibits A-H. |
| 22. | Disputed. This statement is not a material fact, but rather, Bhatia's interpretation of certain documents. There are undeniably issues of fact as to whether 1StopMedia is violating Plaintiff's exclusive rights. | See Rasul Aff. ¶¶ 17-27, 45-66; Exhibits A-H. |

## ADDITIONAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 23. Plaintiff is a cable television company that has exclusive rights, in the United States and Canada, to distribute eight individual programming services, via the signal delivery services internet protocol television system ("IPTV"), WiMax Wireless and Mobile TV. The exclusive services originate in Bangladesh and include: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV (sometimes hereinafter referred to as the "Exclusive Services"). | See Rasul Aff. ¶ 3. |
| 24. Defendants, in direct violation of Plaintiff's exclusive rights, are receiving and using, divulging or retransmitting such communications services, to which they are not entitled, for the purposes of illegally selling said programming to customers of their businesses who subscribe to the Exclusive Services. | See Rasul Aff. ¶ 4. |
| 25. Defendants' conduct is a violation of the Communications Act of 1934, 47 U.S.C. § 605(a), and New York Law. | See Rasul Aff. ¶ 5. |
| 26. Star Cable is a multi-channel provider of subscription video services included in a channel lineup, which includes hundreds of | See Rasul Aff. ¶ 8. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| channels including several from Bangladesh, which are defined above as the Exclusive Services and which are the subject of this action. Additionally, Star Cable offers its subscribers telephone services and high speed data service otherwise known as internet access. | |
| 27. Unlike its competitors, cable television and satellite television, Star Cable transmits its signals from its head end located in Queens, New York, to its subscribers via the internet in the process known as Internet Protocol Television (i.e. IPTV). | See Rasul Aff. ¶ 9. |
| 28. In order to provide the Exclusive Services, Star Cable negotiated and contracted with each Exclusive Service in multi-year Network Affiliation Agreements (the "Agreements"). The Agreements grant exclusive rights to various companies in various nations determined by the method in which their signal is delivered. So, for example, there might be exclusive distribution rights for the United States for a satellite delivery services such as Direct TV. | See Rasul Aff. ¶ 10. |
| 29. In this case, Star Cable was granted exclusive distribution rights for WiMax wireless, IPTV and Mobile TV ("the Exclusive Rights"). | See Rasul Aff. ¶ 11. |
| 30. Because Star Cable generates revenues through the sale of subscription packages and other programming, and because the ability to attract and retain distribution rights for programming is dependent upon preventing unauthorized reception of Star Cable's video channels, Star Cable's channels are digitally secured and encrypted. The encrypted video services are then transmitted via the internet to its customers. | See Rasul Aff. ¶ 12. |
| 31. Each Star Cable customer receives a set top channel converter that contains the technology to receive encrypted programming from Star Cable, determine which services the subscriber has purchased and decrypt those services so that they are intelligible on a television screen. The set top box can also communicate with Star Cable for the purposes of purchasing pay per view material and billing for the same. | See Rasul Aff. ¶ 13. |
| 32. The set top box is part of the monthly service charge of a customer's purchase of IPTV service. If a customer wants a second set top box a service charge is added to the customer's bill each month. | See Rasul Aff. ¶ 14. |
| 33. The set top box provided to a Star Cable customer is designed to make a direct-to-server internet connection with the Star Cable server. Once connected to the Star Cable server, the Star Cable box streams the video channels from the server directly onto the customer's television. | See Rasul Aff. ¶ 15. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| The customer can then use the remote control tied to the set top box and watch programming in real time, in essence, live as transmitted. | |
| 34. Star Cable, through IPTV, has essentially, identical functionality of a satellite delivery service or a cable television service. | See Rasul Aff. ¶ 16. |
| 35. Star Cable has been the beneficiary of exclusive agreements for WiMax, IPTV and Mobile TV for the Exclusive Services: i) Independent TV; ii) Jamuna TV; iii) Channel 16; iv) My TV; v) Asian TV; vi) Bangla Vision; vii) Ekhusey TV; and viii) Somoy TV, for all regions within the United States and Canada. | See Rasul Aff. ¶ 17. |
| 36. A representative of Star Cable traveled to Bangladesh to sign, and did sign, exclusive Network Affiliation Agreements with representative officers of Asian TV, My TV, V.M. International Ltd., Independent Television, Ltd., Channel 16 Insight Telecast, and Jamuna Television. | See Rasul Aff. ¶ 18. |
| 37. A representative of Star Cable met in New York with a representative officer of Ekhushey Television, Ltd. and Shamol Bangla Media Ltd. Similar exclusive Network Affiliation Agreements were executed by mail between Star Cable and Somoy Media Limited. | See Rasul Aff. ¶ 19. |
| 38. More specifically, with regard to Independent TV, Plaintiff and Independent TV entered into an agreement on November 26, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Independent TV provides Plaintiff with the exclusive right to broadcast Independent TV in United States and Canada via IPTV. | See Rasul Aff. ¶ 20; Exhibit A to Rasul Aff. |
| 39. With regard to Jamuna TV, Plaintiff and Jamuna TV entered into an agreement on December 1, 2014. The agreement is for three years and it automatically renews for another three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement. This agreement has not been terminated and is still in effect. The agreement with Jamuna TV provides Plaintiff with the exclusive right to broadcast Jamuna TV in United States and Canada via IPTV. | See Rasul Aff. ¶ 21; Exhibit B to Rasul Aff. |
| 40. With regard to Channel 16, Plaintiff and Channel 16 entered into an agreement on November 24, 2014. The agreement is for eight years. This agreement is still in effect. The agreement with Channel 16 | See Rasul Aff. ¶ 22; Exhibit C to Rasul Aff. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| provides Plaintiff with the <u>exclusive</u> right to broadcast Channel 16 in United States and Canada via IPTV. | |
| 41.  With regard to My TV, Plaintiff and My TV entered into an agreement on November 30, 2014.  The agreement is for nine years.  This agreement is still in effect.  The agreement with My TV provides Plaintiff with the <u>exclusive</u> right to broadcast My TV in United States and Canada via IPTV. . | <u>See</u> Rasul Aff. ¶ 23; Exhibit D to Rasul Aff. |
| 42.  With regard to Asian TV, Plaintiff and Asian TV entered into an agreement on November 25, 2014.  The agreement is for eight years.  This agreement is still in effect.  The agreement with Asian TV provides Plaintiff with the <u>exclusive</u> right to broadcast Asian TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 24; Exhibit E to Rasul Aff. |
| 43.  With regard to Bangla Vision, Plaintiff and Bangla Vision entered into an agreement on June 1, 2016.  The agreement is for two years and it automatically renews for a three-year term unless one party provides at least 90 days written notice to the other side of its desire to terminate the agreement.  This agreement has not been terminated and is still in effect.  The agreement with Bangla Vision provides Plaintiff with the <u>exclusive</u> right to broadcast Bangla Vision in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 25; Exhibit F to Rasul Aff. |
| 44.  With regard to Ekhusey TV, Plaintiff and Ekhusey TV entered into an agreement on June 9, 2016.  The agreement is for five years.  This agreement is still in effect.  The agreement with Ekhusey TV provides Plaintiff with the <u>exclusive</u> right to broadcast Ekhusey TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 26; Exhibit G to Rasul Aff. |
| 45.  With regard to Somoy TV, Plaintiff and Somoy TV entered into an agreement on July 1, 2014.  The agreement is for five years.  This agreement is still in effect.  The agreement with Somoy TV provides Plaintiff with the <u>exclusive</u> right to broadcast Somoy TV in United States and Canada via IPTV. | <u>See</u> Rasul Aff. ¶ 27; Exhibit H to Rasul Aff. |
| 46.  Defendants are telecommunications distribution companies that sell telephony services, high speed data services and which operate a television signal distribution business. They are currently distributing their television signals through an IPTV distribution system through which channels are delivered using the architecture and networking methods of the Internet Protocol Suite over the internet through broadband internet access networks.  Defendants' signal delivery system is almost identical to that of Star Cable. | <u>See</u> Rasul Aff. ¶ 28. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| 47. Defendants' customers must pay a monthly subscription fee, dependent upon the level of programming services purchased and ordered from Defendants. | See Rasul Aff. ¶ 29. |
| 48. Defendants each actively advertise the Exclusive Services to their customers and market themselves as having rights to distribute these services to customers who desire to watch Bangladeshi programming. | See Rasul Aff. ¶ 30. |
| 49. In direct derogation of the exclusive rights of Star Cable, Defendants receive the Exclusive Services in the United States and use or divulge or redistribute said communications to their customers. Said actions of Defendants are an unauthorized divulgence of satellite signals. | See Rasul Aff. ¶ 31. |
| 50. Defendants' violations of Plaintiff's exclusive rights has injured and will continue to injure Star Cable by, among other things, damaging the preeminent reputation of Star Cable as the holder of exclusive rights to the Exclusive Services, depriving Star Cable of revenues derived from the distribution of its programming and by interfering with the contractual and prospective business relationships of Star Cable. | See Rasul Aff. ¶ 32. |
| 51. In its motion, 1StopMedia does not dispute that it is also broadcasting the Exclusive Services. According to 1StopMedia, however, its conduct is not improper because Plaintiff supposedly does not have the exclusive rights to the eight programming services that comprise the Exclusive Services and that 1StopMedia supposedly has rights to broadcast the Exclusive Services. | See Rasul Aff. ¶ 45. |
| 52. Almost all of the documents relied upon by 1StopMedia are unauthenticated and uncertified. | See Rasul Aff. ¶ 46. |
| 53. The documents do not support the relief sought by 1StopMedia. | See Rasul Aff. ¶ 47. |
| 54. In the March 25, 2019 Affirmation of Satish K. Bhatia in support of 1StopMedia's motion ("Bhatia Aff."), Bhatia claims that 1StopMedia is not broadcasting Somoy TV, just because it so alleged in its answer to the Complaint. This is insufficient to find as a matter of law that 1StopMedia is not broadcasting Somoy TV. | See Rasul Aff. ¶ 48. |
| 55. Boishaki TV is not part of the claims in this action. | See Rasul Aff. ¶ 49. |
| 56. The Independent TV agreement specifically states that the agreement automatically renews after the three years. The agreement | See Rasul Aff. ¶ 52. |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| has never been terminated and Star Cable still retains the exclusive rights to broadcast Independent TV in the United States and Canada over IPTV. | |
| 57. 1StopMedia does not deny broadcasting Independent TV -- which is in clear contravention of Star Cable's exclusive rights. | See Rasul Aff. ¶ 53. |
| 58. The agreement between Star Cable and Jamuna TV automatically renews. Thus, the mere fact that there is no additional documentation showing that the agreement was extended after the first time (which expired on December 1, 2017), does not lead to the conclusion that the agreement is no longer in effect. | See Rasul Aff. ¶ 55. |
| 59. The document attached as Exhibit G to the Bhatia Aff. is not authenticated or certified in any manner. It is not notarized and consists of a letter "To Whom it May Concern." Further, the statement in the document that no other organization has the exclusive rights with Jamuna TV to broadcast Jamuna TV anywhere in the world is belied by the exclusive agreement between Star Cable and Jamuna TV. | See Rasul Aff. ¶ 56; Exhibit B to Rasul Aff. |
| 60. Even assuming that Channel 16 has an agreement with Lalon TV, 1StopMedia does not put forth anything to demonstrate that this would insulate it from liability in this matter. | See Rasul Aff. ¶ 57. |
| 61. The only support for the statement that Channel 16 is no longer broadcasting is the unsupported assertion made by the president of 1StopMedia, Saiful Siddique ("Siddique"). | See Rasul Aff. ¶ 57. |
| 62. The document attached as Exhibit I to the Bhatia Aff. is nothing more than a letter "To Whom it May Concern" that is not authenticated, not certified and not notarized. And, the letter is directly contradicted by the exclusive agreement between Star Cable and My TV. | See Rasul Aff. ¶ 59; Exhibit D to Rasul Aff. |
| 63. The letter attached as Exhibit J to the Bhatia Aff. does not demonstrate that Ekhusey TV terminated its agreement with Star Cable by sending a letter to Star Cable on August 23, 2016. | See Rasul Aff. ¶ 60. |
| 64. The agreement between Star Cable and Ekhusey TV only permits the termination of the agreement prior to the expiration of the five-year term, which does not expire until June 2021, if there is a material breach of the agreement and the breach is not cured within sixty days. | See Rasul Aff. ¶ 61; Exhibit G to Rasul Aff. ¶ 10. |
| 65. Even assuming that the letter attached as Exhibit J to the Bhatia Aff. is authentic, the letter does not come close to complying with the | See Rasul Aff. ¶ 61; Exhibit G to Rasul |

| PLAINTIFF'S STATEMENT | SUPPORT FOR STATEMENT |
|---|---|
| language in the agreement for a proper termination of the agreement. In fact, the letter does not even mention paragraph 10 of the agreement, which, if the letter was authentic, one would expect to see in the letter. | Aff. ¶ 10. |
| 66.  With regard to Bangla Vision, 1StopMedia claims that it cannot be liable for its broadcasting of this service because it entered into an agreement with Bangla Vision on September 23, 2014.  The referenced agreement, however, is for mobile apps. | See Rasul Aff. ¶¶ 62-63. |
| 67.  1StopMedia puts forth no explanation as to why if it supposedly obtained exclusive rights from Asian TV in November 20, 2014 it would then enter into an agreement less than two years later for non-exclusive rights. | See Rasul Aff. ¶¶ 64-65. |

Dated:  April 22, 2019

Respectfully submitted,

HOGAN & CASSELL, LLP
Attorneys for Star Cable NA, Inc.

By:

Michael Cassell
500 North Broadway, Suite 153
Jericho, New York 11753
(516) 942-4700
(516) 942-4705
mcassell@hogancassell.com

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

STAR CABLE NA, INC.,                           Docket No. 16-cv-04067

                              Plaintiff,

        vs.

TOTAL CABLE USA LLC. and RADIANT IPTV

                              Defendants.

----------------------------------------------------------------x

# REPLY AFFIRMATION AND MEMORANDUM IN OPPOSITION TO THE OPPSITION FILED BY THE PLAINTIFF

SATISH K. BHATIA, ESQ.,
Bhatia & Associates PLLC
*Attorneys for the Defendants*
38 West, 32nd Street, Suite #1511
New York, NY 10001
Tel: 212-239-6898
Fax: 212-594-7980

## <u>TABLE OF AUTHORITIES</u>

Alvarez v. Prospect Hosp.,

  68 N.Y.2d 320, 324 (1986)…………………………………………….Page 6


Barthelemy v. Air Lines Pilots Ass'n, 897

F2d 999, 1018 (9th Cir. 1990)…………………………………………Page 3


Block v City of L.A., 253 F.3d 410, 419 (9th Cir. 2001)………………..Page 4


Carroll v Radoniqi,

105 A.D.3d 493, 494 (1st Dept. 2013)…………………………………Page 6


Crossell v Wing Farm, Inc.

79 A.D.3d 1334, 1336 (3d Dept. 2010)…………………………………..Page 7


Hecker v Liebgold,

130 A.D.3d 572, 574(2d Dept. 2015)……………………………..………Page 6


Hlinka v Bethlehem Steel Corp.,

863 F.2d 279, 282 (3d Cir. 1988)………………………………………Page 4


Josendis v Wall to Wall Residence Repairs Inc.,

662 F.3d 1292, 1317 (11th Cir. 2011)……………………………..……Page 4


Reale v Tsoukas,

146 A.D.3d 833, 835 (2d Dept. 2017)……………………………..…….Page 7

Stonehill Capital Management, LLC v

Bank of the W., 28 N.Y.3d 439, 448 (2016)………………..……………..Page 6

**Statutes and Rules:**

FRCP 56(c)(4)……………………………………………………………….Pages 3-4

Individual Rules of Honorable

Sterling Johnson Jr. III E……………………………………………………Page 2

## INTRODUCTION

1.  The Plaintiff has commenced the present action against the Defendant 1stop Media &
    Entertainment Inc. alleging that the Plaintiff has exclusive rights to broadcast the eight
    channels mentioned in paragraph 1 of the second amended complaint (Docket No. 38).
    The Defendant 1stop Media & Entertainment Inc. in its answer alleged that the Defendant
    1stop Media & Entertainment Inc. has been broadcasting channels with the consent and
    based on the agreements with the content owners (Docket No. 49). The issue to be
    determined by the Court in this action is whether the Defendant has been broadcasting the
    channels mentioned in the complaint with the consent and based on the agreements with
    the content owners.

## THE OPPOSITION FILED BY THE PLAINITFF IS UNTIMELY AS IT HAS BEEN IN VIOLATION OF THE INDIVIUAL RULES OF THIS COURT

2.  The Court set up deadlines for filing the motion, opposition and reply. The Court ordered
    that the Defendants' motion seeking summary judgment was due by March 14, 2019, the
    Plaintiff's response was due March 21, 2019 and the status conference was scheduled on
    March 26, 2019 (Docket sheet dated March 7, 2019). On March 30, 2019, the Court
    granted extension of time with consent of Defendant's Counsel and changed the schedule
    as ordered on March 7, 2019 (Docket No. 78). The Court ordered that the Defendants'
    motion shall be served by March 25, 2019; Plaintiff's opposition shall be served by April
    9, 2019, the Defendants' reply shall be served by April 17, 2019 and all papers would be
    filed by the end of April 19, 2019. On March 25, 2019, the Defendants provided the
    notice of motion and supporting documents as ordered by the Court to the attorney for the
    Plaintiff. Due to oversight the memorandum prepared by our office was not provided to

the Plaintiff's attorney along with the notice of motion seeking summary judgment. On March 20, 2019, I wrote a letter to this Honorable Court requesting to extend the time to file a reply by the Defendants by April 25, 2019 since I was on vacation. The letter was written with the consent of Michael Cassell, the Plaintiff's attorney (Docket No. 79). On April 2, 2019, the Court granted the extension. Subsequently on April 18, 2019, I received an email from the Plaintiff's Counsel indicating therein that he was trying to provide the opposition by the end of April 19, 2019 but he needs a few days extension due to his hectic schedule. I responded to the email that if I received the opposition by April 23, 2019, I would need time to file the reply until May 2, 2019. The Plaintiff's Counsel sent another email indicating that he consents to as much time as I need to provide the reply. The copy of the exchange of emails during the period of April 18-April 22 are annexed with this memorandum as **Exhibit A**.

3. The Plaintiff's Counsel served the opposition and the memorandum of law on April 23, 2019. Though the deadline to file the opposition was April 9, 2019, the Plaintiff's attorney Michael Cassell filed the opposition on April 23, 2019 with my consent. However, the Plaintiff's attorney did not write a letter to the Court for approval of change of schedules to file an opposition as ordered by the Court on April 2, 2019.

4. The individual rules of this Court pertaining to motions III E, provides "Subject to Court approval, parties may agree on briefing schedule. **No changes in the approved schedule may be made without Court approval**". The opposition filed on April 23, 2019 without Court approval is liable to be rejected.

## THE AFFIDAVIT FILED BY SHAHID BOB RASUL IN OPPOSITION TO THE MOTION FILED BY THE DEFENDANTS FOR SUMMARY JUDGMENT IS NOT BASED ON THE PERSONAL KNOWLEDGE OF SHAHID BOB RASUL AND AS SUCH MR. RASUL'S AFFIDAVIT CANNOT BE CONSIDERED

5.  Shahid Bob Rasul in his affidavit indicates that he is the Chief Technology Officer of the Plaintiff Star Cable NA Inc. and he submitted the affidavit in opposition to the motion for summary judgment filed by 1stop Media & Entertainment Inc. The Chief Technology Officer is simply an employee of the Plaintiff and has no personal knowledge about the issues involved in the motion for summary judgment. Mr. Rasul does not state in his affidavit that he has personal knowledge of the facts of the case and/or source of his knowledge. The declaration/affidavit must be based on personal knowledge as mandated in the Federal Rule of Civil Procedure 56(c)(4). FRCP 56(c)(4) provides:

> "*Affidavits of Declarations.* An affidavit or declaration
> used to support or oppose a motion must be made on
> personal knowledge, set out facts that would be
> admissible in evidence, and show that the affiant or
> declarant is competent to testify on the matters stated".

An affiant's personal knowledge can be reasonably inferred from his/her position and from the nature of his/her personal participation in the matters sworn to in the affidavit. (*See* Barthelemy v. Air Lines Pilots Ass'n, 897 F2d 999, 1018 (9th Cir. 1990). In the present case, Mr. Rasul's position is only as a Chief Technology Officer and does not claim that he is the Principal Officer or the President of Star Cable NA Inc. If the affidavits content makes clear that the affiant relies information from others rather than

first hand participation and experience, the Court may properly refuse to consider the affidavit as not based on personal knowledge. (*See* Block v City of L.A., 253 F.3d 410, 419 (9th Cir. 2001). A statement by the affiant that he/she believes a fact to be true or attest to a fact upon information and belief does not satisfy the requirement that a witness has personal knowledge of the facts. (*See*, e.g., Josendis v Wall to Wall Residence Repairs Inc., 662 F.3d 1292, 1317 (11th Cir. 2011); Hlinka v Bethlehem Steel Corp., 863 F.2d 279, 282 (3d Cir. 1988). The declaration/affidavit must show that the declarant is competent to testify on the matters stated in the declaration, FRCP 56(c)(4).

## THE PLAINTIFF FAILED TO CONTRADICT THE DOCUMENTS RELIED UPON BY THE DEFENDANTS SHOWING THAT THE DEFENDANT HAS BEEN BROADCASTING VARIOUS CHANNELS WITH THE CONSENT OF THE CONTENT OWNERS

6. The Defendant 1stop Media & Entertainment Inc. has annexed various agreements with the content owners, Exhibits K, L M, N, O, P and Q with the affirmation in support of the motion for summary judgment. Mr. Rasul in his affidavit does not deny that these agreements were not executed between the Defendant 1stop Media & Entertainment Inc. and the content owners. Sajid Sohail, the Vice President of Star Cable NA Inc. appeared in the deposition conducted by Joseph F. Kasper, Of Counsel of our law firm. In response to a question of whether Mr. Sohail was aware that Asian Telecast Ltd. entered into agreement with 1stop Media & Entertainment Inc. on November 20, 2014, his response was "I do not know." (Page 28, lines 3-8 of the examination of Sajid Sohail). The agreement was exhibited during the deposition as Exhibit D. Mr. Kasper, asked another question of whether Mr. Sohail was aware that there was a second agreement

between Asian TV and 1stop Media & Entertainment Inc. on June 6, 2016, his response

was "I do not know." (Page 30, lines 14-18 of the examination of Sajid Sohail). This

agreement was exhibited as Exhibit E.  In response to another question of whether Mr.

Sohail was aware that Ekushey TV also entered into agreement with 1stop Media &

Entertainment Inc. and the agreement was signed by Fakrool Alam on behalf of Ekushey

TV, his response was "I do not Know." (Page 32, lines 9-16 of the examination of Sajid

Sohail).  Mr. Kasper asked Mr. Sohail whether he was aware that the entity known as

Channel 16 also entered into agreement with 1stop Media & Entertainment Inc., his

response was "I do not know." (Page 32, lines 22-25 and page 33, lines 2-3 of the

examination of Sajid Sohail).  The agreement was exhibited as Exhibit F.  In response to

the question, whether Mr. Sohail recognized the agreement between ATN News TV and

1stop Media & Entertainment Inc., he responded "I do not know." (Page 35, lines 5-9 of

the examination of Sajid Sohail).  In response to the question of whether he was aware of

the agreement between ATN Bangla Ltd. and 1stop Media & Entertainment Inc., he

responded "No.", (Page 36, lines 18-22 of the examination of Sajid Sohail).  In response

to the question of whether Mr. Sohail was aware of the agreement between International

TV Channel Ltd. and 1stop Media & Entertainment Inc., again he responded "No.",

(Page 37, lines 20-24).  In response to the question of whether Mr. Sohail was aware of

the agreement Independent TV Ltd. and 1stop Media & Entertainment Inc., his response

was "I do not know." (Page 39, lines 11-16 of the examination of Sajid Sohail).  The

agreement was exhibited as Exhibit J during the deposition.  Mr. Kasper also confronted

in the deposition that a notice of default was issued to Star Cable NA Inc. by

Banglavision.  Mr. Sohail admitted that in the notice of default, Banglavision requested

Star Cable NA Inc. to pay the arrears within two months. Mr. Kasper questioned Mr. Sohail of whether Star Cable NA Inc. ever complied with the notice of default and Mr. Sohail responded, "I am not sure." (Page 46, lines 8-11 of the examination of Sajid Sohail. In fact, Mr. Kasper confronted all of the agreements between 1stop Media & Entertainment Inc. and the content owners and the response of Mr. Sohail was that he wasn't aware of any agreements. The relevant portion of the transcripts are annexed with this reply affirmation/memorandum as **Exhibit B**.

## **BACKGROUND LAW**

7. In order to succeed on a motion for summary judgment, the proponent must demonstrate prima facie entitlement to judgment as a matter of law and the absence of any material issues of fact. Stonehill Capital Management, LLC v Bank of the W., 28 N.Y.3d 439, 448 (2016). Once such a showing has been made, "the burden shifts to the party opposing the motion for summary judgment to procedure evidentiary proof in admissible from sufficient to establish the existence of material issues of fact which require a trial of the action." Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324 (1986).

8. Though the facts are viewed in the light most favorable to the non-moving party, "bald, conclusory assertions or speculation" are "insufficient to defeat summary judgment." Stonehill, 28 N.Y.3d at 448. The same is true for "merely conclusory claims." *Id.*; see also Hecker v Liebgold, 130 A.D.3d 572, 574(2d Dept. 2015) ("Bare conclusory assertions, such as those contained in [an] affidavit… are insufficient to demonstrate the absence of any triable issues of fact") (internal quotations omitted); Carroll v Radoniqi, 105 A.D.3d 493, 494 (1st Dept. 2013) (upholding grant of summary judgment for

defendant where, "[p]laintiff had no personal knowledge [of certain allegations]... and his remaining allegations were simply too speculative and conclusory to have merit.").

9. "A party who seeks a finding that a summary judgment motion is premature is required to put forth some evidentiary basis to suggest that discovery might lead to relevant evidence or that the facts essential to justify opposition to the motion were exclusively within the knowledge and control of the movany." Reale v Tsoukas, 146 A.D.3d 833, 835 (2d Dept. 2017). If the party opposing the motion cannot meet that burden, summary judgment is properly granted. Crossell v Wing Farm, Inc. 79 A.D.3d 1334, 1336 (3d Dept. 2010) (granting summary judgment for defendant where plaintiff's claims were "were completely unsupported with evidence or specific factual references.").

## THE COMPLAINT FILED BY STAR CABLE NA INC. SHOULD BE DISMISSED

10. The real controversy in the present case is whether the Defendant 1stop Media & Entertainment Inc. has been broadcasting various channels mentioned in the complaint with the consent and based on the agreement between the content owners and 1stop Media & Entertainment Inc. The Defendant 1stop Media & Entertainment Inc. has filed the agreements between the content owners and 1stop Media & Entertainment Inc. The Plaintiff does not deny in the affidavit of Mr. Rasul or in the deposition of Mr. Sohail the execution of the agreements between the content owners and 1stop Media & Entertainment Inc. but allege that the content owners granted exclusive rights to the Plaintiff to broadcast the channels. Assuming arguendo that the content owners in violation of the agreements with the Plaintiff also executed agreements with other entities including 1stop Media & Entertainment Inc., the Plaintiff has no cause of action to sue the entities who have also been granted rights to broadcast the channels by the content

owners. If the content owners in violation of their agreement with the Plaintiff also granted rights to other entities, the Plaintiff should have sued the content owners seeking damages and not other entities who have been broadcasting the channels with the consent of the content owners. The Court will also note that we have annexed with complaint, answer and stipulation of dismissal of another action commenced by Star Cable NA Inc. against Lalon TV Inc., Total Cable BD, Habibur Rahman, Shahinul Karim, Shahidul Bari, Syed Ahmed and Ahmodul Barobhuiya.

11. The Plaintiff Star Cable NA Inc. was represented by the attorney Michael Cassell in its action commenced against Lalon TV and others, and when Lalon TV showed the agreements between Lalon TV with the content owners, the Plaintiff's attorney Michael Cassell agreed to discontinue that action and a stipulation of dismissal was signed by the respective attorneys of the parties and so ordered by the Court. The Court will note that the allegations in the complaint against Lalon TV and against Total Cable USA LLC & 1stop Media & Entertainment Inc. are identical. The complaint was filed against Lalon TV and other alleging violation of the copyright in respect of the same eight channels, the violations of which is alleged in the present complaint filed against Total Cable USA LLC & 1stop Media & Entertainment Inc.

## THE AFFIANT SHAHID BOB RASUL IS NOT COMPETENT TO PROVE THE AGREEMENTS BETWEEN STAR CABLE NA INC. AND THE CONTENT OWNERS ANNEXED AS EXHIBITS A-H WITH HIS AFFIDAVIT

12. As stated above, Mr. Rasul is the Chief Technology Officer as admitted himself in his affidavit and he does not claim that he has personal knowledge that the agreements with the content owners are continuing. Exhibit A is the affiliation agreement with

Independent TV Ltd. and Star Cable NA Inc. signed by Sajid Sohail on behalf of Star

Cable NA., Inc. and Shamsur Rahman on behalf of Independent TV Ltd. on November

26, 2014.  The affiant, Mr. Rasul is not a signatories to the agreement which was for three

years.  In paragraph 12 of the affidavit, Mr. Rasul states that this agreement is not

terminated.  Relevant clause 2 of the agreement pertaining to termination states that after

the expiration of 3 years, the fee shall be negotiated, and the network shall provide a

written notice to the affiliate of the proposed license fee for the next renewal.  Mr. Rasul

does not allege in his affidavit that any fee was negotiated after the term of three years.

There is therefore no evidence that the affiliation agreement between the Plaintiff and

Independent TV is still in force.  Clause 1 of the agreement further provides that the

affiliate shall have non-exclusive rights to distribute the services.  Similarly, the

agreement annexed as Exhibit B with the affidavit of Mr. Rasul was not signed by Mr.

Rasul and was signed by Sajid Sohail as the Director of Star Cable NA Inc.  Sajid Sohail

who testified in the deposition on behalf of the Plaintiff did not file any affidavit in

opposition.  The other agreements between Star Cable NA Inc. and the content owners

annexed as Exhibits C, D, E, F, G and H were all signed by Sajid Sohail.  Mr. Rasul was

not the signatories of any agreement.

13. Mr. Rasul alleged in his affidavit that the documents filed by 1stop Media &

Entertainment Inc. are not authenticated.  However, Mr. Rasul does not claim that the

documents relied upon by 1stop Media & Entertainment Inc. were not signed by the

content owners or those documents were fabricated or false.

## **CONCLUSION**

14. In view of the above reasons, the Defendant 1stop Media & Entertainment Inc. requests

that this Court reject the opposition filed by the Plaintiff in violation of the local rules of

this Court and in view of the fact that the opposition was supported by the affidavit of

Bob Rasul who is not competent and does not claim any personal knowledge and in view

of the proposition of law explained above, the Court should grant the motion filed by

1stop Media & Entertainment Inc. seeking summary judgment dismissing the complaint

filed by the Plaintiff.

Dated: May 2, 2019

Respectfully submitted,

SATISH K. BHATIA, ESQ.,
Bhatia & Associates PLLC
38 West, 32nd Street, Suite #1511
New York, NY 10001
Tel: 212-239-6898
Fax: 212-594-7980

# EXHIBIT A

Apr 22 at 11:00 AM

**Michael Cassell** <mcassell@hogancassell.com>
To: 'satish bhatia'

I will have the opposition to you tomorrow.  I consent to as much time as you need for the reply.  I appreciate the additional time.

Mike

Hide original message

**From:** satish bhatia [mailto:satishbhatiaus@yahoo.com]
**Sent:** Friday, April 19, 2019 3:59 PM
**To:** Michael Cassell
**Subject:** Re: Star Cable v Total Cable USA LLC

Michael,

I am on vacation right now and I will be back on April 22, 2019.  If I receive the opposition by April 23, 2019, I will need time until May 2, 2019 to file a reply to your opposition.

Regards,

Satish K Bhatia, Esq.
Bhatia & Associates PLLC
38W 32nd Street Suite # 1511
New York NY 10001
Phone: (212) 239-6898
Fax: (212) 594-7980

Disclaimer:

This email is intended only for the use of the individual to whom or the entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please notify us immediately by collect telephone.

5/3/2019 (2,984 unread) - satishbhatiaus@yahoo.com - Yahoo Mail

On Thursday, April 18, 2019, 8:53:02 PM EDT, Michael Cassell <mcassell@hogancassell.com> wrote:

I am trying to provide you with the opposition by the end of the day tomorrow, but I will most likely need a few-day extension. Most significantly, my partner has been out all week on a personal issue, leaving me to handle everything. In addition, I just got notice that I have to be in Kings Supreme Court tomorrow morning to respond to an Order to Show Cause. I should be able to get you the opposition by the end of the day on Monday (Tuesday at the latest). Obviously, I will agree to provide you with as much time as you need for the reply. Please advise.

Michael Cassell

# EXHIBIT B

ORIGINAL

1

2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

3    ------------------------------------------X
     STAR CABLE NA, INC.,

4
                                PLAINTIFF,
5
                   -against-        Index No.
6                                   16-CV-04067(SJ)

7    TOTAL CABLE USA LLC. and ISTOPMEDIA AND
     ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
8    ABC, INC., XYZ CORP. and JOHN DOES 1-10,

9                                DEFENDANTS.
     ------------------------------------------X

10

11                   DATE:   June 8, 2018

12                   TIME:   12:14 P.M.

13

14

15              EXAMINATION BEFORE TRIAL of the

16   Plaintiff, STAR CABLE NA, INC., by a

17   witness, SAJID SOHAIL, the Plaintiff, taken

18   by the Defendant, pursuant to Stipulation,

19   held at the law office of Michael Kessler,

20   located at 500 North Broadway, Suite 153,

21   Jericho, New York 11753, before Martha

22   Trikas, a Notary Public of the State of New

23   York.

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    HOGAN & CASSELL, LLP
          Attorney for the Plaintiff
 5        STAR CABLE NA, INC.
          500 North Broadway, Suite 153
 6        Jericho, New York 11753
          BY:  SHAUN K. HOGAN, ESQ.
 7

 8
      BHATIA & ASSOCIATES, PLLC
 9        Attorneys for the Defendants
          TOTAL CABLE USA LLC. and ISTOPMEDIA AND
10        ENTERTAINMENT, INC. d/b/a RADIANT IPTV,
          ABC, INC., XYZ CORP. and JOHN DOES 1-10
11        38 West 32nd Street, Suite 1511
          New York, New York 10001
12        BY:  JOSEPH F. KASPER, ESQ., of Counsel

13

14

15

16

17

18
                    *          *          *
19

20

21

22

23

24

25
```

```
 1                       S. SOHAIL
 2          A.    I don't remember.
 3          Q.    Are you aware that Asian
 4    Telecast Limited doing business as Asian TV
 5    also entered into an agreement with
 6    1Stopmedia and Entertainment doing business
 7    as Radiant IPTV on November 20th, 2014?
 8          A.    I don't know.
 9               MR. KASPER:  Give me a moment,
10          Counsel.
11               MR. HOGAN:  Yes.
12               THE WITNESS:  I need a copy of
13          that.
14               MR. KASPER:  Off the record.
15               (Whereupon, an off-the-record
16          discussion was held.)
17               MR. KASPER:  I ask this
18          document be marked as Defendants'
19          Exhibit D for identification
20          (handing).
21               I move to enter into evidence.
22               (Whereupon, the aforementioned
23          business agreement was marked as
24          Defendants' Exhibit D for
25          identification as of this date by the
```

DIAMOND REPORTING   (718) 624-7200    info@diamondreporting.com

28

```
 1                    S. SOHAIL
 2          Reporter.)
 3                MR. KASPER:  I move to enter
 4          into evidence.
 5          Q.    I show you this document that's
 6     been marked as Defendants' Exhibit D
 7     (handing).
 8                And I'm going to ask you to
 9     look at the agreement and look at the
10     person who signed the agreement on behalf
11     of Asian Telecast Limited and ask you:  Do
12     you recognize the name of that individual?
13          A.    (Complying.)
14                No.
15          Q.    I call your attention to Clause
16     11 of that agreement.
17                MR. HOGAN:  Read it all.
18                THE WITNESS:  (Complying.)
19          A.    Yes.
20                MR. KASPER:  I'm sparing
21          counsel the necessity of saying the
22          document speaks for itself.
23          Q.    Is it correct that that clause
24     provides that it was an agreement for three
25     years?
```

```
 1                    S. SOHAIL
 2              MR. HOGAN:  You can answer.
 3         A.    What is your question?
 4         Q.    Is it correct based upon your
 5    reading and understanding of that clause
 6    that that subject agreement runs for a
 7    period of three years?
 8         A.    Yes, that's what it says.
 9         Q.    And is it also your
10    understanding that there was a provision
11    for automatic renewal for another three
12    years?
13         A.    Yes.
14         Q.    Now, are you aware that there
15    was a second agreement between Asian TV and
16    1Stopmedia Entertainment which was, in
17    fact, executed on June 6, 2016?
18         A.    I don't know.
19              MR. KASPER:  I would ask this
20         document be marked for identification
21         as Defendants' Exhibit E (handing).
22              (Whereupon, the aforementioned
23         business agreement was marked as
24         Defendants' Exhibit E for
25         identification as of this date by the
```

```
 1                    S. SOHAIL
 2          Reporter.)
 3          Q.    I show you the document marked
 4     as Defendants' Exhibit E (handing).
 5                I'm going to ask you to look at
 6     said agreement, and I'm going to ask you if
 7     you can see on the page where someone
 8     signed their name on behalf of Asian TV.
 9          A.    Yes.
10          Q.    And can you tell me the name of
11     that person.
12          A.    It says K.M. Abdullah.
13          Q.    And are you familiar with that
14     individual?
15          A.    No.
16                MR. KASPER:  Off the record.
17                (Whereupon, an off-the-record
18                discussion was held.)
19          Q.    Is it correct that a company
20     that you're associated with, Star Cable,
21     entered into an agreement with the Ekushey
22     television channel?
23          A.    Yes.
24          Q.    Do you recall the date that you
25     entered into the agreement roughly, that
```

```
 1                    S. SOHAIL
 2    you entered into the agreement with the
 3    Ekushey channel?
 4         A.    I don't remember.
 5         Q.    Are you aware that Ekushey TV
 6    also entered into an agreement with
 7    1Stopmedia and Entertainment?
 8         A.    No.
 9         Q.    Are you aware that that
10    agreement was signed by Fakrool Alam;
11    F-A-K-R-O-O-L A-L-A-M?
12         A.    (No response.)
13         Q.    So you're not aware whether an
14    agreement was signed with Fakrool Alam on
15    behalf of Ekushey TV and 1Stopmedia?
16         A.    I don't know.
17         Q.    Would you know if he was the
18    person that signed the agreement with your
19    company?
20         A.    I believe so.
21               But I'm not sure.
22         Q.    Are you aware that an entity
23    known as Channel 16 also entered into an
24    agreement with 1Stopmedia and
25    Entertainment, Incorporated on or about
```

```
 1                    S. SOHAIL
 2    September 9th, 2014?
 3         A.    I don't know.
 4              MR. KASPER:  I ask this
 5         document be marked for identification
 6         as Defendants' F (handing).
 7              (Whereupon, the aforementioned
 8         Insight Telecast document was marked
 9         as Defendant's Exhibit F for
10         identification as of this date by the
11         Reporter.)
12         Q.    I show this document to you
13    that's been marked for identification as
14    Defendants' Exhibit F and ask you:  Do you
15    recognize the signature of one K.G. Moheet
16    as managing director on behalf of Channel
17    16 (handing)?
18         A.    (Complying.)
19              No.
20         Q.    Well, is that his name there on
21    the document?
22              MR. HOGAN:  Page 2 of what has
23         been marked as Defendants' F.
24         A.    Yes, the name is there.
25         Q.    And is there a signature there
```

```
 1                    S. SOHAIL
 2       above the name?
 3            A.   Yes.
 4            Q.   But you don't recognize it?
 5            A.   No.
 6            Q.   Okay.
 7                 MR. KASPER:  I would ask that
 8            this document be marked for
 9            identification as Defendants' Exhibit
10            G (handing).
11                 (Whereupon, the aforementioned
12            business agreement was marked as
13            Defendants' Exhibit G for
14            identification as of this date by the
15            Reporter.)
16            Q.   I show this document to you
17       (handing).
18                 MR. HOGAN:  Are you ready?
19                 THE WITNESS:  Yes.
20                 One second.
21                 (Whereupon, a short recess was
22            taken.)
23                 MR. KASPER:  What is it?
24                 MR. HOGAN:  He's asking do you
25            recognize this document?
```

```
 1                   S. SOHAIL
 2        Q.    Do you recognize that document?
 3        A.    (Complying.)
 4              No.
 5        Q.    Independently whether you
 6   recognize that document, are you aware that
 7   there was an agreement between ATN New TV
 8   and 1Stopmedia Entertainment Incorporated?
 9        A.    I don't know.
10        Q.    Well, I'm going to ask you to
11   review that document.
12              And would it be correct to say
13   that it appears to have been signed by a
14   Dr. Mafusa Ramen on behalf of ATN News TV
15   (phonetic)?
16              MR. HOGAN:  Note my objection.
17              MR. KASPER:  To how I
18         pronounced the name?
19              MR. HOGAN:  No.
20              Form.
21              So I think the question was do
22         you acknowledge if that's his
23         signature?
24              Do you know?
25              THE WITNESS:  I don't know.
```

```
 1                    S. SOHAIL
 2              MR. KASPER:  I ask that this
 3         document be marked as Defendants' H
 4         for identification (handing).
 5              (Whereupon, the aforementioned
 6         business agreement was marked as
 7         Defendants' Exhibit H for
 8         identification as of this date by the
 9         Reporter.)
10              MR. KASPER:  Off the record
11         counsel.
12              (Whereupon, an off-the-record
13         discussion was held.)
14         Q.    I show you this document which
15    has been marked as Defendants' Exhibit H
16    (handing).
17         A.    (Complying.)
18         Q.    And I ask you:  Independent of
19    this document, are you aware of an
20    agreement between ATN BanglaLimited and
21    1Stop Media & Entertainment, Incorporated?
22         A.    No.
23         Q.    Now that you have seen that
24    document, are you now aware of an agreement
25    between them or what purports to be an
```

```
 1                    S. SOHAIL
 2    agreement between them?
 3         A.    I'm not sure.
 4         Q.    And is it correct if you would
 5    be kind enough to examine the document, is
 6    it correct that it appears to have been
 7    signed by GNMD Shansul Uda (phonetic)?
 8         A.    Yes, it's signed by them.
 9               MR. HOGAN:  It appears to be
10          signed by them.
11         A.    It appears.
12               MR. KASPER:  I would ask this
13          document be marked for identification
14          as Defendants' Exhibit I (handing).
15               (Whereupon, the aforementioned
16          business agreement was marked as
17          Defendants' Exhibit I for
18          identification as of this date by the
19          Reporter.)
20         Q.    Are you aware of an agreement
21    between International TV Channel Limited
22    otherwise known as Capital NTV and
23    1Stopmedia and Entertainment, Incorporated?
24         A.    No.
25         Q.    I'm going to ask you to examine
```

```
 1                    S. SOHAIL
 2    the document that's been marked as
 3    Defendants' Exhibit I and ask you if it is
 4    correct that it appears to be an agreement
 5    between International TV Channel Limited
 6    otherwise known as NTV and 1Stop Media &
 7    Entertainment.
 8         A.    I'm not sure.
 9         Q.    I'm going to ask you to review
10    said document briefly and go to the last
11    page, second to last page.
12              And isn't it correct that this
13    document appears to have been executed by
14    one Alhaj Mohammad Mosaddak,
15    M-O-H-A-M-M-A-D M-O-S-A-D-D-A-K A-L-I on
16    behalf of International Television and
17    Channel Limited?
18         A.    It appears to be.
19         Q.    And are you familiar with that
20    gentleman?
21         A.    No.
22         Q.    Have you ever heard of him?
23         A.    No.
24              MR. KASPER:  Off the record.
25              (Whereupon, an off-the-record
```

```
 1                    S. SOHAIL
 2            discussion was held.)
 3       Q.    Are you aware of an agreement
 4   between Independent Television Limited, an
 5   entity known as Independent Television
 6   Limited otherwise known as ITV and
 7   1Stopmedia and Entertainment, Incorporated?
 8       A.    I'm sorry.
 9             What's the question?
10             MR. KASPER:  I'll rephrase.
11       Q.    Are you aware of an agreement
12   between an entity known as Independent
13   Television Limited also known as ITV and
14   the company known as 1Stopmedia and
15   Entertainment, Incorporated?
16       A.    I don't know.
17             MR. KASPER:  I would ask this
18             be marked for identification as
19             Defendants' Exhibit J (handing).
20             (Whereupon, the aforementioned
21             business agreement was marked as
22             Defendants' Exhibit J for
23             identification as of this date by the
24             Reporter.)
25       Q.    Sir, I show you the document
```

```
 1                    S. SOHAIL
 2    that's been marked as Defendants' Exhibit J
 3    and I ask you:  Do you recognize it by any
 4    chance?
 5         A.    (Complying.)
 6               No.
 7         Q.    Does it appear to be an
 8    agreement between Independent Television
 9    Limited ITV and 1Stop Media &
10    Entertainment?
11         A.    It appears to be.
12               But I'm not sure.
13         Q.    Now, I'm going to ask you to
14    review the signature page.
15               Is it correct that the name M.
16    Shamsur Rahman is on that page?
17         A.    Yes.
18         Q.    And is it correct that there
19    appears to be a signature subscribed above
20    that name?
21         A.    Yes.
22         Q.    Do you recognize that name; Mr.
23    M. Shamsur Rahman by any chance?
24         A.    I don't remember.
25         Q.    Did you ever done business with
```

```
 1                      S. SOHAIL
 2    him?
 3         A.    I don't remember.
 4         Q.    Does any company you are
 5    associated with ever sign an agreement with
 6    a person known as M. Shamsur Rahman?
 7         A.    I don't remember.
 8         Q.    Do you recognize any his
 9    signature?
10         A.    No.
11              MR. KASPER:  If you could give
12         me a moment, Counsel, or if you want
13         to take a quick break.
14              MR. HOGAN:  That's fine.
15              (Whereupon, a short recess was
16         taken.)
17         Q.    You may recall, sir, that I
18    asked you whether Star Cable was involved
19    in any other litigation either as a
20    plaintiff or a defendant.
21              And can we agree your answer
22    was yes?
23         A.    I'm sorry.
24              What is the question again?
25         Q.    Sir, you recall I asked you
```

```
 1                      S. SOHAIL
 2     whether Star Cable was involved in any
 3     litigation, correct?
 4           A.    Yes.
 5           Q.    And was it my recall correctly
 6     that you answered yes?
 7           A.    Yes.
 8           Q.    Now, do you recall in this
 9     other litigation was Star Cable involved in
10     either a plaintiff or as a defendant?
11           A.    I'm not sure.
12           Q.    Well, would it help if I said
13     were they being sued or were they suing?
14           A.    I don't remember.
15           Q.    Did Star Cable, to your
16     knowledge, enter into an agreement with
17     Shamal Bangla Media Limited otherwise known
18     as Banglavision?
19           A.    Yes.
20           Q.    And do you recall the date that
21     Star Cable entered into that agreement?
22           A.    Not sure.
23           Q.    I'm not asking you to speculate
24     but roughly speaking, was it within the
25     last several years?
```

```
  1                        S. SOHAIL
  2          A.    Yes.
  3          Q.    Was it 2014 or 2015?
  4          A.    I'm not sure.
  5          Q.    Was it more recently than 2015
  6    or was it earlier than 2015?
  7          A.    I would say around 2015.
  8          Q.    And is that agreement still in
  9    force?
 10          A.    Yes.
 11          Q.    Now, do you have any knowledge
 12    of Banglavision Company sending a notice of
 13    default to anyone on August 24th, 2016?
 14          A.    I don't know.
 15          Q.    Isn't it correct that or would
 16    it refresh your recollection --
 17                MR. KASPER:  If you don't mind
 18          me phrasing the question in that
 19          matter, Counsel.
 20          Q.    -- that Star Cable was sent a
 21    notice of default on or about August 24,
 22    2016?
 23          A.    I'm not sure.
 24                MR. KASPER:  Off the record.
 25                (Whereupon, an off-the-record
```

```
 1                    S. SOHAIL
 2          discussion was held.)
 3               MR. KASPER:  I'm going to ask
 4          that this document be marked as
 5          Defendants' Exhibit K (handing).
 6               (Whereupon, the aforementioned
 7          notice of affidavit was marked as
 8          Defendants' Exhibit K for
 9          identification as of this date by the
10          Reporter.)
11          Q.   Sir, I show you this document
12     that's been marked as Defendants' Exhibit
13     K, and I ask you to confirm that it is
14     indeed dated August 24, 2016 (handing).
15          A.   (Complying.)
16               I see no date on it.
17               Oh, yes, August 24.  Yes.
18          Q.   And I'm going to ask you to
19     turn to the first page.
20          A.   (Complying.)
21          Q.   I'm going to ask you to examine
22     it briefly and acknowledging to your very
23     capable counsel that the document, of
24     course, speaks for itself.
25               Isn't it correct that that
```

```
 1                    S. SOHAIL
 2   document appears to be a notice of default
 3   sent to Star Cable by BanglaVision Company?
 4             MR. HOGAN:  Note my objection.
 5        A.    It appears to be.
 6        Q.    I'm going to ask you to review
 7   it, sir, the entire document.
 8        A.    (Complying.)
 9             Yes.
10        Q.    And having reviewed that
11   document, I'm going to call your attention
12   to it once again and ask you:  Is it
13   correct that as part of that notice that
14   BanglaVision Company is requesting that it
15   be provided the number of subscribers and
16   also to pay arrears as dues --
17             MR. KASPER:  Counsel, I'm going
18        to withdraw my question.
19        Q.    Isn't it correct that that
20   document asks to have Star Cable provide a
21   number for subscribers?
22        A.    It appears to be, yes.
23        Q.    And isn't it correct that that
24   document also asks to have Star Cable pay
25   arrears of dues within two months?
```

```
 1                    S. SOHAIL
 2            MR. HOGAN:  Objection to form.
 3       A.    It appears to be.
 4       Q.    It appears to be that, sir.
 5             Are you familiar with that
 6  document?
 7       A.    I don't remember.
 8       Q.    Well, to your knowledge, did
 9  Star Cable ever comply in any way with the
10  requests contained in that document?
11       A.    I'm not sure.
12       Q.    Would you know if they didn't?
13       A.    I don't know.
14            MR. KASPER:  I'm going to ask
15        that this document be marked as
16        Defendants' Exhibit L (handing).
17            (Whereupon, the aforementioned
18        letter was marked as Defendants'
19        Exhibit L for identification as of
20        this date by the Reporter.)
21            MR. KASPER:  I would show this
22        document to the witness that's been
23        marked as Defendants' Exhibit L
24        (handing).
25       Q.    I ask you to review that
```

```
 1                    S. SOHAIL
 2    document (handing).
 3         A.    (Complying.)
 4         Q.    Having reviewed that document,
 5    I'm going to ask you:  Is it a fact that
 6    Star Cable received a legal notice from the
 7    law offices of Mohammad A. Azis that Star
 8    Cable should immediately cease and desist
 9    broadcasting (phonetic)?
10              MR. HOGAN:  Objection.
11         A.    I don't remember.
12              MR. HOGAN:  You can answer.
13              THE WITNESS:  I can answer?
14              MR. HOGAN:  You already did.
15         Q.    I'm sorry?
16              MR. HOGAN:  I objected.
17              And he had previously answered
18         saying he doesn't remember so I just
19         reiterated to him.
20         Q.    Independent of that document,
21    are you aware of any requests by an
22    attorney named Mohammad Azis to send a
23    cease and desist notice to Star Cable?
24         A.    No.
25         Q.    Did Star Cable ever cease and
```

```
 1                    S. SOHAIL
 2   desist broadcasting as a result of a
 3   request to do so?
 4        A.    I don't know.
 5        Q.    Now, I'm going to call your
 6   attention again to Exhibit K and call your
 7   attention again to the name of the person
 8   that signed the notice of default on behalf
 9   of --
10             We are again addressing Exhibit
11   K.  And if I did not ask you the question
12   previously:  Are you familiar with the name
13   of the person that purported or appears to
14   have signed that notice of default on
15   behalf of Shamal Bangla Media Limited?
16        A.    I don't know.
17        Q.    Well, I'm going to ask you to
18   examine that document.
19             Does it correctly appear that a
20   Ishrak Hosain signed that notice of default
21   as deputy managing director for Shamal
22   Bangla Media limited (phonetic)?
23        A.    It appears to be.
24        Q.    And are you aware that Shamal
25   Bangla Media Limited thereafter commenced a
```

```
 1                    S. SOHAIL
 2    legal action in the Supreme Court of Bronx
 3    County following this notice of default?
 4         A.    I don't remember.
 5         Q.    Are you aware of a lawsuit in
 6    which Shamal Bangla Media Limited as
 7    plaintiff claimed damages and sought an
 8    injunction to restrain Star Cable from
 9    broadcasting the BanglaVision channel?
10         A.    I'm sorry.
11               Can you repeat that again?
12         Q.    Are you aware of a legal action
13    in which BanglaVision channel otherwise
14    known as Shamal Bangla Media Limited
15    claimed damages against Star Cable North
16    America?
17         A.    I don't.
18         Q.    Are you aware of a legal action
19    in which Shamal Bangla Media Limited sought
20    an injunction to restrain Star Cable from
21    broadcasting its channel?
22         A.    I don't remember.
23         Q.    Are you aware of an agreement
24    between ITV, otherwise known as independent
25    TV Limited and Star Cable?
```

```
 1                    S. SOHAIL
 2        A.    I'm sorry.
 3              Can you repeat that question
 4    again?
 5        Q.    Are you aware of an agreement
 6    between Independent TV Limited and Star
 7    Cable?
 8        A.    Yes.
 9        Q.    Do you recall roughly when that
10    agreement was entered into?
11        A.    I'm not sure.
12        Q.    Would you know by any chance
13    who would have signed that agreement on
14    behalf of Independent TV Limited?
15        A.    I don't remember.
16              MR. KASPER:  If we haven't done
17          it previously, I would call for
18          production of the agreement between
19          ITV Limited and Star Cable.
20              MR. HOGAN:  Consistent with
21          what we previously discussed post EBT
22          demand, and we'll respond to it in
23          kind.
24        Q.    Do you recall when you entered
25    into that agreement between Star Cable and
```

```
 1                    S. SOHAIL
 2      Independent TV Limited?
 3           A.    I don't remember.
 4           Q.    Well, do you remember anything
 5      about the nature of the agreement?
 6           A.    It was exclusive rights.
 7           Q.    So you do remember what the
 8      agreement was.
 9                 And having indicated you
10      remember that, you're telling me that the
11      nature of the agreement was something as to
12      providing exclusive rights?
13           A.    Yes.
14           Q.    Could you tell me what
15      exclusive rights were obtained in that
16      agreement.
17           A.    Independent TV broadcasting
18      rights.
19           Q.    To broadcast what?
20           A.    The TV channel.
21           Q.    Do you recall what TV channel?
22           A.    Independent TV Channel.
23           Q.    And that was by Star Cable?
24           A.    Yes.
25           Q.    Now, is that agreement between
```

```
 1                    S. SOHAIL
 2    Star Cable and ITV, otherwise known as
 3    Independent TV still in effect?
 4         A.    Yes.
 5         Q.    So you say this agreement is
 6    still in effect.  But isn't it correct that
 7    you were served with a notice of
 8    termination as to an agreement between -- I
 9    shouldn't say you, sir.
10                   Isn't it correct that Star
11    Cable and yourself in capacity as a
12    director of Star Cable was served with a
13    notice of termination by Independent TV
14    Limited or ITV?
15                   MR. HOGAN:  Objection to form.
16                   The witness never testified he
17              was a director.  He testified he was
18              a VP with a hundred percent of the
19              stock being held by his partner.
20                   You can answer that question
21              with that objection outstanding.
22                   MR. KASPER:  At this point, I'm
23              going ask that this document be
24              marked as Respondent's Exhibit M
25              (handing).
```

```
 1                    S. SOHAIL
 2              (Whereupon, the aforementioned
 3         notice for terminating the network
 4         was marked as Defendants' Exhibit M
 5         for identification as of this date by
 6         the Reporter.)
 7              MR. KASPER:  I am showing this
 8         document marked as Defendants'
 9         Exhibit M to the witness.
10         Q.    I'M going to ask you to please
11    review it, sir.
12         A.    (Complying.)
13              Yes.
14         Q.    Is it correct that that
15    document appears to have been signed by an
16    individual known as Mr. Shamsur Rahman?
17         A.    It appears to be.
18         Q.    I call your attention to the
19    first page of that document.
20              Isn't it correct that that
21    first page of that document appears to be
22    addressed to you individually?
23         A.    (Complying.)
24              Yes.
25         Q.    I'm sorry.
```

```
 1                    S. SOHAIL
 2              Your answer again, sir?
 3         A.    Yes.
 4         Q.    And as a result of that
 5    document, did Star Cable cease and desist
 6    in doing anything?
 7         A.    No.
 8              Because our contract was valid.
 9         Q.    I'm sorry.
10              Your contract was?
11         A.    Our contract is valid.
12         Q.    Okay.
13              Do you know who Shamsur Rahman
14    is?
15         A.    I don't remember.
16         Q.    When you say the contract was
17    valid, in what manner do you mean that?
18              MR. HOGAN:   It calls for a
19         legal conclusion.
20              Objection.
21              MR. KASPER:   I'm asking him if
22         he knows.
23              His personal opinion.
24              MR. HOGAN:   You can answer.
25         A.    According to our contract,
```

1                           S. SOHAIL

2      EXHIBIT     EXHIBIT
       NUMBER      DESCRIPTION                        PAGE
3
       P           Network Affiliation
4                  Agreement                          66

5      Q           Summons                            68

6      R           Affidavit of Service              68

7
              (Exhibits retained by Counsel.)
8

9

10
                        I N D E X
11
       EXAMINATION BY                                 PAGE
12
       MR. KASPER                                     5
13

14

15
           INFORMATION AND/OR DOCUMENTS REQUESTED
16     INFORMATION AND/OR DOCUMENTS         PAGE

17     (None)

18

19

20         QUESTIONS MARKED FOR RULINGS
       PAGE LINE QUESTION
21
       (None)
22

23

24

25

1                      S. SOHAIL

2              C E R T I F I C A T E

3

STATE OF NEW YORK        )

4                                :  SS.:

COUNTY OF NASSAU         )

5

6          I, MARTHA TRIKAS, a Notary Public for

7     and within the State of New York, do hereby

8     certify:

9          That the witness whose examination is

10    hereinbefore set forth was duly sworn and

11    that such examination is a true record of

12    the testimony given by that witness.

13         I further certify that I am not

14    related to any of the parties to this

15    action by blood or by marriage and that I

16    am in no way interested in the outcome of

17    this matter.

18         IN WITNESS WHEREOF, I have hereunto

19    set my hand this 25th day of June, 2018.

20

21    _____

22              MARTHA TRIKAS

23

24

25

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

STAR CABLE NA, INC.,                                    Docket No. 16-cv-04067

                                    Plaintiff,

            vs.


TOTAL CABLE USA LLC. and RADIANT IPTV          REPLY AFFIDAVIT OF SAIFUL
                                                                   SIDDIQUE

                                    Defendants.

-----------------------------------------------------------------x

I Saiful Siddique, do swear under penalty of perjury as follows:

1. I am the President of the Defendant 1stopmedia & Entertainment Inc. d/b/a Radiant IPTV
   and as such I am conversant with the facts and circumstances of this case.

2. I am making this affidavit in opposition to the affidavit filed by Bob Rasul in opposition
   to the motion filed by 1stopmedia & Entertainment Inc. in support of dismissal of the
   complaint.

3. In the affirmation in support of motion for summary judgment, our attorney has stated in
   paragraph 2 of the affirmation that Defendant 1stopmedia & Entertainment Inc. d/b/a
   Radiant IPTV has been broadcasting channels with the consent and on the basis of a
   written agreement with the content owners.  In the affirmation in support of motion, we
   have annexed Exhibit G containing the certification from Jamuna TV dated January 10,
   2017, signed by ASM Arifur Rahman, the head of broadcast operation engineering,
   certifying that 1stopmedia & Entertainment Inc. is Jamuna TV's client and Jamuna TV
   granted rights to 1stopmedia & Entertainment Inc. in North America and Canada.  This
   certification also provides that no other organization has any valid exclusive right with

Jamuna TV to broadcast Jamuna TV anywhere in the world.  We have also annexed a certification pertaining to the channel Banglavision certifying that Star Cable NA Inc. has no valid agreement to broadcast Banglavision.  We also annexed Exhibit I certifying that Star Cable NA Inc. has no legal valid agreement with MyTV.  Exhibit J annexed with the affirmation in support of the motion is a letter issued to Sajid Sohail dated August 23, 2016, terminating the agreement between Ekushey and Star Cable NA Inc. Exhibit K annexed with the affirmation is the agreement between Asian TV and 1stopmedia & Entertainment Inc. granting broadcasting rights to 1stopmedia & Entertainment Inc. Exhibit M annexed with the affirmation is the agreement between ATN Bangla Ltd. and 1stopmedia & Entertainment Inc. dated September 23, 2014 granting broadcasting rights. Exhibit N is an agreement between ATN News Ltd. and 1stopmedia & Entertainment Inc. dated December 1, 2014 granting broadcasting and distribution rights to 1stopmedia & Entertainment Inc.  Exhibit O is an agreement dated June 1, 2015 between Boishakhi Media Ltd. and 1stopmedia & Entertainment Inc. granting broadcasting rights to 1stopmedia & Entertainment Inc.  Exhibit P is an agreement between International TV Channel and 1stopmedia & Entertainment Inc. granting broadcasting rights to 1stopmedia & Entertainment Inc.  Exhibit Q is the agreement between Independent TV Ltd. and 1stopmedia & Entertainment Inc. granting broadcasting rights to 1stopmedia & Entertainment Inc.  I have already filed an affidavit with the motion seeking summary judgment.

4. The Court set up deadlines for filing the motion, opposition and reply.  The Court ordered that the Defendants' motion seeking summary judgment was due by March 14, 2019, the Plaintiff's response was due March 21, 2019 and the status conference was scheduled on

March 26, 2019 (Docket sheet dated March 7, 2019).  On March 30, 2019, the Court

granted extension of time with consent of Defendant's Counsel and changed the schedule

as ordered on March 7, 2019 (Docket No. 78).  The Court ordered that the Defendants'

motion shall be served by March 25, 2019; Plaintiff's opposition shall be served by April

9, 2019, the Defendants' reply shall be served by April 17, 2019 and all papers would be

filed by the end of April 19, 2019.  On March 25, 2019, the Defendants provided the

notice of motion and supporting documents as ordered by the Court to the attorney for the

Plaintiff.  Due to oversight the memorandum prepared by my attorney was not provided

to the Plaintiff's attorney along with the notice of motion seeking summary judgment.

On March 20, 2019, our attorney wrote a letter to this Honorable Court requesting to

extend the time to file a reply by the Defendants by April 25, 2019 since he was on

vacation.  The letter was written with the consent of the Plaintiff's attorney Michael

Cassell, the Plaintiff's attorney (Docket No. 79).  Subsequently on April 18, 2019, our

attorney received an email from the Plaintiff's Counsel indicating therein that he was

trying to provide the opposition by the end of April 19, 2019 but he needs a few days

extension due to his hectic schedule.  Our attorney responded to the email that if he

received the opposition by April 23, 2019, he would need time to file the reply until May

2, 2019.  The Plaintiff's Counsel sent another email indicating that he consents to as

much time as the Defendants needed to provide the reply.

5.   The Plaintiff's Counsel served the opposition and the memorandum of law on April 23,

2019.  Though the deadline to file the opposition was April 9, 2019, the Plaintiff's

attorney Michael Cassell filed the opposition on April 23, 2019.  However, the Plaintiff's

attorney did not write a letter to the Court for approval of change of schedules to file an opposition as ordered by the Court on April 2, 2019.

6. Shahid Bob Rasul in his affidavit indicates that he is the Chief Technology Officer of the Plaintiff Star Cable NA Inc. and he submitted the affidavit in opposition to the motion for summary judgment filed by 1stop Media & Entertainment Inc. The Chief Technology Officer is simply an employee of the Plaintiff and has no personal knowledge about the issues involved in the motion for summary judgment. Mr. Rasul does not state in his affidavit that he has personal knowledge of the facts of the case and/or source of his knowledge. The declaration/affidavit must be based on personal knowledge.

7. The Defendant 1stop Media & Entertainment Inc. has annexed various agreements with the content owners, Exhibits K, L M, N, O, P and Q with the affirmation in support of the motion for summary judgment. Mr. Rasul in his affidavit does not deny that these agreements were not executed between the Defendant 1stop Media & Entertainment Inc. and the content owners. Sajid Sohail, the Vice President of Star Cable NA Inc. appeared in the deposition conducted by Joseph F. Kasper, Of Counsel of Bhatia & Associates PLLC. In response to a question of whether Mr. Sohail was aware that Asian Telecast Ltd. entered into agreement with 1stop Media & Entertainment Inc. on November 20, 2014, his response was "I do not know." (Page 28, lines 3-8 of the examination of Sajid Sohail). The agreement was exhibited during the deposition as Exhibit D. Mr. Kasper, asked another question of whether Mr. Sohail was aware that there was a second agreement between Asian TV and 1stop Media & Entertainment Inc. on June 6, 2016, his response was "I do not know." (Page 30, lines 14-18 of the examination of Sajid Sohail). This agreement was exhibited as Exhibit E. In response to another question of whether

Mr. Sohail was aware that Ekushey TV also entered into agreement with 1stop Media & Entertainment Inc. and the agreement was signed by Fakrool Alam on behalf of Ekushey TV, his response was "I do not Know." (Page 32, lines 9-16 of the examination of Sajid Sohail). Mr. Kasper asked Mr. Sohail whether he was aware that the entity known as Channel 16 also entered into agreement with 1stop Media & Entertainment Inc., his response was "I do not know." (Page 32, lines 22-25 and page 33, lines 2-3 of the examination of Sajid Sohail). The agreement was exhibited as Exhibit F. In response to the question, whether Mr. Sohail recognized the agreement between ATN News TV and 1stop Media & Entertainment Inc., he responded "I do not know." (Page 35, lines 5-9 of the examination of Sajid Sohail). In response to the question of whether he was aware of the agreement between ATN Bangla Ltd. and 1stop Media & Entertainment Inc., he responded "No.", (Page 36, lines 18-22 of the examination of Sajid Sohail). In response to the question of whether Mr. Sohail was aware of the agreement between International TV Channel Ltd. and 1stop Media & Entertainment Inc., again he responded "No.", (Page 37, lines 20-24). In response to the question of whether Mr. Sohail was aware of the agreement Independent TV Ltd. and 1stop Media & Entertainment Inc., his response was "I do not know." (Page 39, lines 11-16 of the examination of Sajid Sohail). The agreement was exhibited as Exhibit J during the deposition. Mr. Kasper also confronted in the deposition that a notice of default was issued to Star Cable NA Inc. by Banglavision. Mr. Sohail admitted that in the notice of default, Banglavision requested Star Cable NA Inc. to pay the arrears within two months. Mr. Kasper questioned Mr. Sohail of whether Star Cable NA Inc. ever complied with the notice of default and Mr. Sohail responded, "I am not sure." (Page 46, lines 8-11 of the examination of Sajid

Sohail.  In fact, Mr. Kasper confronted all of the agreements between 1stop Media & Entertainment Inc. and the content owners and the response of Mr. Sohail was that he wasn't aware of any agreements.

8. The real controversy in the present case is whether the Defendant 1stop Media & Entertainment Inc. has been broadcasting various channels mentioned in the complaint with the consent and based on the agreement between the content owners and 1stop Media & Entertainment Inc.  The Defendant 1stop Media & Entertainment Inc. has filed the agreements between the content owners and 1stop Media & Entertainment Inc.  The Plaintiff does not deny in the affidavit of Mr. Rasul or in the deposition of Mr. Sohail the execution of the agreements between the content owners and 1stop Media & Entertainment Inc. but allege that the content owners granted exclusive rights to the Plaintiff to broadcast the channels.   Assuming arguendo that the content owners in violation of the agreements with the Plaintiff also executed agreements with other entities including 1stop Media & Entertainment Inc., the Plaintiff has no cause of action to sue the entities who have also been granted rights to broadcast the channels by the content owners.  If the content owners in violation of their agreement with the Plaintiff also granted rights to other entities, the Plaintiff should have sued the content owners seeking damages and not other entities who have been broadcasting the channels with the consent of the content owners.  The Court will also note that we have annexed with complaint, answer and stipulation of dismissal of another action commenced by Star Cable NA Inc. against Lalon TV Inc., Total Cable BD, Habibur Rahman, Shahinul Karim, Shahidul Bari, Syed Ahmed and Ahmodul Barobhuiya.

9. The Plaintiff Star Cable NA Inc. was represented by the attorney Michael Cassell in its action commenced against Lalon TV and others, and when Lalon TV showed the agreements between Lalon TV with the content owners, the Plaintiff's attorney Michael Cassell agreed to discontinue that action and a stipulation of dismissal was signed by the respective attorneys of the parties and so ordered by the Court. The Court will note that the allegations in the complaint against Lalon TV and against Total Cable USA LLC & 1stop Media & Entertainment Inc. are identical. The complaint was filed against Lalon TV and other alleging violation of the copyright in respect of the same eight channels, the violations of which is alleged in the present complaint filed against Total Cable USA LLC & 1stop Media & Entertainment Inc.

10. As stated above, Mr. Rasul is the Chief Technology Officer as admitted himself in his affidavit and he does not claim that he has personal knowledge that the agreements with the content owners are continuing. Exhibit A is the affiliation agreement with Independent TV Ltd. and Star Cable NA Inc. signed by Sajid Sohail on behalf of Star Cable NA., Inc. and Shamsur Rahman on behalf of Independent TV Ltd. on November 26, 2014. The affiant, Mr. Rasul is not a signatories to the agreement which was for three years. In paragraph 12 of the affidavit, Mr. Rasul states that this agreement is not terminated. Relevant clause 2 of the agreement pertaining to termination states that after the expiration of 3 years, the fee shall be negotiated, and the network shall provide a written notice to the affiliate of the proposed license fee for the next renewal. Mr. Rasul does not allege in his affidavit that any fee was negotiated after the term of three years. There is therefore no evidence that the affiliation agreement between the Plaintiff and Independent TV is still in force. Clause 1 of the agreement further provides that the

affiliate shall have non-exclusive rights to distribute the services.  Similarly, the agreement annexed as Exhibit B with the affidavit of Mr. Rasul was not signed by Mr. Rasul and was signed by Sajid Sohail as the Director of Star Cable NA Inc.  Sajid Sohail who testified in the deposition on behalf of the Plaintiff did not file any affidavit in opposition.  The other agreements between Star Cable NA Inc. and the content owners annexed as Exhibits C, D, E, F, G and H were all signed by Sajid Sohail.  Mr. Rasul was not the signatories of any agreement.

11. Mr. Rasul alleged in his affidavit that the documents filed by 1stop Media & Entertainment Inc. are not authenticated.  However, Mr. Rasul does not claim that the documents relied upon by 1stop Media & Entertainment Inc. were not signed by the content owners or those documents were fabricated or false.

12. Star Cable NA Inc. never served any notice to 1stop Media & Entertainment Inc. prior to the commencement of this action.  Digital Millennium Copyright Act provides the requirement of  written notice by a party who is believed to be affected by copyright infringement.  Star Cable NA Inc. never served any notice to 1stop Media & Entertainment Inc. to notify of any wrong doing.  In fact, 1stop Media & Entertainment Inc. d/b/a Radiant IPTV took all legal permission from the copyright owners directly in order to broadcast their contents in the US and Canada.  1stop Media & Entertainment Inc. continues paying the license fees to the content owners directly.  For broadcasting various channels.  The content owners never served any notice to 1stop Media & Entertainment Inc. for copyright infringement directly or indirectly. N None of the Tv channel owners ever notified 1stop Media & Entertainment Inc. that they are violating the rights of Star Cable NA Inc.

**WHEREFORE**, I request that the motion filed by the Defendant 1stop Media & Entertainment

Inc. seeking dismissal of the complaint be granted along with any other just and proper relief.

Saiful Siddique

Verified On: May 2, 2019

In the County of New York

In the State of New York

(Notary Public)

SATISH KUMAR BHATIA
Notary Public, State Of New York
No. 02BH6343050
Certified in New York County
Commission Expires 05/31/2020